# EXHIBIT

# A

**Plaintiff's Motion to Compel – Plaintiff's First Set of Document Requests to Aries Financial**

| Plaintiff's First Set of Document Requests | Aries' Production & Response | Depositions of Aries' Defendants | Plaintiff's Request for Missing Documents | Aries' Response | Plaintiff's Further Requests For Missing Documents | Aries' Production & Response | Plaintiff's Further Request for Missing Documents | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| 1/28/10<br><br>Documents, including e-mails, re: Britt trans. DR 2.[1] | 4/5/10<br><br>NONE. [2]<br><br>Already produced or privileged, no log provided. | 4/27/10 – 7/28/10 | 7/14/10<br><br>Renewed demand based on depositions of AL, CL, LR, DK.[3] ¶18. | 8/13/10<br><br>NONE.<br><br>Already produced or privileged, no log provided. | 11/5/10<br><br>Renewed request, challenged privilege claim. ¶13. | 11/17/10<br><br>NONE, privilege log provided.<br><br>Already produced, see deposition testimony. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |

---

[1] "DR" refers to the specific document request.
[2] Nine e-mails were produced on 4/5/10, none relevant to this request.  Aries Rule 26 documents were produced in 10/09 and consisted of Mr. Britt's loan file with  no e-mails.
[3] "AL," "CL," "LR," and "DK" refer to Al London, Candice London, Larry Ramaekers and Doug Kahan, respectively.

**Plaintiff's Motion to Compel – Plaintiff's First Set of Document Requests to Aries Financial**

| Plaintiff's First Set of Document Requests | Aries' Production & Response | Depositions of Aries' Defendants | Plaintiff's Request for Missing Documents | Aries' Response | Plaintiff's Further Requests For Missing Documents | Aries' Production & Response | Plaintiff's Further Request for Missing Documents | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| 1/28/10<br><br>E-mail to / from D. Kahan from 1/1/05 re: any loan & LLC formation. DR 6, 7. | 4/5/10<br><br>One e-mail produced.<br><br>Already produced or privileged no log provided. | 4/27/10 – 7/28/10 | 7/14/10<br><br>Renewed demand based on depositions of AL, CL, LR, DK. ¶19. | 8/13/10<br><br>NONE.<br><br>Already produced or privileged, no log provided.<br><br>**10/15-28/10**<br><br>Incomplete production, privilege log provided. | 11/5/10<br><br>Renewed request & challenging privilege claim. ¶11. | 11/17/10<br><br>Incomplete production.<br><br>Already produced, see deposition testimony. | 12/14/10<br><br>Renewed request. ¶4. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |
| 1/28/10<br><br>E-mail to/from A. Morse re: Britt mortgage, post-closing activities or premises & re: any loan since 1/1/05. DR 8 – 10. | 4/5/10<br><br>NONE.<br><br>Already produced. | 4/27/10 – 7/28/10 | 7/14/10<br><br>Renewed demand based on depositions of AL, CL, LR. ¶15. | 8/13/10<br><br>NONE.<br><br>Already produced. | 11/5/10<br><br>Renewed request. ¶5. | 11/17/10<br><br>NONE.<br><br>Already produced, see deposition testimony. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |

**Plaintiff's Motion to Compel – Plaintiff's First Set of Document Requests to Aries Financial**

| Plaintiff's First Set of Document Requests | Aries' Production & Response | Depositions of Aries' Defendants | Plaintiff's Request for Missing Documents | Aries' Response | Plaintiff's Further Requests For Missing Documents | Aries' Production & Response | Plaintiff's Further Request for Missing Documents | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| **1/28/10**<br><br>E-mails from 1/1/05 to/from Divine Intervention, D. Robertson, 1st Lincoln Mort. Bnkrs, Templar Sales. DR 11-16, 20-23. | **4/5/10**<br><br>NONE. | **4/27/10 – 7/28/10** | **7/14/10**<br><br>Renewed demand based on depositions of AL, CL, LR. ¶15. | **8/13/10**<br><br>NONE. Already produced. | **11/5/10**<br><br>Renewed request. ¶5. | **11/17/10**<br><br>NONE. Already produced, see deposition testimony. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE. E-mail deleted or otherwise not preserved. |
| **1/28/10**<br><br>E-mails to/ from Fredric Powell re: Britt mortgage, post-closing activities or premises & re: any loan since 1/1/05. DR 17-19. | **4/5/10**<br><br>NONE.<br><br>Already produced or privileged, no log provided.. | **4/27/10 – 7/28/10** | **7/14/10**<br><br>Renewed demand based on depositions of AL, CL, LR. ¶20. | **8/13/10**<br><br>NONE.<br><br>Already produced. | **11/5/10**<br><br>Renewed request. ¶12. | **11/17/10**<br><br>NONE; already produced, see deposition testimony. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |

**Plaintiff's Motion to Compel – Plaintiff's First Set of Document Requests to Aries Financial**

| Plaintiff's First Set of Document Requests | Aries' Production & Response | Depositions of Aries' Defendants | Plaintiff's Request for Missing Documents | Aries' Response | Plaintiff's Further Requests For Missing Documents | Aries' Production & Response | Plaintiff's Further Request for Missing Documents | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| 1/28/10<br><br>E-mails to/from U.S. Bank, re: Britt's mortgage, post-closing activities or premises & re: any loan since 1/1/05. DR 24-26. | 4/5/10<br><br>NONE.<br><br>Already produced. | 4/27/10 – 7/28/10 | 11/5/10<br><br>Renewed request. ¶13. | 11/17/10<br><br>NONE.<br><br>Already produced, see deposition testimony. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. | | |
| 1/28/10<br><br>Aries business plans. DR 1. | 4/5/10<br><br>NONE.<br><br>Already produced. | 4/27/10 – 7/28/10 | 7/14/10<br><br>Renewed request. ¶5. | 8/13/10<br><br>NONE.<br><br>Aries has no responsive documents. | 11/5/10<br><br>Renewed request. ¶1, 2. | 11/17/10<br><br>Incomplete production.<br><br>Already produced. | 12/14/10<br><br>Renewed request. ¶5. | 1/5/11<br><br>Produced. |

**Plaintiff's Motion to Compel – Plaintiff's First Set of Document Requests to Aries Financial**

| Plaintiff's First Set of Document Requests | Aries' Production & Response | Depositions of Aries' Defendants | Plaintiff's Request for Missing Documents | Aries' Response | Plaintiff's Further Requests For Missing Documents | Aries' Production & Response | Plaintiff's Further Request for Missing Documents | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| **1/28/10**<br><br>Affiliates or subsidiaries of Aries. DR 1. | **4/5/10**<br><br>Incomplete production. | **4/27/10 – 7/28/10** | **11/5/10**<br><br>Request renewed, specifying Ramgallon, LLC, which counsel independently discovered. ¶9. | **11/17/10**<br><br>Incomplete production. | **12/14/10**<br><br>Renewed Request. ¶3. | **1/5/11**<br><br>Incomplete production. | | |

**Plaintiff's Motion to Compel –Plaintiff's First Demand Letter to Aries**

| Plaintiff's First Demand Letter | Aries' Production & Response | Deposition Dates | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| **7/14/10**<br><br>Aries profit & loss statements, 2005-2009. ¶3. | **8/13/10**<br><br>NONE.<br><br>Nonexistent | **4/27/10 – 7/28/10** | **8/31/10**<br><br>Renewed request, asking for documents related to Aries financing. DR 4. | | **12/14/10**<br><br>Renewed request, asking for documents related to Aries financing. ¶4. | | | |
| **7/14/10**<br><br>E-mails between Aries or Ramaekers & D. Cunningham, 2004 -6/3/10. ¶10, 11. | **8/13/10**<br><br>NONE.<br><br>Privileged, no log produced. | **4/27/10 – 7/28/10** | **11/5/10**<br><br>Renewed request for all Ramaekers e-mails. ¶7. | **11/17/10**<br><br>NONE. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE. | | |
| **7/14/10**<br><br>E-mails among Aries employers & owners. ¶14. | **8/13/10**<br><br>NONE.<br><br>Already provided. | **4/27/10 – 7/28/10** | | **10/15/10 – 10/29/10**<br><br>Incomplete production, AL & LR PL.[1]<br><br>Privileged. | **11/5/10**<br><br>Renewed request. ¶4, 7, 8, 11, 13. | **11/17/10**<br><br>NONE.<br><br>Already produced, see deposition testimony. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |

---

[1] "PL" refers to privilege log.

**Plaintiff's Motion to Compel –Plaintiff's First Demand Letter to Aries**

| Plaintiff's First Demand Letter | Aries' Production & Response | Deposition Dates | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response |
|---|---|---|---|---|---|---|---|---|
| **7/14/10**<br><br>E-mails to/from mortgage brokers. ¶15. | **8/13/10**<br><br>NONE.<br><br>Already provided. | **4/27/10 – 7/28/10** | | **10/15/10– 10/29/10**<br><br>Incomplete production, AL & LR PL.<br><br>Privileged. | **11/5/10**<br><br>Renewed request. ¶5. | **11/17/10**<br><br>NONE.<br><br>Already produced, see deposition testimony. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |
| **7/14/10**<br><br>E-mails to/from borrowers. ¶16 | **8/13/10**<br><br>NONE.<br><br>Already produced. | **4/27/10 – 7/28/10** | | | **11/5/10**<br><br>Renewed request. ¶6. | **11/17/10**<br><br>NONE.<br><br>Already produced, see deposition testimony. | **12/14/10**<br><br>Renewed request. ¶2. | **1/5/11**<br><br>NONE.<br><br>Nonexistent. |

**Plaintiff's Motion to Compel – Plaintiff's Second Set of Document Requests to Aries**

| Aries Defendants' Deposition Dates | Plaintiff's Second Set of Document Requests | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response |
|---|---|---|---|---|---|---|
| **4/27/10 – 7/28/10** | **8/13/10**<br><br>Aries' net worth statements, accounting audits, 2005-2009. DR 2-4. | | **12/14/10**<br><br>Renewed request. ¶4. | | | |
| **4/27/10 – 7/28/10** | **8/13/10**<br><br>Statements from financial institutions providing escrow services on Aries' mortgages. DR 6. | | **12/14/10**<br><br>Renewed request. ¶4. | | | |

**Plaintiff's Motion to Compel – Second Interrogatories & Third Set of Document Requests to Aries**

| Aries Defendants' Deposition Dates | Plaintiff's Second Interrogatories & Third Set of Document Requests | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response |
|---|---|---|---|---|---|---|
| 4/27/10 – 7/28/10 | 8/31/10<br><br>Identify sources of Aries' funding, incl. account identification, disbursement dates & amounts. Int. 1. | | 1/27/11<br><br>Renewed request. | 1/30/11<br><br>Incomplete, unsworn answer. | | |
| 4/27/10 – 7/28/10 | 8/31/10<br><br>Applications, correspondence & documents submitted to each entity from which Aries sought funding. ¶2. | | 11/5/10<br><br>Renewed request. ¶1. | 11/17/10<br><br>NONE.<br><br>Refused to provide because Wachovia already provided. | 12/14/10<br><br>Renewed request. ¶4. | 1/5/10<br><br>Incomplete production.<br><br>Refused to provide because Wachovia already provided. |

**Plaintiff's Motion to Compel – Plaintiff's Second Demand Letter to Aries**

| Aries Defendant's Deposition Dates | Plaintiff's Second Demand Letter | Aries' Production & Response | Plaintiff's Further Request | Aries' Production & Response |
|---|---|---|---|---|
| 4/27/10 – 7/28/10 | 11/5/10<br><br>E-mails from Candice London, C. Gallo & C. Laxner e-mail files. ¶4. | 11/17/10<br><br>NONE. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |
| 4/27/10 – 7/28/10 | 11/5/10<br><br>E-mails to/from Al London prior to 9/2009. ¶8. | 11/17/10<br><br>Incomplete production, privilege log provided.<br><br>Privileged. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE.<br><br>E-mail deleted or otherwise not preserved. |
| 4/27/10 – 7/28/10 | 11/5/10<br><br>E-mails to/from Larry Ramaekers prior to 2007. ¶8. | 11/17/10<br><br>Incomplete production, privilege log provided.<br><br>Privileged. | 12/14/10<br><br>Renewed request. ¶2. | 1/5/11<br><br>NONE<br><br>E-mail deleted or otherwise not preserved. |

**Plaintiff's Motion to Compel - Douglas Kahan**

| Plaintiff's Requests | Kahan Production & Response | Kahan Deposition | Plaintiff's Further Request | Kahan Production & Response | Plaintiff's Further Request | Kahan Production & Response | Plaintiff's Further Request | Kahan Production & Response |
|---|---|---|---|---|---|---|---|---|
| 1/28/10<br><br>Identify all agreements or business with A. London, Larry Ramaekers & Aries Financial & provide related documents. Inter. 1, 12; DR1.[1] | 3/25/10<br><br>Incomplete answer.<br><br>Incomplete production. | 4/22/10 | 12/14/10<br><br>Request renewed, specifying Ramgallon, LLC, which counsel independently discovered. ¶3. | 1/10/11<br><br>NONE.<br><br>Refused to produce because public record. | | | | |
| 1/28/10<br><br>All docs, incl. e-mail, re: Britt, his property or his transactions. DR 2, 4, 5. | 3/25/10<br><br>Incomplete production.<br><br>Privileged, no log provided.[2] | 4/22/10 | 7/14/10<br><br>Renewed request. ¶18. | 8/11/10<br><br>NONE.<br><br>Privileged, no log provided. | | 10/22/2010<br><br>Four e-mails produced, privilege log provided. | 12/14/10<br><br>Request renewed. ¶4. | 1/10/11<br><br>NONE.<br><br>None exist, 4/10 AOL server failure, otherwise not preserved. |

---

[1] Interrogatory numbers are provided for the Court's convenience. "DR" indicates the specific document request.
[2] Kahan produced his first privilege log 10/22/10.  He subsequently produced revised versions.

**Plaintiff's Motion to Compel - Douglas Kahan**

| Plaintiff's Requests | Kahan Production & Response | Kahan Deposition | Plaintiff's Further Request | Kahan Production & Response | Plaintiff's Further Request | Kahan Production & Response | Plaintiff's Further Request | Kahan Production & Response |
|---|---|---|---|---|---|---|---|---|
| **1/28/10**<br><br>All documents, incl. e-mail, to/from Aries re: any loan 1/1/05-1/28/06. DR 6. | **3/25/10**<br><br>One e-mail produced.<br><br>Privileged, no log provided. | **4/22/10** | **7/14/10**<br><br>Renewed request. ¶19. | **8/11/10**<br><br>NONE.<br><br>Privileged, no log provided. | | **10/22/10**<br><br>Three e-mails produced. | **12/14/10**<br><br>Request renewed. ¶4. | **1/10/11**<br><br>NONE.<br><br>None exist, 4/10 AOL server failure, otherwise not preserved. |

# EXHIBIT

# B

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMAN BRITT,<br><br>            Plaintiff,<br><br>   v.<br><br>ARIES FINANCIAL, LLC., DIVINE INTERVENTION INSTITUTE, INC., ANDREW MORSE, DOUGLAS KAHAN,<br><br><br><br>          Defendants. | Civil Action No.: 09-civ-2398 (RJD) (ALC)<br><br><br><br>**PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS PURSUANT TO FED. R. CIV. P. RULES 33 AND 34** |

**PLEASE TAKE NOTICE THAT** pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiff Herman Britt, by and through his undersigned counsel, hereby requests that defendant ARIES FINANCIAL, LLC respond to the following Interrogatories and Requests for Production of Documents.

These documents are to be made available for inspection and duplication, within thirty (30) days after service hereof, at the offices of South Brooklyn Legal Services, 105 Court Street, 3rd Floor, Brooklyn, NY 11201, attention TaeRa Franklin.

## INSTRUCTIONS

1.      **Time Period Covered.**  Unless otherwise specified herein, the period of time covered by these requests is from January 1, 2005 to the present.

2.      **Broad Scope.**  These requests are to be construed broadly, so as to bring within their scope all documents and information that, by a more restrictive interpretation, might be deemed non-responsive.

3.      **Continuing Nature.**  These requests are continuing in character so as to require you to supplement your responses and produce additional documents, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, in the same manner and at the same address as the original production if you generate, locate or obtain possession, custody, or control of such additional responsive documents at any time prior to trial.

4.      **Production of All Responsive Documents.**  Produce both original, drafts and non-identical versions of all responsive documents in your possession, custody, or control, regardless of the location where the information is stored or the manner in which the information is stored, electronically or otherwise.  You are specifically requested to produce all responsive documents or e-mails stored in or originating from personal computers or laptops, Palm Pilots, Blackberries, or any other personal digital assistants (PDAs) used by you.  You are also specifically requested to produce all audio, video, graphic, electronic, or handwritten responsive documents.  A document with handwritten notes, editing marks, or any other notations or markings shall be deemed to be non-identical to any version of the document not bearing such modifications, and shall be produced.

5.      **Production of Documents Requested Not In Possession.**  If a document requested herein is not in your possession, but is in the possession of any other person from

whom you have a legal right to obtain possession of the document, such as present or former attorneys, accountants, advisors, agents, employees, and consultants, you are requested to produce the document.

6.  **Lack of Knowledge Sufficient to Answer.**  If you lack knowledge sufficient to answer a particular document request or any part of it, state so in writing in your response to the request and state the name, address and telephone number of any person(s) who possesses the necessary information and knowledge.

7.  **No Documents Responsive**.  If there are no documents responsive to a category in this request, state so in writing in your response to the request.

8.  **Inability to Locate Documents Requested**.  If you are unable to locate any document requested, state all efforts that have been made to locate it and identify any individual whom you believe is likely to possess any information regarding the document's whereabouts.

9.  **Lost, Discarded, Destroyed, Erased or Otherwise Disposed of Documents**.  In the event that a document called for by these requests has been lost, discarded, destroyed, erased, or otherwise disposed of, with respect to such document you are instructed to:

    (a)    identify the document by date, type, and subject matter;

    (b)    describe the circumstances under which the document was lost, discarded, destroyed, erased, or otherwise disposed of;

    (c)    identify each person who wrote or edited the document, and the employer, business, and title or position of each;

    (d)    identify all intended recipients of the document, all other known recipients of the document, and the employer, business, title or position of each;

    (e)    provide the last known location of the document;

    (e)    describe the efforts and due diligence undertaken by you to locate and or obtain the document and/or copies of it;

    (f)    state the reason for the inability to produce the document; and

    (g)    if the document was destroyed, the date on which the document was destroyed, the reason why the document was destroyed, and identities of the person(s) who authorized the document to be destroyed and/or who destroyed the document(s).

    10.    **Manner of Document Production**. The documents requested shall be produced as they have been kept in the usual course of business or shall be organized and labeled to correspond with the categories in this request and with information indicating their source, i.e., the person from whom the documents were obtained.  If a document is responsive to more than one paragraph or subparagraph of this document request, it need be produced only once.

    11.    **Production of Entire Document**.  A request for any document shall be deemed to include, in addition to the document itself, a request for exhibits and attachments to the document and enclosures sent or kept with the document.  To the extent that a portion or part of any document is responsive to this request, this request shall be construed to call for production of the entire document.

    12.    **Production of File Folder or Container**.  The file folder or other container in which a document is kept is deemed to be an integral part of the document and shall be produced with the document.  If, for any reason, the folder or container cannot be produced, produce copies of all labels or other identifying marks.

13.    **Privileged or Work Product Matters.**  If any request is deemed to call for the production of privileged or work product materials and any documents or information are not produced because such privilege or work product is asserted, you are instructed to provide:

(a)    the nature of the privilege or protection that is being claimed;

(b)    the type of document;

(c)    the general subject matter of the document;

(d)    the date of the document; and

(e)    such other information as is sufficient to identify the document for a *subpoena duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) of the document, including anyone who viewed or has possession of the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other.

If a portion of that document contains information subject to a claim of privilege, only that portion shall be redacted and the remainder shall be produced.  If any document or portion thereof is withheld on the basis of some other objection, state with particularity the nature of and complete factual basis for the objection and identify the document as set forth above.

14.    **Objection to Document Request.**  If you object to any document request or part thereof, all documents to which your objection does not apply shall be produced.

## DEFINITIONS

1.      The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Rules of the United States District Court for the Eastern District of New York ("Rule 26.3") are incorporated by reference into this document request.

2.      In addition to the Rule 26.3, the term **"Agreement"** means any formal, informal, oral or written contract between two or more parties.

3.      The terms **"all,"** **"any,"** and **"each,"** shall be construed as all, any and/or each as necessary to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

4.      **"Aries Financial"** means Aries Financial, LLC, its agents, employees, officers, directors, principals, accountants, and any other person or entities acting on its behalf, as well as any parent, subsidiary or affiliate.

5.      **"Divine Intervention"** means Divine Intervention Institute, Inc., its agents, employees, officers, directors, principals, accountants, and any other person or entities acting on its behalf, as well as any parent, subsidiary or affiliate.

6.      The term **"identify"** means when used in reference to:

    (a)      an <u>oral</u> statement, communication, conference or conversation, to state separately: (i) its date and the place where it occurred; (ii) means of communication including telephones, in-person meetings, video conferences or Skype; (iii) its substance; (iv) the identity of each person making the statement or participating in the communication, conference or conversation; and (v) the present location and custodian of all notes, memoranda, or other documents

memorializing, referring to or relating to the subject matter of the statement, communication, conference or conversation;

(b)   a <u>natural person or persons</u>, to state separately: (i) the full name of each such person; (ii) his or her present, or last known business address and his or her present, or last known residential address; (iii) the present or last known employer of the person at the time to which the interrogatory answer is directed and the person's title or position at such employment; and (iv) contact information, including business phone numbers, home phone numbers, email addresses and any other means of contact; and

(c)   an <u>organization or entity</u> other than a natural person (e.g., a corporation, company, firm, association, or partnership), to state separately: (i) the full name and type of organization or entity; (ii) the date and state of organization or incorporation; (iii) the address of its principal place of business; (iv) the nature of the business conducted; and (v) contact information, including phone numbers, email addresses and any other means of contact.

7.   The term **"including"** does not in any way limit a request to specific items or concepts listed, but rather shall be read to mean "including, but not limited to".

8.   An **"LLC"** refers to a Limited Liability Company.

9.   The phrase **"post-closing activities"** refers to any and all communications, payments, activities or agreements with respect to the Premises, the subject mortgage loan, Herman Britt, or that occurred from October 16, 2006 to the present.

10.   The term **"Premises"** refers to the property located at 8901 Avenue L, Brooklyn, NY 11236.

11.    The terms **"relating to," "related to,"** or **"regarding"** mean containing, constituting, concerning, embodying, reflecting, identifying, stating, showing, or in any manner relating or referring to the subject, directly or indirectly.

12.    The phrase **"subject matter of this litigation"** means any and all matters described or alleged in any complaint, answer, defense, or counterclaim, filed in this action by any party.

13.    The phrase **"subject mortgage loan"** refers to the mortgage loan originated to 8901 Avenue L LLC by Aries Financial on or about October 16, 2006.

14.    The phrase **"subject mortgage loan transaction"** refers to any closings, transfers, agreements, contracts or transactions, or disclosures and any other documents, made, entered into or involved in connection to negotiation, application(s), underwriting, review, credit assessment, approval, funding, closing and recording of the subject mortgage loan, including the formation of 8901 Avenue L LLC.

15.    The terms **"you"**, **"your"** and **"yourself"** refer to you, defendant Aries Financial, LLC, as well as your agents, representatives, employees, officers, directors, principals, accountants, attorneys, or any other persons acting on your behalf.

16.    The use of the singular form of any word shall include the plural and *vice versa*.

17.    The present tense includes the past and *vice versa*.

## INTERROGATORIES

1.    Identify Aries Financial, including but not limited to a description of:

(i)     its mission statement;

(ii)     its businesses conducted;

(iii)    the place and manner of its business operations;

8

       (iv)    its assets and liabilities;

       (v)    its locations for business operations; including post office boxes or answering services used relating to your businesses; and

       (vi)    any licenses authorizing Aries Financial to conduct its business activities in the 50 states and the territories of the United States and Cayman Islands.

2.    Identify all mortgages secured by a home in the name of an LLC that Aries Financial originated in all 50 states and the territories of the United States from January 1, 2005 to present.  In your response, provide:

       (i)    the name and address of the borrower;

       (ii)    the name of the managing member of the LLC;

       (iii)    the amount, origination date, and terms of any such mortgage loans;

       (iv)    the name and contact information of the broker for each mortgage;

       (v)    the name and contact information of the closing agent for each mortgage; and

       (vi)    the name and contact information of the escrow agent for each mortgage.

3.    Identify all mortgages secured by a home in the name of an LLC or homeowner and involving an escrow account of six months or more of monthly mortgage payments and that Aries Financial originated from January 1, 2005 to present.

4.    Identify all mortgages secured by a home in the name of an LLC or homeowner, having interest-only payment features, that Aries Financial originated from January 1, 2005 to present.

9

5.    Identify all mortgages secured by a home in the name of an LLC or homeowner and providing for interest rates that exceed 15% in the first three years of the mortgage loan that Aries Financial originated from January 1, 2005 to present.

6.    Identify any business plans, models or manuals, whether internally created or acquired from an external source, that Aries Financial used, reviewed or referred to in making the mortgages described in Interrogatories Nos. 2 through 5. In your response, specify the name and contact information of any external source identified and the date of the acquisition.

7.    Identify by type all financial products sold or originated by Aries Financial in each state and the territory of the United States from January 1, 2005 to present. For each product identified, indicate how many such products were sold or originated in each state or territory.

8.    Identify any affiliates, subsidiaries or parent companies of Aries Financial, including a description of:

    (i)    the nature of their relationship to Aries Financial;

    (ii)    the businesses conducted;

    (iii)    the business locations;

    (iv)    the assets and liabilities;

    (v)    any and all licenses held by them; and

    (vi)    the principals, officers, directors, and employees, identifying any principals or employees that also work or have worked or performed services for Aries Financial from January 1, 2005 to the present.

9.     Describe the current business status of Aries Financial in the 50 states and the territories of the United States and Cayman Island.  If inactive, dissolved, discontinued, suspended or otherwise terminated, please state the reason for and time period of such status.

10.     Identify any and all 1-4 family residential properties that Aries Financial purchased, obtained, or otherwise acquired title to in the 50 states and the territories of the United States from January 1, 2005 to present.  In your response, please state:

        (i)     the name of the borrower;

        (ii)    the property address;

        (iii)   the date and manner of such acquisition; and

        (iv)   the current owner status of these residences.

11.     Identify by name, last known home addresses, and contact information all employees and principals of Aries Financial from January 1, 2005 to present.  In your response, provide the title, description of duties, and time period during which each employee or principal was employed, affiliated or performed any tasks for Aries Financial.

12.     Identify by name, last known address, last known place of employment, and contact information each person with knowledge of the facts regarding the subject matter of the litigation, including the solicitation, negotiation, underwriting, origination, performance and/or non-performance of the subject mortgage and loan, and summarize the knowledge of each person concerning this subject.

13.     Identify by name, last known address, and contact information each and every Aries Financial employee, officer, director, principal, agent, independent contractor, affiliate and any other person or entity acting on its behalf who performed any task associated with the subject mortgage loan transaction, the Premises or the post-closing activities.

11

14.     Describe the task(s) performed by each employee, agent, independent contractor, affiliate, person or entity identified in response to Interrogatory No. 13.

15.     Identify all information you obtained concerning the ability of Herman Britt or 8901 Avenue L LLC to pay the subject mortgage loan, including but not limited to household income and savings, credit reports, assets, and liabilities, the source of such information, the dates you received such information, and whether you relied on such information when underwriting and/or originating the loan.

16.     Describe all due diligence conducted in connection with the subject mortgage loan, including but not limited to the condition, sale history, title information and value of the Premises.

17.     Describe all post-closing activities in connection with 8901 Avenue L LLC, Herman Britt, the Premises, or the subject mortgage loan transaction.

18.     Describe in detail the business, legal or personal relationship as related to the subject mortgage loan transaction or the post-closing activities between or involving you and:

    (i)     Andrew Morse;

    (ii)    Douglas Kahan;

    (iii)   Deborah Robertson;

    (iv)    Fredric Powell;

    (v)     Eydie Kahan;

    (vi)    Kenneth M. Ross;

    (vii)   Martin C. Simmons;

    (viii)  Cheung Ting;

    (ix)    Divine Intervention;

12

(x)    Worldwide Financial Resources;

(xi)    Templar Sales, Inc.;

(xii)    First Lincoln Mortgage Bankers;

(xiii)    U.S. Bank N. A.;

(xiv)    Wachovia Bank N.A.;

(xv)    Stein & Sheidlower LLP;

(xvi)    Sharp Appraisal, Inc.;

(xvii)    Filmore Agency;

(xviii)    L&R Management, LLC;

(xix)    Land America Lawyers Title Insurance Corporation;

(xx)    Old Republic Credit Services; or

(xxi)    Tower Insurance Company of New York.

19.    Identify each and every person or entity that received proceeds, income, bonuses, yield spread premiums or other compensation or payment related to the subject mortgage loan or post-closing activities.  For each and every disbursement, state:

(i)    the amount of such disbursement;

(ii)    the name and title of the person(s) authorizing such disbursement;

(iii)    the name of the payee;

(iv)    the purpose for any such disbursement; and

(v)    the date and manner in which such disbursement was made.

20.    Identify any and all meetings, discussions, agreements, conversations, disclosures or other oral or written communications concerning the Premises, the subject mortgage loan and/or the post-closing activities between you and any other person or entity.

13

21.    Describe all compensation, points, payments and fees you received in connection with the Premises or the subject mortgage loan transaction or post-closing activities, including the amount of compensation, the source, the date upon which you received the compensation, points, payments or fees, and the service performed in exchange for the compensation, points, payments or fees.

22.    Identify all judicial actions, administrative proceedings, regulatory inquiries, or other complaints (including those currently pending) that have been brought against you.  In your response provide a summary of:

      (i)     the issues raised;

      (ii)    how the matter was resolved;

      (iii)   the caption of each action, proceeding, inquiry or complaint;

      (iv)    the name of the court or forum;

      (v)     the docket or case number; and

      (vi)    the venue for each action, proceeding, inquiry or complaint.

23.    Provide the name, address, telephone number and policy number for each and every liability protection or other indemnification whether in the form of insurance, bonds or the like to cover your liability as alleged in this litigation.  If self-insured, please describe in full detail what such self-insurance entails.

## REQUEST FOR PRODUCTION OF DOCUMENTS
### (From January 1, 2005 to Present)

1.      All documents referred to in the foregoing interrogatories and in the answers thereto.

2.      All documents, including electronic correspondence, handwritten notes, and calendar entries, relating to:

      (i)      Herman Britt;

      (ii)     8901 Avenue L LLC;

      (iii)    the subject mortgage loan transaction;

      (iv)     the Premises; or

      (v)      the post-closing activities.

3.      All conversation, communication, or telephone logs concerning:

      (i)      Herman Britt;

      (ii)     8901 Avenue L LLC;

      (iii)    the Premise;

      (iv)     the subject mortgage loan transaction; or

      (v)      the post-closing activities.

4.      All correspondence between you and Douglas Kahan relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

5.      All correspondence between you and Douglas Kahan relating to the post-closing activities, including electronic correspondence.

15

6.      All correspondence between you and Douglas Kahan relating to any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

7.      All correspondence between you and Douglas Kahan relating to the formation of limited liability companies from January 1, 2005 to present, including electronic correspondence.

8.      All correspondence between you and Andrew Morse relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

9.      All correspondence between you and Andrew Morse relating to the post-closing activities, including electronic correspondence.

10.      All correspondence between you and Andrew Morse relating to any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

11.      All correspondence between you and Divine Intervention relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

12.      All correspondence between you and Divine Intervention relating to the post-closing activities, including electronic correspondence.

13.      All correspondence between you and Divine Intervention relating to any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

14.      All correspondence between you and Deborah Robertson relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

15.      All correspondence between you and Deborah Robertson relating to the post-closing activities, including electronic correspondence.

16

16.     All correspondence between you and Deborah Robertson relating to any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

17.     All correspondence between you and Fredric Powell relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

18.     All correspondence between you and Fredric Powell relating to the post-closing activities, including electronic correspondence.

19.     All correspondence between you and Fredric Powell relating to any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

20.     All correspondence between you and First Lincoln Mortgage Bankers relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

21.     All correspondence between you and First Lincoln Mortgage Bankers relating to the post-closing activities, including electronic correspondence.

22.     All correspondence between you and Templar Sales, Inc. relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

23.     All correspondence between you and Templar Sales, Inc. relating to the post-closing activities, including electronic correspondence.

24.     All correspondence between you and U.S. Bank, N.A. relating to the subject mortgage loan transaction or the Premises, including electronic correspondence.

25.     All correspondence between you and U.S. Bank, N.A. relating to the post-closing activities, including electronic correspondence.

26.     All correspondence between you and U.S. Bank, N.A. relating to any other loan originated by Aries Financial from January 1, 2005 to present.

27.     The complete mortgage loan origination file for the subject mortgage loan, including but not limited to commitment letters, closing documents, and any and all loan applications, partial or complete, made by or on behalf of:

      (i)     Herman Britt;

      (ii)    8901 Avenue L LLC; or

      (iii)   any person acting on behalf of Herman Britt or 8901 Avenue L LLC.

28.     Any and all documents used to determine Herman Britt or 8901 Avenue L LLC's credit worthiness with respect to the subject mortgage loan transaction or post-closing activities by you or any defendant, including Andrew Morse and Divine Intervention.

29.     Any and all documents used, referenced, or considered during the course of any evaluation of the value of the Premises, including appraisal reports for the Premises and reports relating to property values in the geographic area.

30.     Any and all Aries Financial rate sheets issued, used, or in effect at any time during calendar years 2006 and 2008.

31.     All correspondence with employees, directors, officers, principals, agents, mortgage brokers, and independent contractors explaining the features, use, benefits, or advantages of originating mortgage loans to limited liability companies, corporations, or partnerships.

32.     All correspondence with employees, agents, mortgage brokers, and independent contractors encouraging the formation of limited liability companies within the context of residential mortgage lending.

33.    All materials discussing limited liability companies that you provided to potential or actual customers.

34.    Any and all operating or training manuals, plans, memoranda, instruction sheets, or other documents in effect during any period from January 1, 2005 to present and relating to your or any defendant's policies, practices, or procedures for soliciting, advertising, promoting, initiating, underwriting, closing, or taking and/or processing applications for mortgage loans.

35.    All documents used to train Aries Financial employees relating to compliance with federal and state consumer protection and fair lending laws, including TILA and HOEPA.

36.    Any and all guidelines, policies, or procedures pertaining to consideration, fees, commissions, bonuses, yield spread premiums, or other compensation related to mortgage loans since January 1, 2005.   This request includes any documents explaining or identifying fees and other compensation charged or received by Aries Financial in connection with mortgage lending from January 1, 2005 to present.

37.    Any and all of your by-laws, certificates of incorporation, and/or other formation documents, annual reports, certificates of good standing, minutes of meetings, and any other evidence of compliance with corporate formalities.

DATED:    January 28, 2010
           Brooklyn, NY


                              SOUTH BROOKLYN LEGAL SERVICES
                              John C. Gray, Esq.


                    By:    _____
                           TaeRa Franklin, Of Counsel
                           Jennifer Sinton, Of Counsel
                           105 Court St., 3rd Floor
                           Brooklyn, NY 11201


                                    19

(718) 246-3271 (Telephone/Fax)
*Attorneys for Plaintiff*

To:    Frederic Sosinsky, Esq.
THE LAW OFFICE OF FREDERIC L. SOSINSKY
45 Broadway, 30th Floor
New York, NY 10006
*Attorney for Defendant Aries Financial, LLC*

Douglas Kahan
1328 Boston Post Road
Larchmont, New York 10538
*Pro Se Defendant*

DIVINE INTERVENTION INSTITUTE, INC.
36 North Columbus Avenue
Freeport, New York 11520

# EXHIBIT
# C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X

HERMAN BRITT,

     Plaintiff,    Case No. 09-cv-2398
              (RJD) (ALC)

   -against-

ARIES FINANCIAL, LLC, DIVINE
INTERVENTION INSTITUTE, INC.,
ANDREW MORSE, DOUGLAS KAHAN,
      Defendants.

--------------------------------X


### RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS BY DEFENDANT ARIES FINANCIAL, LLC

   Defendant Aries Financial, LLC ("Aries"), by its attorney, Frederick L. Sosinsky, responding to the First Set of Interrogatories and Request for Production of Documents of the plaintiff Herman Britt, states as follows:

### RESERVATION OF RIGHTS

   Any production of documents by Aries in response to the First Set of Interrogatories and Request for Production of Documents (the "Discovery Demands") of Plaintiff will be subject to Aries' right to object to the admission into evidence of any and all such documents on the grounds that they, or any of them, are irrelevant to the issues in this action or are otherwise inadmissible. The responses and objections are based upon Aries'

present knowledge and/or information and belief. These responses and objections are subject to amendment and may be supplemented as Aries acquires additional information or documentation and completes its investigation, review and analysis.

### GENERAL OBJECTIONS

1.   Aries objects to the Discovery Demands to the extent that it seeks the production of documents subject to the attorney-client, attorney work-product or other privileges. In responding to these Demands, Aries does not waive but preserves all such privileges.

2.   Inadvertent production of privileged or otherwise objectionable documents shall not be deemed a waiver of such privilege or objection.

3.   Plaintiff's Discovery Demands in their entirety fail to describe the categories or types of documents requested with any "reasonable particularity". Fed. R. Civ. P. 34(b) requires that "the request shall set forth the items to be inspected either by individual item or category and describe each item and category with reasonable particularity."

4.   Aries objects on the ground that the individual requests for documents are ambiguous, confusing, and voluminous and subject to varied interpretation compelling Aries to guess

2

at the meaning of the Discovery Demands and whether a category of documents is responsive.

5. Aries objects to the requests for documents created on or after the date of the filing of this action on the grounds of relevance and privilege.

6. Additional documents will be produced as they are identified and located by Aries.

## INTERROGATORY RESPONSES

1. Identify Aries Financial, including but not limited to a description of:

      (i)  its mission statement;

      (ii) its businesses conducted;

      (iii) the place and manner of its business operations;

      (iv) its assets and liabilities;

      (v) its locations for business operations; including post office boxes or answering services used relating to your businesses; and

      (vi) any licenses authorizing Aries Financial to conduct its business activities in the 50 states and the territories of the United States and Cayman Islands.

3

<u>Answer to Interrogatory 1</u>:

(i)  Aries does not have any "mission statement." However, it has been engaged in the business of making commercial mortgage refinance loans to property owners since 2005.  See also documents produced and attached as Exhibit A hereto.

(ii) See above.

(iii)  Office located at 2901 Clint Moore Road, PMB 216, Boca Raton, Florida 33494.  Business conducted principally by telephone and electronic communications and banking.

(iv) Aries' assets are principally the value of the mortgages owned by the company, which presently have a face value of approximately $12 million dollars.  The worth of these assets is presently unknown.  Aries' liabilities are estimated at approximately $2.8 million dollars.

(v)  See (iii) above.

(vi) Aries is licensed to do business in the State of Alaska.

2.  Identify all mortgages secured by a home in the name of an LLC that Aries Financial originated in all 50 states and the territories of the Untied States from January 1, 2005 to present.  In your response, provide:

(i)  the name and address of the borrower;

4

(ii) the name of the managing member of the LLC;

(iii) the amount, origination date, and terms of any such mortgage loans;

(iv) the name and contact information of the broker for each mortgage;

(v) the name and contact information of the closing agent for each mortgage; and

(vi) the name and contact information of the escrow agent for each mortgage.

Answer to Interrogatory 2:

(i) See Exhibit B attached hereto.  See also documents provided with this response.

(ii) See (i) above.

(iii) See (i) above.

(iv) See (i) above.

(v) See (i) above.  The closing agents for Aries' loans were either Fred Powell or Douglas Kahan.

(vi) See (i) above.  Escrow agents were Wachovia, U. S. Bank and/or Nationwide Court Services.

3. Identify all mortgages secured by a home in the name of an LLC or homeowner and involving an escrow account of six months or more of monthly mortgage payments and that Aries Financial originated from January 1, 2005 to the present.

Answer to Interrogatory 3:

All of the loans made by Aries involved an escrow account from which interest payments were made and secured by real property.  See Exhibit B attached hereto.

4.   Identify all mortgages secured by a home in the name of an LLC or homeowner, having interest-only payment features that Aries Financial originated from January 1, 2005 to the present.

Answer to Interrogatory 4:

All of the loans made by Aries involved interest-only payments.  See Exhibit B attached hereto.

5.   Identify all mortgages secured by a home in the name of an LLC or homeowner, and providing for interest rates that exceed 15% in the first three years of the mortgage loan that Aries Financial originated from January 1, 2005 to the present.

Answer to Interrogatory 5:

See Exhibit B attached hereto.   See also documents produced hereto.

6.   Identify any business plans, models or manuals, whether internally created or acquired from an external source, that Aries Financial used, reviewed or referred to in making the mortgages described in Interrogatories Nos. 2 through 5.  In

6

your response, specify the name and contact information of any external source identified and the date of the acquisition.

<u>Answer to Interrogatory 6</u>:

      None.

      7.   Identify by type all financial products sold or originated by Aries Financial in each state and the territory of the United States from January 1, 2005 to present.   For each product identified, indicate how many such products were sold or originated in each state or territory.

<u>Answer to Interrogatory 7</u>:

      Commercial loans.  See documents provided hereto.

      8.   Identify any affiliates, subsidiaries or parent companies of Aries Financial, including a description of:

        (i)  the nature of their relationship to Aries Financial;

        (ii) the businesses conducted;

        (iii) the business locations;

        (iv) the assets and liabilities;

        (v)  any and all licenses held by them; and

        (vi) the principals, officers, directors and employees, identifying any principals or employees that also work or have worked or performed services for Aries Financial from January 1, 2005 to the present.

7

<u>Answer to Interrogatory 8</u>:

L&R  Management,  LLC.   Members  are  Al  London  and Lawrence Ramaeckers.   The  company  was  formed  for  purposes  of founding  and  managing  Aries  Financial  LLC.   The  business  address of the company is the same as for Aries.

Aries  Investments,  LLC.   The  company  engages  in  the same business as Aries.   The business address is the company is the same as for Aries.

9.   Describe  the  current  business  status  of  Aries Financial  in  the  50  states  and  the  territories  of  the  United States  and  Cayman  Islands.   If  inactive,  dissolved, discontinued,  suspended  or  otherwise  terminated,  please  state the reason for and time period of such status.

<u>Answer to Interrogatory 9</u>:

Active.

10.  Identify  any  and  all  1-4  family  residential properties  that  Aries  Financial  purchased,  obtained,  or otherwise acquired title to in the 50 states and the territories of the United States from January 1, 2005 to present.   In your response, please state:

(i)   the name of the borrower;

(ii)  the property address;

8

(iii) the date and manner of such acquisition; and

(iv) the current owner status of these residences.

Answer to Interrogatory 10:

See Exhibit B attached hereto.

a)   8350 N.W. 24th Place, LLC (Herard)
     8350 N.W. 24th Place,
     Sunrise, Florida Property
     Foreclosure judgment to Aries

b)   11 Hammersley Avenue, LLC (Johnson)
     11 Hammersley Avenue
     Poughkeepsie, New York Property
     Foreclosure judgment to Aries

c)   1766 Dannet Place, LLC (Foley)
     1766 Dannet Place
     East Meadow, New York 11554
     Foreclosure judgment to Aries

d)   74-27 93rd Avenue (Medrano)
     74-27 93rd Avenue
     Woodhaven, New York  11421
     Foreclosure judgment to Aries
     Property sold

e)   Loan #544 (Mark)
     Foreclosure judgment to Aries
     Property sold

Except where indicated, Aries retains ownership of the properties listed above at this time.

11.  Identify by name, last known home addresses, and contact information all employees and principals of Aries Financial from January 1, 2005 to present.  In your response,

9

provide the title, description of duties, and time period during which each employee or principal was employed, affiliated or performed any tasks for Aries Financial.

Answer to Interrogatory 11:

    Albert O. London, co-owner, Managing Member/Partner

    Lawrence Ramaekers, co-owner, Managing Member/Partner

    Carl Gallo, co-owner, Managing Member/Partner

    Candice London, Administrative Assistant, document preparation

    Carol Laxner, Administrative Assistant, document preparation

    All of the above persons may be contacted c/o Aries.

    12. Identify by name, last known address, last known place of employment, and contact information each person with knowledge of the facts regarding the subject matter of the litigation, including the solicitation, negotiation, underwriting, origination, performance and/or non-performance of the subject mortgage and loan, and summarize the knowledge of each person concerning this subject.

Answer to Interrogatory 12:

    Albert O. London (decision-maker on loan, modification and release, Candice London (administrative), Carol Laxner (administrative), each of the parties hereto, including Douglas

10

Kahan, Esq., Aries' closing agent on the loan and modification/release, title closing agent, all of the sales agents and brokers associated with the loan to plaintiff's LLC, plaintiff's wife, and other parties who previously made mortgage or refinance loans to plaintiff.

13. Identify by name, last known address, and contact information each and every Aries Financial employee, officer, director, principal, agent, independent contractor, affiliate and any other person or entity acting on its behalf who performed any task associated with the subject mortgage loan transaction, the Premises or the post-closing activities.

Answer to Interrogatory 13:

See 12 above. See also documents previously produced and produced herewith.

14. Describe the task(s) performed by each employee, agent, independent contractor, affiliate, person or entity identified in response to Interrogatory No. 13.

Answer to Interrogatory 14:

See 12 above. See also documents previously produced and produced herewith.

15. Identify all information you obtained concerning the ability of Herman Britt or 8901 Avenue L LLC to pay the subject mortgage loan, including but not limited to household

11

income and savings, credit reports, assets, and liabilities, the source of such information, the dates you received such information, and whether you relief on such information when underwriting and/or originating the loan.

Answer to Interrogatory 15:

Any appraisal of the subject property obtained by a mortgage broker or their representative; any appraisal of the subject property obtained by Aries; any loan application and/or credit report provided to Aries by a mortgage broker or a representative thereto and any title report prepared. See Exhibit A attached hereto. Aries is a hard-money lender.

16. Describe all due diligence conducted in connection with the subject mortgage loan, including but not limited to the condition, sale history, title information and value of the Premises.

Answer to Interrogatory 16:

Due diligence included review of the information and/or documents set forth in 15 above.

17. Describe all post-closing activities in connection with 8901 Avenue L LLC, Herman Britt, the Premises, or the subject mortgage loan transaction.

12

Answer to Interrogatory 17:

See documents previously provided to plaintiff. See also documents produced herewith. Such documents may include correspondence sent to the borrower regarding payments coming due, or overdue, or for which there were insufficient funds in escrow or otherwise, correspondence concerning homeowner insurance premium payments and cancellation of such policy, correspondence with suggestions for refinance, correspondence regarding payment of property taxes, modification documents, and release of claims documents.

18. Describe in detail the business, legal or personal relationship as related to the subject mortgage loan transaction or the post-closing activities between or involving you and:

(i) Andrew Morse;

(ii) Douglas Kahan;

(iii) Deborah Robertson;

(iv) Fredric Powell;

(v) Eydie Kahan;

(vi) Kenneth M. Ross;

(vii) Martin C. Simmons;

(viii) Cheung Ting;

(ix) Divine Intervention;

13

(x)   Worldwide Financial Resources;

(xi) Templar Sales, Inc.;

(xii) First Lincoln Mortgage Bankers;

(xiii) U.S. Bank N.A.;

(xiv) Wachovia Bank N.A;

(xv) Stein & Sheidlower LLP;

(xvi) Sharp Appraisal, Inc,;

(xvii) Fillmore Agency;

(xviii) L&R Management, LLC;

(xix)   Land   American   Lawyers   Title   Insurance
Company;

(xx) Old Republic Credit Services; or

(xxi) Tower Insurance Company of New York.

Answer to Interrogatory 18:

(i)  Mortgage broker;

(ii) Closing agent/attorney on loan modification
and release;

(iii) No relationship or information;

(iv)  No relationship on this loan;

(v)   Title closing agent;

(vi) Appraiser;

(vii)  No relationship or information;

(viii) Appraiser;

14

(ix) No relationship or information;

(x)  No relationship or information on this loan;

(xi) No relationship or information on this loan;

(xii)  No  relationship  or  information  on  this loan;

(xiii)  Escrow agent;

(xiv)  Kahan escrow bank and Aries bank;

(xv)  Foreclosure/payoff attorneys;

(xvi)  No relationship or information;

(xvii)  No relationship or information;

(xviii)  No relationship on this loan;

(xix)  Title insurance on loan;

(xx)  No relationship or information;

(xxi) Borrower's  property  and  hazard  insurance carrier.

19.  Identify  each  and  every  person  or  entity  that received  proceeds,  income,  bonuses,  yield  spread  premiums  or other  compensation  or  payment  related  to  the  subject  mortgage loan  or  post-closing  activities.   For  each  and  every disbursement, state:

(i)  the amount of such disbursement;

(ii) the  name  and  title  of  the  person(s)  authorizing such disbursement;

15

(iii) the name of the payee;

(iv) the purpose for any such disbursement; and

(v)  the date and manner in which such disbursement was made.

Answer to Interrogatory 19:

See documents previously provided to plaintiff.  See also documents produced herewith.  These documents include the HUD-1 form and list of checks paid, copies of all checks paid at closing, as well as copies of checks received by Aries from the escrow agent representing interest payments on the loan or from plaintiff.  The purpose of each of the payments made is as described on the HUD-1 form, the escrow agreement, the note, the mortgage and the modification agreement.

20.  Identify any and all meetings, discussions, agreements, conversations, disclosures or other oral or written communications concerning the Premises, the subject mortgage loan and/or the post-closing activities between you and any other person or entity.

Answer to Interrogatory 20:

See documents previously provided.  See also documents produced herewith.

21.  Describe all compensation, points, payments and fees you received in connection with the Premises or the subject

16

mortgage loan transaction or post-closing activities, including the amount of compensation, the source, the date upon which you received the compensation, points, payments or fees, and the service performed in exchange for the compensation, points, payments or fees.

Answer to Interrogatory 21:

See response to 19 above.

22. Identify all judicial actions, administrative proceedings, regulatory inquiries, or other complaints (including those currently pending) that have been brought against you. In your response provide a summary of:

(i) the issues raised;

(ii) how the matter was resolved;

(iii) the caption of each action, proceeding, inquiry or complaint;

(iv) the name of the court or forum;

(v) the docket or case number; and

(vi) the venue for each action, proceeding, inquiry or complaint.

Answer to Interrogatory 22:

*Aries Investments, LLC, Aries Financial, LLC v.*
*First American Title Insurance Co., et al*
Superior Court of the State of New Jersey
Law Division
Monmouth County
Docket No. MON-L-711-10

17

*First American Title Insurance Company v.*
*Douglas Kahan, Esq, et al.*
Third-Party Action
Docket No. C-163-09
In Active Litigation

*In Re Antonio Dasilva*
Bk. Case No. 08-19547 (RG)
*Marie Greenberg, Chapter 13 Standing Trustee and*
*Antonia Dasilva,*
*Individually, debtor v. Aries Financial, LLC et al.*
Adversary Proceeding # 09-01148 (RG)
US Bankruptcy Court
District of New Jersey (Newark)
In Active Litigation

*Aries Financial, LLC, et al. v.*
*10 Beechcroft Drive, LLC and Thomas Bacola, et al.*
Superior Court of the State of New Jersey
Chancery Division, Mercer County
Docket No.: MER-C-46-09
In Active Litigation

*Aries Financial, LLC and Kenneth Kasten*
*v. 1766 Dannett Place LLC, Veronica Foley, et al.*
Index No. 07-22103
Nassau County Supreme Court (Justice Karen V. Murphy)
Defendant's Motion for Summary Judgment Denied
Aries Owns Property

*Marie Petersen, et al. v. Aries Financial, LLC*
Civil Docket 06-0134 (RJD)(RML)
United States District Court
Eastern District of New York
In Active Litigation

*Alavita Williams v. Aries Financial, LLC*
Civil Docket No 09 Civ. 1816 (JG)(AMC)
United States District Court
Eastern District of New York
In Active Litigation

18

*Aries Financial, LLC v. 2729 Clafin Avenue,*
*LLC, et al.*
Index No. 381809/08
Bronx County Supreme Court (Justice Betty Owen
Stinson)
In Active Litigation

*In Re: Philip Cunningham*
Bk. Case No. 09-36603
United States Bankruptcy Court
Southern District of New York (Poughkeepsie)(CGM)
*Cunningham v. Aries Financial, LLC, et al.*
Adversary Proceeding No. 09-09072 (CGM)
Defendants' Motion for Dismissal on Pleadings Granted

23.  Provide the name, address, telephone number and policy number for each and every liability protection or other indemnification whether in the form of insurance, bonds or the like to cover your liability as alleged in this litigation.  If self-insured, please describe in full detail what such self-insurance entails.

Answer to Interrogatory 23:

Lawyers Title Insurance Corporation, Policy G47-3238952.  This document has previously been provided.  There is no address or contact information on the policy.

### RESPONSES TO DOCUMENT REQUESTS

1.  See documents previously produced and produced herewith.

2.  See documents previously produced and produced herewith.

19

3.  See documents previously produced and produced herewith.

4.  To the extent any such correspondence is not privileged, see documents produced.

5.  To the extent any such correspondence is not privileged, see documents produced.

6.  To the extent any such correspondence is not privileged, see documents produced.

7.  To the extent any such correspondence is not privileged, see documents produced.

8.  See documents previously produced and produced herewith.

9.  See documents previously produced and produced herewith.

10. See documents previously produced and produced herewith.

11. None.

12. None.

13. None.

14. None.

15. None.

16. None.

17. To the extent any such correspondence is not privileged, see documents produced.

18. To the extent any such correspondence is not privileged, see documents produced.

19. To the extent any such correspondence is not privileged, see documents produced.

20. None.

21. None.

22. None.

23. None.

24. See documents previously produced and produced herewith.

25. See documents previously produced and produced herewith.

26. See documents previously produced and produced herewith.

27. See documents previously produced and produced herewith.

28. See documents previously produced and produced herewith.

29. See documents previously produced and produced herewith.

30. None.

31. See Exhibit A hereto.

32. None.

33. Other than the LLC documents provided to borrowers prior to or at loan closings, none.

34. See Exhibit A hereto.

35. None.

36. None.

37. See Exhibit A hereto.

Dated:   New York, New York
         April 5, 2010

                         FREDERICK L. SOSINSKY, ESQ.
                         Attorney for Defendant
                         Aries Financial, LLC

                         By: _____
                             Frederick L. Sosinsky (CM)

                         45 Broadway, 30th Floor
                         New York, New York, 10006
                         (212) 285-2270

TO:   TaeRa Franklin, Of Counsel
      Jennifer Sinton, Of Counsel
      Jennifer Light, Of Counsel
      John C. Gray, Esq.
      South Brooklyn Legal Services
      105 Court Street, Third Floor
      Brooklyn, New York  11201

      Douglas Kahan, Esq.
      225 Broadway, Suite 715
      New York, New York  10007

      Divine Intervention Institute, Inc.
      36 North Columbus Avenue
      Freeport, New York  11520

22

# EXHIBIT D

## Page 18

D. Kahan

1
2 twenty years.  And as far as I can tell, it's
3 pretty clerical.  I don't think you have to
4 be a lawyer to fill out a HUD.  I think
5 that's the rule in New Jersey.  Lawyers don't
6 have to do it.  I think they're very simple
7 and very easy to fill out.  And, again, most
8 of the information, a lot of the information
9 would be on there from the lender, and it's
10 about math.  It's about knowing how either
11 use a calculator or how to add the numbers
12 long-hand.  So I don't think there is
13 anything technical in a HUD.  I think almost
14 anybody could do it.  Probably my son or
15 daughter who are in middle school could
16 probably put the numbers in and add it up.
17     Q.  So for these closings where you
18 represented the lender, which states did you
19 do that for?
20     A.  I don't have that off the top of my
21 head.  There could have been lenders from
22 California, somebody from Connecticut.  There
23 could have been people from Florida.  And,
24 again, it was a handful.  It wasn't a
25 hundred.  It probably wasn't even twenty.  It

## Page 19

D. Kahan

1
2 was probably less than ten.
3     Q.  So for the non-Aries loans, did you
4 ever do any non-legal work for those
5 transactions?
6     A.  What do you mean by non-legal work?
7     Q.  Work that wasn't exclusively done
8 towards practicing law.
9     A.  Probably not.  You would have to
10 give me some more specific examples of what
11 work you're talking about.
12     Q.  Did you ever work as a broker?
13     A.  No.
14     Q.  Did you ever work as a settlement
15 agent?
16     A.  Yes.
17     Q.  And did you ever perform any other
18 clerical duties aside from help filling out
19 the HUD?
20     A.  I probably photocopied documents.
21 I probably downloaded documents.  I probably
22 collated documents.  I probably made phone
23 calls, sent out letters, I mean if that's
24 what you mean by non-legal and secretarial or
25 clerical.  I do everything.  I'm a small

## Page 20

D. Kahan

1
2 practitioner.  I don't do anything that a
3 secretary or receptionist wouldn't do.  I do
4 everything that they would do.
5     Q.  Did you act as a notary?
6     A.  I also act as a notary, yes.  I am
7 a licensed New York State notary.
8     Q.  Are you licensed anywhere else?
9     A.  No.
10     Q.  Are you just licensed in New York
11 or --
12     A.  Yes.
13     Q.  -- any other state?
14     A.  Just in New York.
15     Q.  With any of these non-Aries loans,
16 did you ever loan money in any way connected
17 with those loans?
18     A.  Did I personally loan money?
19     Q.  Um-hmm.
20     A.  I never personally loaned anybody
21 any money in any loan, Aries, non-Aries
22 loans, anything.  I never acted as a lender.
23     Q.  Did you ever own any shares or
24 other ownership interest in any of these
25 entities?

## Page 21

D. Kahan

1
2     A.  No.
3     Q.  Did you ever invest any money with
4 any of these entities?
5     A.  I did not.
6     Q.  Getting a little bit back to your
7 personal history, do you have any criminal
8 record?
9     A.  I do not.
10     Q.  Have you ever sued anyone?
11     A.  As a plaintiff?
12     Q.  Um-hmm.
13     A.  Yeah.  I think when I was six years
14 old I got hit in the head with a soda can.  I
15 might have been eight.  And I probably had to
16 sue somebody because my -- the doctors didn't
17 want to cover me because somebody else was at
18 fault for hitting me in the head with a soda
19 can.  I was probably eight years old.  I
20 think it was the opening day of Little League
21 Baseball.  It was probably 1970.  So I was
22 probably the plaintiff in a lawsuit when I
23 got hit in the head with a soda can.  Other
24 than that, umm --
25     Q.  I'm assuming that soda can was

Page 58

D. Kahan

1  them?
2  
3      A.  Yes.
4      Q.  Any other ways you would get, you
5  know, referrals from like individuals, any
6  other ways you would get clients for these
7  kind of loans?
8      A.  No.
9      Q.  Now, do you know why Aries was
10  using Wachovia for any particular purpose as
11  their bank?
12      A.  I do not.
13      Q.  Now, previously you mentioned that
14  you set up a new trust account because it
15  would be easier and the new transactions were
16  bigger; is that correct?
17      A.  Yes.
18      Q.  How bigger were they than the
19  previous real estate transactions you were
20  involved in?
21      A.  Well, the previous transactions
22  were very much one at a time.  It could be
23  one and not another one for another
24  three months, six months, nine months, a
25  year.  The Aries transactions happened a

Page 59

D. Kahan

1  little bit more sooner than that, so there
2  was going to be more money sitting in the
3  account.  So it made sense to have its own
4  account.
5      Q.  Now, when did you first meet
6  Mr. London?
7      A.  Sometime in the fall of '05, I
8  believe.
9      Q.  And how did you meet him?
10      A.  Phone call.
11      Q.  Who initiated the phone call?
12      A.  I don't recall.
13      Q.  And we're talking about Albert
14  London; right?
15      A.  Yes.
16      Q.  Just to clarify for the record.
17  Now, for Mr. London, have you ever done
18  non-legal work for Al London?
19      A.  When I would do closings for Aries
20  in New Jersey as their settlement agent, yes,
21  that would be considered non-legal work.
22      Q.  Any other non-legal work?
23      A.  No.
24      Q.  Now, there's Aries Financial;
25  

Page 60

D. Kahan

1  right?
2  
3      A.  Yes.
4      Q.  Is Al London, to your knowledge,
5  the owner of any other companies?
6      A.  I don't know what other companies
7  he owns.  He is not the sole owner, I
8  believe, at Aries Financial.  There are
9  several partners.
10      Q.  Do you know who those partners are?
11      A.  I believe they are Carl Gallo and
12  Larry Ramaekers, R-a-m-a-e-k-e-r-s.
13      Q.  Did you ever have any
14  communications with them?
15      A.  I did have conversations with Larry
16  Ramaekers.
17      Q.  Now, anyone else in the company did
18  you meet?
19      A.  When you say meet, do you mean in
20  person or speak to over the phone?
21      Q.  Both.  Have conversations with.
22      A.  In the beginning it was Al London
23  and Larry Ramaekers, and sometime later also
24  Candace London, who was Mr. London's
25  daughter, and Carol Laxner, L-a-x-n-e-r, were

Page 61

D. Kahan

1  working in the company.
2  
3      Q.  Who was Carol Laxner?
4      A.  She works for Al London and Aries
5  Financial in Florida.  I have never met her
6  in person, but I have spoken to her on the
7  phone.
8      Q.  Do you know what her job is?
9      A.  She works for Aries.  As far as I
10  know, it's a small company, and I'm sure she
11  puts together paper work, does
12  correspondence.  She's an office worker,
13  secretary, receptionist, does it all.
14      Q.  Do you know if Al London is an
15  attorney?
16      A.  I do not know that.
17      Q.  That's ambiguous.
18      A.  I don't know if he is or if he
19  isn't.
20      Q.  Okay.  Now, when you were first
21  introduced to Mr. London, was he referred to
22  you out of the blue, or how did you guys get
23  together?
24      A.  A friend of mine who lives here in
25  Larchmont had a friend in Florida, and they

Page 74

D. Kahan

1
2  were involved with also involved Mr. Powell?
3      A.  Not a lot.  I can't say the exact
4  number.  I'm sure it's all in the documents
5  that we turned over, that Aries turned over.
6  It's all there.
7      Q.  And the ones you were involved
8  with, did he act as a broker?
9      A.  He probably acted as a co-broker in
10 a few of the loans that I was involved in,
11 yes.
12     Q.  Did he ever act in any other
13 capacity for the loans that you were involved
14 with?
15     A.  Well, if I was involved as the
16 lawyer, he was not involved as the lawyer.
17 So I don't know what other capacities he
18 would have been involved in.  He, as I said
19 earlier, he was involved in bringing parties
20 together.
21     Q.  So Aries made loans that you
22 weren't connected with; correct?
23     A.  That's correct.
24     Q.  Do you know why you were chosen to
25 act in any capacity for individual Aries

Page 75

D. Kahan

1
2  loans as opposed to others?
3      A.  No.
4      Q.  In what states were you working as
5  an attorney or any other capacity for Aries?
6      A.  An attorney in New York, settlement
7  agent for some New Jersey loans, and probably
8  settlement agent for a few Connecticut loans.
9      Q.  And what were your job duties as a
10 settlement agent?
11     A.  To see that the documents were
12 brought to the closing, see that all the
13 documents got executed properly, see that the
14 HUD was filled out.  I would write checks.  I
15 would form the limited liability company.
16 Those are about the extent of my duties.
17     Q.  Any other duties you can remember?
18     A.  I would make sure that the
19 borrowers understood what they were doing.
20     Q.  How would you make the borrowers
21 understand what they were doing?
22     A.  I would ask them questions.  I
23 would ask them if they had any questions
24 about the documents that they were signing.
25 I would go over those documents with them if

Page 76

D. Kahan

1
2  they needed me to.  And I would explain those
3  documents to them if they needed me to
4  explain them.
5      Q.  Do you recall any of the questions
6  that you were asked by borrowers?
7      A.  In general?
8      Q.  Yeah.
9      A.  How much money am I getting, can
10 you make sure that my foreclosure is going to
11 stop today, can we have a closing at
12 three o'clock tomorrow, can we have the
13 closing in your Manhattan office instead of
14 your Westchester office, can we have the
15 closing at the broker's office instead of
16 either of your offices, how much is my payoff
17 that you have to pay for me, are you going to
18 pay my homeowner's insurance for me, do I
19 still have to pay real estate taxes, what
20 happens with the first year's escrow?  Just
21 general questions about the loan.
22     Q.  So questions about the escrow, what
23 kind of questions did they ask about the
24 escrow account?
25     A.  The borrowers already knew that

Page 77

D. Kahan

1
2  they were going to escrow the first year's
3  payments interest only.  So specific
4  questions were like does that include my
5  homeowner's insurance?  And the answer
6  routinely would be no, because we were going
7  to pay a full year's homeowner's insurance
8  today, if it wasn't already paid.  And if it
9  was mid-year, I was going to hold money so we
10 can pay for it at the time, because some
11 homeowners insurance companies didn't want to
12 start over.  They wanted that year or
13 whatever six-month period to be finished, and
14 then we would pay it.  So I would hold the
15 homeowner's insurance in escrow.  They would
16 ask me if they still have to pay real estate
17 taxes, and I told them that they would still
18 have to pay real estate taxes, that this was
19 an interest-only loan, and the borrowers
20 routinely acknowledged that they understood
21 that and knew that before coming to the
22 closing table.
23     Q.  Did every loan that you did for
24 Aries include these escrow accounts?
25     A.  Yes.

Page 102

D. Kahan

1    A.  All the documents for the loans
2  would have a document prep fee.  Not just
3  this one document.  And I believe Aries would
4  take a document prep fee, yes.
5    Q.  And did you draft this document?
6    A.  I did not.
7    Q.  Do you have any idea who did?
8    A.  No.
9    Q.  So we're going to come back to
10 this, but I just wanted to clarify that.
11      So what percentage of your revenue
12 in 2006 was from Aries?
13   A.  I would have to look at my records.
14   Q.  I mean was it less than 50 percent?
15   A.  Yes.
16   Q.  Less than 25 percent?
17   A.  Probably around there.  I probably
18 did on average an Aries loan one to two --
19 one every one or two weeks.  So in the year
20 of 2006 maybe I did 35.  And so if that meant
21 I made about $35,000 or so, that would have
22 probably been hopefully in a good year
23 20 percent, in a better year, ten percent, in
24 a worse year, never half.  If it was half, I

Page 103

D. Kahan

1  would not be doing too well.
2    Q.  Did the percentage go up or down or
3  stay about the same in 2007?
4      MR. SOSINSKY:  In 2000 and?
5      MR. BRINEGAR:  Seven.
6    A.  I think 2006 we did an entire year.
7  2007 might have only been three or
8  four months.  So certainly the percentage
9  would have gone way down.
10   Q.  Did you do any closings for Aries
11 in 2008?
12   A.  I don't believe so.
13   Q.  2009?
14   A.  No.
15   Q.  2010?
16   A.  No.
17   Q.  And not prior to 2006; correct?
18   A.  There might have been one or two or
19 three or four in the end of 2005.
20   Q.  Oh, I see.  Okay.
21   A.  But you have -- they're in the
22 documents.
23   Q.  Now, when did you start doing
24 foreclosure work for Aries?

Page 104

D. Kahan

1    A.  I can't recall the first case that
2  they came to me with for foreclosure.  My
3  best recollection would be 2008, although
4  there could have been a case in 2007.  But
5  without looking at the paperwork in front of
6  me, I don't know.
7    Q.  And how much were you paid for each
8  settlement?
9    A.  The closings?
10   Q.  Um-hmm.
11   A.  I believe it was between $1345 or
12 1385, approximately that.  That included --
13 you would have to subtract the amount of
14 money then that I paid for the LLC, which is
15 different amongst the states.  So that would
16 be my payment and expenses.
17   Q.  Did that payment ever go up from
18 2005 to 2007?
19   A.  Yeah.  Like I said, it may have
20 been 1345 or 1350 at one time, or it might
21 have been 1385 or 90 at one point in time.
22 It also could have been less.  I'm sure there
23 were some loans where it was just 800,
24 because there was a refinance and the people

Page 105

D. Kahan

1  already had an LLC.  And that was also
2  possible that I didn't get the extra fee.
3  That fee -- the base pay I believe was 895 or
4  850, and then the LLC was 4, 450.  So
5  together it was the 1350 to 1385.
6    Q.  Aside from representing Aries in
7  foreclosure proceedings, did you ever get any
8  other compensation from Aries?
9    A.  No.
10   Q.  Did they ever refer any clients to
11 you?
12   A.  I have another client that I got,
13 and I'm not sure if it was an Aries referral
14 or Jay Josephson referral, who is the
15 gentleman I told you referred me to Aries in
16 the first place.  There was one other lender
17 that did only less than five loans.
18   Q.  What kind of lender is that?
19   A.  They were a private equity
20 investment company.
21   Q.  Are they based in New York?
22   A.  No.
23   Q.  In Florida?
24   A.  Yes.

# EXHIBIT E

Page 62

A. LONDON - 5/20/10
1
2    usury questions, high-interest-rate loan questions,
3    questions that pertained to the general topic of
4    mortgage lending.
5        Q.  What was his conclusion about becoming a
6    bank?
7        A.  He never really came to conclusions.  He
8    provided us with information, and we came to
9    conclusions.  He didn't tell us do it or don't do
10   it.  That wasn't his role.
11       Q.  Did you-all become a bank?
12       A.  No.
13       Q.  Why not?
14       A.  At some point, we decided it wasn't
15   practical.
16       Q.  Why wasn't it practical?
17       A.  I think we needed too much money, and
18   there was so many federal statutes and so many
19   different federal agencies that regulated banks,
20   that the more we learned, the more overwhelming it
21   became.  And we decided we just didn't want to do
22   it.
23       Q.  Why did you choose the LLC as the -- as
24   the format for your business?
25       A.  Well, it would have to be an LLC or a

Page 63

A. LONDON - 5/20/10
1
2    subchapter S corporation or a type C corporation.
3    And LLCs were very popular, and we decided that that
4    had the best of both words:  It was a corporation
5    and a partnership.
6        Q.  Why -- why was that the best of both
7    worlds for you-all?
8        A.  Well, it gave you the protection of a
9    corporation, and it also allowed us -- in case we
10   had losses, it allowed us to take the losses off
11   personally.  And if we had profits, the profits
12   would be pass-through profits for tax purposes, so
13   we would haven't to pay corporate taxes and personal
14   taxes.
15       So it was probably more of a tax
16   consideration, having a limited liability company
17   with the ability to pay taxes personally or take the
18   losses personally.
19       Q.  Did Mr. Mann research --
20       A.  Excuse me.  His name is N-A-M-M.
21       Q.  Oh, I'm sorry.
22       A.  No.  I may have said it wrong.
23       Q.  N-A-M-M?
24       A.  Yes.
25       Q.  Okay.  We'll see how many times I call him

Page 64

A. LONDON - 5/20/10
1
2    Mr. Mann from here on out, though.
3        A.  He's a very young man.
4        Q.  Okay.  Did Mr. Namm research consumer
5    protection law for you-all?
6        A.  I think so, yes.  That would have been
7    part of the questions we would have asked.
8        Q.  And did he advise you about consumer
9    protection laws?
10       A.  His -- his role was never to advise us.
11   His role was to find the rules; explain the rules to
12   us; if there were cases, show us the cases and help
13   us to understand what the cases said.  So it was
14   more interpretation of the statutes, regulations,
15   and -- in cases that were -- that he discovered.
16       Q.  And did Mr. Namm also advise you on the
17   creation of the company?
18       A.  No.  We had the company formed before
19   we -- I don't -- we may have asked him some
20   questions before we formed the company, but he
21   didn't have any role in helping us decide to form
22   our company.
23       Q.  Did he -- what did you use the results of
24   his research for?  Like what specific decisions did
25   his research inform?

Page 65

A. LONDON - 5/20/10
1
2        A.  Well, we wanted to structure the company
3    in a certain way, and we wanted to find out if what
4    we were doing was correct.  We didn't want to do
5    anything that might be improper or break any rules.
6    So we tried to learn what the rules were and how the
7    courts interpreted certain actions and what -- we
8    just really, we changed a lot of things.
9        Like I said, we wanted to be a bank.  We
10   changed our mind; we weren't going to be a bank.
11   We -- we learned a lot about the banking business or
12   the mortgage lending business from him, from his
13   research.  And we tried to cobble together a
14   business plan from some of the things that he
15   discovered in the rules, in the laws.
16       Q.  Do you remember specifically any other
17   changes that you made, besides becoming -- the
18   decision whether to become a bank or not, that were
19   informed by his research?
20       A.  I don't remember anything specific, but
21   I'm sure his work had influence on us.
22       Q.  Did his research influence the geographic
23   areas that you chose to practice in -- to do
24   business in?  Sorry.
25       A.  Later on.  Originally, we had intended to

Page 70

A. LONDON - 5/20/10

1
2   the particular case, although there were cases that
3   seemed to say the opposite.
4        Q.  Did you talk to any other lawyers about
5   what their conclusions would be?
6        A.  I never spoke to anybody about -- about
7   this.  He was the guy that I went to, because he did
8   the research.  And I found that when you talk to
9   people who haven't done their research, they'll give
10  you a lot of off-the-cuff answers, and often that
11  information is not reliable.
12       That's why I wanted to see the cases, and
13  I wanted to see the interpretation of the cases so I
14  could see what -- what a court would say.  I mean,
15  this was all public stuff he was digging at.  It
16  wasn't like he was writing anything that was new.
17       Q.  Was he mostly focused on New York usury
18  law?
19       A.  Well, we asked about jurisdiction.
20  Originally, we focused on New York.  When we thought
21  about doing other states, we looked at the usury
22  laws there.  And it got very confusing because there
23  was federal laws, there was state laws.  And in some
24  places, there were even city or county laws.
25       I recall Baltimore had its own -- its own

Page 71

A. LONDON - 5/20/10

1
2   laws that were different than the State of Baltimore
3   and different than the federal government.  So it
4   was kind of mind-boggling, with all the rules and
5   regulations.
6        Q.  What other states was he looking into for
7   you?
8        A.  He looked at a whole bunch of different
9   states.  Mostly East Coast.  We looked at -- we did
10  one more mortgage in Illinois, so we looked into
11  that a little bit.  We did a mortgage in Florida,
12  maybe two, so we looked into Florida.  We looked
13  into New Jersey, because we did some loans there.
14  We looked into Connecticut, because we did a loan
15  there.  And we looked into some other states, like
16  Pennsylvania and maybe Virginia.
17       A few of the other states, we sort of
18  touched on just to see whether or not they would --
19  we would like to do business in any of those states.
20  And we -- we found that, whether it was opportunity
21  or the market changed, we ended up doing loans in --
22  or sometimes only one loan.  We did a loan in -- we
23  did one or two loans in Florida, one in Illinois.
24  We did about a dozen in New Jersey.  The majority of
25  them were done in New York, and we did one in

Page 72

A. LONDON - 5/20/10

1
2   Connecticut.
3        Q.  Would you have him do the research on the
4   state -- I'm going to rephrase that.
5        You mentioned that brokers were telling
6   you -- were asking you "could you get me a
7   mortgage" -- who had worked with you in New York
8   were asking you if you could get mortgages in other
9   states.
10       Would -- would their requests spur your
11  requests for research, or were you looking into
12  other states without a specific request in mind?
13       A.  No.  We never advertised, we never
14  solicited.  The -- the brokers would come to us with
15  requests.  And a lot of times, brokers are good
16  salesmen, and they try to convince you that if you
17  will be willing to make loans where they want you to
18  go, they'll get you tons of business.
19       So occasionally I would ask for the
20  research to be done.  I would discuss it with Larry.
21  Larry was sensitive to the cost of doing research,
22  so we didn't want to waste our money.  So we, at
23  least, looked -- we looked, if nothing else,
24  casually to see if there was any interest to go in
25  deeper.  And we -- we often decided that where we

Page 73

A. LONDON - 5/20/10

1
2   were was fine.
3        Q.  Had you ever formed a business -- I know
4   that you had your seats on the exchanges.  Beyond
5   those, had you ever had your own business prior to
6   starting Aries?
7        A.  I had one business that my wife and I were
8   involved in and a few other people.  That was called
9   Sportthentic.  And its business was to paint
10  pictures of athletes and turn them into lithographs,
11  have the athletes sign them, and market the
12  lithographs.  So we did -- we did some of those.
13       But it was very difficult to make a
14  profit.  The printing of the lithographs, the way we
15  were making them, were just too expensive.  We
16  couldn't recover enough money, so we closed that.
17       And I had some partnerships with friends
18  that we would go in and do something sometimes, just
19  common -- like an investment of some kind.  But, no,
20  I didn't -- I never had a real operating business
21  since I retired.  If you can call Aries an operating
22  business, that would have been the only one.
23       Q.  The partnerships with your friends, were
24  those real-estate-oriented partnerships?
25       A.  No.

19

Page 74

A. LONDON - 5/20/10

1    Q.  So let's talk a little bit about Aries'
2  formation again.
3       You -- you spoke about -- did you -- who
4  are the members of Aries Financial?
5       A.  Larry Ramaekers and Carl Gallo.
6       Q.  Who is Carl Gallo?
7       A.  He is another one of our neighbors who's
8  retired and wanted to join us when he heard Larry
9  and I were doing something.
10      Q.  And when did he get -- when, in the
11 process of forming Aries, did he get involved?
12      A.  I guess about six months after we
13 originally formed Aries.
14      Q.  Had the LLC already been formed?
15      A.  Yes.
16      Q.  And what's Carl Gallo's role in it --
17 what -- throughout the year, if you could start from
18 when he became involved to the present, what has
19 Carl Gallo's role been in Aries?
20      A.  From the beginning, he was a silent
21 partner.  From -- for the last six months or eight
22 months, he's become more active in the company,
23 because we found that we're beginning to own some
24 properties, and the properties that we were getting

Page 75

A. LONDON - 5/20/10

1  back were in pretty awful condition.
2       It's -- it was hard to believe the -- the
3  extent of the value of these properties having
4  dropped so sharply, and the only way we could do
5  anything was to try to fix them up.
6       And he had a little more -- none of us
7  were ever in the construction business, but he had a
8  little more understanding of construction.  And he's
9  like a hands-on hobbyist.  You know, he's more
10 likely -- he has calluses on his hands, unlike a lot
11 of white-collar people.
12      So he was helpful to us in that way.  In
13 fact, he found a contractor to help us fix up one of
14 the houses on Long Island, and the house came out
15 nice.
16      Q.  Is he also from the New York area?
17      A.  No.
18      Q.  No.
19      A.  He and Larry are originally from Michigan.
20      Q.  And did he -- you said he had a little
21 more knowledge of construction or contracting.
22      Is that based on the employment he retired
23 from?
24      A.  No.  No.  I think you'd consider him more

Page 76

A. LONDON - 5/20/10

1  of a hobbyist.  He loves to do work around the
2  house:  Gardening, carpentry work.  He's a -- he's a
3  handy fellow who enjoys doing that, but his business
4  was not that.
5       Q.  What type of business was he in?
6       A.  Well, I don't know how to describe it
7  exactly.  He represented a lot of charities and
8  private organizations and fundraising.
9       Q.  And how did he locate the contractor that
10 Aries used?
11      A.  I believe it was somebody related to --
12 his son was getting married, and it was somebody
13 from the wife's family who was a contractor.
14      Q.  What is -- what is Larry Ramaekers' role
15 in Aries?  And if you could describe it
16 historically, that would be --
17      MR. SOSINSKY:  From the beginning to
18      today?
19 BY MS. LIGHT:
20      Q.  From the beginning to today.
21      A.  At the beginning, he was equal with me in
22 decision-making.  And we had to -- we reviewed
23 everything together, and we couldn't make a mortgage
24 unless he agreed or I had agreed.  It had to be

Page 77

A. LONDON - 5/20/10

1  unanimous between the two of us.
2       And he was a -- you know, he was good with
3  spreadsheets, and he understood banking, he had a
4  lot of dealings with banks.  And when we wanted to
5  expand the business, we needed more money because
6  our own capital was limited.  So we went out to
7  borrow money.
8       And the -- he had a lot of banking
9  connections, so he -- he would invite me to go with
10 him, and we would meet with bankers and explain to
11 them our business plan and see if they would lend us
12 money.
13      Q.  What was the business plan?
14      A.  Well, had -- it evolved into, as I
15 described earlier, either a bridge loan or a bailout
16 type of loan for borrowers who were in foreclosure
17 or facing foreclosure, people who had gone to
18 conventional banks and tried to get mortgages and
19 could not and were usually facing the loss of their
20 house, people who didn't want to sell their house.
21      And we created an idea where we would lend
22 them the money to pay -- to pay the mortgage.  If
23 there was enough equity in the property, we'd pay
24 off their credit cards; we would pay all of the

**Page 78**

A. LONDON - 5/20/10

1  real-estate taxes, we would pay the insurance.
2        And we would loan them -- or we'd -- but,
3  of course, it was an LLC. We didn't loan anybody
4  personal money. We would lend them enough money to
5  pay the interest for one year.
6        And the theory was that if we paid all of
7  their debts, all of their current debts, and took
8  them out of foreclosure, and created a situation for
9  them that they didn't even have credit card debts,
10  if that was possible, if there was enough, and they
11  behaved frugally and conservatively, after about 12
12  months, they would be able to leave us and get a
13  conventional loan at a lower rate of interest.
14        And that's the nature of a bailout, and we
15  based the loan -- we based the loan on an appraisal
16  that we did of the property. We didn't accept, for
17  the most part, any broker's appraisal, because we
18  didn't know the brokers real well, and brokers tend
19  to be salespeople.
20        So we wanted to make sure that we were
21  making a loan on a property that had value and that
22  people would be in a position to repay it at the --
23  at some point along the way.
24    Q.  You said that the idea evolved, that your

**Page 79**

A. LONDON - 5/20/10

1  business plan evolved into that idea. What did it
2  start off with?
3    A.  Well, like I said, we were going to be a
4  bank originally. And then we didn't want to be a
5  bank.
6    Q.  Okay. So we were actually talking about
7  Mr. Ramaekers' role. So initially, he was -- you
8  were -- I believe that you said you were involved
9  about 50/50?
10    A.  Yes.
11    Q.  You both consulted on every mortgage,
12  whether to approval or not?
13    A.  Yes. Yes.
14    Q.  And then how did his role change or
15  continue over -- over time to the present?
16    A.  As I described him, he was a very astute
17  and capable person. And this little business of
18  ours, I don't think, was able to hold his attention
19  for very long. And he was -- even though he was
20  retired, he was getting calls from large companies
21  who wanted him to come in and do what he used to do
22  on a consulting basis or a part-time basis. And
23  they would offer him generous fees to do it.
24        And one day he announced that he was

**Page 80**

A. LONDON - 5/20/10

1  taking on such a -- such an activity and he'd be
2  gone for about a year and a half. So he was no
3  longer available on a day-to-day basis. So, I mean,
4  he still tried. He tried to be active. He thought
5  maybe he could do it on the weekends and things like
6  that, but it wasn't really very practical.
7        So for the most part, he started doing
8  other things, and he left the management of the
9  company to me. And then, later on, Carl Gallo
10  joined in the management of the company when I found
11  it was more than I could handle alone.
12    Q.  When do you think that Mr. Ramaekers
13  backed off somewhat on his involvement in the
14  company, as you described?
15    A.  I would have to guess at the time frame,
16  but I'd say about two years ago.
17    Q.  Okay. And when do you think that Mr. Gallo
18  became more involved?
19    A.  About six months ago.
20    Q.  Okay. What is your interest in the LLC?
21    MR. SOSINSKY: Objection to the form.
22        But go ahead.
23    A.  Do you mean percentage?
24  BY MS. LIGHT:

**Page 81**

A. LONDON - 5/20/10

1    Q.  What is your financial interest in the
2  LLC?
3    A.  Originally, I owned 50 percent. And then
4  when Gallo came in, my percentages dropped down to
5  about where they are now, which I think is about
6  35 percent.
7    Q.  And what about Mr. Ramaekers' interest?
8    A.  Same as -- it's the same as mine.
9    MR. SOSINSKY: From the beginning until
10  today?
11    MS. LIGHT: Yes.
12    MR. SOSINSKY: Ramaekers'?
13    A.  He and I had the same percentages
14  throughout. When mine went down, his went down and
15  so on. And the reason they went down is because
16  Gallo came in. And as the company raised more money
17  personally from the -- from the three of us, Gallo's
18  percentages began to rise, which meant that our
19  percentages were going down.
20  BY MS. LIGHT:
21    Q.  What are the current percentages of each
22  member?
23    A.  As best as -- as best as I can recall, I
24  think it's about 35 percent for Ramaekers and myself

Page 86

A. LONDON - 5/20/10

1     A. LONDON - 5/20/10
2     A.  It was supposed to manage the activities
3  of Aries Financial.
4     Q.  In what -- in what way would it do that?
5     A.  Well --
6        MR. KAHAN:  Objection.  Did it ever -- if
7     it ever did that might be a better way to get
8     where you're trying to go.
9  BY MS. LIGHT:
10    Q.  What was the purpose of -- of forming L &
11  R Management?
12    A.  Larry and I had spoken about expanding --
13  Larry always had large plans.  He was never a small
14  businessman.  He always thought in much bigger
15  numbers.  And he thought if we went into this
16  business, we could eventually either become a bank
17  or we -- we could become a very large lending
18  company.
19        And we could borrow very large sums of
20  money and take in other investors.  And he said if
21  that was the case, we would be managing it.  We
22  should be paid separately for the management, so he
23  suggested that we put together a separate management
24  company to manage -- to manage Aries.
25        So L & R was London and Ramaekers, and we

Page 87

A. LONDON - 5/20/10

1  were supposed to get 20 percent of the profits for
2  managing the company.  As it turns out, we only took
3  in one investor, and that was Carl Gallo.  And we
4  never -- never took in any other investors.  And we
5  never -- well, we did get a bank loan, but that was
6  not an investor.
7     Q.  When you say get 20 percent of the profits
8  of the company, when you say "the company," do you
9  mean L & R or Aries Financial?
10    A.  No.  L & R was supposed to get 20 percent
11  of the profits of Aries Financial for the purpose of
12  managing this enormous enterprise that never became
13  enormous.
14    Q.  Did L & R have any employees?
15    A.  No.
16    Q.  Did L & R -- did you end up using L & R?
17        MR. SOSINSKY:  Objection to the form.
18        You can answer it.
19        In what way?
20  BY MS. LIGHT:
21    Q.  Was L & R engaged in business at all?
22    A.  Only to the extent that Larry and I would
23  decide on whether or not to do a mortgage, and that
24  was essentially the role L & R -- L & R had a whole

Page 88

A. LONDON - 5/20/10

1  bunch of stuff it was supposed to do, but it never
2  had to do anything because Aries was so small.
3        So L & R did get paid 20 percent of the
4  profits from -- from Aries Financial.  These names
5  are just, you know, confusing me already.  No.  They
6  got -- L & R got 20 percent.  Larry and I would then
7  have the 20 percent for ourselves and split it up
8  10 percent each.  And it was a fee that we were
9  earning as managers separate from our investment in
10  Aries Financial.
11    Q.  You said that L & R had a bank loan.  What
12  did L & R borrow?
13        MR. SOSINSKY:  Objection.  He said Aries
14     got a bank loan, I believe.
15        THE WITNESS:  Yes.
16        MR. SOSINSKY:  Anyway.
17        MS. LIGHT:  It sounded to me like that's
18     what he said, so if he -- he can tell me that
19     that's wrong, and he can answer.
20        MR. SOSINSKY:  That's fine.
21    A.  I may have misspoken with all of these
22  different -- who did this or what.
23        Aries Financial wanted to get a bank loan,
24  and we went to a lot of places that Larry introduced

Page 89

A. LONDON - 5/20/10

1  us to, to get a bank loan.  And we found that we
2  weren't able to get bank loans anywhere, even though
3  a lot of people said they liked the form of our
4  business.  And the main objection was because we
5  were formed in Alaska, and they looked at us as if
6  Alaska was a foreign country.
7        And it -- I mean, going to Alaska to form
8  this thing was purely innocent, but it did have --
9  it did have a strangeness about it, especially if
10  you were talking to people in South Florida.  They
11  thought Alaska was on the moon.
12        So we decided to form another company.  We
13  called it Aries Investments, and we formed it in
14  Florida.  And then we -- the same owners, the same
15  percentages and so on.  We put no money into it,
16  maybe a hundred dollars.
17        And then we went to try to borrow some
18  money for Aries Investments, and we were able to get
19  a bank loan.
20  BY MS. LIGHT:
21    Q.  What year did you form Aries Investments?
22    A.  That might have been '06.  Probably
23  somewhere in '06.
24    Q.  And what lender gave you the bank loan?

Page 90

A. LONDON - 5/20/10
1
2      A.   Wachovia.
3      Q.   Had you gone to Wachovia with Aries
4   Financial, trying to borrow money?
5      A.   I don't remember.  We probably spoke to
6   them, but we knew people at -- I knew people at
7   Wachovia.  We did go to other banks, like Bank of
8   America, and we even went to a large hedge fund.  We
9   went to different places, but nobody seemed
10   interested in talking to an Alaska company.
11         As soon as we became a Florida company,
12   they liked us.  And it just never made any sense to
13   me, but that was the reality of life.  So we -- we
14   were able to get a bank loan from Wachovia to expand
15   the business, provided we agreed to personally
16   guarantee the loan.  And we did.  And we had to have
17   our wives sign, as well, to personally guarantee the
18   loan.
19      Q.   And what was the amount of that loan?
20      A.   Originally, I believe it was about
21   $3 million.
22      Q.   And did you go back to Wachovia?
23      A.   As the business began to grow, we went
24   back to Wachovia several times to increase the line.
25   And they agreed to increase the line, and they put

Page 91

A. LONDON - 5/20/10
1
2   other provisions in.  For example, that Ramaekers,
3   Gallo and myself increase our capital in the company
4   as well.
5         So to move this thing along, the largest
6   amount that we had in a loan that we were approved
7   for was $15 million.  And the amount of capital
8   Gallo, London and Ramaekers put in was two and a
9   half million dollars each.
10         So between the fifteen million and the
11   seven and a half million, we had capital to operate
12   with up of up to about $22 million.
13      Q.   Did you get any bank loans from anybody
14   except Wachovia?
15      A.   No.
16      Q.   Did L & R Management ever take out a bank
17   loan?
18      A.   No.
19      Q.   And did -- was Aries Financial ever able
20   to take out a financial bank loan?
21      A.   No.  Aries Financial was funded by Aries
22   Investments.  When Aries Investments would draw down
23   on the loan, the money would -- it would just move
24   over by computer into Aries Financial.
25      Q.   Did Aries Investments have any employees?

Page 92

A. LONDON - 5/20/10
1
2      A.   No.
3      Q.   Was there a written agreement between
4   Aries Investments and Aries Financial regarding
5   payment -- repayment of the money Aries Investments
6   gave to Aries Financial?
7      A.   I don't -- I don't recall any specific
8   document that -- the important thing to us was that
9   we were personally liable for that money.  So it
10   really didn't matter what company we put it into.
11   We were personally on the line for that money.
12         So personal guarantees are very serious.
13   So it really didn't matter.  We could have put the
14   money in our pocket and walked around with it, but
15   we were personally responsible.
16      Q.   Who is David Findel?
17      A.   David Findel works or did work for a
18   company called Worldwide Financial.
19      Q.   Was he involved in any of the Aries
20   companies?
21      A.   No.
22      Q.   Is he involved in any of the Aries
23   companies?
24      A.   No.
25      Q.   Or in L & R Management?

Page 93

A. LONDON - 5/20/10
1
2      A.   We have no business relationship with him
3   currently, nor did we ever have a business
4   relationship with him.
5      Q.   Does Aries Financial have any employees?
6      A.   Yes.
7      Q.   And how many employees does it have?
8      A.   Well, the principals.  You have the names
9   of those three principals.
10      Q.   Uh-huh.  Yes.
11      A.   And there were two women that worked for
12   us.  One is my daughter, named Candice London.
13   Candice is C-A-N-D-I-C-E.
14      Q.   Thank you.
15      A.   And the other woman is Carol Laxner.
16   That's L-A-X-N-E-R.
17      Q.   And what are their roles?
18      A.   Clerical.
19      Q.   And how long have they worked for Aries
20   Financial?
21      A.   Since approximately '06.
22      Q.   What are their actual activities for the
23   company?  You could start with -- if you would start
24   with Candice.
25         What are Candice's actual activities for

Page 94

A. LONDON - 5/20/10

1
2 the company?
3       MR. SOSINSKY:  Objection to the form.
4       You can answer.
5       A.   Candice has more dealings or had more
6 dealings with the brokers and the applications and
7 the appraisals, initially.
8       And Carol was more recordkeeping,
9 spreadsheets, keeping track of interest payments,
10 monies that were paid, monies that were due, monies
11 that were going out, coming back in.  She was, I
12 would say, more bookkeeping.
13       And Candice dealt more with people.
14 BY MS. LIGHT:
15       Q.   Where does -- where did Candice work when
16 she worked for Aries?
17       A.   Well, she still works for Aries.  She's
18 still an employee.  She has a home office in Boca
19 Raton, and she works out of her home office.
20       Q.   Where did -- does Carol work for Aries?
21       A.   Same answer.  She -- except it's not Boca
22 Raton; it's Lake Worth.
23       Q.   She works out of her own home?
24       A.   Yes.
25       Q.   Thank you.

Page 95

A. LONDON - 5/20/10

1
2       Are all five of -- you've named
3 Mr. Ramaekers, Mr. Gallo, yourself, Carol Laxner and
4 Candice London.
5       All five of those people are salaried
6 employees?
7       A.   No.  The two women are salaried employees.
8 Ramaekers never received a salary.  After Ramaekers
9 left, I began to take a salary.  And in the last six
10 months, when Gallo became more involved, he began to
11 get a salary, except that the difficulty of paying
12 the salaries has become such that Gallo and I have
13 stopped taking salaries because the company just
14 couldn't afford to pay us.
15       Q.   Does Aries provide benefits to its
16 employees?
17       A.   No.
18       Q.   So is there a 401(k) program for the
19 employees of Aries Financial?
20       A.   No.
21       Q.   Are there any other companies that you own
22 or are a partner in or member of?
23       A.   Nothing in real estate.
24       Q.   What other companies, outside of real
25 estate, are you --

Page 96

A. LONDON - 5/20/10

1
2       MR. SOSINSKY:  Are you asking about today
3 or ever?
4       MS. LIGHT:  I'm asking about now.
5       MR. SOSINSKY:  Okay.
6       A.   There are -- well, let's see.  I guess I'd
7 have to say there aren't any, now that I think about
8 it, not currently.  Even the -- the horse
9 partnerships that I mentioned earlier, technically,
10 I wasn't a partner or a shareholder or anything like
11 that.  I was interested in it.  I -- I participated,
12 but it was really my wife's activity.
13 BY MS. LIGHT:
14       Q.   Are all -- are -- is L & R still actively
15 conducting business today?
16       A.   No.
17       Q.   Is Aries Investments still actively
18 conducting business?
19       A.   No.
20       Q.   When was the last time Aries Investments
21 obtained a bank loan?
22       A.   That's a tricky question to answer
23 correctly.  When Wachovia was taken over by Wells
24 Fargo, the -- most of the people at Wachovia that we
25 knew were terminated.  So somebody contacted us from

Page 97

A. LONDON - 5/20/10

1
2 Wells Fargo and said that they did not want to renew
3 our loan.  Apparently, it was coming due or had some
4 termination on it.  So they agreed that they would
5 renew the loan under different terms.
6       So that took place less than a year ago,
7 where we had to agree to new terms, technically with
8 Wachovia, but it was all being dictated by Wells
9 Fargo.  So that took place -- we didn't take any
10 loans in that sense.  We didn't borrow any new
11 money.  We've been repaying money to them.  But
12 we've negotiated a new loan with them.
13       Q.   When was the last time Aries Investments
14 took out new money with Wachovia?
15       A.   My guess would be somewhere around '07,
16 early part of '07.
17       Q.   Does Aries Financial have any of its own
18 expenses.  I'm sorry.  May I rephrase that?
19       Does Aries Investments have any of its own
20 expenses?
21       MR. SOSINSKY:  Objection to the form.
22       You can answer.
23       A.   I think we were required to file tax
24 returns, so we had to pay an accountant.
25 BY MS. LIGHT:

Page 154

A. LONDON - 5/20/10

1
2 doing modifications?
3      A.  No.  We just asked the people what they
4 thought they could afford to pay us.
5      Q.  And did you require -- did Aries require
6 any type of income proof, proof of income?
7      A.  At the time of the modifications?
8      Q.  Yes.
9      A.  No.  We weren't -- like I said, we were in
10 a marriage.  And we had a problem, and we were
11 trying to work out the problems.
12      And Candice would usually say to them,
13 "Look, this is how much is owed.  How much can you
14 pay?  What do you think you can pay?  You still have
15 to pay your real-estate taxes and so on."
16      Some people would want us to increase the
17 loan so that we'd pay off their real-estate taxes,
18 because it was their responsibility all long, but
19 they couldn't pay their real-estate taxes, and they
20 were in danger of losing their house.  Even if they
21 could satisfy us, they could lose their house to the
22 town or the county.
23      So these were people who had difficulties,
24 and we were having difficulties trying to resolve
25 the issues with them.  It was never easy, and

Page 155

A. LONDON - 5/20/10

1
2 anything that could come close to looking
3 reasonable, we would encourage.
4      Q.  So Candice would be -- would talk on the
5 phone with people.  And then -- then what would
6 happen?  What was the practice in terms of how these
7 decisions were made?
8      A.  Well, I don't think everything was the
9 same each time.  It wasn't like we were, you know,
10 some sort of very large bank that had procedures.
11 These were just conversations.  There were people at
12 the other end, there were people at our end, and it
13 was talk.
14      It was -- this is what they said they
15 could pay.  Candice would go to Carol Laxner.  And
16 we would go into the computer to see how much the
17 principal was, how much the unpaid balance was, were
18 there fees involved, was there unpaid real estate,
19 what do we think the house is worth.
20      It -- it came down to just trying to make
21 a judgment on how we could all survive this thing,
22 because we were all victims of a collapsing
23 real-estate market.
24      Q.  When -- when the -- you said, We would
25 look at the computer.  That's you --

Page 156

A. LONDON - 5/20/10

1
2      A.  Carol would look at the computer --
3      Q.  Carol would look at the computer?
4      A.  -- and feed -- feed me the information in
5 the computer.
6      For instance, did we or did we not pay
7 real-estate taxes for this property in the last --
8 ever, you know, since -- since the 12
9 months expire, do we pay real-estate taxes?  Were
10 there any other expenses that -- that we, out of
11 pocket, paid?  Was there a storm, and the roof
12 needed repairing?
13      We couldn't allow -- if a person said,
14 Look, I got a hole in my roof, and I can't afford to
15 fix it -- we had a security interest in that house.
16 We couldn't allow the house to fall down.  So we
17 would send a roofer in -- I'm just giving you an
18 example of one situation.  We would send a roofer
19 in, get an estimate and fix the roof so the house
20 was livable.
21      We're not cold-hearted or -- quite the
22 contrary.  We tried very hard to be as human as we
23 could, and we tried to treat these people the way we
24 would have hoped to have been treated.
25      Q.  Who would make the decisions about the

Page 157

A. LONDON - 5/20/10

1
2 modifications, about whether to approve or deny the
3 modifications?
4      A.  Originally, Larry and I would do that.
5 But over the last year or two, Larry Ramaekers has,
6 more or less, absented himself from the operations
7 of the company.
8      And the decisions -- the ultimate decision
9 would generally fall on me.  But in the last six
10 months or so -- of course, I would notify them of
11 what I wanted to do.  And they could -- either one
12 of them could say, no, don't do, I disagree with it.
13      But since Carl Gallo got involved in the
14 management, I would run everything by him, and we
15 would make a joint decision.  But it wasn't very
16 hard to make a decision on a modification.  If
17 people said they could pay and they wanted to pay,
18 and it was anything that we thought was reasonable,
19 we were willing.
20      Q.  Did Aries ever waive late fees during the
21 modification process?
22      A.  Yes.
23      Q.  And how often do you think that happened?
24      A.  I don't remember exactly, but we would
25 just come up with a number.  Sometimes -- fees --

Page 158

A. LONDON - 5/20/10

1    fees and interest was waived from time to time.
2    Whether it was a modification or a sale of a home or
3    a refinancing, we didn't have any regular procedure.
4    We did what we thought had to be done under -- under
5    the circumstances that were presented to us.
6        Q.  Now, there were also -- so it sounds like
7    you often decided -- am I correct, was it -- did
8    Carl Gallo or Larry Ramaekers ever veto or say you
9    shouldn't do a modification?
10       A.  There may have been a time or two that
11   Larry might have objected to a modification.
12       Q.  And then did that, therefore, end the
13   modification process?
14           MR. SOSINSKY:  Objection to the form.
15       But you can answer.
16       A.  Discussions would be ongoing.  I never
17   wanted to take a -- a hard approach.  I wanted to
18   find the solution.  And if he would object to a
19   solution, which was not often, I would try to find
20   some other way to come up with a solution that the
21   borrower and Larry could agree to.
22       But lately, Larry has not participated in
23   those decisions.  So as long as it was fair,
24   whatever was fair -- you know, you're speaking about

Page 159

A. LONDON - 5/20/10

1    modification.  It could be any -- any way that we
2    could resolve the issues, I'd be very anxious to
3    explore, and so would Carl Gallo.
4    BY MS. LIGHT:
5        Q.  Did Aries ever reduce the principal amount
6    in a modification?
7        A.  I don't know if we did that in a
8    modification, but I know we've done that in other
9    resolutions.
10       Q.  In what type of resolutions would Aries
11   reduce the principal?
12       A.  A sale -- a sale of the -- of the property
13   or a refinancing or maybe even in a modification.
14   It didn't matter.  The idea was to survive this.
15   We've been trying to survive in a very, very
16   difficult market, and so have the borrowers.
17       And we just keep hoping that the economy
18   will increase, and the prices of houses will
19   increase and that will offer relief to everybody.
20   In the meantime, we're all trying to stay alive.
21       Q.  There were a number of documents that
22   borrowers signed with their modifications.  One was
23   a waiver of claims.
24       Who created the waiver of claims form?

Page 160

A. LONDON - 5/20/10

1        A.  One of our attorneys.
2        Q.  Who are your -- which attorneys are you
3    referring to?
4        A.  I think the modifications -- I may be
5    wrong, but I think the modifications were all done
6    by Doug Kahan, and he used forms that he was
7    familiar with.
8        Q.  And who made the decision to have a waiver
9    of claims go along with a modification?
10       A.  It was an attorney recommendation.
11       Q.  From Doug Kahan.
12       A.  I believe so.
13       Q.  And would Aries give a modification to
14   someone who would not sign a waiver of claims?
15       A.  That's a speculation.  I don't know if it
16   ever came up.
17       Q.  Did anyone ever complain about having to
18   file a waiver of claims.
19       A.  Not to me.
20       Q.  Who developed the form for the confession
21   of judgment that went along with the -- with an
22   Aries modification?
23       A.  Well, we explored that at Aries.  We
24   looked it over, and we were trying to see what we

Page 161

A. LONDON - 5/20/10

1    would get back in return.  If we were willing to
2    stop a foreclosure and give people a lower rate of
3    interest, and they would have to now live up to
4    terms that were very generous compared to what they
5    had previously, we didn't want to have to go through
6    this whole foreclosure business again.
7        It -- I mean, it became stupid to modify a
8    mortgage, and then a month later, the person is in
9    default again.  And we had -- it was just too
10   costly, and it was a -- it was a very dumb thing to
11   do.  We had to say, "Look, let us continue the
12   foreclosure if you're going into default again."
13       The idea of doing the modification was the
14   person was saying to us, I can afford this, and I
15   will pay you, and I don't want you to foreclose, and
16   let me stay in my house.
17       And we were saying, "Okay.  We'll
18   cooperate in every way, but don't do this again.
19   You're saying you can pay this.  If you can't pay
20   it, then we're going to go through with the
21   foreclosure, and I don't want to have to go through
22   the legal steps a second time after I went through
23   it the first time."
24       And they were in agreement.  Nobody --

# EXHIBIT

# F

Page 46

London
1  us and say, Look, I have a loan that -- I have a
2  second mortgage on my loan and my -- my
3  brother-in-law who gave it to me agrees that we
4  don't have to pay it off. But he'll be first --
5  more -- he'll be first lien. So would you
6  accept him as first lien and you become the
7  second lien? So, you know, you negotiate that.
8  And eventually -- I remember that loan. And
9  that loan we turned down until the
10 brother-in-law agreed to -- to stay -- to -- to
11 give up his first position and become second
12 position and we became first position.
13         So there were -- there were
14 negotiations, if you want to call them
15 negotiations. I would say questions were asked
16 and answered. And I wouldn't characterize them
17 as negotiations. They were questions that came
18 from the broker and responses were given. And
19 loans were either granted or not granted, or
20 sometimes they were altered to -- to fit the
21 needs of the -- of the contract, or the
22 contractors, I should say.
23    Q.   Who would make the decisions about
24 altering the terms?

Page 47

London
1    A.   All decisions on making a loan or
2  not making a loan had to be approved by Larry
3  Raemakers and myself unanimously.
4    Q.   Would -- did Aries ever alter the
5  interest rate terms?
6         MR. SOSINSKY: Other than what
7  you've asked him about in the case of
8  modification agreements?
9         MS. LIGHT: At the origination of
10 the refinanced loan.
11        MR. SOSINSKY: Okay.
12   Q.   Did Aries have a --
13   A.   We changed our program a few times,
14 sure.
15   Q.   Was that in response to an
16 individual borrower or broker?
17   A.   No, not -- oh. The answer to that
18 is no, but certainly we were asked.
19   Q.   Did Aries ever agree to change the
20 interest rate term in response to a borrower or
21 broker's inquiry?
22   A.   Not that I can recall.
23   Q.   What was Aries' practice regarding
24 the explanation of the terms of the loan that

Page 48

London
1  was given to borrowers?
2         MR. SOSINSKY: Objection.
3         To whom?
4         MS. LIGHT: That was given to
5  borrowers.
6         MR. SOSINSKY: By whom?
7    Q.   Who explained the terms of the loan
8  to borrowers -- of an Aries' loan to the
9  borrowers?
10   A.   I think the answer to that would be
11 Candice; but not to the borrowers, to the
12 brokers.
13   Q.   And who did Aries expect to explain
14 the terms of an Aries' loan to the borrowers?
15   A.   The mortgage broker.
16   Q.   And what instructions did Aries give
17 the mortgage brokers regarding explaining the
18 terms of the loan to Aries borrowers?
19   A.   Well, I can only tell you secondhand
20 information, although there were some borrowers
21 that -- some borrowing brokers that I did speak
22 to. I did not speak to Britt's brokers about
23 the terms. And we're also here to speak about
24 the Petersen situation. And I may have spoken

Page 49

London
1  to the Petersen people about it. But in any
2  event, the general terms were well-known and we
3  went over it.
4         And I -- either I or Candice made
5  sure that the brokers understood the terms of
6  the loan and what was expected and what the plan
7  was. And I remember specifically, and I'm
8  pretty sure Candice got my message too, that we
9  wanted to make sure the borrowers understood
10 everything that had to do with this loan and how
11 it worked. I did not want to go -- and I
12 mentioned this last week, I did not want to have
13 people assemble at a closing and go through all
14 of the work and paperwork only to find the
15 borrower not understand or be very surprised at
16 what was going on, and then the -- the closing
17 would fail and everybody's time would be wasted.
18        They were instructed over and over
19 again, make sure the borrower understands this
20 loan. I don't want any surprises at the
21 negotiating table, at the closing table,
22 whatever you want to call it.
23   Q.   And who instructed the brokers to do
24 that?

13 (Pages 46 to 49)

Page 50

London

1
2      A.   I would do it, sometimes Candice
3   would do it as well.
4      Q.   Did Aries have a policy about the
5   explanations that were to be given to borrowers?
6      A.   The policy was that the brokers had
7   to understand it completely.  And we underlined
8   to the brokers that you must explain this to
9   your borrower.  Make sure he understands all of
10  the terms.  We were very, very explicit in
11  saying the borrower must understand the loan.
12     Q.   Was that policy put in writing
13  anywhere?
14     A.   Not that I know of, but it certainly
15  was -- was made very, very clear.  I don't
16  think -- I don't think any broker that we dealt
17  with could honestly say they didn't hear it over
18  and over again.
19     Q.   Did Aries provide trainings for the
20  brokers?
21        MR. SOSINSKY:  Objection.
22        You can answer.
23     A.   When you say "training," we didn't
24  have, well, classrooms.  Our business was
25  conducted by telephone, by fax and by e-mail.

Page 51

London

1
2   And there was no -- we didn't do so many loans
3   that we were a factory.
4        Candice or myself, usually Candice,
5   spoke to the brokers over and over again
6   explaining everything.  It was more than a
7   training session.  It wasn't a teacher in front
8   of a classroom with a dozen brokers.  It was
9   one-on-one, answering questions, making
10  statements, asking questions to make sure
11  everything was -- was understood.  There was no
12  shortage of time spent making the brokers
13  understand, and the brokers had to understand.
14       First of all, we had -- just so
15  you -- also just as, I guess, important, we had
16  many more loans coming to us than we could fill,
17  and we had more brokers coming to us.  We could
18  easily have done all the loans we wanted to do
19  with other brokers.  If they weren't going to do
20  what we asked them to do, we wouldn't deal with
21  them.
22       So they were -- they were expected
23  to explain the terms of the loan carefully to
24  their -- to their borrowers, and I believe they
25  did.  And I don't -- I don't believe anybody

Page 52

London

1
2   could say they didn't -- any -- any borrower
3   could say they didn't understand the terms of
4   the loan and be honest about it.
5      Q.   On what do you base your belief that
6   the brokers explained the terms of the loan?
7      A.   That's what we were told.  And we
8   never got -- or hardly ever got any feedback
9   from the lawyers at the closing that the -- that
10  the borrowers were shocked at the terms that
11  were being explained to them.
12       As a matter of fact, the lawyers
13  were told -- and especially Doug Kahan, he was
14  told over and over again, make sure you
15  understand our loan so you can answer every
16  question that's asked, if there is any questions
17  that's asked, just in case the broker forgot to
18  say something.
19     Q.   When you say that you never heard
20  feedback from the lawyers at the closing, you
21  mean the lawyers Aries hired at the closing, or
22  are you referring to some other lawyers?
23     A.   No.  It would be our lawyers.
24  Because if -- if a closing did -- I would always
25  speak to the lawyer after the closing, and I

Page 53

London

1
2   would ask how it went.  How long did it take?
3   Were there any problems?  Did anything happen,
4   unusual, at the closing?  And I would get a
5   report from the lawyer.
6        And that was one of my ways to keep
7   track of how good a job the broker did with the
8   customer, because the lawyer was working for me
9   and he wasn't working for the broker.  And if
10  the broker didn't do a good job in informing the
11  client, the lawyer would see it and know it and
12  he would tell me about it.  And that didn't
13  happen.  I can only remember one time it
14  happened, actually.
15     Q.   Do you remember who the borrower was
16  in that instance?
17     A.   No, but I do remember the -- I -- I
18  do remember the incident.
19     Q.   Could you explain the incident to
20  me, please?
21     A.   There was a husband and wife that
22  were at a closing.  The wife had everything
23  explained to her very, very carefully, wanted
24  the loan, and she didn't tell her husband
25  anything about it.  The broker worked with the

14  (Pages 50 to 53)

Page 74

London

1    different rules.  They -- you don't need a
2    lawyer.  You can close with a title closer
3    there.
4        Q.    And what were the closing agents'
5    duties to Aries?
6        A.    Specific to where, those three
7    places?
8        MR. SOSINSKY:  No.  She wants in
9    general.
10       Q.    In general.
11       A.    In general, they were supposed to
12   bring all of the paperwork with them, answer any
13   questions that might come up.  Make sure all of
14   the paperwork was properly executed.  You know,
15   and make sure that the closing went -- they
16   were -- we never attended any closings, none of
17   my partners or any of our employees.  So the
18   closing agent, usually the attorney, was
19   supposed to be there to make sure everything
20   went correctly.
21       Q.    What documents did Aries send to the
22   closing agents?
23       A.    Oh, it was numerous documents.  I
24   can't give you a list.  But I'm sure we've given

Page 75

London

1    you every one that was ever -- ever done,
2    especially on the mortgages you're interested
3    in.
4        Q.    When were the closing agents
5    provided documents?
6        A.    Usually within -- most, three days
7    in advance; sometimes, two.  Sometimes even the
8    same day, because a lot of times it had to be
9    changed because the numbers were changed.  The
10   last minute the title -- the title person who
11   was investigating the title would find another
12   lien.  Sometimes closing couldn't take place and
13   they would reschedule for maybe the following
14   few days or following weeks.
15       So the title -- and sometimes
16   something had to be changed so much that it had
17   to go back to our office and the whole thing had
18   to be re-prepared.
19       Q.    Were borrowers provided with the
20   documents as well?
21       A.    Well, they had to be; otherwise, how
22   could they sign them?
23       Q.    Were borrowers provided with the
24   documents prior to the closing?

Page 76

London

1        A.    I don't know.
2        Q.    How were the documents transmitted
3    to the closing attorney?
4        A.    By e-mail.
5        MR. SOSINSKY:  When you say "closing
6    attorney," you mean --
7        MS. LIGHT:  I'm sorry, closing
8    agent.
9        MR. SOSINSKY:  Including closing
10   agent?
11       MS. LIGHT:  Yes.  Or closing agent.
12       A.    It would have been by e-mail.
13       Q.    Did the closing agents draft any of
14   the documents themselves?
15       A.    Fred Powell did for some of the
16   mortgages he did for us.  And then we changed
17   the documentation that we were using.  So we --
18   we began to provide the documentation.
19       Q.    And what -- what documents did
20   Fred Powell draft himself?
21       A.    Well, he did them all originally.
22   And then we decided that we didn't like -- that
23   we didn't like them.  So they were -- they
24   evolved into an entirely different package.  And

Page 77

London

1    then we -- we -- we came to the conclusion that
2    we didn't want any of the closing agents to use
3    their forms, which a lot of it was just
4    boilerplate forms that didn't necessarily
5    describe the mortgage as -- as we understood it.
6        We wanted the documents to be
7    specific to the type of mortgage we were making.
8    So we supplied all of the documentation.
9        Q.    When did Aries start supplying its
10   own versions of the forms to closing agents?
11       A.    I guess it was sometime in '05 or
12   the early part of '06.
13       Q.    And who drafted those forms for
14   Aries?
15       A.    Well, the -- it all -- it all got
16   into Larry Raemakers' computer.  It was never in
17   my computer.  Larry Raemakers assembled all of
18   the documents and edited them and worked on it.
19   And we would -- he would print it up.  He and I
20   would sit and look at it and talk about what he
21   had changed and whether or not I was agreeable
22   to it, or I might suggest something.  And it was
23   a -- it was an effort that we -- we made
24   jointly; although some of documents themselves

Page 154

London

1  working with him or his assistant. And somehow
2  I got a phone number from somebody. I don't
3  remember. Maybe it was I had to make a couple
4  of calls or maybe one, but I did get a cell
5  phone number for this Steve.
6      Q.  Okay. And when Candice called
7  Steve's number last week --
8      A.  Yes.
9      Q.  -- or what we believed to be Steve's
10 number --
11     A.  Yes.
12     Q.  -- do you know whether there was
13 anything else that they discussed at that time?
14     A.  No.
15     Q.  Do you know if Candice got any
16 address for him?
17     A.  No. She wasn't trying to track him
18 down. I remember the question had been asked
19 about a cell phone for him or how you'd speak to
20 him. And I was able to find a number that I had
21 in my Rolodex.
22     Q.  Mm-hmm.
23     A.  And I was just busy. So I said
24 Candice -- I mean, she is getting paid. She's

Page 155

London

1  working.
2      Q.  Mm-hmm.
3      A.  So I said, Candice, find out if this
4  is a good cell phone number for this Steve. She
5  says what should I -- if it is what should I say
6  to him? I said tell him that Ms. Petersen's
7  lawyers want to talk to him.
8      Q.  Mm-hmm.
9      A.  And that's what she said. She said
10 it's a good number and she told him. And that
11 was the end of the conversation.
12     Q.  Okay. Thank you.
13         The -- when Aries decided to go to
14 start making loans in New York, you had done
15 some exploratory research; is that right?
16     A.  Yes.
17     Q.  And at that time you were an Alaskan
18 LLC?
19     A.  Yes.
20     Q.  Did you apply for authority to do
21 business in New York?
22     A.  No.
23     Q.  And why not?
24     A.  We weren't of -- we didn't think

Page 156

London

1  we -- we were required to have a license in
2  New York because the loans that we were making
3  were going to be to corporations or LLCs. And
4  we were of the opinion that -- not our opinion,
5  but from the information that we received, you
6  didn't need a license in New York to do that.
7      Q.  Mm-hmm. Where did you get that
8  information?
9      A.  From the statutes.
10     Q.  Do you know what statutes you were
11 looking at?
12     A.  I guess it would have been banking
13 rules on licensing.
14     Q.  Okay. The -- there are also rules
15 that apply to limited liability companies.
16         Do you know if you looked at those
17 rules?
18     A.  I don't think I looked at rules on
19 limited liability companies, no, not that I can
20 recall.
21     Q.  Did you have anyone advising you on
22 the legalities of your business at that time?
23     A.  Not -- not advising me on the
24 legalities of the business, but we did employ --

Page 157

London

1  and I've mentioned his name several times, Jared
2  Namm, to do research. And he -- it isn't that
3  we employed him to say, Hey, here's our business
4  plan, go find everything out about it and tell
5  us if what we're doing is right or wrong. It
6  was more that we asked him a specific question,
7  usually, through e-mail, and he would do some
8  research on it and send us statutes, send us
9  cases and interpretations. And it was really
10 left for us to decide whether or not that
11 information was helpful to our plan or
12 discouraged it.
13     Q.  Okay. Do you have those e-mails?
14     A.  I don't have a whole bunch of them.
15 I've shared some of them with my counsel. And I
16 guess he can get you what is appropriate unless
17 it's a -- I think -- you know, I don't know
18 what's appropriate and what's not. But if you
19 speak to counsel, I'm sure he can get you copies
20 of whatever it is.
21     Q.  Okay. Did you turn over to counsel
22 all of the e-mails that you had?
23         MR. SOSINSKY: We have -- I have,
24 what, up until now, certainly, that I

40 (Pages 154 to 157)

# EXHIBIT
# G

43

ALBERT LONDON - BY MS. JUROW

1   that you're not going to find many people that

2   have enough equity in their properties because he

3   said these were hard money loans and hard money

4   loans usually were commercial in nature.  So he

5   says, If you're talking about hard money loans,

6   that's an interesting business.  He said, But

7   mortgage loans to residential borrowers, there

8   would be probably no takers or very few.

9        Q      And so what was his advice to you

10  then, Mr. Ramakers?

11       A      He said if a legal way could be

12  found to do such a thing, he'd be interested in

13  exploring it.

14       Q      So what did you do then after

15  that?

16       A      We sought legal guidance.

17       Q      What did you do to seek legal

18  guidance?

19      A    Well, there was an attorney that

20  we knew -- that I knew who was a recent law

21  school graduate and he was supposed to be expert

22  in research, and I asked him if he would research

23  questions for us.  And he agreed to do this

24  because he was great at research and he was sort

25  of underemployed.  And we would ask him

70

ALBERT LONDON - BY MS. JUROW

1  there.

2      Q      I rephrased my question.  Is your

3  business model that in the later years of the

4  loan, the interest rate is lower?

5      A      Yes.

6      Q      And that serves to lower the APR

7  so that it's lower than the rate that's for the

8  first year of the loan, say?

9      A      It doesn't matter whether the

10  early years or high or low.  The APR is an

11  average of all of the years.

12      Q      And you don't remember what

13  statute it was that you were trying to comply

14  with by bringing the APR at a certain level?

15      A      There are, from just my casual

16  reading, a lot of statutes that include that.

17      Q      And these were statutes that were

18  for consumers; is that right?  Directed at

19  consumers?

20      A      Well, you had usury, for example,

21   and there was statutes that had to do with usury.

22   And those statutes -- those statutes were for

23   anybody who borrowed money or anything that

24   borrowed money.  We didn't want to violate any

25   law.  We didn't want to appear to be violating

53

ALBERT LONDON - BY MS. JUROW

1   was -- we thought it was a kind of a unique niche

2   that we had fallen into and we wanted to make the

3   business bigger, so we started going to

4   commercial lenders to see if we could borrow

5   money, and we laid out our plans and we had

6   discussions with bankers.  I don't remember

7   exactly.  Some were smaller banks, other were

8   places like Bank of America.  And we heard back

9   from many of them that this is unique and this is

10  -- it's a good thing that you're doing and you're

11  bailing people out who can't -- who are gonna

12  lose their property otherwise.

13       Q     When you say you laid out your

14  plans, did you make any kind of written

15  presentations to any of these banks, commercial

16  lenders, small lenders, Bank of America?

17       A     I believe we had -- usually,

18  Larry would do this.  We would create some sort

19  of -- he was familiar with dealing with banks,

20   and he would lay out some sort of -- some sort of

21   a general business plan that he would create each

22   time we had a meeting, and he would present it to

23   them, which they would study.  And, usually, they

24   asked a lot of questions.

25              And some of the places that we

56

ALBERT LONDON - BY MS. JUROW

1  because we had created something -- we invented

2  something and it was being examined so carefully

3  by professionals who were trying to poke holes in

4  it from every aspect, from the legal, from the

5  business, from the social.  They were looking at

6  it every which way and, in the end, they liked

7  what they saw and they wanted to acquire our

8  company.  So, for me, it was a unique experience.

9      Q     And you flew there, I would

10  imagine?

11      A     Yes.

12      Q     Do you remember getting on the

13  plane?  You went there together with Larry, I

14  guess?

15      A     I can't remember getting on the

16  plane but, yes, we went together and came back

17  together.  And I think we did it all in one day.

18      Q     And you made a written

19  presentation or a Power Point presentation,

20   something like that, to this dozen people?

21        A    Well, the three of us were there.

22   Carl Gallo said almost nothing.  He's kind of a

23   quiet person.  He sat and he listened.  Larry

24   made the initial presentation to these people.

25   And he's a very professional person.  And, yes,

57

ALBERT LONDON - BY MS. JUROW

1  he did give them something to read. I'm sure

2  there was something to read. I don't know -- I

3  probably contributed to it, but he mostly

4  prepared it. He was familiar with that sort of

5  thing. And I answered a lot of questions

6  verbally, trying to explain what we did and why

7  we did it and how we came to the conclusion of

8  doing it this way and not that way.

9      Q    And I'm going to ask that you

10  produce any written materials that you have that

11  relate to that meeting.

12      A    If it still exists, I'll be happy

13  to give it to you.

14          MR. McLEAN:  You're going to

15  follow-up with a letter, I assume?

16          MS. JUROW:  Yes.

17      Q    And do you recall when they

18  ultimately turned you down for reputational

19   reasons, was that communicated to you in writing?

20        A     No.

21        Q     How was that communicated?

22        A     By telephone.

23        Q     From whom?

24        A     The local people in Boca Raton

25   were the ones that recommended that we go up

70

ALBERT LONDON - BY MS. JUROW

1  there.

2       Q     I rephrased my question.  Is your

3  business model that in the later years of the

4  loan, the interest rate is lower?

5       A     Yes.

6       Q     And that serves to lower the APR

7  so that it's lower than the rate that's for the

8  first year of the loan, say?

9       A     It doesn't matter whether the

10  early years or high or low.  The APR is an

11  average of all of the years.

12       Q     And you don't remember what

13  statute it was that you were trying to comply

14  with by bringing the APR at a certain level?

15       A     There are, from just my casual

16  reading, a lot of statutes that include that.

17       Q     And these were statutes that were

18  for consumers; is that right?  Directed at

19  consumers?

20       A     Well, you had usury, for example,

71

ALBERT LONDON - BY MS. JUROW

1   any law.  And just like you referred to

2   consumers, even though we were making loans to

3   LLCs, corporate type loans and, technically, some

4   of the laws didn't apply to corporate loans,

5   there was always the concern that somebody like

6   you would come along and say it really wasn't a

7   corporate loan, it was a consumer loan.  So we

8   wanted to make sure that if your argument ever

9   prevailed, then we wouldn't violate that law

10   either.

11       Q     Aside from the usury law, do you

12   know what other laws you were trying to satisfy

13   by fitting the APR into a particular formula?

14       A     I believe there were high

15   interest rate laws in the State of New Jersey and

16   also in New York.  We were concerned that we

17   didn't violate any of those statutes.

18       Q     And you indicated that there was

19   a computer program that you used to do the

20   estimation?

21          A      I would say more of a

22   calculation.

23          Q      A calculation.  And do you

24   remember what computer program that was?

25          A      It was done by -- in-house.

72

ALBERT LONDON - BY MS. JUROW

1  It was just a spreadsheet.

2      Q      Who created the spreadsheet?

3      A      Either Carol Laxner or Larry

4  Ramakers or perhaps they did it together.

5      Q      And do you still have that

6  spreadsheet?

7      A      I never had it.  It was -- it's

8  in the computer that I believe Carol has.

9      Q      And it's maintained?

10      A      I believe so.

11      Q      It's not been destroyed?

12      A      I believe it still exists.

13      Q      And it's your understanding that

14  this was a program that was created in-house, not

15  something -- not software that you bought from a

16  mortgage company or that was predesigned to

17  calculate the APR under a variety of mortgage

18  statutes, anything like that?  And I'm not asking

19   you to guess.  I'm just asking you if you know.

20       A    If I can't guess, then I have to

21   say I don't know.

22       Q    You should not be guessing at all

23   here because, when you answer a question and you

24   give the answer, the presumption is that you're

25   giving an answer that you know, not what you

125

ALBERT LONDON - BY MS. JUROW

1  advise or make suggestions or request certain

2  bits of information. And I would also have

3  conversations with attorneys from time to time if

4  there was a mortgage that was contentious in any

5  way.

6      Q     Now, when you say you get reports

7  from them --

8      A     Verbal or e-mail.

9      Q     Now, in terms of e-mail, how do

10  you -- how do you maintain e-mail for Aries

11  Financial?

12      A     I kept what I thought might be

13  pertinent but, usually, when whenever the matter

14  was resolved, I would just dump it from my

15  computer because I knew either Candice or Carol

16  would have a record. I also changed computers --

17  computer systems. I went from the -- what's it

18  called, the XP originally? The Microsoft XE, I

19  went to Vista and now I've gone to Windows 7.

20   And, periodically, I just clean out everything

21   that I don't think I any longer need.

22        Q     Do you use, like, an e-mail,

23   like, or a website or something that everybody

24   has an Aries e-mail address or --

25        A     I don't, but Candice has one and

126

ALBERT LONDON - BY MS. JUROW

1   I believe Carol has one, also.  My e-mail address

2   is my personal that comes to me.  And over the

3   last few years, it's either attorneys or Candice

4   or Carol that I'm hearing from.  Occasionally,

5   from my partners or I'll share something that I

6   learned about a particular mortgage or an offer

7   for settlement or somebody wants to refinance or

8   sell a property.  But I don't tend to keep any of

9   that stuff any longer than necessary.  It just

10  becomes clutter.

11      Q      And when you looked through your

12  documents, your physical documents, to respond to

13  the requests in this lawsuit, did you also look

14  through your e-mail?

15      A      I looked through it but, for the

16  most part, all the information that was requested

17  really was supplied by Candice or Carol or both.

18      Q      I'm going to show you -- this had

19  been marked at an earlier deposition as Exhibit

20  D-3.  This is what purports to be an e-mail

21  related to the DaSilva loan.  And it's copied

22  together and I apologize to you but the circling

23  on that is mine.  It didn't come that way to me.

24  The little numbers at the bottom, you see that

25  DAS002?

133

ALBERT LONDON - BY MS. JUROW

1   conversations that you had might have had with

2   anyone about the DaSilva loan at around the time

3   that you were making the decision to either make

4   the loan or not make it?

5        A     This loan was -- well, this

6   attempt to get a loan was one of many, and I'm

7   sure I spoke to people who had some knowledge of

8   these loans that they could share with me.  I do

9   not recall any specific conversation with any

10  person about any loan.  Not just this one, but

11  any particular loan.

12           MS. JUROW:  Could you read back

13  the question, please?

14           (The last question was read

15  back.)

16        A     I don't know if anything would

17  refresh my memory.

18        Q     You don't have any notes?  You

19   didn't keep notes?

20      A   I do have -- I do have, on a

21   yellow card, the name and address of the

22   borrower, how much money was asked for, the date

23   of the appraisal, how much the appraiser said the

24   property was worth, who the broker was.  I do

25   keep on an index card -- I do have that

134

ALBERT LONDON - BY MS. JUROW

1  information, but it's very, very limited.  It

2  doesn't even fill up the whole index card.

3      Q    Did you produce that card to your

4  attorney?

5      A    I don't know.  I considered it

6  just some notes that I kept.  I could make a copy

7  of it.  That's not hard.

8      Q    Well, notes that you kept are

9  part of what you should be producing.  And it's

10  not really for you to decide whether something's

11  important or not important.  It's whether it

12  relates to the lawsuit or not.

13      A    Well, it was just some

14  handwritten notes that I put together.

15          MR. McLEAN:  I'm sure that

16  counsel's going to request that you produce that

17  to me, and then I'll produce it to her.

18          THE WITNESS:  Okay.

19     Q     Are there things besides the

20   yellow card, additional handwritten notes that

21   you have that you have not produced?

22     A     No.

23     Q     And how do you maintain these

24   cards?

25     A     In alphabetical order of loans

144

ALBERT LONDON - BY MS. JUROW

1      Q      Was DaSilva the first New Jersey

2   loan that you did?

3      A      I really don't recall.  I don't

4   think so.  It may have been.  They all kind of

5   come together in my mind.  But it was a very

6   narrow window when we were making New Jersey

7   loans.  This was probably done in a period of

8   time that did not exceed nine or 12 months.

9      Q      So this e-mail is dated July 21,

10   2006.  It's a Friday, it says.  Now, the next

11   page, there's an e-mail from you, dated Monday

12   August 7, 2006, to Candice, and it purports to

13   include some attachments, one described -- just

14   the very next page.  Page 10.

15         MR. McLEAN:  The next page.

16      A      Oh.

17      Q      It purports to include an

18   attachment from you for the DaSilva loan.  it

19    says, "DaSilva loan, DaSilva title, RE_DaSilva,"

20    and then, "payoffs."  Do you recall -- can you

21    tell me anything about this transmission?

22        A    Not from my recollection, no.

23        Q    Was it the practice that you

24    would get a hard copy of a loan?  Do you know

25    what the ".eml" stands for?

151

ALBERT LONDON - BY MS. JUROW

1   we would go forward with the loan.

2        Q     And you don't remember, though,

3   this decision-making process for this particular

4   DaSilva loan, as you sit here today?

5        A     Not for any one loan, no.

6        Q     Have you spoken to Larry Ramakers

7   about the DaSilva case?

8        A     No, I haven't spoken to Larry in

9   quite some time.

10       Q     Why is that?

11       A     There's been no need.  He hasn't

12  been around.  The day-to-day work that I do with

13  Aries has to do -- Carl Gallo and I speak almost

14  every day, and Larry kind of absented himself

15  from the management of the company.  And when I

16  communicate with him, and I'm usually not sure

17  where he is, so it's convenient to communicate

18  through e-mail, and the e-mails are usually very

19  brief.  And if you asked me today, and I am under

20  oath, where is he, I couldn't tell you.

21      Q    So you haven't had any

22  communication with him regarding the DaSilva loan

23  since the litigation has been started; is that

24  correct?

25      A    I may have e-mail him we're

152

ALBERT LONDON - BY MS. JUROW

1   having -- the lawyers working with the DaSilva

2   loan or I will be in a deposition for the DaSilva

3   loan in New Jersey.  Things of that nature.  But

4   I never -- I haven't spoken to him in at least

5   six months by telephone.  I haven't seen him in

6   probably longer.

7        Q    Okay.  My question, though, is:

8   Have you ever talked to him since the time that

9   you think you must have talked to him about

10  making the DaSilva loan in the first place back

11  in 2006, have you talked to him to help refresh

12  your recollection?  Did you say, I don't remember

13  this, do you remember anything about this guy,

14  anything of that nature?

15       A    You know, over the last four

16  years, I'm sure I spoke to him.  I don't remember

17  any specific conversation.

18       Q    Let me just draw your attention

19  to the second page of the exhibit that's in front

20   of you, which is the one that's dated earlier,

21   June 15th.  And this is the typical form that you

22   would use in your business, is that right, for

23   making decisions?

24        A    It was a tool, yes.

25        Q    And I want to draw your attention

214

ALBERT LONDON - BY MS. JUROW

1  that you didn't have any other documents, that

2  you checked with your daughter and Carol for the

3  documents that were maintained for this case and

4  you produced them. This is, especially, your

5  response. And I am going to ask you if you

6  remember that you went through it at the time and

7  you authorized it to be made.

8      A      I probably told Candice send them

9  everything they want. And there was nothing I

10  had that I thought was appropriate to send you.

11  There might have been attorney-client

12  conversation, so I would not have included that.

13  But everything that I thought you were supposed

14  to get, I told them to send you.

15      Q      Okay. Well, in connection with

16  attorney-client privilege documents, I would be

17  entitled to get a list of what's being withheld.

18  So if you have documents back at your house that

19  you withheld because you thought that they were

20   privileged, you really need to give those over to

21   Gary, and Gary will tell me I have two pages or

22   100 pages and, Peggy, I'm not giving them to you

23   because I think that they're privileged.  And

24   that's something that we would have between us.

25        A    Well, Gary would have everything

# EXHIBIT H

Page 22

CANDICE LONDON

1
2      A. I've never heard of them, so no.
3      Q. Okay. Okay. Let's talk a little bit about
4  your background. Did you attend college?
5      A. Yes.
6      Q. And did you graduate?
7      A. Yes.
8      Q. When was that?
9      A. In 1998.
10     Q. And what was your graduation -- what was your
11 degree in?
12     A. Media communication.
13     Q. Have you attended any further schooling or
14 training since 1998?
15     A. No.
16     Q. What was your first job after college?
17     A. Aside from part-time jobs, my first full-time
18 job was working for a company called ChoicePoint.
19     Q. And what did -- what kind of company was
20 that?
21     A. It was an online public records database.
22     Q. And what did you do there?
23     A. Customer service, tech support for the
24 customers.
25     Q. And how long did you work there?

TSG Reporting - Worldwide   877-702-9580

Page 23

CANDICE LONDON

1
2      A. Five years.
3      Q. Could you tell me the years --
4      A. 2000 --
5      Q. -- the actual years?
6      A. Yeah. 2000 to 2005.
7      Q. And why did you leave there?
8      A. Cutbacks.
9      Q. You said that you had some part-time jobs
10 previous to that after college. What types of jobs
11 were those?
12     A. Like babysitting or jobs for people that were
13 not like anything on any books or anything.
14     Q. What were the nature, other than babysitting,
15 what other types of activities did the jobs entail?
16     A. What type of activities does babysitting
17 entail?
18     Q. No. I said the other jobs.
19     A. That was basically --
20     Q. You said there were others.
21     A. No, that was basically it. I was a nanny for
22 a family, driving the kids around, diaper changes. You
23 know, babysitting.
24     Q. Um-hmm. Yep. Have you ever -- did you ever
25 have a part-time job that was related to real estate?

TSG Reporting - Worldwide   877-702-9580

Page 24

CANDICE LONDON

1
2      A. No.
3      Q. Or finance?
4      A. No.
5      Q. So after you left ChoicePoint, where did you
6  work next?
7      A. I worked for Aries next.
8      Q. And how did you come to work for Aries?
9      A. My father is one of the partners in Aries and
10 he told me that he could use some help. So it was a
11 good thing that I wasn't working at the time because he
12 was wanting to hire me.
13     Q. And when did you start working at Aries?
14     A. At the very beginning of 2006. February, I
15 believe it was.
16     Q. During the time that you've worked at Aries,
17 had you had any other jobs --
18     A. No.
19     Q. -- as well?
20 I'm sorry. Could you say that again?
21     A. I said no.
22     Q. Thanks. Where is your office at Aries?
23     A. I work out of my home. You have the address.
24     Q. Does any -- are you separate from the other
25 employees of Aries?

TSG Reporting - Worldwide   877-702-9580

Page 25

CANDICE LONDON

1
2      MR. SOSINSKY: Objection. You can
3  answer.
4      THE WITNESS: Objection, I can answer?
5      MR. SOSINSKY: Yes.
6      THE WITNESS: Oh, okay. Everybody has
7  their own office.
8  BY MS. LIGHT:
9      Q. And are all those offices in separate
10 locations?
11     A. Yes.
12     Q. How would you characterize your current work
13 at Aries?
14     MR. SOSINSKY: Objection.
15     When I say objection, unless you hear
16 otherwise, you can answer the question that's
17 been asked unless it's rephrased. So go
18 ahead.
19     THE WITNESS: Okay. What was the
20 question?
21     MR. SOSINSKY: How would you
22 characterize your --
23 BY MS. LIGHT:
24     Q. What are your current job duties for Aries,
25 at Aries?

TSG Reporting - Worldwide   877-702-9580

7 (Pages 22 to 25)

Page 34

CANDICE LONDON

1
2      Q.  And what would you have to include in the
3   reports that you submitted to Al and Larry?
4      A.  Updates, so they would be up to date on
5   what's gone on for the week.  They're weekly updates.
6      Q.  Were those e-mailed or telephone calls or
7   faxed?
8      A.  Those were e-mailed.
9         MS. LIGHT:  We'd like to ask for
10        production of the weekly reports.
11        MR. SOSINSKY:  If they exist, I'll be
12        happy to get you them.
13  BY MS. LIGHT:
14     Q.  Were you the Aries employee that notified a
15  broker whether an application was approved or denied?
16     A.  At one point I was.
17     Q.  At which points were you that employee?
18     A.  After I was the employee who also ordered
19  appraisals, I think my job description had changed to
20  where I would talk to the brokers more at that point.
21  So that would have been what I would do maybe six --
22     Q.  And --
23     A.  I was just going to say maybe six months
24  after I was hired.
25     Q.  Okay.  And did that continue throughout

TSG Reporting - Worldwide   877-702-9580

---

Page 35

CANDICE LONDON

1
2   your -- throughout the time Aires was lending?
3      A.  Yes.
4      Q.  Would you -- in these conversations, did you
5   explain the reasons for Aires' decision?
6      A.  I never knew the reason, so no.
7      Q.  So what would you say to a broker when you --
8   when an application had been denied?
9      A.  That it was denied.
10     Q.  And if the broker -- did brokers ever ask if
11  they could do something to get it approved?
12     A.  I don't remember.  This is all something from
13  years ago, but I don't think that they asked.  They
14  probably knew.  I don't know.
15     Q.  How would you know if an application had been
16  denied or approved?
17     A.  My father would tell me.
18     Q.  Did he tell you over the telephone or e-mail
19  you?
20     A.  Telephone.
21     Q.  Did he ever explain to you the reasons he
22  approved or rejected a loan?
23     A.  No.
24        MR. SOSINSKY:  Objection to the form.
25        You can answer.

TSG Reporting - Worldwide   877-702-9580

---

Page 36

CANDICE LONDON

1
2      THE WITNESS:  No.
3         MR. SOSINSKY:  Wait for my objections,
4         please, I'd just ask --
5      THE WITNESS:  There's a delay.  I'm
6      sorry.  I don't know when you've objected
7      until after I've answered.
8         MR. SOSINSKY:  That's why you should
9         wait an extra second.
10     THE WITNESS:  Okay.
11  BY MS. LIGHT:
12     Q.  Did you ever ask your father why he approved
13  or rejected a particular loan?
14     A.  No.
15     Q.  Did you speak to brokers about the
16  information that Aires needed from the borrowers?
17     A.  Yes.
18        MR. SOSINSKY:  Objection to the form.
19        Answer.
20     THE WITNESS:  Yes.
21  BY MS. LIGHT:
22     Q.  And what type of information did you ask the
23  brokers to provide?
24     A.  It varied, but anything that was missing from
25  the short form application that I believe you have a

TSG Reporting - Worldwide   877-702-9580

---

Page 37

CANDICE LONDON

1
2   copy of.
3      Q.  Were there any other documents or pieces of
4   information that Aires required from the brokers to
5   provide prior in order to assess a loan?
6      A.  No, not that I'm aware of.
7      Q.  So you're -- I just want to make sure that I
8   understand you.  You're saying that Aires approved and
9   denied loans based on the short form application?
10     A.  I don't know --
11        MR. SOSINSKY:  Objection.
12        THE WITNESS:  Oh, I'm sorry.  I don't
13        know what they used to approve or deny loans.
14        I wasn't part of the approval committee.
15  BY MS. LIGHT:
16     Q.  But the only piece of information you
17  received from brokers was the short form application?
18     A.  Yes.
19     Q.  Do you know if anyone at Aires received
20  further information about the borrowers?
21     A.  You'd have to ask those people.
22     Q.  Who -- who would I ask that question?
23     A.  Al and Larry.
24     Q.  When we spoke to Al --
25        MS. LIGHT:  What?

TSG Reporting - Worldwide   877-702-9580

Page 82

CANDICE LONDON

1
2  You can answer.
3      THE WITNESS:  I never recommended
4  anything to anybody.
5  BY MS. LIGHT:
6      Q.  Were you ever told to recommend that a
7  borrower get a second mortgage?
8      A.  I didn't have those conversations.  I
9  wouldn't know.
10     Q.  When you were delivered -- am I correct that
11 you were delivered a big 300-pound file at your home
12 office?
13     A.  It's 300 pounds empty and all the files were
14 in it, so I'm sure the whole thing weighed a lot more
15 than that.  But, yes, it was delivered to my office in
16 my home.
17     Q.  Did that contain canceled files when you
18 received it?
19     A.  By "canceled," we might be talking about two
20 different things.  I call --
21     Q.  Why don't you explain to me what you meant by
22 "canceled".
23     A.  When I referred to and use the word
24 "canceled," I was talking about loans that never took
25 place, therefore there was no file.  It's just an

TSG Reporting - Worldwide   877-702-9580

Page 83

CANDICE LONDON

1
2  e-mail folder that has applications that never amounted
3  to anything.
4      Q.  That's what I was talking about too, the
5  applications that didn't amount to anything.
6      A.  They're just an e-mail.  It's an e-mail file
7  that I have in my Outlook that's just for the purpose
8  of taking up space in my computer at this point.
9      Q.  That's what we're asking --
10     A.  There was never a file printed up.
11     Q.  Okay.  That's what we're asking be produced,
12 please.
13     A.  Okay.
14     Q.  And that's what we're asking not be
15 destroyed, please.
16     A.  Okay.
17     Q.  One moment, please.
18 Oh, what is the e-mail address you used that would
19 contain those, that would have received those files?
20     A.  C London at Aries Mortgages dot com.
21     Q.  Did you ever talk to the closing agents about
22 what happened at a closing, at a particular closing?
23     A.  You mean after the thing closed?
24     Q.  Yes.
25     A.  Yes.

TSG Reporting - Worldwide   877-702-9580

Page 84

CANDICE LONDON

1
2      Q.  Was that part of your job duties?
3      A.  Well, later on it was part of my job duties
4  to find out if everything closed and everything got
5  sent off to wherever it was going, I guess my dad, so
6  eventually.  I don't know when exactly that became one
7  of the things that I do, but I did do it at one point.
8      Q.  And what was -- what would you ask about the
9  closings?
10     A.  How did it go?  Did it close?
11     Q.  Did any of the loans not close at their
12 scheduled closing?
13     A.  Maybe one or two.
14     Q.  Do you remember the circumstances surrounding
15 those?
16     A.  No, at that point I don't think I was the one
17 who would talk to the closing agent, but I heard about
18 one or two.  So I should say I don't remember.
19     Q.  Who did talk to the -- who talked to the
20 closing agent prior to you having that job duty?
21     A.  I think it was my father.
22     Q.  What were you told about the closings in
23 these conversations?
24     A.  In what conversations?
25     MR. SOSINSKY:  Objection to the form.

TSG Reporting - Worldwide   877-702-9580

Page 85

CANDICE LONDON

1
2  You can answer.
3      THE WITNESS:  What conversation?
4  BY MS. LIGHT:
5      Q.  What were you told -- what were you told
6  about the closings when you would talk to the closing
7  agent after one had taken place?
8      A.  That it's done.
9      Q.  I'm sorry, what?
10     A.  That it is done.
11     Q.  Were you ever told that any closing had any
12 problems?
13     A.  No, not directly.
14     Q.  What do you mean "not directly"?
15     A.  If there ever was any problem before I was in
16 charge of -- I mean, I know that there was one loan
17 where somebody decided at the closing that they didn't
18 want to do the loan and so they didn't do a loan, but
19 that was before it was my job.  So when it was my job
20 to take care of it, there was never anything like that
21 that I remember.
22     Q.  How long were the conversations you would
23 usually have with the closing agent about the closing?
24     A.  A minute.
25     Q.  Do you know why that person didn't close?

TSG Reporting - Worldwide   877-702-9580

CANDICE LONDON

1   me on and that was L J Ramaekers at Ramaekers Group dot
2   com, and that was a couple months ago.
3       Q.  Thank you.
4       A.  You're welcome.
5       Q.  Thank you.  Now, what is your practice
6   regarding deleting or saving e-mails that have to do
7   with Aries Financial?
8       A.  I put them in an electronic file if there's
9   something that needs to be remembered.  I just delete
10  it if it's something like, okay, fine, I got it, thank
11  you.
12      Q.  Did Aires -- does Aries Financial have a
13  policy regarding the preservation of e-mails?
14      A.  No.
15      Q.  I'd like to ask you a few questions, do
16  you -- about a few other people -- do you know Eydie
17  Kahan?
18      A.  I never met her.
19      Q.  Do you know who she is?
20      A.  I know who she is, yeah.
21      Q.  Do you know what kind of business, if she did
22  any business with Aries Financial?
23      A.  I believe she did.
24      Q.  Do you know the nature of that business?

CANDICE LONDON

1       A.  I think she's a title closer.
2       Q.  Do you know how many transactions she was
3   involved with?
4       A.  No.
5       Q.  Do you know what her role was in the Britt
6   transaction?
7       A.  No, I don't.
8       Q.  Did you have any communications with her?
9       A.  Yes, but not about the Britt loan.
10      Q.  What did you have communications with her
11  about?
12      A.  After some other loan had closed once, there
13  was something that was missing, I believe, and I asked
14  her if she ever saw it or knew what had happened to it
15  and it ended up getting straightened out.  She was very
16  helpful and pleasant.
17      Q.  Do you know -- do you remember which loan
18  that was?
19      A.  It was a loan that took place in New Jersey.
20      Q.  Do you remember the name of the lender or the
21  address or any -- the town?
22      A.  No, I don't remember.
23      Q.  I'm sorry.  The name of the borrower or the
24  address?

CANDICE LONDON

1       A.  No, not at the moment.  I just remember that
2   it was a New Jersey loan.
3       Q.  Do you remember what was missing?
4       A.  Nope.
5       Q.  When was the last time you had contact with
6   Eydie Kahan?
7       A.  That was the only time I had contact with
8   her, and that was years ago.
9       Q.  Do you know who Fred Powell is?
10      A.  I know who he is.
11      Q.  Could you tell me who he -- what kind of
12  business he did with Aries Financial?
13      A.  He -- I believe that he's an attorney, but he
14  had people coming to him for various reasons and he
15  would introduce some of them to Aries.  And by the time
16  I started working for Aires, I think that Fred was
17  really not doing that much business with us anymore so
18  I had very limited contact with him.  Maybe in the
19  first couple months I worked there, and that was it.
20      Q.  Do you know why he was doing limited business
21  with Aries?
22      A.  I don't know why.  I was very new at the
23  time.
24      Q.  When you did have contact with him, what did

CANDICE LONDON

1   you -- did you have -- when you did have contact with
2   him, was it over the phone?
3       A.  Yes.
4       Q.  Was it ever by e-mail?
5       A.  I don't think so.
6       Q.  What were the nature of the phone
7   conversations you had with Fred Powell?
8           MR. KAHAN:  Objection.  At the time he
9           was Aries lawyer.
10  BY MS. LIGHT:
11      Q.  Did you ever have any conversations with Fred
12  Powell that didn't have to do with legal matters --
13      A.  Yes.
14      Q.  -- that Aries was dealing with?
15      A.  Yes.
16      Q.  Can you tell me the nature of those
17  conversations, please?
18      A.  He was acting as a broker, I suppose, on the
19  very first loan that I ever saw get done.  That was
20  loan No. 35.  And I don't think we had an application
21  at the time, or at least I hadn't seen one, but he just
22  gave all the information that would have gone on to an
23  application over the phone and I relayed it to my
24  father.

Page 122

CANDICE LONDON

1           CANDICE LONDON
2    Q.  Did he have the borrower in that loan, that
3 loan 35, sign the application?
4    A.  I don't remember.  I don't think that there
5 was an application, actually, I just testified.  So I
6 don't remember.
7    Q.  Um-hmm.  And what -- withdrawn.
8    Did you have any other contact with Fred Powell
9 besides loan 35?
10    A.  I don't think I did.  I don't remember.
11    Q.  Did you ever talk to him after the closing of
12 a loan?
13    A.  I don't remember.
14    Q.  When was the last time you had contact with
15 Fred Powell?
16    A.  About five years ago.  Oh, no, I'm sorry.
17 About four years ago.  My mistake.
18    Q.  I had one question relating to some things we
19 talked about before lunch.  Was there a modification
20 application that Aries required borrowers to fill out
21 in order to get a loan modification?
22    A.  Repeat that, please.
23    Q.  Did Aries require borrowers to fill out an
24 application for the loan modification?
25    A.  The borrowers didn't fill anything out, as
TSG Reporting - Worldwide   877-702-9580

Page 123

CANDICE LONDON

1           CANDICE LONDON
2 far as I know.
3    Q.  Okay.  Do you know how Aries found brokers to
4 work with?
5    A.  I don't know.
6    Q.  Do you know how brokers found out about
7 Aries' product?
8    A.  I don't know.
9    Q.  Were you ever told not to work with a
10 specific broker?
11    A.  No.
12    Q.  Did you play any role in setting brokers'
13 fees?
14    A.  No.
15    Q.  Did you play any role in communicating what
16 the fee -- what the brokers' fee would be to the
17 broker?
18    A.  I think that it was on the application and I
19 may have e-mailed it to them from -- like I think that
20 Larry created those applications with the numbers on
21 there and I probably transmitted those via e-mail, but
22 it's not any conversation I ever had.
23    Q.  I just want to be clear.  Did you type in the
24 numbers or did Larry type in the numbers?
25    A.  He typed them in and they were locked.  I
TSG Reporting - Worldwide   877-702-9580

Page 124

CANDICE LONDON

1           CANDICE LONDON
2 didn't have the code for that.
3    Q.  Okay.  Do you know if Aries had written
4 agreements with the brokers --
5    A.  I don't.
6    Q.  -- between the broker -- go ahead.
7    A.  I'm not aware of anything like that.
8    Q.  And after the closing on a particular loan,
9 would you review the copies of the checks that were
10 paid to the brokers?
11    A.  No.
12    Q.  Did you review the copies of the checks that
13 were issued at the closing?
14    A.  Yes.
15    Q.  And what were you looking for when you
16 reviewed the copies of the check?
17    A.  Well, it wasn't standard practice for me to
18 do that, but every once in a while, just in case like
19 my father might ask me to check to see if something
20 matched something else, like on the HUD, I would just
21 look and see if the check and the HUD matched or the
22 copies of the checks drawn and the HUD matched, for
23 whatever his various reasons could have been.
24    Q.  Did you ever check to see that the broker
25 that was paid was the broker listed on the
TSG Reporting - Worldwide   877-702-9580

Page 125

CANDICE LONDON

1           CANDICE LONDON
2 borrower/broker acknowledgment?
3    A.  I could have.  I don't remember doing that,
4 though.
5    Q.  Did you ever notice a discrepancy between the
6 HUD and the checks --
7    A.  No.
8    Q.  -- you reviewed?
9    A.  Not that I remember.
10    Q.  Okay.  Do you know what Fred Powell's
11 relationship to the Britt mortgage was?
12    A.  I don't know.
13    Q.  Do you know what Andrew Morse's relationship
14 to the Britt mortgage was?
15    A.  Well, Andrew told me that he was the broker.
16    Q.  When did he tell you that?
17    A.  I suppose when the loan -- when the
18 application got sent to me, it came from him.  I think
19 that's where it came from.  I don't think it came from
20 Fred.
21    Q.  Have you talked about the mortgage with
22 Andrew Morse since the closing of the Britt mortgage?
23    A.  I may have talked to him about the
24 possibility of refinancing it about a year or so after.
25 That might have been why his name was mentioned in that
TSG Reporting - Worldwide   877-702-9580

CANDICE LONDON

1
2    Q.  Would you have any records which would show
3  if you had referred any new loans to him?  Would that
4  have been in an e-mail or any other records?
5    A.  I don't have any records.  I don't think we
6  provided him anything anyway.
7    Q.  Do you know if you had provided any referrals
8  for new loans with Mr. Cucuzza?
9    A.  Can you repeat that?  I apologize.
10    Q.  Yes, yes.  In your dealings with Gary
11  Cucuzza, did you refer any borrowers to him or any
12  entity he was working at for refinance of the Aries'
13  loans when they became due?
14    A.  I don't think that I did.
15    Q.  Would you have any records that would show
16  whether or not you had referred any of the borrowers
17  that needed refinancing to Mr. Cucuzza or any entity he
18  worked for?
19    A.  No.
20    Q.  Did you contact — have any contact, other
21  than phone conversations with Mr. Cucuzza or
22  Mr. Trentacosta?  Did you have any e-mail communication
23  with either one of them?
24    A.  I don't remember specifically.
25    Q.  If you had, would those have been in the

CANDICE LONDON

1
2  e-mail files that you talked about earlier having
3  saved?
4    A.  We provided everything that I had.  So
5  everything that's saved you should probably have a copy
6  of it, but I don't remember specifically off the top of
7  my head.
8    Q.  But you may have — you may have saved some
9  of the e-mails between --
10    A.  If I did, we already provided it, but I don't
11  remember.
12      MS. DOUGHERTY:  Okay.  I'm going to call
13    for the production of any e-mails between
14    Aries, Joseph Trentacosta, Gary Cucuzza or
15    Berkshire Financial.
16  BY MS. DOUGHERTY:
17    Q.  Do you know an entity named J & G Realty?
18    A.  I don't remember the name.
19    Q.  Okay.  Did Joseph Trentacosta ever advise you
20  that they were now working for an entity called J & G
21  Realty?
22    A.  They didn't tell me that.  I don't know.
23  They could have told my father, if that's the case, but
24  I don't ever remember that, no.
25    Q.  And then I would say the same question for

CANDICE LONDON

1
2  Gary Cucuzza, did Gary Cucuzza ever mention an entity
3  named J & G Realty to you?
4    A.  Same answer.
5    Q.  Which is, just for the record so we can have
6  an answer?
7    A.  The answer is, no, not to my knowledge.
8    Q.  You testified — thank you.
9      You testified earlier, Ms. London, that one of
10  your responsibilities was to check the loan file and
11  make sure all of the appropriate documents were there;
12  is that correct?
13    A.  As they would come in later on, yes.
14    Q.  As they would come in.  Okay.  Did you — I'm
15  sorry.  One second.
16      (Reporter requests name clarification.)
17      MS. DOUGHERTY:  I'm sorry.  J & G, J as
18    in Joseph; G as in Gary.
19      THE WITNESS:  Oh, that does make sense.
20  BY MS. DOUGHERTY:
21    Q.  Does that at all refresh your recollection?
22    A.  No.  It makes sense, though.
23    Q.  It makes sense?
24    A.  Sure.
25    Q.  Thanks, Ms. London.  Ms. London, back to what

CANDICE LONDON

1
2  I — we were talking about with the checking of the
3  appropriate documents in the loan files.  One of them
4  you mentioned earlier today was the mortgage broker
5  agreement.
6    A.  Yes.
7    Q.  Do you recall that?
8    A.  I do recall that.
9    Q.  Okay.  And in the mortgage broker agreement
10  that you dealt with with Mr. Cucuzza, was that a
11  mortgage broker agreement between Mr. Cucuzza and the
12  borrower or Berkshire and the borrower?
13    A.  I don't know.  I didn't memorize them.  You'd
14  have to look in the files that we provided to you.  I
15  don't know.  I should say I don't remember.  I'm sorry.
16  I apologize.
17      Can I — what I meant to say was I don't remember.
18  Of course I've read everything, but, you know, five
19  years ago, so I would have to look again or I would
20  advise you to look.
21    Q.  Okay.  Is it, to the best of your
22  recollection, when we are talking about Gary Cucuzza,
23  is it your understanding that the broker in the
24  agreements that Aries had was the broker Gary Cucuzza
25  or was the broker Berkshire Financial?

Page 174

CANDICE LONDON

1  easily, so that became -- you know, it used to be a lot
2  more simple where people would just refinance. And it
3  was like, Oh, I want to. Okay, I'm done. And that
4  became a lot more of a struggle at a certain point as
5  the economy went further and further south.
6      And then, you know, sometimes lawsuits would have
7  to take place if people were unresponsive altogether,
8  so my responsibilities changed again. I had to deal
9  more with like the attorneys and do things like what
10  we're doing today with depositions. I mean, it really
11  evolved into something totally different.
12      **Q. So you're handling some aspect of lawsuits,**
13  **some aspect of -- are you still servicing the loans or**
14  **managing the loans?**
15      A. Yes.
16      **Q. Yep. Okay. How many loans do you still --**
17  **are you still servicing?**
18      A. I don't know right at the moment.
19      **Q. About.**
20      A. About 30.
21      **Q. And then any other responsibility?**
22      A. Whatever my dad tells me he needs me to do.
23          MS. DOUGHERTY: Okay. Okay. Hold on.
24  Can I take -- I'm going to just take one

TSG Reporting - Worldwide    877-702-9580

Page 175

CANDICE LONDON

1  minute before --
2  BY MS. DOUGHERTY:
3      **Q. Ms. London, when we were talking about the**
4  **weekly -- I'm sorry. Is it okay?**
5      A. Yes, go ahead.
6      **Q. Okay. When we were talking about the weekly**
7  **updates that we've requested production of and what did**
8  **you do at the end of the week, did you print those**
9  **updates out?**
10      A. No.
11      **Q. What did you do with them and how did they**
12  **get -- you know, how did everybody look at them?**
13      A. Well, it's my understanding that Carol and I
14  would just compare notes over the phone and she would
15  put it together and rewrite what was there from the
16  week before, like write over it because it has a new
17  status now obviously, and she would just e-mail it to
18  my father and whoever else in the company asked for it.
19  I would assume Larry if Larry wanted it.
20      **Q. Okay. And would you -- would any copy be**
21  **put, do you know, if you know, would Carol put a copy**
22  **of anything in the file?**
23      A. I don't think that she did because it wasn't
24  just for one particular file. It was for everything,

TSG Reporting - Worldwide    877-702-9580

Page 176

CANDICE LONDON

1  so...
2      **Q. Did she keep an Aries' file?**
3      A. You'll have to check with her. Sorry.
4      **Q. Okay. But you don't know whether there's an**
5  **Aries' file?**
6      A. Not in my office anyway, there's not.
7      **Q. When you talked earlier about -- we've talked**
8  **about your responsibilities changing over time and your**
9  **dad would tell you what to communicate back to the**
10  **brokers. Did your dad tell you at any point in time of**
11  **your responsibilities to discuss with the brokers the**
12  **terms of the loan?**
13      A. No.
14          MS. DOUGHERTY: I'm going to call -- I'm
15  going to call for the production of all the
16  e-mails that have been discussed in this
17  deposition between the Aries' employees and
18  the Aries' partners.
19          MR. KAHAN: Take that under advisement.
20          MS. DOUGHERTY: As well as any e-mails
21  that went from Aries either to broker, broker
22  houses, the escrow agents, any communication
23  within the business.
24          THE WITNESS: Okay. I think that we

TSG Reporting - Worldwide    877-702-9580

Page 177

CANDICE LONDON

1  already did. We did a lot of the stuff over
2  the phone, but I think --
3          MR. KAHAN: Wait for a question. Wait
4  for a question.
5          THE WITNESS: Sorry.
6          MS. DOUGHERTY: Well, and I'd make that
7  both to and from, and the borrowers.
8  BY MS. DOUGHERTY:
9      **Q. I'm just looking quickly through my notes so**
10  **that we don't have to call you back.**
11      A. Thank you.
12      **Q. Okay. I just want to go back to the**
13  **testimony earlier today and ask, you talked about one**
14  **case you said that you had learned of where there was a**
15  **problem at the closing. I just wanted to know if you**
16  **remember, and you said a borrower decided not to close**
17  **the loan or not to take the Aries' loan. Do you**
18  **remember anything else about that loan?**
19      A. I was told that it was a husband and wife.
20  And I don't know what their problem was, but I think
21  they had an argument in the closing room and one of
22  them stormed out. And it just sounded pretty dramatic,
23  but it had nothing to do with Aries. It was their
24  marriage. I don't know.

TSG Reporting - Worldwide    877-702-9580

45 (Pages 174 to 177)

# EXHIBIT

# I

Page 26

CAROL LAXNER

Q. So was there a gap in your position at Control Systems until you started working at Aries Financial?

A. Approximately a month and a half to two months.

Q. And what were you doing then?

A. Looking for work.

Q. Okay. When did you first start working at Aries Financial?

A. July 2006, the end, possibly the 25th.

Q. Did you have to go through an interview process?

A. Yes.

Q. Who did you interview with?

A. Larry Ramaekers.

Q. Anybody else?

A. No.

Q. Did you discuss what Aries Financial was looking for in an employee, the position you were applying for?

A. I don't recall, but I suppose so.

Q. What did they explain what they were looking for was?

Page 27

CAROL LAXNER

A. They were looking -- they were looking for someone that could use Excel, someone that could do mail merges in a Word-like software program. They weren't looking for any other specific experience that I know of.

Q. Okay. I'd like to discuss about your job duties at Aries Financial. What were your job duties when you first started in 2006 at Aries Financial?

A. My first responsibility were to generate loan documents. That was my primary responsibility. I also kept track of applications that were received; kept track in the sense that I kept a file on them.

When I was -- I was also responsible to print up a sheet every month that was sent to Al London to keep track of payments that were received.

Those were my primary job duties.

Q. Anything else -- any other duties when you first started at Aries Financial?

A. That would be my primary job responsibilities. If somebody asked me to do something, I would do it, but I can't think

Page 28

CAROL LAXNER

specifically of anything.

Q. Okay. So you said that -- I'm sorry, were you saying something?

A. No.

Q. Okay. You indicated that one of your primary responsibilities was to generate loan documents; is that correct?

A. Correct.

Q. Could you describe to me what those loan documents are?

A. It was all written already, so I wouldn't know exactly which documents there were. But using a mail-merge-type program, I would input the name of the LLC and the borrower's name and the closing date and the loan amount, and generate things like the adjustable rate note comes to mind. I guess the mortgage would have been in that package. I can picture having seen something that said mortgage rider. There are probably more documents, but I don't know specifically all that were contained.

Q. Okay. Can you describe to me what you mean by keep a file on these applications?

A. I kept -- I physically -- not a

Page 29

CAROL LAXNER

physical file, but an E -- I kept a file on my computer of all the applications received, and those were -- whether they were approved or rejected, I was just told to keep them all.

Q. When you say your computer, is that a computer you kept at an office or was that -- where was the computer?

A. The computer's at my home.

Q. So is that a personal computer, then?

A. I don't personally own it, no. But it is a personal computer, yes.

Q. Who owns your computer?

A. Aries, I guess.

Q. But did they give it to you when you first started your position at Aries?

A. Yes, they did.

Q. And do you still have that computer?

A. I still have it.

Q. And do you still have all these files that you kept track of in your computer?

A. I have them, and I burnt them to disk and sent everything to you. Or to the

8 (Pages 26 to 29)

Page 34

CAROL LAXNER

1  Mr. London or anybody else?
2
3      A.   My e-mail address at Aries is
4  CLSXNER@Ariesmortgages.com.
5      Q.   Are there any other e-mail
6  addresses that you used to send any information
7  with respect to Aries Financial's loans?
8      A.   No.
9      Q.   Why don't you keep your e-mails,
10 your work e-mails?
11     A.   The computer I have doesn't have
12 much memory.  They take up space, and I just
13 don't save them.  Once I'm done with something, I
14 delete it.
15     Q.   I just would like to -- just to get
16 the grasp of what information was included in the
17 CDs that you produced to your attorneys.
18         So it included -- you mentioned
19 that it included the applications that were not
20 approved by Aries Financial, and these blank
21 sheets that you sent to Al London each month.
22 And what other things did that CD include?
23         MR. KAHAN:   Objection.
24         You can answer in a second.
25         I'm just not sure her testimony was

Page 35

CAROL LAXNER

1
2      that this blank sheet was produced.
3         MS. FRANKLIN:   Oh, okay.  I'm
4      sorry.
5  BY MS. FRANKLIN:
6      Q.   Did the CD include those blank
7  sheets that we discussed?
8      A.   I don't believe so.
9      Q.   Do you have copies of the those
10 blank sheets?
11     A.   I'm not sure, but I could check.
12     Q.   Could you please check and produce
13 to us if you find some?
14     A.   If I have them, I will.
15     Q.   And any that you have, please
16 produce all of those blank sheets to plaintiff's
17 counsel.
18         So what other information did the
19 CD include?
20     A.   There were many CDs.  I had each
21 file scanned and burned to disk, anything that
22 was in the file.  So the mortgage documents,
23 whatever were contained in each file, were
24 scanned and burned to disk.
25     Q.   Anything else?

Page 36

CAROL LAXNER

1
2      A.   Like I said, there were
3  applications, there were -- that's all I can
4  recall right now.  There was a lot of scanning.
5      Q.   When you say "applications," can
6  you describe what that application contains, what
7  information that application contains?
8      A.   From my recollection, it contained
9  their name, the address of the property, how much
10 money they were looking for, maybe phone numbers,
11 work phone numbers, who the broker may have been.
12 There may have been more information, but that's
13 all I recall.
14     Q.   Let me ask you:  Were these
15 applications created by Aries Financial?
16     A.   I don't know who created them, but
17 maybe.
18     Q.   Were these applications one page?
19 How many pages were these applications?
20     A.   I only ever saw one-page
21 applications, so I guess they were one page.
22     Q.   Were these applications typed?
23     A.   Sometimes.
24     Q.   Were these applications signed by
25 the borrower?

Page 37

CAROL LAXNER

1
2      A.   I don't know.
3      Q.   When did you get these
4  applications?
5      A.   I guess I got them when Aries
6  received them.  I don't know exactly.
7      Q.   So would you receive all
8  applications that Aries Financial received?
9      A.   I think so.
10         From the time I started, anyway.
11     Q.   How many applications did you
12 receive from Aries Financial to date?
13     A.   I don't know.  I don't know.  Could
14 be a hundred, could be 200, I don't know.
15     Q.   About that blank sheet that you
16 mentioned, we discussed, I'm just wondering, are
17 you still sending those blank sheets to Al
18 London?
19     A.   No.
20     Q.   When did you stop sending those to
21 Al London?
22     A.   I don't know exactly, but it's been
23 at least a year since I have.
24     Q.   Why did you stop sending them to Al
25 London?

10  (Pages 34 to 37)

Page 78

CAROL LAXNER

1
2     A.   I generate them, but I don't do
3  anything specific in entering data onto this form
4  in generating them.
5     Q.   Who enters data in these forms?
6     A.   It's automatically generated
7  through the loan paperwork program.
8     Q.   What's the name of the loan
9  paperwork program?
10    A.   It was something that I believe was
11 done through QuickBooks.
12    Q.   On whose computer were these
13 entries automatically entered?
14    A.   From the time that I started
15 generating loan documents, it would have been on
16 my computer.
17    Q.   Okay.  Any other information that
18 typically you would insert in a HUD 1 before
19 closing?
20    A.   On the second set of documents, the
21 three pages of HUD.
22    Q.   Yes?
23    A.   Those -- I may have typed in those
24 figures that would have been provided to me prior
25 to the closing by the closing agent, Doug Kahan.

Page 79

CAROL LAXNER

1
2     Q.   And how many days in advance of the
3  closing date would you receive these figures from
4  Mr. Kahan?
5     A.   Typically, no more than a day
6  before or the same day.
7     Q.   And how do you transmit these
8  HUD 1s to Mr. Kahan?
9     A.   It's been such a long time, but, I
10 have to guess -- well, I'm not supposed to guess.
11 I must have e-mailed them.
12    Q.   What address did you use to e-mail
13 to Mr. Kahan?
14    A.   I don't know his e-mail address off
15 the top of my head.
16    Q.   Okay.  When you say figures
17 provided by Mr. Kahan, do you mean any numbered
18 figures in these three pages?
19    A.   I mean any dollar figures on these
20 pages.
21    Q.   Okay.  Could you tell me, on the
22 third page the Bates stamp Aries B4 0001630, on
23 the top right-hand corner, do you see your
24 handwriting there?
25    A.   That's not my handwriting.

Page 80

CAROL LAXNER

1
2     Q.   Can you tell me what that
3  handwriting means?
4     A.   It would appear that it means the
5  loan number and the member's name.
6     Q.   Member of what?
7     A.   The member of the LLC.  The member
8  of the borrower's LLC.
9     Q.   When you say borrowers of LLC, who
10 do you refer to?
11    A.   I'm referring to 8901 Avenue L,
12 LLC.
13    Q.   Okay.  Whose handwriting is that on
14 the top right-hand corner on the third page of
15 Plaintiff's Exhibit 20?
16    A.   I don't know whose handwriting that
17 is.  It's not mine.
18    Q.   Could we go to the fourth page,
19 please.
20    A.   Okay.
21    Q.   Could you look at the line that
22 says, I believe, 342?
23        MR. KAHAN:  There's no 342 on this
24 page.
25        MS. FRANKLIN:  I'm sorry.  Maybe

Page 81

CAROL LAXNER

1
2  then I'll just go by what the line is
3  supposed to be identified as.
4  BY MS. FRANKLIN:
5     Q.   The line where it says, "Cash to
6  borrower," do you see that?
7     A.   I see --
8     Q.   In the middle of the fourth page.
9     A.   I see that.
10    Q.   Could you tell me what the amount
11 is listed in that line?
12    A.   It's not clear in my copy.  It
13 appears to be a negative 1,000-something.
14    Q.   What does it mean when the cash to
15 borrower figure is a negative amount?
16    A.   I would think that means -- no.
17        MR. KAHAN:  Objection.
18        Only if you know.
19        THE WITNESS:  I don't know what
20 that means.
21 BY MS. FRANKLIN:
22    Q.   Have you heard of any Aries
23 Financial loan closing where borrower gave money
24 to Aries Financial?
25    A.   I don't recall having heard that.

21  (Pages  78 to 81)

Page 102

```
1              CAROL LAXNER
2    representation.
3         Q.   So let me just ask you if I
4    understand this correctly or not:  So the
5    variations you create mainly pertain to the
6    amount owed under the loan; is that correct?
7         MR. KAHAN:  Objection.
8         You can answer.
9         THE WITNESS:  Variations would be,
10        or specifically which loan somebody wants
11        to look at.  Somebody may want to see just
12        New York loans.  And I'm not saying that I
13        have one just for that, I'm just giving
14        that as an example.
15   BY MS. FRANKLIN:
16        Q.   Did you work on any other
17   spreadsheets?
18        A.   Possibly, but nothing specific
19   comes to mind.
20        Q.   Did you create any other data --
21   not the spreadsheets, but any other data with
22   respect to Aries Financial loans?
23        MR. KAHAN:  Objection.
24        THE WITNESS:  I don't understand
25        the question anyway.
```

Page 103

```
1              CAROL LAXNER
2    BY MS. FRANKLIN:
3         Q.   I'm sorry.  I think it was too
4    broad.  Sorry about that.
5              Did you create any reports?
6         A.   No.
7              Wait.  Yes.  I'm now thinking about
8    status reports.  Yes.
9         Q.   And what are those status reports?
10        A.   Every week or so Candice and I
11   would get on the phone and discuss where we were
12   or where things were regarding open loans, if --
13   particularly those that are in foreclosure, and I
14   would put this information into a spreadsheet
15   which I updated each time we had the discussion.
16   And that would -- and then that would be sent to
17   Al.
18        Q.   What do you mean by "where we
19   were," when you said "where we were," in terms of
20   the loan?
21        A.   Whether or not somebody was paying
22   on time; if they were behind in their payments;
23   if it had -- if a foreclosure proceeding had
24   begun, where we were in that process.  That's
25   what I meant.
```

Page 104

```
1              CAROL LAXNER
2         Q.   You mean where in the foreclosure
3    process?
4         A.   Correct.
5         Q.   Any other documents that you
6    created for Aries Financial?
7         A.   Possibly, but that's all that comes
8    to mind.
9         Q.   Does Aries Financial --
10        MS. DOUGHERTY:  Can I just -- if --
11        Ms. Laxner, we're going to leave a space
12        in the deposition.  I know you said that
13        that's what comes to mind.  If any other
14        reports or summaries come to mind, please
15        fill them in when you get the deposition.
16        THE WITNESS:  Okay.
17        MS. DOUGHERTY:  Thank you.
18        THE WITNESS:  Thank you.
19   ANSWER:
20   _____
21   BY MS. FRANKLIN:
22        Q.   Ms. Laxner, how were these reports
23   sent to Al London?
24        A.   It would have been e-mailed.
25        Q.   Could you --
```

Page 105

```
1              CAROL LAXNER
2         MS. FRANKLIN:  Doug, could you
3         please produce these reports?
4         THE WITNESS:  They're -- never
5         mind.  I'm sorry, you're talking to Doug.
6         MR. KAHAN:  I will certainly take
7         it under advisement and see if any of
8         these reports exist, if they weren't
9         already provided.
10   BY MS. FRANKLIN:
11        Q.   Ms. Laxner, do you have any of
12   these reports in your computer or anywhere else?
13        A.   There is only one report that gets
14   updated.
15        Q.   And where is it kept?
16        A.   I have the last copy in my
17   computer, but it hasn't been updated probably
18   since 2008.
19        Q.   Okay.
20        MS. FRANKLIN:  Mr. Kahan, could you
21        please produce that?
22        MR. KAHAN:  I take that under
23        advisement.
24   BY MS. FRANKLIN:
25        Q.   Ms. Laxner, you said that you would
```

Page 106

CAROL LAXNER

1
2   send these reports as they're updated to
3   Mr. London; is that correct?
4        A.   I didn't say that I sent them.  I
5   said that they would have been sent to him, and I
6   think via e-mail.  Candice may have sent them,
7   but I'm not certain if she did it or I did it all
8   the time.
9        Q.   How would Candice get these
10  reports?
11       A.   Candice -- if Candice forwarded it
12  to him, it would have been because I sent it to
13  her.
14       Q.   And how would you have sent those
15  reports to Candice London?
16       A.   It would have been through e-mail.
17       Q.   Do you still have those e-mails --
18       A.   No, I don't save them --
19       Q.   -- on sending those reports?
20       I'm sorry?
21       A.   No, I don't save my e-mails.
22       MS. SINTON:  Your e-mail system
23  doesn't save any sent e-mails as they're
24  sent?
25       THE WITNESS:  Well, it does, but at

Page 107

CAROL LAXNER

1
2   some point I go in and clean them all out
3   because they just take up space, and my
4   computer is too slow anyway.
5        MS. SINTON:  Ms. Laxner, we'd like
6   to ask you this:  Would you please go and
7   look at whatever -- pull up whatever
8   e-mails you do have that were either sent
9   or received in your in-box and provide
10  them to us.  And from this point
11  forward -- your attorney should already
12  have instructed you about this, but
13  absolutely from this point forward please
14  do not delete any e-mails or destroy any
15  documents related to Aries.
16       MR. KAHAN:  We'll take that under
17  advisement and discuss that with counsel.
18       MS. SINTON:  You're not going to
19  advise her not to delete anything or
20  destroy anything?
21       MR. KAHAN:  I don't have to have
22  you advise her.  We'll take care of it.
23  BY MS. FRANKLIN:
24       Q.   Ms. Laxner, do these reports
25  include any information about loan applications?

Page 108

CAROL LAXNER

1
2        A.   No.
3        Q.   Ms. Laxner, I'm just wondering,
4   when was the last time you deleted these reports,
5   e-mails transmitting these reports, any e-mails?
6        A.   I don't recall the last time that I
7   did it, because my computer crashed and I lost
8   everything some time ago anyway.  And I would say
9   that that happened about six or seven months ago.
10       Q.   Does Aries have any backup files?
11       A.   Not that I'm aware of.  I did not
12  have any.
13       Q.   Does Aries Financial have any
14  policy on preserving business records, including
15  electronic records?
16       A.   Not that I'm aware of.
17       MS. SINTON:  Mr. Kahan, to the
18  extent that Aries has any backup system
19  that stores those e-mails that may -- or
20  any other information that may have been
21  lost when her computer crashed, we'd
22  request information, basically the
23  information in the backup system, all of
24  that.
25       MR. KAHAN:  We'll certainly find

Page 109

CAROL LAXNER

1
2   out if there was a backup system.
3        THE WITNESS:  I don't have --
4   BY MS. FRANKLIN:
5        Q.   Go ahead, Ms. Laxner.
6        A.   Okay.
7        I don't have a backup system, and
8   it's just my computer.
9        Q.   Okay.  Is your computer linked to
10  any other computers at Aries Financial?
11       A.   No, it is not.
12       Q.   I'm just trying to figure out, can
13  you just tell me when was the last time you ever
14  deleted these Aries related e-mails?
15       MR. KAHAN:  Objection.
16       THE WITNESS:  I don't recall.
17  BY MS. FRANKLIN:
18       Q.   Ms. Laxner, has anybody ever
19  instructed you not to delete or spoliate or omit
20  or destroy any information with respect to Aries
21  loan files?
22       MR. KAHAN:  Objection.
23       Talking about other than counsel?
24       MS. SINTON:  The question was, has
25  anyone made this instruction to her.

28  (Pages 106 to 109)

| Page 110 | Page 111 |
|---|---|

**Page 110**

CAROL LAXNER

1                 CAROL LAXNER
2      MR. KAHAN:  I'm going to object to
3  conversations with counsel.
4      MS. SINTON:  She can answer as to
5  whether anyone has given her that
6  instruction.
7      MS. FRANKLIN:  That I do believe is
8  correct.
9      MR. KAHAN:  Did you understand the
10  question?
11     THE WITNESS:  I'm not sure I do.
12     MS. FRANKLIN:  Let me rephrase it.
13  I'm sorry.
14  BY MS. FRANKLIN:
15     Q.   Has anybody instructed you not to
16  delete any of these e-mails or electronic
17  documents, electronically stored information?
18     A.   Not that I can --
19     Q.   Has anybody?
20     A.   Not that I recall.
21     Q.   Ms. Laxner, did anybody ever ask
22  you to preserve these e-mails, loan documents,
23  electronically stored information with respect to
24  Aries Financial loan documents or business?
25     A.   Not that I --

**Page 111**

1                 CAROL LAXNER
2      MR. KAHAN:  Objection.
3  You can go ahead.
4     THE WITNESS:  Not that I recall.
5  BY MS. FRANKLIN:
6     Q.   Do you know if Larry Ramaekers also
7  looks at the reports that you generate?
8     A.   I don't know.
9     Q.   Let me ask you:  How many people
10  work for Aries Financial currently?
11     A.   For Aries?
12     Q.   Yes.
13     A.   I think just Candice and I.
14     Q.   And how many people have interest
15  in -- business interest in Aries Financial, if
16  you know?
17     A.   I don't know who has business
18  interest in Aries Financial.
19     MS. FRANKLIN:  Doug --
20     MS. SINTON:  Can we take a break?
21     MR. KAHAN:  Okay.
22     MS. SINTON:  We don't need to stop
23  for lunch.  I don't know if you or the
24  witness or the court reporter --
25     MR. KAHAN:  Ask them.

**Page 112**

1                 CAROL LAXNER
2      MS. DOUGHERTY:  Take five minutes.
3     (A recess was taken from 1:29 p.m.
4  to 1:38 p.m.)
5  BY MS. FRANKLIN:
6     Q.   So let's talk about Aries
7  Financial's structure in general.  Does Aries
8  Financial keep books and records?
9     A.   I don't know what they keep.
10     Q.   Does Aries Financial have any
11  accounting methods adopted that keeps records of
12  their business?
13     A.   I don't know.
14     Q.   Have you come across any accounting
15  system used by Aries Financial during your
16  employment for Aries Financial?
17     A.   No, I have not.
18     Q.   How does Aries Financial keep track
19  of their profit and losses?
20     A.   I have no idea.
21     Q.   Do you know who might?
22     A.   I don't know.
23     Q.   Other than the loan interest that
24  Aries Financial receives, do you know if Aries
25  Financial has any other revenue sources?

**Page 113**

1                 CAROL LAXNER
2     A.   I don't know.
3     Q.   Do you know if Aries Financial has
4  an accountant for its records?
5     A.   I think they do.
6     Q.   Have you ever heard that they do?
7     A.   I've heard of an accountant.  I
8  don't know if he is specifically for Aries
9  Financial or not.
10     Q.   Do you happen to recall the name of
11  the accountant mentioned?
12     A.   I know his first name.  I can't
13  recall his last.
14     Q.   What is his first name?
15     A.   First name, Michael.
16     Q.   Who mentioned his name?
17     A.   I don't recall.
18     Q.   Do you know who files taxes for
19  Aries Financial?
20     A.   I don't know who does that.
21     Q.   Do you know who manages Aries
22  Financial's business?
23     A.   No, I do not.
24     Q.   Do you have any understanding about
25  what Aries Investment, LLC, does?

29  (Pages 110 to 113)

# EXHIBIT

# J

Page 110

Ramaekers

1
2    A.   She didn't work for me then.  I
3  don't know.
4    Q.   So after early 2007, she would --
5  she was mostly working with Al, correct?
6    A.   I don't know what you mean "mostly."
7  She was only working for Al.
8    Q.   Was only working for Al.
9         Okay.  So that leads to another
10 topic.
11        Are you involved in the day-to-day
12 operations of Aries Financial now?
13   A.   No.
14   Q.   Okay.  When did you cease being
15 involved in the day-to-day operations of Aries
16 Financial?
17   A.   Early 2007.
18   Q.   Okay.  Was there a reason why you
19 chose to cease assisting in day-to-day
20 operations?
21   A.   I have full-time another job.
22   Q.   Was that the sole reason?
23   A.   No.
24   Q.   Okay.  What were the other reasons?
25   A.   Al and Karl felt Al should do it.

Page 111

Ramaekers

1
2    Q.   Did they tell you why Al should do
3  it?
4    A.   Because I wasn't there.
5    Q.   And you weren't there because of --
6    A.   I had another job.
7    Q.   Okay.  Was there any other reason?
8    A.   Not to my knowledge.
9    Q.   Now, let's talk about Al's duties.
10        Were -- prior to early 2007, were
11 his duties substantially the same as yours?
12   A.   It took -- it took a 51 percent vote
13 of two people.
14   Q.   Mm-hmm.  But were his duties the
15 same as yours, substantially similar?
16   A.   Yes.
17   Q.   Okay.
18   A.   No.  No, no, no.  Now that I think
19 about it, he was the one that contacted the
20 brokers.  He had the contacts with the brokers.
21   Q.   Okay.  Anything else that he did
22 differently?
23   A.   I can't think of it.
24   Q.   Okay.  Did he work on any of the
25 forms?

Page 112

Ramaekers

1
2    A.   No.
3    Q.   Did he review them?
4    A.   You'd have to ask him.
5    Q.   But you don't have any knowledge of
6  him reviewing the forms, correct?
7    A.   Correct.
8    Q.   Okay.  Did you ever talk to the
9  brokers?
10   A.   Ever?  Yes.
11   Q.   Okay.  Was that -- well, tell me
12 about -- was this pre- or post-early 2007?
13   A.   Yes.
14   Q.   Both?
15   A.   Yes.
16   Q.   Okay.  So in early -- prior to early
17 2007, what kind of contacts did you have with
18 brokers?
19   A.   Met with Fred Powell.
20   Q.   Mm-hmm.
21   A.   Spoke to him on the phone a couple
22 of times.  If there was a question on a loan
23 that Al couldn't explain after his discussions
24 with the brokers, I would talk to them.
25   Q.   Mm-hmm.

Page 113

Ramaekers

1
2    A.   Spoke to Steven Schwartz about what
3  his business was; how his model worked.
4    Q.   Mm-hmm.
5    A.   Sometimes when I rejected a loan,
6  the broker would call me to want to know why.
7    Q.   Mm-hmm.
8    A.   That's all I can recall.
9    Q.   And I'm sorry to switch back, but
10 did you -- have you ever had any e-mail
11 communications with Carol Laxner?
12   A.   Ever?  Yes.
13   Q.   Okay.  What about Candice?
14   A.   Probably, though I don't recall any.
15   Q.   What about with Al?
16   A.   Yes.
17   Q.   Okay.  So let's talk about your
18 relationship -- well, I don't want to get too
19 far ahead of myself.  Hold on.  Just a second,
20 excuse me.  Well, let's go back.  Let's save
21 that for -- for later on.
22        So did -- did -- oh, post-early
23 2007, you also had some communications with
24 brokers, correct?
25   A.   Yes.

Page 198

Ramaekers

1    don't remember the name of it.  Calculator.
2    Q.    Mm-hmm.  That Aries mortgage
3    calculator template?
4    A.    Aries mortgage calculator template.
5    Q.    Okay.  So was this ever given to the
6    borrower?
7    A.    Not by me.
8    Q.    Okay.  Do you know if anyone did?
9    A.    I do not.
10   Q.    Okay.  Do you know who would fill
11   this out?
12   A.    Carol.  Oh, no.  This is -- this the
13   broker would fill out and send to us.
14   Q.    Okay.  Now, how would the broker
15   send it to you?
16   A.    Electronically.
17   Q.    Over e-mail?
18   A.    I don't know if it was e-mail or
19   how.
20   Q.    Okay.  Now, the third line down from
21   the top, it says applicant, "Herman Britt."
22   Did I read that correctly?
23   A.    Yes.
24   Q.    Do you know why it says the
25

Page 199

Ramaekers

1    applicant is Herman Britt, as opposed to an LLC?
2    A.    There was no LLC formed at the time
3    he was making the loan -- he was applying.
4    Q.    Okay.  But the broker knew he
5    wouldn't make loans to individuals, correct?
6    A.    Correct.
7    Q.    So why would he -- why would the
8    broker put down the name of a person instead of
9    a proposed LLC?
10   MR. KAHAN:  Objection.
11   A.    I don't know.
12   Q.    Did anyone at Aries instruct brokers
13   how to fill out this form?
14   A.    I believe so.
15   Q.    Do you know who that would be?
16   A.    Probably Candice.
17   Q.    Okay.
18   A.    But I don't know.
19   Q.    Do you know if anyone at Aries told
20   brokers that they should apply -- have the loans
21   applied for in the name of an LLC or in the name
22   of an individual?
23   A.    I do not know.
24   Q.    Okay.  So what was the purpose of
25

Page 200

Ramaekers

1    this form?
2    A.    It was to show us whether or not the
3    loan would work.  And you see a net cash to
4    borrower of negative six that loan will not
5    work.
6    Q.    Mm-hmm.
7    A.    It was to have the broker notify us
8    what his -- what his commission agreement was.
9    Q.    Mm-hmm.
10   A.    And to determine whether or not
11   there was any other debt that had to be paid
12   off.
13   Q.    Mm-hmm.  Anything else?
14   A.    Not that I recall.
15   Q.    Do you know if this document was
16   created before or after the short form of the
17   loan application?
18   A.    I do not.
19   Q.    Would this document be sent to
20   people at Aries along with additional
21   documentation?
22   A.    Yes.
23   Q.    Okay.  What else would be included
24   in that?
25

Page 201

Ramaekers

1    A.    I think this was the first thing we
2    would get.
3    Q.    Mm-hmm.
4    A.    So we could look and say that loan
5    won't work.  And he would have gotten a response
6    back, said, cannot make that loan.
7    Q.    Do you know where the borrowers --
8    brokers, rather, instructed to electronically
9    send these documents to anyone in particular?
10   A.    I don't believe it was Candice, but
11   I'm not sure.
12   Q.    Okay.  Now -- can you flip now to
13   what's been marked as Ramaekers' Exhibit No. 7.
14   Are you there?
15   A.    Yes.
16   Q.    Have you ever seen this document
17   before?
18   A.    No.
19   Q.    Okay.  Are you familiar with this
20   template?
21   A.    No.
22   Q.    Okay.  Were you aware that brokers
23   was sending to Mr. London documents like this?
24   MR. KAHAN:  Objection.
25

51  (Pages 198 to 201)

Page 266

Ramaekers

1 assume this document would come back to Aries,
2 correct?
3     A.   Yes.
4     Q.   Did anyone check it to make sure it
5 was done -- filled out correctly?
6     A.   The answer to that is did they go
7 through and read to see if the 285 was correct?
8     Q.   Yeah.  In other words, similar
9 notations in it like the initial monthly
10 payment, for example.
11     A.   I believe that was all done before
12 it was sent out.
13     Q.   Okay.  By Aries.
14         So Aries didn't feel like it needed
15 to check it again, right?
16     A.   I doubt that -- we did not look to
17 see if someone had altered it on the way.
18     Q.   Did Aries check for a signature,
19 though?
20     A.   They were supposed to.
21     Q.   And whose responsibility would that
22 have been?
23     A.   I think Candice.
24     Q.   Now, who -- did someone at Aries

Page 267

Ramaekers

1 find this document?
2     A.   I believe this was given to us by
3 the Detroit attorneys.
4     Q.   Okay.
5     A.   Or a draft of it.
6     Q.   Was a similar document to this, of
7 course, variations for the principal amounts and
8 payments used for all the loans that Aries made?
9     A.   I don't know if we changed it at all
10 for that period.  I don't believe so.
11     Q.   Now, why -- why did Aries choose to
12 use this specific form?
13     A.   I don't know.
14     Q.   Are you -- do you know if adjustable
15 rate notes are different for commercial loans
16 than residential loans --
17     A.   I do not.
18     Q.   -- or consumers' loans, rather?
19         MR. KAHAN:  Did you get his answer?
20     A.   I do not.
21     Q.   Okay.  Moving back to Ramaekers'
22 Exhibit No 3, Page No. 4 now.
23     A.   Are you with me?

Page 268

Ramaekers

1     A.   Yes.
2     Q.   At the top it says "Mortgage,"
3 right?
4     A.   At the top it says "Mortgage."
5     Q.   Okay.  Did I read that correctly?
6     A.   Right.
7     Q.   Was this document supposed to be
8 filled out by Aries, then sent to the closing
9 attorney or the closing agent?
10     A.   Yes.
11     Q.   Okay.  All right.  Flip to
12 Ramaekers' Exhibit No. 11.
13     A.   Okay.
14     Q.   Well, first of all, when you gave
15 all these documents to the closing agent or the
16 closing attorney, how were they given to the
17 closing agent or the closing attorney?
18     A.   Electronically.
19     Q.   Do you know what order they were
20 presented to the closing agent or closing
21 attorney?
22     A.   There would be a closing checklist
23 somewhere in your stuff.  And they would have
24 been presented in -- probably in that order.

Page 269

Ramaekers

1     Q.   Did Aries instruct closing agents or
2 the closing attorneys to have any of the
3 documents executed by the borrowers in a certain
4 order?
5     A.   I don't believe so.
6     Q.   Are you aware of whether or not they
7 were executed in a certain order?
8     A.   I am not.
9     Q.   Now, turning to Ramaekers No. 11,
10 have you ever seen this document, or this
11 template of this document?
12     A.   Okay.
13     Q.   Have you ever seen this template?
14     A.   Yes.
15     Q.   Is it a true and accurate copy of
16 the template?
17     A.   Again, I just looked at the first
18 page. I'm presuming it is. But I'd have to
19 read it.
20     Q.   Okay.  That would be long and
21 boring.
22     A.   I know. I'll take your word for it
23 that this was the Britt document.
24     Q.   Do you know what this document is?

68  (Pages 266 to 269)

Page 355

Ramaekers

1
2     **What was your position at Jay Alix &**
3  **Associates?**
4     A.   At what time?
5     Q.   Well, were you a partner there?
6     A.   No.
7     Q.   Were you a principal?
8     A.   Yes.
9     Q.   Okay.  Now, did — was -- connected
10 with the Centennial Technology's lawsuit, was a
11 judgment entered against Jay Alix & Associates?
12    A.   No.
13    Q.   Was a settlement reached between Jay
14 Alix & Associates in any claim?
15    A.   I believe so.
16    Q.   Okay.  Was that settlement for
17 $2.1 million?
18    A.   I do not know.
19    Q.   Did you have to pay any money?
20    A.   No.
21    Q.   Were you ever found at fault by a
22 court for misrepresentation?
23    A.   No.
24    Q.   But it was your understanding that
25 the matter was settled out of court?

TSG Reporting - Worldwide    877-702-9580

Page 356

Ramaekers

1
2     A.   Yes.
3     Q.   Now switching gears a little bit,
4  Aries Financial, LLC, took a loan from Wachovia,
5  correct?
6     A.   Yes.
7     Q.   Now when you went to Wachovia, you
8  presented a business plan, correct?
9     A.   Asked and answered.  Yes.
10    Q.   Did you also present them with any
11 other forms?
12    A.   Forms, no.
13    Q.   Did Wachovia request that Aries
14 Financial amend any of its forms related to
15 loans made by Aries Financial?
16    A.   Any of its forms.  "Its" being
17 Aries?
18    Q.   Yes.
19    A.   No.
20    Q.   Did it request that Aries Financial
21 change its escrow practices?
22    A.   No.
23    Q.   Did it request that Aries Financial
24 change any of its business practices?
25    A.   Not to my knowledge.

TSG Reporting - Worldwide    877-702-9580

Page 357

Ramaekers

1
2     Q.   Now we touched on Candice's role in
3  the first part of this deposition, but the
4  information was just solely that she was the
5  person that would work with words.  We haven't
6  gotten any further information.
7         Could you please tell me what
8  Candice's "work with words" meant?
9     A.   The documents that had words in them
10 were primarily Candice's responsibility.
11    Q.   Do you recall which documents those
12 were?
13    A.   No.
14    Q.   And her responsibility -- her
15 responsibility to do what?
16    A.   Oh, my God.  You need to get much
17 more specific.
18    Q.   Well, what were Candice's job
19 responsibilities?
20    A.   Candice's job responsibilities was
21 to contact the brokers, get initial forms filled
22 out; check the documents when they came back;
23 primary discussions with borrowers.  That's what
24 I remember her responsibilities to be.
25    Q.   "Primary discussions with

TSG Reporting - Worldwide    877-702-9580

Page 358

Ramaekers

1
2  borrowers," what do you mean by that?
3     A.   People who were not paying their
4  bills to discuss payments.
5     Q.   Was she the sole person responsible
6  for communicating with borrowers regarding
7  payment?
8     A.   I don't think so, but I don't know.
9     Q.   Did she have any other
10 communications with borrowers aside from
11 pertaining to payments of the loans?
12    A.   I do not know.
13    Q.   Now you mentioned that -- well, what
14 forms of communications would she have to
15 borrowers pertaining to payments suitable?
16    A.   You need to ask her.  I don't know.
17    Q.   Do you know if she sent letters?
18    A.   I suspect that she did, but I have
19 no knowledge.
20    Q.   Do you know if she sent e-mails?
21    A.   No.
22    Q.   Now you also stated that she had
23 discussions with brokers, correct?
24    A.   Yes.
25    Q.   Were those written discussions or

TSG Reporting - Worldwide    877-702-9580

Page 407

Ramaekers

1    instructions?
2    A.   I don't recall instructions.
3    Q.   So how did you know that the loans
4    would be done properly -- how did Aries
5    Financial know that the loans would be done
6    properly?
7    A.   By review of the paperwork.
8    Q.   Who reviewed the paperwork?
9    A.   Candice.  The first ones I reviewed.
10   Q.   Now, prior to this lawsuit being
11   filed, had you --
12   A.   Which lawsuit?
13   Q.   Britt and Petersen.
14   A.   "This" refers to two lawsuits?
15   Q.   They're connected, yes.
16   A.   Well you said "this lawsuit."  I
17   presume that meant an individual lawsuit.  You
18   misspoke.
19   Q.   Okay.  When I say "this," I mean the
20   Britt lawsuit and the Petersen lawsuit.
21   A.   Okay.
22   Q.   Did you have any -- did you ever
23   speak with Doug Kahan prior to the filing of
24   these lawsuits?
25   TSG Reporting - Worldwide    877-702-9580

Page 408

Ramaekers

1    "These" I mean Petersen and Britt?
2    MR. KAHAN:  Prior to the filing of
3    the suits?
4    MR. BRINEGAR:  Yes.
5    A.   Yes, I did.
6    Q.   How did you meet Doug Kahan?
7    A.   I was introduced to him by Al
8    London.
9    Q.   And what did Al London tell you
10   about Doug Kahan?
11   A.   He's a good guy and a lawyer that we
12   could use.
13   Q.   Did he tell you anything else?
14   A.   Probably, but I don't recall it.
15   Q.   Do you know if Doug Kahan has
16   done any -- has had any business interactions
17   with anyone in your family?
18   A.   In my family?
19   Q.   Yeah.
20   A.   Lawrence Ramaekers' family?
21   Q.   That would be you.
22   A.   None.
23   Q.   And what about you?
24   A.   None.
25   TSG Reporting - Worldwide    877-702-9580

Page 409

Ramaekers

1    Q.   Okay.  Do you know if he's done any
2    sort of business transactions aside from
3    representing Aries Financial in these lawsuits
4    with any of the employees of Aries?
5    A.   No.
6    Q.   Did -- was Doug Kahan ever consulted
7    on anything involving what's contained in
8    Ramaekers' Exhibit No. 3?
9    A.   I don't believe so.
10   Q.   Did Doug Kahan draft any documents
11   on behalf of Aries Financial?
12   A.   None that I'm aware of.
13   Q.   Did Doug Kahan have any input into
14   whether or not to make any loans to borrowers?
15   A.   No.
16   Q.   Okay.
17   A.   Not to my knowledge.
18   Q.   Now, are you aware that Doug Kahan
19   charged a fee in connection with closing loans?
20   A.   Yes.
21   Q.   Okay.  Do you know how he set that
22   fee?
23   A.   No.
24   Q.   Did anyone at Aries approve that
25   TSG Reporting - Worldwide    877-702-9580

Page 410

Ramaekers

1    fee?
2    A.   I don't know.
3    Q.   What was Aries Financial's
4    understanding of Doug Kahan's duties at these
5    real estate closings?
6    A.   See that the paperwork was properly
7    filled out; that the moneys were transferred.
8    Q.   Any other duties?
9    A.   Not to my knowledge.
10   Q.   Can you turn to Ramaekers Exhibit
11   No. 9.
12   A.   Okay.
13   Q.   Have you ever seen this document
14   before?
15   A.   Yes.
16   Q.   Do you know who drafted this
17   document?
18   A.   I did.
19   Q.   Is it a true and accurate copy of
20   this document?
21   A.   I'd have to review it.  But it
22   appears to be.
23   Q.   Okay.  Now, up above it says -- the
24   first one says, "Aries Instructions to Closing
25   TSG Reporting - Worldwide    877-702-9580

# EXHIBIT
# K

Page 66

Powell

1 to them about the waiver of the jury trial?
2     A.   No.
3     Q.   Did you ever speak to them about
4 the waiver of set offs or counterclaims?
5     A.   No.
6     Q.   Did you ever speak to them about
7 the arbitration rider?
8     A.   No.
9     Q.   Now how would you receive the
10 documents when you were the closing attorney
11 for Aries; how would you receive documents in
12 order to close it?
13    A.   They would E-mail them to us.
14    Q.   Who would E-mail them to you?
15    A.   Whoever was -- I guess Candace.
16    Q.   Did you ever communicate via
17 E-mail with Mr. London?
18    A.   Yes.
19    Q.   What about Mr. Ramaekers?
20    A.   No.
21    Q.   But Candace yes, you communicated
22 with her by E-mail?
23    A.   Yes.
24    Q.   Did you ever exchange any faxes

TSG Reporting - Worldwide    877-702-9580

Page 67

Powell

1 with Candace?
2     A.   Yes.
3     Q.   What about Mr. London?
4     A.   Yes.
5     Q.   What about with Mr. Ramaekers?
6     A.   No.
7     Q.   Did you receive any mail from
8 Candace?
9     A.   Mail; maybe, yes.  Possibly.
10    Q.   Do you remember --
11    A.   I don't recall.
12    Q.   What about from Mr. London?
13    A.   I don't recall.
14    Q.   What about Mr. Ramaekers?
15    A.   No.
16    Q.   Did you ever sign any contracts
17 with Aries?
18    A.   No.
19    Q.   What about with Mr. London?
20    A.   No.
21    Q.   What about with Mr. Ramaekers?
22    A.   No.
23    Q.   How did you go about setting your
24 fees to be the closing agent?

TSG Reporting - Worldwide    877-702-9580

Page 68

Powell

1     A.   I felt, you know, I felt -- I
2 charged what I considered to be a reasonable
3 fee considering the amount of the loan, how
4 much work I had put in and that is about it.
5     Q.   Did you negotiate that with anyone
6 at Aries, the amount of the fee?
7     A.   On occasion.
8     Q.   But the fee was never paid by
9 Aries; correct?
10    A.   Correct.
11    Q.   Do you know why they were
12 negotiating with you about the fees?
13    A.   They wanted me to reduce it, my
14 fees.
15    Q.   Do you know why?
16    A.   I don't know, I guess they felt I
17 was making -- they were not happy with my fees
18 I guess.
19    Q.   But you don't know why they were
20 unhappy with them?
21    A.   No.
22    Q.   How much were the highest fees
23 that you charged in connection with an Aries
24 loan?

TSG Reporting - Worldwide    877-702-9580

Page 69

Powell

1     A.   Maybe 7,500.
2     Q.   That is strictly attorney's fees?
3     A.   Yes.
4     Q.   What about the lowest amount?
5     A.   3,500.
6     Q.   Did you ever get an origination
7 fees?
8     A.   No.
9     Q.   Or points?
10    A.   No.
11    Q.   So you would get an E-mail from
12 Candace or maybe someone in your office would
13 get a Candace E-mail with the closing
14 information.  What would be in the closing
15 packet?
16    A.   The initial contact would be, I
17 would receive documents from the mortgage
18 broker and I would fill out a form prepared by
19 Aries and I would fill out the form and I
20 would give them the information that they
21 requested and I would probably fax it to
22 Candace or facts it to AI and they would look
23 at it.
24    Q.   How would they get back to you on

TSG Reporting - Worldwide    877-702-9580

18  (Pages 66 to 69)

# EXHIBIT L



South
Brooklyn
Legal
Services

July 14, 2010

**BY ELECTRONIC & U.S. MAIL**

Frederick Sosinsky, Esq.
45 Broadway, 30th Floor
New York NY 10006-3007

Douglas Kahan, Esq.
1328 Boston Post Road
Larchmont, New York 10538

        Re: *Britt v. Aries Financial LLC et al.*, 09-civ-2398
           *Petersen v. Aries Financial LLC et al.*, 06-civ-06663

Dear Mr. Sosinsky and Mr. Kahan:

        I am writing on behalf of counsel in both of the above cases to formally request that Aries Financial, Aries Investments, L&R (collectively "Aries"), Al London, and Doug Kahan produce several documents identified by Al London, Candice London, Carol Laxner, and Larry Ramaekers and requested by plaintiffs' counsel during the depositions. In addition, we are making second requests for a number of documents we did not receive pursuant to our initial discovery requests.[1]

1. Any and all documents regarding the mortgages Mr. London invested in with Fred Powell following 2000 and prior to the formation of Aries Financial. A. London 47:8-48:11.

2. Any and all documents regarding salary and compensation paid to each employee, owner and others by Aries for 2005, 2006, 2007, 2008, 2009, including bonuses. C London 51:3-7; A. London 104:2-22.

---

[1] Some citations to plaintiffs' interrogatories and requests for production of documents refer to requests that were either broader or narrower than the demands made at deposition and referenced here; these citations are provided because we believe that these previous requests would have encompassed at least some of same information.

**South Brooklyn Legal Services**
105 Court Street, 3rd Floor   Brooklyn, NY 11201
Phone: 718-237-5500   Fax: 718-875-8546   www.sbls.org
**John C. Gray**, Project Director

**Towards justice and dignity for all – Por la Justicia y Dignidad de Todos**

LSC

3. Profit and loss statements and/or consolidated balance sheets for Aries for 2005, 2006, 2007, 2008, 2009. A. London 104:11-18.

4. The HUD booklet sent by Aries to its borrowers. A. London 115:21-116:14.

5. Any versions of the Aries business plan (description of Aries' products) sent or given to its prospective lenders, including Wachovia, N.A. A. London 173:3-174:14; *Britt Interrogatories ¶6; Britt Request for Production of Documents ¶1; Petersen Interrogatories ¶2; Petersen Request for Production of Documents ¶1.*

6. Any and all instructions given to closing agents for each of the loans closed for Aries throughout the U.S. A. London 176:2-25; *Petersen Interrogatories ¶16; Petersen Request for Production of Documents ¶16.*

7. The number of applications Aries received, approved and rejected in 2005, 2006, 2007, 2008, and 2009. A. London 27:16-28:2.

8. Communications (including e-mails) between Aries and Jared Namm between 2004 and June 3, 2010. A. London 156:24 - 158:11.

9. Communications (including e-mails) between Al London and Jared Namm between 2004 and June 3, 2010. A. London 156:24 - 158:11.

10. Communications (including e-mails) between Aries and D. Cunningham (a Detroit lawyer) between 2004 and June 3, 2010. Ramaekers deposition.

11. Communications (including e-mails) between Lawrence Raemakers and D. Cunningham between 2004 and June 3, 2010. Ramaekers deposition.

12. Mortgage Modification Documents for the following Mortgages (Last Name, Mortgage Number):
    i. Geronimo (593)
    ii. Hines (564)
    iii. Williams (573)
    iv. Polynice (565). A. London 151:20-152:9; *Britt Interrogatories ¶2; Britt Request for Production of Documents ¶1.*

13. Copies of any checks (front and back) written from Doug Kahan's trust account to Berkshire Financial, *Petersen Interrogatories ¶13; Petersen Request for Production of Documents ¶15; D. Kahan 343:16-344:21.*

14. All communications, including e-mail, between and among employees and owners of Aries. C. London 176:15-19; *Britt Request for Production of Documents ¶¶ 2, 3, 31, 32.*

15. All communications, including e-mail, between and among employees and owners of

Aries and mortgage brokers. C. London 159:12-15, 176:21-24; *Britt Request for Production of Documents* ¶¶8-26; *Petersen Interrogatories* ¶12.

16. All communications, including e-mail, between employees and owners of Aries and borrowers. C. London 176:21-177:8; *Britt Request for Production of Documents* ¶¶2, 22.

17. Any and all communications, including e-mail, between employees and owners of Aries and Jared Namm, the attorney in Florida who advised Aries at various points. A. London 156:24 - 158:11.

18. All communications, including e-mail, between and among employees and owners of Aries and Doug Kahan relating to Mr. Britt's mortgage, loan modification, closings, and post-closing actions. *Britt Request for Production of Documents* ¶3.

19. All communications, including e-mail, between and among employees and owners of Aries and Doug Kahan relating to all loans made since 2005. *Britt Request for Production of Documents* ¶4.

20. All communications, including e-mail, between and among employees and owners of Aries and Fred Powell relating to 519 Throop Ave., Brooklyn, and any other loan made since 2005. *Petersen Interrogatories* ¶12; *Petersen Request for Production of Documents* ¶¶22, 24.

21. Any record in Aries' possession or control, including any record held at the offices of Doug Kahan, Esq, indicating any business address utilized by J & G Property Solutions, including but not limited to a West Village address or any former office of Berkshire Financial. D. Kahan 346:22-347:7; 367:21-368: 9.

22. Copies of the fronts and backs of checks written by Doug Kahan to J&G Property Solutions. D. Kahan 343:22-344:10; 348:12-17.

23. Doug Kahan's records regarding the formation and/or filing of Articles of Organization for J&G Property Solutions LLC. D. Kahan 355: 25- 356:4.

24. Aries' weekly update reports. Laxner: 103:10-17, 105: 3, 21; C. London 34:4-10; *Britt Interrogatories* ¶20; *Britt Request for Production of Documents* ¶1; *Petersen Request for Production of Documents* ¶¶1, 15.

25. Any and all documents or communications related to loan applications Aries did not approve. In Ms. London's deposition, she called these files "cancelled" loan files. Laxner 30:20 -31: 25; C. London 80:19-81:4; *Petersen Request for Production of Documents* ¶25.

26. All documents used to train Aries employees relating to compliance with state and federal consumer protection and fair lending laws, including TILA and HOEPA. *Britt Interrogatories* ¶6; *Britt Request for Production of Documents,* ¶¶1, 35; *Petersen*

3

*Request for Production of Documents ¶12.*

27. Copies of the "blank sheets" which were created for each Aries loan, identified by Carol Laxner as having the LLC name and boxes representing 12 months (including completed / partially completed sheets). Laxner 32:6-9, 35:12, 16.

28. Any and all correspondence with employees, directors, officers, principals, agents, mortgage brokers, and independent contractors explaining the features, use, benefits or advantages of originating mortgage loans to limited liability companies, corporations or partnerships. *Britt Request for Production of Documents ¶31; Petersen Request for Production of Documents ¶8.*

29. Any and all materials or information discussing limited liability companies that you provided to potential or actual customers. *Britt Request for Production of Documents ¶33.*

30. Any and all operating or training manuals, plans, memoranda, instruction sheets, or other documents in effect during any period from January 1, 2005 to present and relating to your or any defendant's policies, practices or procedures of soliciting, advertising, promoting, initiating, underwriting, closing, or taking and /or processing applications for mortgage loans. *Britt Request for Production of Documents ¶34; Petersen Interrogatories ¶¶16-17; Petersen Request for Production of Documents ¶¶8, 11-12, 16.*

31. Any and all maps created by Aries employees or owners reflecting the location of Aries' borrowers' homes. Laxner 66:14-69:21.

Please feel free to call or e-mail me with any questions. Thank you.

Sincerely,

Jennifer Light

cc by electronic mail:

Donna Dougherty, Esq.
Leslie Salzman, Esq.
Nina Simon, Esq.
Matthew Brinegar, Esq.

# EXHIBIT
# M

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMAN BRITT,<br><br>        Plaintiff,<br><br>    v.<br><br>ARIES FINANCIAL, LLC., DIVINE INTERVENTION INSTITUTE, INC., ANDREW MORSE, DOUGLAS KAHAN,<br><br>        Defendants. | 09-cv-2398 (RJD) (ALC)<br><br><br><br><br><br>**PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** |
| MARIE PETERSEN,<br><br>        Plaintiff,<br><br>    v.<br><br>ARIES FINANCIAL, LLC., FREDERIC A. POWELL, BERKSHIRE FINANCIAL GROUP INC., STEVE HAVLAMA a.k.a. "STEVE HULAMA" and JACQUES MICHANE<br><br>        Defendants. | 06-cv-6663 (RJD) (ALC) |

    **PLEASE TAKE NOTICE THAT** pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiffs Herman Britt and Marie Petersen, by and through their undersigned counsel, hereby requests that defendant ARIES FINANCIAL, LLC respond to the following Requests for Production of Documents.

These documents are to be made available for inspection and duplication, within thirty

(30) days after service hereof, at the offices of South Brooklyn Legal Services, 105 Court Street,

3rd Floor, Brooklyn, NY 11201, Jennifer Light.

## INSTRUCTIONS

1.    **Time Period Covered.**  Unless otherwise specified herein, the period of time

covered by these requests is from January 1, 2005 to the present.

2.    **Broad Scope.**  These requests are to be construed broadly, so as to bring within

their scope all documents and information that, by a more restrictive interpretation, might be

deemed non-responsive.

3.    **Continuing Nature.**  These requests are continuing in character so as to require

you to supplement your responses and produce additional documents, pursuant to Rule 26(e) of

the Federal Rules of Civil Procedure, in the same manner and at the same address as the original

production if you generate, locate or obtain possession, custody, or control of such additional

responsive documents at any time prior to trial.

4.    **Production of All Responsive Documents.**  Produce both original, drafts and

non-identical versions of all responsive documents in your possession, custody, or control,

regardless of the location where the information is stored or the manner in which the information

is stored, electronically or otherwise.  You are specifically requested to produce all responsive

documents or e-mails stored in or originating from personal computers or laptops, Palm Pilots,

Blackberries, or any other personal digital assistants (PDAs) used by you.  You are also

specifically requested to produce all audio, video, graphic, electronic, or handwritten responsive

documents.  A document with handwritten notes, editing marks, or any other notations or

2

markings shall be deemed to be non-identical to any version of the document not bearing such modifications, and shall be produced.

5.   **Production of Documents Requested Not In Possession**.  If a document requested herein is not in your possession, but is in the possession of any other person from whom you have a legal right to obtain possession of the document, such as present or former attorneys, accountants, advisors, agents, employees, and consultants, you are requested to produce the document.

6.   **Lack of Knowledge Sufficient to Answer**.  If you lack knowledge sufficient to answer a particular document request or any part of it, state so in writing in your response to the request and state the name, address and telephone number of any person(s) who possesses the necessary information and knowledge.

7.   **No Documents Responsive**.  If there are no documents responsive to a category in this request, state so in writing in your response to the request.

8.   **Inability to Locate Documents Requested**.   If you are unable to locate any document requested, state all efforts that have been made to locate it and identify any individual whom you believe is likely to possess any information regarding the document's whereabouts.

9.   **Lost, Discarded, Destroyed, Erased or Otherwise Disposed of Documents**.  In the event that a document called for by these requests has been lost, discarded, destroyed, erased, or otherwise disposed of, with respect to such document you are instructed to:

      (a)    identify the document by date, type, and subject matter;

      (b)    describe the circumstances under which the document was lost, discarded, destroyed, erased, or otherwise disposed of;

(c)     identify each person who wrote or edited the document, and the employer, business, and title or position of each;

(d)     identify all intended recipients of the document, all other known recipients of the document, and the employer, business, title or position of each;

(e)     provide the last known location of the document;

(e)     describe the efforts and due diligence undertaken by you to locate and or obtain the document and/or copies of it;

(f)     state the reason for the inability to produce the document; and

(g)     if the document was destroyed, the date on which the document was destroyed, the reason why the document was destroyed, and identities of the person(s) who authorized the document to be destroyed and/or who destroyed the document(s).

10.     **Manner of Document Production**. The documents requested shall be produced as they have been kept in the usual course of business or shall be organized and labeled to correspond with the categories in this request and with information indicating their source, i.e., the person from whom the documents were obtained.  If a document is responsive to more than one paragraph or subparagraph of this document request, it need be produced only once.

11.     **Production of Entire Document**.  A request for any document shall be deemed to include, in addition to the document itself, a request for exhibits and attachments to the document and enclosures sent or kept with the document.  To the extent that a portion or part of any document is responsive to this request, this request shall be construed to call for production of the entire document.

12.     **Production of File Folder or Container**. The file folder or other container in which a document is kept is deemed to be an integral part of the document and shall be produced with the document. If, for any reason, the folder or container cannot be produced, produce copies of all labels or other identifying marks.

13.     **Privileged or Work Product Matters**. If any request is deemed to call for the production of privileged or work product materials and any documents or information are not produced because such privilege or work product is asserted, you are instructed to provide:

(a)     the nature of the privilege or protection that is being claimed;

(b)     the type of document;

(c)     the general subject matter of the document;

(d)     the date of the document; and

(e)     such other information as is sufficient to identify the document for a *subpoena duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) of the document, including anyone who viewed or has possession of the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other.

If a portion of that document contains information subject to a claim of privilege, only that portion shall be redacted and the remainder shall be produced. If any document or portion thereof is withheld on the basis of some other objection, state with particularity the nature of and complete factual basis for the objection and identify the document as set forth above.

14.     **Objection to Document Request**. If you object to any document request or part thereof, all documents to which your objection does not apply shall be produced.

5

## DEFINITIONS

1.      The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Rules of the United States District Court for the Eastern District of New York ("Rule 26.3") are incorporated by reference into this document request.

2.      In addition to the Rule 26.3, the term **"Agreement"** means any formal, informal, oral or written contract between two or more parties.

3.      The terms **"all,"** **"any,"** and **"each,"** shall be construed as all, any and/or each as necessary to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

4.      **"Aries Financial"** means Aries Financial, LLC, its agents, employees, officers, directors, principals, accountants, and any other person or entities acting on its behalf, as well as any parent, subsidiary or affiliate.

5.      The term **"identify"** means when used in reference to:

        (a)      an oral statement, communication, conference or conversation, to state separately: (i) its date and the place where it occurred; (ii) means of communication including telephones, in-person meetings, video conferences or Skype; (iii) its substance; (iv) the identity of each person making the statement or participating in the communication, conference or conversation; and (v) the present location and custodian of all notes, memoranda, or other documents memorializing, referring to or relating to the subject matter of the statement, communication, conference or conversation;

6

(b)     a <u>natural person or persons</u>, to state separately: (i) the full name of each

such person; (ii) his or her present, or last known business address and his or her

present, or last known residential address; (iii) the present or last known employer

of the person at the time to which the interrogatory answer is directed and the

person's title or position at such employment; and (iv) contact information,

including business phone numbers, home phone numbers, email addresses and

any other means of contact; and

(c)     an <u>organization or entity</u> other than a natural person (e.g., a corporation,

company, firm, association, or partnership), to state separately: (i) the full name

and type of organization or entity; (ii) the date and state of organization or

incorporation; (iii) the address of its principal place of business; (iv) the nature of

the business conducted; and (v) contact information, including phone numbers,

email addresses and any other means of contact.

6.     The term **"including"** does not in any way limit a request to specific items or

concepts listed, but rather shall be read to mean "including, but not limited to".

7.     The terms **"relating to," "related to,"** or **"regarding"** mean containing,

constituting, concerning, embodying, reflecting, identifying, stating, showing, or in any manner

relating or referring to the subject, directly or indirectly.

8.     The phrase **"subject matter of this litigation"** means any and all matters

described or alleged in any complaint, answer, defense, or counterclaim, filed in this action by

any party.

7

9.      The terms **"you"**, **"your"** and **"yourself"** refer to you, defendant Aries Financial, LLC, as well as your agents, representatives, employees, officers, directors, principals, accountants, attorneys, or any other persons acting on your behalf.

10.     The use of the singular form of any word shall include the plural and *vice versa.*

11.     The present tense includes the past and *vice versa.*

## REQUEST FOR PRODUCTION OF DOCUMENTS
### (From January 1, 2005 to Present)

1.  Any and all files and records relating to or containing information about Aries loans and/or the payments made or due thereon, including spreadsheets, notes, logs, and bookkeeping, accounting and servicing records, including records in electronic file format. Please identify the software (including version and latest updates installed) that Aries used to create or maintain these records.

2.  Any and all Aries Financial and Aries Investments net worth statements for 2005, 2006, 2007, 2008, and 2009.

3.  Any and all Aries Financial and Aries Investments accounting audits for 2005, 2006, 2007, 2008, and 2009.

4.  Any and all Aries Financial and Aries Investments profit / loss statements 2005, 2006, 2007, 2008, and 2009.

5.  Any and all net worth statement prepared by Aries Financial, Aries Investments or Al London at any time since 2005, including but not limited to any loan or credit applications made by you

6.  Any and all statements received from any bank or financial institution providing escrow services on loans Aries made to borrowers.

DATED:      July 16, 2010
            Brooklyn, NY

SOUTH BROOKLYN LEGAL SERVICES

By:   Jennifer Light, Of Counsel
      TaeRa Franklin, Of Counsel

8

Jennifer Sinton, Of Counsel
John C. Gray, Esq.
105 Court St., 3rd Floor
Brooklyn, NY 11201
(718) 246-3271 (Telephone/Fax)
*Attorneys for Plaintiff*

Nina F. Simon, *pro hac vice*
Matthew Brinegar, *pro hac vice*
CENTER FOR RESPONSIBLE LENDING
910 17th Street, NW, Suite 500
Washington, DC 20006-2610
(202) 349 1879

*Attorneys for Plaintiff Herman Britt*

Donna Dougherty, Esq.
JASA/Legal Services for the Elderly in
Queens
97-77 Queens Blvd., Suite 600
Rego Park, New York 11374

Leslie Salzman, Esq.
Cardozo Bet Tzedek Legal Services
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, NY 10003

*Attorneys for Plaintiff Marie Petersen*

TO:

Fredrick Sosinsky, Esq.
45 Broadway, 30th Floor
New York, NY 10006
(212) 285-2270
*Counsel for Aries Financial, LLC* in
Case Nos. 06-cv-6663 & 09-cv-2398

Douglas Kahan, Esq.
1328 Boston Post Road
Larchmont, New York 10538
(914) 630-1178
*Pro Se Defendant* in
Case No. 09-cv 2398

9

Divine Intervention Institute, Inc.
36 North Columbus Avenue
Freeport, New York 11520
*Defendant* in
Case No. 09-cv 2398

Andrew Sfouggatakis
172 Neck Road
Brooklyn, New York 11223
*Counsel for Gary Cucuzza* in
Case No. 06-cv-6663

Joseph Trentacosta
55 Chinkaberry Ct.
Howell, NJ 07731
718-612-9720
*Pro Se Defendant* in
Case No. 06-cv-6663

James Uston
275 Avenue U
Brooklyn, NY 11223
*Pro Se Defendant* in
Case No. 06-cv-6663

Gary Schoer, Esq.
6800 Jericho Trnpk. Suite 1087
Syosset, New York 11791
*Attorney for Frederic Powell* in
Case No. 06-cv-6663

Winograd and Winograd PC
Corey Winograd, Esq.
450 Seventh Avenue
New York, New York 10123
*Attorney for Jacques Michaane* in
Case No. 06-cv-6663

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HERMAN BRITT,<br><br>    Plaintiff,<br><br>  v.<br><br><br>ARIES FINANCIAL, LLC., DIVINE INTERVENTION INSTITUTE, INC., ANDREW MORSE, DOUGLAS KAHAN,<br><br>    Defendants. | Civil Action No.:  09-civ-2398 (RJD) (ALC)<br><br><br>**CERTIFICATE OF SERVICE** |

|  |  |
|---|---|
| MARIE PETERSEN,<br><br>    Plaintiff,<br><br>  v.<br><br><br>ARIES FINANCIAL, LLC., FREDERIC A. POWELL, BERKSHIRE FINANCIAL GROUP INC., STEVE HAVLAMA a.k.a. "STEVE HULAMA" and JACQUES MICHANE<br><br>    Defendants. | 06-cv-6663 (RJD) (ALC) |

I hereby certify that I have on this 13th day of August, 2010 caused the foregoing

**Plaintiff's Second Set of Document Requests to Defendant Aries Financial, LLC**

**("Plaintiff's Discovery Requests to Aries Financial")** to be served upon the following persons

by electronic mail at the e-mail addresses indicated below, pursuant to agreement among

counsel:

Fredrick Sosinsky, Esq.
fsosinsky@hotmail.com
*Counsel for Aries Financial, LLC* in
Case Nos. 06-cv-6663 & 09-cv-2398

Douglas Kahan, Esq.
dougkahanlegal@aol.com
*Pro Se Defendant* in Case No. 09-cv 2398

I hereby further certify that I caused the **Plaintiff's Discovery Requests to Aries**

**Financial** on Divine Intervention Institute Inc. by depositing the same in the U.S. post box under

the exclusive care and custody of the U.S. Post Office by U.S. First Class Mail at the addresses

indicated below:

DIVINE INTERVENTION INSTITUTE, INC.
36 North Columbus Avenue
Freeport, New York 11520
*Defendant* in Case No. 09-cv 2398

Andrew Sfouggatakis
172 Neck Road
Brooklyn, New York 11223
*Counsel for Gary Cucuzza* in
Case No. 06-cv-6663

Joseph Trentacosta
55 Chinkaberry Ct.
Howell, NJ 07731
718-612-9720
*Pro Se Defendant* in
Case No. 06-cv-6663

James Uston
275 Avenue U
Brooklyn, NY 11223
*Pro Se Defendant* in
Case No. 06-cv-6663

Gary Schoer, Esq.
6800 Jericho Trnpk. Suite 1087
Syosset, New York 11791
*Attorney for Frederic Powell* in
Case No. 06-cv-6663

Winograd and Winograd PC
Corey Winograd, Esq.
450 Seventh Avenue

New York, New York 10123
*Attorney for Jacques Michaane* in
Case No. 06-cv-6663

Jennifer Light, Esq.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, New York 11201

13

# EXHIBIT
# N

LAW OFFICES OF

# FREDERICK L. SOSINSKY

45 BROADWAY, 30TH FLOOR

NEW YORK, NEW YORK 10006

TELEPHONE (212) 285-2270

TELECOPIER (212) 509-8403

EMAIL: FredS@newyork-criminaldefense.com

August 13, 2010

<u>BY FEDERAL EXPRESS</u>
Jennifer Light, Esq.
Jennifer Sinton, Esq.
Taera Franklin, Esq.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, New York 11201

Douglas Kahan, Esq.
225 Broadway, Suite 715
New York, New York 10007

Gary Schoer, Esq.
6800 Jericho Turnpike, Suite 108W
Syosset, New York 11791

Donna Dougherty, Esq.
Legal Services for the Elderly
97-77 Queens Boulevard, Suite 600
Rego Park, New York 11374

Re:   Herman Britt v. Aries Financial, LLC, *et al.*
      09 Civ 2398 (RJD)(ALC)  and
      Marie Petersen v. Aries Financial, LLC *et al.*
      <u>06 Civ 6663 (RJD) (ALC)</u>

Dear Counsel:

On behalf of defendants Aries Financial, LLC ("Aries") and Al London ('London"), this letter shall respond to the letter of Jennifer Light, Esq. dated July 14,

2010 in which Ms. Light on behalf of all counsel for plaintiffs Britt and Petersen, makes a number of supplemental discovery demands.

We reiterate our general reservation of the right to object to the introduction into evidence at trial of any document or item produced herewith on the grounds set forth in our prior responses to plaintiffs' discovery demands and our responses thereto.

We also note, as I have advised Ms. Dougherty, that because Al London and Larry Ramaekers are not presently at their homes in Florida, there may be additional information and/or materials responsive to these requests that will be provided following their return to Florida after September. Moreover, I expect to receive early next week some additional documents from Mr. Ramaekers which I will provide to you then.

Finally, there are some additional materials -- status reports and updates -- that I am currently reviewing and that I will be producing next week in redacted form. I will be redacting only those entries on these forms that we submit are protected from disclosure pursuant to the attorney-client and work-product privileges. I understand from counsel that you will be making a motion directed towards this issue but I will produce these documents with these redactions next week.

Below is our response to each numbered demand.

1.      Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Without waiving such objections, Aries and London state that they are not in possession of such documents. We note that at the deposition of defendant Fred Powell taken by Petersen, Powell indicated that he believed he maintained records of such investments.

2.      Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Without waiving such objections, Aries and London state as follows: for the year 2005, there were wages or payments made to any employee or partner. For the year 2006, a total of $44,000 in wages were paid to employees and no payments were made to a partner. For the year 2007, a total of $72,000 in wages were paid to employees and $120,000 was paid to partners. For the year 2008, a total of $75,600 in wages were paid to employees and $70,000 was paid to partners. For the year 2009, a total of $72,800 in wages were

2

paid to employees and $75,000 was paid to partners. Attached hereto are copies of W-2 statements for 2007-2009.

3.        Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Without waiving such objections, Aries and London state that they are not in possession of any such documents.

4.        Aries and London will provide a sample of the HUD booklet to plaintiffs as soon as it is located.

5.        Aries and London state that they are not in possession of any such documents.

6.        All such documents have previously been provided.

7.        See attached document. Aries and London have previously provided copies of every application received by Aries (contained on CD entitled "Applications").

8.        Aries and London object to this request on the ground that all such information and/or materials are protected from disclosure pursuant to the attorney-client and work-product privileges.

9.        See response to 8.

10.       See response to 8.

11.       See response to 8.

12.       To the extent that such documents have not already been produced (CD containing loan files), Aries will produce the requested documents shortly.

13.       This request is made to defendant Kahan.

14.       Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Without waiving any objection, Aries

3

and London have previously provided documents responsive to this request (CD containing loan files).

15.    Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Without waiving any objection, Aries and London have previously provided documents responsive to this request (CD containing loan files).

16.    Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Without waiving any objection, Aries and London have previously provided documents responsive to this request (CD containing loan files).

17.    Aries and London object to this request on the ground that all such information and/or materials are protected from disclosure pursuant to the attorney-client and work-product privileges.

18.    Without waiving any objection, Aries and London have previously provided documents responsive to this request (CD containing loan files). To the extent that this request calls for production of information and/or materials arising after the commencement of this litigation, Aries and London object on relevance and materiality grounds. Additionally, Aries and London object to this request on the ground that all such information and/or materials are protected from disclosure pursuant to the attorney-client and work-product privileges.

19.    Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Additionally, Aries and London object to this request on the ground that all such information and/or materials are protected from disclosure pursuant to the attorney-client and work-product privileges Without waiving any objection, Aries and London have previously provided

4

documents responsive to this request (CD containing loan files).

20.     Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Additionally, Aries and London object to this request on the ground that all such information and/or materials are protected from disclosure pursuant to the attorney-client and work-product privileges Without waiving any objection, Aries and London have previously provided documents responsive to this request (CD containing loan files).

21.     Aries and London are not in possession of any such record.

22.     This request is made to defendant Kahan.

23.     This request is made to defendant Kahan.

24.     Aries and London object to this request as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Aries and London also object on the ground that the request is unduly burdensome. Without waiving any objection, Aries and London attach hereto copies of documents encompassed by this request.

25.     See attached document.  Aries and London have previously provided copies of every application received by Aries (contained on CD entitled "Applications").

26.     Aries and London are not in possession of any such documents.

27.     See attached document.

28.     Aries and London object to this request as being vague and general, as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Without waiving any objection, Aries and London have previously provided a document responsive to this request and are not in possession of any other documents.

5

29.     Aries has previously provided plaintiffs with copies of the LLC documents prepared and executed by borrowers in connection with each of the loans Aries made to LLC's.

30.     Aries and London object to this request as being vague and general, as calling for production of information and/or materials that are irrelevant, immaterial and wholly unrelated to any matter at issue herein. Without waiving any objection, Aries and London have previously provided a document responsive to this request and are not in possession of any other documents.

31.     Aries and London are not in possession of any such information and/or materials.

Thank you for your attention to this matter.

Very truly yours,

Frederick L. Sosinsky

FLS:bms
Encl.

6

# EXHIBIT

# O

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HERMAN BRITT,<br><br>        Plaintiff,<br><br>    v.<br><br>ARIES FINANCIAL, LLC., DIVINE INTERVENTION INSTITUTE, INC., ANDREW MORSE, DOUGLAS KAHAN,<br><br>        Defendants. | 09-cv-2398 (RJD) (ALC) |
| | **PLAINTIFFS' SECOND SET OF INTERROGATORIES AND THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO ARIES FINANCIAL, LLC** |
| MARIE PETERSEN,<br><br>        Plaintiff,<br><br>    v.<br><br>ARIES FINANCIAL, LLC., FREDERIC A. POWELL, BERKSHIRE FINANCIAL GROUP INC., STEVE HAVLAMA a.k.a. "STEVE HULAMA" and JACQUES MICHANE<br><br>        Defendants. | 06-cv-6663 (RJD) (ALC) |

**PLEASE TAKE NOTICE THAT** pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiffs Herman Britt and Marie Petersen, by and through their undersigned counsel, hereby request that defendant ARIES FINANCIAL, LLC respond to the following Interrogatories and Requests for Production of Documents.

These documents are to be made available for inspection and duplication, within thirty (30) days after service hereof, at the offices of South Brooklyn Legal Services, 105 Court Street, 3rd Floor, Brooklyn, NY 11201, Jennifer Light.

## INSTRUCTIONS

1.    **Time Period Covered.** Unless otherwise specified herein, the period of time covered by these requests is from January 1, 2000 to the present.

2.    **Broad Scope.** These requests are to be construed broadly, so as to bring within their scope all documents and information that, by a more restrictive interpretation, might be deemed non-responsive.

3.    **Continuing Nature.** These requests are continuing in character so as to require you to supplement your responses and produce additional documents, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, in the same manner and at the same address as the original production if you generate, locate or obtain possession, custody, or control of such additional responsive documents at any time prior to trial.

4.    **Production of All Responsive Documents**. Produce both original, drafts and non-identical versions of all responsive documents in your possession, custody, or control, regardless of the location where the information is stored or the manner in which the information is stored, electronically or otherwise. You are specifically requested to produce all responsive documents or e-mails stored in or originating from personal computers or laptops, Palm Pilots, Blackberries, or any other personal digital assistants (PDAs) used by you. You are also specifically requested to produce all audio, video, graphic, electronic, or handwritten responsive documents. A document with handwritten notes, editing marks, or any other notations or

2

markings shall be deemed to be non-identical to any version of the document not bearing such modifications, and shall be produced.

5. **Production of Documents Requested Not In Possession**. If a document or information requested herein is not in your possession, but is in the possession of any other person from whom you have a legal right to obtain possession of the document or information, such as present or former attorneys, accountants, advisors, agents, employees, and consultants, you are requested to produce the document or information.

6. **Lack of Knowledge Sufficient to Answer**. If you lack knowledge sufficient to answer a particular interrogatory or document request or any part of it, state so in writing in your response to the request and state the name, address and telephone number of any person(s) who possesses the necessary information and knowledge.

7. **No Documents Responsive**. If there are no documents responsive to a category in this request, state so in writing in your response to the request.

8. **Inability to Locate Documents Requested**. If you are unable to locate any document or information requested, state all efforts that have been made to locate the document or information and identify any individual whom you believe is likely to possess responsive information or information regarding a document's whereabouts.

9. **Lost, Discarded, Destroyed, Erased or Otherwise Disposed of Documents**. In the event that a document called for by these requests has been lost, discarded, destroyed, erased, or otherwise disposed of, with respect to such document you are instructed to:

(a)    identify the document by date, type, and subject matter;

(b)    describe the circumstances under which the document was lost, discarded, destroyed, erased, or otherwise disposed of;

3

(c)   identify each person who wrote or edited the document, and the employer, business, and title or position of each;

(d)   identify all intended recipients of the document, all other known recipients of the document, and the employer, business, title or position of each;

(e)   provide the last known location of the document;

(e)   describe the efforts and due diligence undertaken by you to locate and or obtain the document and/or copies of it;

(f)   state the reason for the inability to produce the document; and

(g)   if the document was destroyed, the date on which the document was destroyed, the reason why the document was destroyed, and identities of the person(s) who authorized the document to be destroyed and/or who destroyed the document(s).

10.   **Manner of Document Production**. The documents requested shall be produced as they have been kept in the usual course of business or shall be organized and labeled to correspond with the categories in this request and with information indicating their source, i.e., the person from whom the documents were obtained.  If a document is responsive to more than one paragraph or subparagraph of this document request, it need be produced only once.

11.   **Production of Entire Document**.  A request for any document shall be deemed to include, in addition to the document itself, a request for exhibits and attachments to the document and enclosures sent or kept with the document.  To the extent that a portion or part of any document is responsive to this request, this request shall be construed to call for production of the entire document.

4

12.   **Production of File Folder or Container**.  The file folder or other container in which a document is kept is deemed to be an integral part of the document and shall be produced with the document.  If, for any reason, the folder or container cannot be produced, produce copies of all labels or other identifying marks.

13.   **Privileged or Work Product Matters**.  If any request is deemed to call for the production of privileged or work product materials and any documents or information are not produced because such privilege or work product is asserted, you are instructed to provide:

(a)   the nature of the privilege or protection that is being claimed;

(b)   the type of document;

(c)   the general subject matter of the document;

(d)   the date of the document; and

(e)   such other information as is sufficient to identify the document for a *subpoena duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) of the document, including anyone who viewed or has possession of the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other.

If a portion of that document contains information subject to a claim of privilege, only that portion shall be redacted and the remainder shall be produced.  If any document or portion thereof is withheld on the basis of some other objection, state with particularity the nature of and complete factual basis for the objection and identify the document as set forth above.

14.     **Objection to Document Request or Interrogatory**.  If you object to any document request or interrogatory or part thereof, all documents and information to which your objection does not apply shall be produced.

## DEFINITIONS

1.     The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Rules of the United States District Court for the Eastern District of New York ("Rule 26.3") are incorporated by reference into these interrogatories and requests for documents.

2.     In addition to the Rule 26.3, the term **"Agreement"** means any formal, informal, oral or written contract between two or more parties.

3.     The terms **"all,"** **"any,"** and **"each,"** shall be construed as all, any and/or each as necessary to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

4.     **"Aries Financial"** means Aries Financial, LLC, Aries Investments, LLC, L&R Management, LLC, and their agents, employees, officers, directors, principals, accountants, and any other person or entities acting on their behalf, as well as any parent, subsidiary or affiliate.

5.     The term **"identify"** means when used in reference to:

(a)     an oral statement, communication, conference or conversation, to state separately: (i) its date and the place where it occurred; (ii) means of communication including telephones, in-person meetings, video conferences or Skype; (iii) its substance; (iv) the identity of each person making the statement or participating in the communication, conference or conversation; and (v) the present location and custodian of all notes, memoranda, or other documents

6

memorializing, referring to or relating to the subject matter of the statement, communication, conference or conversation;

(b)    a <u>natural person or persons</u>, to state separately: (i) the full name of each such person; (ii) his or her present, or last known business address and his or her present, or last known residential address; (iii) the present or last known employer of the person at the time to which the interrogatory answer is directed and the person's title or position at such employment; and (iv) contact information, including business phone numbers, home phone numbers, email addresses and any other means of contact; and

(c)    an <u>organization or entity</u> other than a natural person (e.g., a corporation, company, firm, association, or partnership), to state separately: (i) the full name and type of organization or entity; (ii) the date and state of organization or incorporation; (iii) the address of its principal place of business; (iv) the nature of the business conducted; and (v) contact information, including phone numbers, email addresses and any other means of contact.

6.    The term **"including"** does not in any way limit a request to specific items or concepts listed, but rather shall be read to mean "including, but not limited to".

7.    The terms **"relating to," "related to,"** or **"regarding"** mean containing, constituting, concerning, embodying, reflecting, identifying, stating, showing, or in any manner relating or referring to the subject, directly or indirectly.

8.    The phrase **"subject matter of this litigation"** means any and all matters described or alleged in any complaint, answer, defense, or counterclaim, filed in this action by any party.

9. The terms "**you**", "**your**" and "**yourself**" refer to you, defendant Aries Financial, LLC, as well as your agents, representatives, employees, officers, directors, principals, accountants, attorneys, or any other persons acting on your behalf.

10. The use of the singular form of any word shall include the plural and *vice versa*.

11. The present tense includes the past and *vice versa*.

## **INTERROGATORIES**

1. Identify all sources of funding that Aries Financial used to issue mortgage loans, including any loans or lines of credit provided to Aries Financial by Wachovia or any other entity. For each funding source, identify the following:

   a. The full and complete name of the entity providing funds to Aries Financial, contact information for the entity, and all other information identified in paragraph 5(c) of the Definitions herein;

   b. Any loan number, account number, tax identification number, employee identification number, and/or other identifying markers used by the entity issuing such funds;

   c. The amount(s) and disbursement date(s) for all such funds received by Aries Financial.

## **REQUEST FOR PRODUCTION OF DOCUMENTS**

1. All documents referred to in the foregoing interrogatories and in the answers thereto.

2. All applications and other documents submitted to any bank, financial institution, or other entity for the purpose of obtaining a loan or line of credit to fund the issuance of mortgage loans by Aries Financial.

8

3.    All documents, including correspondence, between Aries Financial and any entity

identified in response to Interrogatory No. 1, relating to or reflecting the nature of the

loans to be issued by Aries Financial using the funds provided, the Aries Financial

business plan, and/or the intended or actual use of such funds by Aries Financial.

4.    All documents, including correspondence, between Aries Financial and any entity

identified in response to Interrogatory No. 1, relating to or reflecting the reason for

the termination of the lending relationship with Aries Financial and/or the termination

of the line of credit provided to Aries Financial.

DATED:    Brooklyn, NY
          August 31, 2010

                                        SOUTH BROOKLYN LEGAL SERVICES


                              By:    _____
                                     Jennifer Light, Of Counsel
                                     TaeRa Franklin, Of Counsel
                                     Jennifer Sinton, Of Counsel
                                     John C. Gray, Esq.
                                     105 Court St., 3rd Floor
                                     Brooklyn, NY 11201
                                     (718) 246-3268 (phone/fax)

                                     Nina F. Simon, *pro hac vice*
                                     Matthew Brinegar, *pro hac vice*
                                     CENTER FOR RESPONSIBLE LENDING
                                     910 17th Street, NW, Suite 500
                                     Washington, DC 20006-2610

                                     *Attorneys for Plaintiff Herman Britt*

                                     Donna Dougherty, Esq.
                                     JASA/Legal Services for the Elderly in
                                     Queens
                                     97-77 Queens Blvd., Suite 600
                                     Rego Park, New York 11374

9

Leslie Salzman, Esq.
Cardozo Bet Tzedek Legal Services
Benjamin N. Cardozo School of Law
55 Fifth Avenue
New York, NY  10003

*Attorneys for Plaintiff Marie Petersen*

TO:

Fredrick Sosinsky, Esq.
45 Broadway, 30th Floor
New York, NY 10006
(212) 285-2270
*Counsel for Aries Financial, LLC* in
Case Nos. 06-cv-6663 & 09-cv-2398

Douglas Kahan, Esq.
1328 Boston Post Road
Larchmont, New York 10538
(914) 630-1178
*Pro Se Defendant* in
Case No. 09-cv 2398

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

HERMAN BRITT,

                    Plaintiff,

      v.

ARIES FINANCIAL, LLC., DIVINE
INTERVENTION INSTITUTE, INC., ANDREW
MORSE, DOUGLAS KAHAN,

              Defendants.

Civil Action No.:  09-civ-2398
(RJD) (ALC)

**CERTIFICATE OF SERVICE**

---

MARIE PETERSEN,

                    Plaintiff,

      v.

ARIES FINANCIAL, LLC., FREDERIC A.
POWELL, BERKSHIRE FINANCIAL GROUP
INC., STEVE HAVLAMA a.k.a. "STEVE
HULAMA" and JACQUES MICHANE

              Defendants.

06-cv-6663 (RJD) (ALC)

I hereby certify that I have on this 31st day of August, 2010 caused the foregoing

**Plaintiffs' Second Set of Interrogatories and Third Set of Document Requests to Defendant**

**Aries Financial, LLC** to be served upon the following persons by electronic mail at the e-mail

addresses indicated below, pursuant to agreement among counsel:

Fredrick Sosinsky, Esq.
fsosinsky@hotmail.com
FredS@newyork-criminaldefense.com
*Counsel for Aries Financial, LLC* in
Case Nos. 06-cv-6663 & 09-cv-2398

11

Douglas Kahan, Esq.
dougkahanlegal@aol.com
*Pro Se Defendant* in Case No. 09-cv 2398

Jennifer Sinton, Esq.

# EXHIBIT P

LAW OFFICES OF

# FREDERICK L. SOSINSKY

45 BROADWAY, SUITE 3010

NEW YORK, NEW YORK 10006

TELEPHONE (212) 285-2270

TELECOPIER (212) 248-0999

EMAIL: FredS@newyork-criminaldefense.com

October 15, 2010

BY FEDERAL EXPRESS

Jennifer Light, Esq.
Jennifer Sinton, Esq.
Taera Franklin, Esq.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, New York 11201

Douglas Kahan, Esq.
225 Broadway, Suite 715
New York, New York 10007

Gary Schoer, Esq.
6800 Jericho Turnpike, Suite 108W
Syosset, New York 11791

Donna Dougherty, Esq.
Legal Services for the Elderly
97-77 Queens Boulevard, Suite 600
Rego Park, New York 11374

Re:    Herman Britt v. Aries Financial, LLC, et al.
       09 Civ 2398 (RJD)(ALC)  and
       Marie Petersen v. Aries Financial, LLC et al.
       06 Civ 6663 (RJD) (ALC)

Dear Counsel:

On behalf of defendants Aries Financial, LLC ("Aries") and Al London ('London"), this letter shall supplement certain discovery previously provided and/or referenced in my letter dated August 13, 2010.

We reiterate our general reservation of the right to object to the introduction into evidence at trial of any document or item produced herewith on the grounds set

forth in our prior responses to plaintiffs' discovery demands and our responses thereto.

Enclosed herewith are the following:

1.    Printouts of email messages to/from Al London regarding Aries' matters in Aries' and/or London's possession. Certain of these items have been withheld from disclosure pursuant to our claim of privilege, either attorney-client and/or work product. A privilege log regarding these emails is enclosed as well.

2.    A CD containing files sent by or to Al London to or from Jared Namm regarding Aries.

3.    A pamphlet entitled "Buying Your Home" issued by HUD and referenced by Al London during his deposition which is in the possession of Aries.

4.    Copies of short form applications with notes in possession of Larry Ramaekers.

5.    Copies of loan status reports and outstanding loan reports in possession of Aries.

We are presently reviewing emails recently received from Larry Ramaekers and expect that we will produce to you these emails, together with a privilege log, if any, sometime next week.

We note that we have not been provided with copies of any discovery requested by Britt and/or Petersen from any other defendant.

Finally, I understand that Douglas Kahan will be sending you copies of certain emails in his possession responsive to your prior requests and that Mr. Kahan's response will include a privilege log regarding some of these emails as well.

Thank you for your attention to this matter.

Very truly yours,

Frederick L. Sosinsky

2

FLS:bms
Encl.

cc: All other parties (w/o enclosures)

**Peterson/Britt v. Aries Financial, LLC, et. al.**

## PRIVILEGE LOG

Document Responses from ALBERT LONDON

| Number | Date | Creator | Recipient | Description |
|--------|------|---------|-----------|-------------|
| 1. | 10-14-09 | J. Hotz | Al London | Atty. Cl. Re: litigation |
| 2. | 10-14-09 | F. Accisano | Al London | Atty. Cl. Re: litigation |
| 3. | 10-16-09 | G. McLean | Al London | Atty. Cl. Re: litigation |
| 4. | 10-22-09 | McLean | Al London | Atty. Cl. Re: litigation |
| 5. | 10-16-09 | Accisano | Al London | Atty. Cl. Re: litigation |
| 6. | 10-21-09 | A. Kotarski | Al London | Atty. Cl. Re: litigation |
| 7. | 10-21-09 | S. Hayek | Al London | Atty. Cl. Re: litigation |
| 8. | 10-22-09 | Accisano | Al London | Atty. Cl. Re: litigation |
| 9. | 10-23-09 | Accisano | Al London | Atty. Cl. Re: litigation |
| 10. | 10-26-09 | R. Mondonza | Al London | Atty. Cl. Re: litigation |
| 11. | 10-27-09 | D. Kahan | Al London | Atty. Cl. Re: litigation |
| 12. | 10-28-09 | Kahan | Al London | Atty. Cl. Re: litigation |
| 13. | 10-29-09 | Accisano | Al London | Atty. Cl. Re: litigation |
| 14. | 10-30-09 | L. Haas | Al London | Atty. Cl. Re: lawsuit |
| 15. | 10-30-09 | Kahan | Al London | Atty. Cl. Re: litigation |
| 16. | 10-30-09 | K. Annunziata | Al London | Atty. Cl. Re: litigation |
| 17. | 11-2-09 | Mendonza | C. Laxner/A. London | Atty. Cl. Re: litigation |
| 18. | 11-3-09 | D. Lepore | C. Laxner/A. London | Atty. Cl. Re: litigation |

19.    11-5-09   Accisano        Al London        Atty. Cl. Re: litigation

20.    11-12-09 Kahan           Al London        Atty. Cl. Re: litigation

21.    11-13-09 K. Boesch       Al London        Atty. Cl. Re: litigation

22.    11-13-09 Kahan        C. Laxner/A. London Atty. Cl. Re: litigation

23.    11-16-09 C. Laxner  Carl Gallo/A./C. London     work product from attorneys

24.    11-16-09 D. Jose     C. Laxner/A. London  Atty. Cl. Re: litigation

25.    11-9-09  F. Sosinsky  D. Jose/ A. London  Atty. Cl. Re: litigation

26.    11-18-09 Kahan       C. Laxner/A. London  Atty. Cl. Re: litigation

27.    11-18-09 A. London       Kahan            Atty. Cl. Re: litigation

28.    11-19-09 Kahan          Al London         Atty. Cl. Re: litigation

29.    5-7-10    Accisano       Al London        Atty. Cl. Re: litigation

30.    5-17-09 (2)Accisano      Al London        Atty. Cl. Re: litigation

31.    5-17-09  Accisano/A. London  Ramaekers/Gallo Atty. Cl. Re: litigation

32.    5-18-09  Kahan          Laxner/London     Atty. Cl. Re: litigation

33.    5-19-10  T. Terrell  C. Laxner/Al London  Atty. Cl. Re: litigation

34.    5-20-10  Accisano       Al London         Atty. Cl. Re: litigation

35.    5-26-10  S. Patel    C. Laxner/Al London  Atty. Cl. Re: litigation

36.    5-27-10  A. London       Accisano         Atty. Cl. Re: litigation
                Accisano        Al London

37.    5-28-10  Accisano        Al London        Atty. Cl. Re: litigation
                A. London       Accisano

38.    6-3-10   C. London   Kahan/Al London  Atty. Cl. Re: litigation

39.    6-3-10   J. Widuch   C. Laxner/Al London Atty. Cl. Re: litigation

| 40. | 6-4-10 | C. Laxner | Al London/Kahan | Atty. Cl. Re: litigation |
|---|---|---|---|---|
| 41. | 6-7-10 | Accisano | Al London | Atty. Cl. Re: litigation |
| 42. | 6-8-10 | K. Boesch | Al London | Atty. Cl. Re: litigation |
| 43. | 6-9-10 | L. Jennings | C. Laxner/Al London | Atty. Cl. Re: litigation |
| 44. | 6-9-10 | Boesch | C. London/Al London | Atty. Cl. Re: litigation |
| 45. | 6-9-10 | Accisano | C. London/Al London | Atty. Cl. Re: litigation |
| 46. | 6-10-10 | London Kahan | Kahan London | Atty. Cl. Re: litigation |
| 47. | 6-14-10 | Accisano | A.London/G. Mclean | Atty. Cl. Re: litigation |
| 48. | 6-16-10 | Patel | C. London/Al London | Atty. Cl. Re: litigation |
| 49. | 6-16-10 | Haas | Al London | Atty. Cl Re: litigation |
| 50. | 6-16-10 | Al London Kahan | Kahan Al London | Atty. Cl. Re: litigation |
| 51. | 6-18-10 | Accisano | A. London/Kahan | Atty. Cl. Re: litigation |
| 52. | 6-25-10 | S. DeRosier | C. Laxner/Al London | Atty. Cl. Re: litigation |
| 53. | 6-29-10 | McLean | A. London/C. Laxner | Atty. Cl. Re: litigation |
| 54. | 6-29-10 | Accisano | Al London | Atty. Cl. Re: litigation |
| 55. | 6-30-10 | Accisano | Al London | Atty. Cl. Re: litigation |
| 56. | 7-1-10 | C. London | E. Conolly/A. London | Atty. Cl. Re: litigation |
| 57. | 7-7-10 | DeRosier | C. Laxner/A. London | Atty. Cl. Re: litigation |
| 58. | 7-8-10 | Kahan | Al London | Atty. Cl. Re: litigation |
| 59. | 7-12-10 | Accisano | Al London | Atty. Cl. Re: litigation |
| 60. | 7-13-10 | Accisano | C. Laxner/A/C London | Atty. Cl. Re: litigation |

| 61. | 7-13-10 | S. Kaufman | C./A. London | Atty. Cl. Re: litigation |
| 62. | 7-19-10 | Hayek | C. Laxner/Al London | Atty. Cl. Re: litigation |
| 63. | 7-19-10 | C. Laxner | Al London/Kahan | Atty. Cl. Re: litigation |
| 64. | 7-21-10 | C. Laxner | Al London/Kahan | Atty. Cl. Re: litigation |
| 65. | 7-21-10 | McLean Al London | Al London McLean | Atty. Cl. Re: litigation |
| 66. | 7-21-10 | Boesch | Al London | Atty. Cl. Re: litigation |
| 67. | 7-23-10 | Boesch | Al London | Atty. Cl. Re: litigation |
| 68. | 7-23-10 | Kahan | Al London | Atty. Cl. Re: litigation |
| 69. | 7-27-10 | C. Laxner | Al London/McLean | Atty. Cl. Re: litigation |
| 70. | 7-27-10 | Accisano | Al London | Atty. Cl . Re: litigation |
| 71. | 7-28-10 | Accisano | Al London | Atty. Cl. Re: litigation |
| 72. | 7-28-10 | Al London | Mclean | Atty. Cl. Re: litigation |
| 73. | 7-30-10 | Al London | Mclean | Atty. Cl. Re: litigation |

# EXHIBIT Q



November 5, 2010

Frederick L. Sosinsky, Esq.
45 Broadway, 30th Floor
New York, New York 10006

      Re: Requests for Production

Dear Mr. Sosinsky:

We write on behalf of counsel in both *Petersen v. Aries Financial, et al* and *Britt v. Aries Financial, et al*. Both parties are in receipt of your production of documents in response to our numerous demands. However, they are still woefully and legally inadequate. Please find below a detailed list of the missing documents:

1. Aries has produced no documents from/to Wachovia/Wells Fargo regarding the line of credit it took or the business loan that was sought and denied from the same. Similarly, Aries has failed to produce any documents relating to any communications with other banks or credit unions regarding its failed attempt to obtain a business loan. At a minimum the instructions for the request for production require Aries to account for any missing documents.

2. Aries has failed to produce its business plan or an accounting for why it is missing.

3. Aries failed to produce any of the attachments to the e-mails that were produced in discovery.

4. Aries failed to produce any e-mails from the files of Candice London, Carl Gallo or Carol Laxner. Testimony at deposition indicated that the majority of their business was handled over e-mails. Furthermore, during her deposition, Candice explained that she kept all her Aries Financial e-mails.

5. Aries failed to produce any e-mails to or from any brokers with which Aries worked.

6. Aries failed to produce any e-mails to or from its borrowers.

7. Aries failed to produce—or account for their disappearance—of any e-mails to/from Al London older than September 2009.

8. Aries failed to produce—or account for their disappearance—of any e-mails from/to Larry Ramaekers prior to 2007.

9. Aries failed to turn over documents relating to an LLC its three principals formed in New York during the period of document discovery and depositions. The company is called RAMGALLON, LLC., and documents related to its creation (including business plan), funding and business activities clearly fall within the documents requested by plaintiffs. During their depositions, Al London and Larry Raemakers denied having any businesses with any of the other principals in Aries aside from two Aries-affiliated

entities formed in Florida.  Doug Kahan, Ramgallon, LLC's representative for service of process in New York also denied working in this capacity for Aries and did not disclose the existence of Ramgallon, LLC.

10. Aries failed to turn over more than a handful of e-mails to/from Larry Ramaekers.  Many e-mails from various sources that were turned over reference earlier emails that were not produced.

11. Aries failed to produce any e-mails to/from Doug Kahan when he was acting solely in his capacity as a closing agent.

12. Aries failed to produce any e-mails to/from Fred Powell.

13. Aries produced only one e-mail that referenced either the Britt or Petersen loans or litigation.

14. There are notations in the privilege log stating that "work product" was the reason for not producing e-mails between Larry Ramaekers and Al London.  As neither one of these individuals is an attorney, there are no grounds for the privilege asserted.  Please provide these documents and attachments.

These documents are outstanding despite our repeated demands for the same and Aries' ongoing obligations—consist with the Federal Rules of Civil Procedure—to supplement their responses.  Please respond to this demand and produce the requested documents immediately.  At the very minimum the rules and the instructions obligate Aries to provide an accounting of the missed and/or destroyed documents requested.  Jennifer Light can be reached at 718-237-5556 or jlight@sbls.org

Please also be aware that we plan on filing a motion to compel at the end of discovery.  We shall seek sanctions against your client if necessary.

Finally, we reserve the right to depose any or all of the witnesses in this matter at Aries' cost because of this continued failure to produce all relevant documents requested and because of the significant relevant nature of the discoverable information withheld and unaccounted for in these cases.

Sincerely,

/s/

Matthew Brinegar
Attorney for Herman Britt

2

# EXHIBIT R

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through February 1, 2011.

Selected Entity Name: RAMGALLON, LLC
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | RAMGALLON, LLC |
| **Initial DOS Filing Date:** | APRIL 01, 2010 |
| **County:** | WESTCHESTER |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O DOUGLAS KAHAN, ESQ.
1328 BOSTON POST RD
LARCHMONT, NEW YORK, 10538

**Registered Agent**

NONE

This office does not require or maintain information
regarding the names and addresses of members or
managers of nonprofessional limited liability
companies. Professional limited liability companies
must include the name(s) and address(es) of the
original members, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| APR 01, 2010 | Actual | RAMGALLON, LLC |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

<u>Search Results</u>   <u>New Search</u>

<u>Services/Programs</u>   |   <u>Privacy Policy</u>   |   <u>Accessibility Policy</u>   |   <u>Disclaimer</u>   |   <u>Return to DOS Homepage</u>   |   <u>Contact Us</u>

2/2/2011 3:08 PM

# EXHIBIT
# S

# Aries Financial, LLC
# Overview

**Who we are:**

- **Hard Money Lender**
- **Primarily Owner-Occupied Residential Property**
- **Secured by First Mortgage @ maximum 65% LTV**
- **Seven year loan terms with 15% Initial Interest Rate**
- **First Year's Interest fully covered by Escrowed Funds**

*Loans only to LLC's*

**Alaskan LLC owned by:**
- **Carl Gallo**
- **Al London**
- **Larry Ramaekers**

**Source of Funds:**
- **$3,000,000 Owner's Capital**
- **$9,000,000 Committed Bank Loans**

**Source of Loans**
- **Mortgage Brokers in NYC area**

**Managed by sister company, L & R Management, LLC**

- **Fees equal 20% of profits, plus**
- **2% of new capital invested**

08/30/2010   05:58 5819850087                  LARRYRAMAEKERS                  #0290 P.003/017

# Aries Financial, LLC
## Current Status

**$8,300,000 in loans outstanding**
- **First loan originated March7, 2005**

**New loans of $2,000,000 originated per month**

**$3,700,000 in committed bank financing remaining**

**$1,500,000 in additional Capital committed**

**Startup Company profitable almost immediately**

  o  **Few fixed costs**
  o  **Interest spread on borrowed funds exceeds 8%**

09/30/2010   05:59  5819850067                    LARRYRAMAEKERS                    #0290 P.004/017

# Aries Needs for Continued Growth

**Short Term Needs (Next 4 Weeks)**
- Additional Bank commitment of $4,500,000
- Select third party loan servicer
- Train clerical staff
- Complete Underwriting Guidelines and Procedures

**Intermediate Needs (Next 18 Months)**
- Increase Capital from $4,500,000 to $12,000,000
- Increase commitment for borrowed funds to $36,000,000
- Expand Territory into New Jersey
- Hire full-time management employee
  - Day-to-day broker contact
  - Loan document supervision

**Long-Term Goals**
- Fund business with Capital and Loans to $250,000,000 level
- Determine Exit strategy for original investors
- Obtain Federal Banking Charter

08/30/2010   05:59  5619850087                    LARRYRAMAEKERS                  #0280 P.005/017

# Aries Financial, LLC
## Considerations for Potential Lender

### Favorable Considerations

**Loan to Profitable Company with simple Balance Sheet with only minor creditors other than bank debt**

**Owner/Managers with significant business success record**

**Aries LTV's averaging 54.6%**

- **Lender advancing 75% would have potential secured real estate collateral of 2.38 times its advances**

**Borrower's escrowed interest funds deposited at lender could average 10% of outstanding bank debt**

**Loans are intended to be 12-15 months in duration so the collateral pool has a short-term exit strategy**

### Potential Risks

**Massive Deflation in housing prices**

**No track record on loan refinancing of Aries portfolio**
- **Some anecdotal experience with similar loans**

**Long-term business success dependent upon continued inventory of homes with high LTV potential**

**Infrastructure not currently in place to manage significantly larger business**

**Loans have potential to be 7 year loans and cost of borrowing fluctuates daily**

09/30/2010   05:59  5819950067                    LARRYRAMAEKERS                    #0280 P.006/017



09/30/2010  08:00 5919950087          LARRYRAMAEKERS                    #0290 P.007/017



Aries Outstanding Loans



09/30/2010   06:02   5818850067           LARRYRAMAEKERS                    #0290 P.008/017



Aries Revenue Trends

# Aries Financial, LLC
# Business Plan

## Overview

The mainstream mortgage market for A credits is vast and has many competitors, which causes the pricing for these loans to be acceptable for large banking institutions, but is not acceptable to private loan investors. Even certain of the large lenders choose not to keep loans that they have originated and instead sell or otherwise dispose of their loans while keeping the profitable fees, servicing and escrow benefits. Some enter into securitization arrangements to increase profits.

There is another market of borrowers, known as the sub-prime mortgage market, which is comprised of homeowners who find themselves temporarily classified as higher risk credits. They have fallen into this category because they are having financial difficulties and have not been able to keep current on the payments for their first mortgage and usually other obligations as well.

As their current lender begins collection procedures these borrowers look for options to maintain ownership of their homes. They search for parties willing to lend money for second mortgages, bargain with their creditors and/or find their way to mortgage brokers who try to assist them in their search for funds. A few sell their homes but most do not want to move from the home that their family has occupied for several years.

A subset of sub-prime borrowers with the lowest ratings, now with a lowered FICO score along with the problem that caused their financial difficulty in the first place, cannot find lenders willing to loan them money at terms that borrowers with better credit can obtain. Often they cannot find any conventional lender willing to become involved with this type of borrower, at any interest rate. Additionally, they may have procrastinated to the point where foreclosure is imminent and they are now desperate to save their home.

While the percentage of individuals in this predicament is small, that small percentage of the mortgage market represents billions of dollars in potential loans. The over-all mortgage market is estimated to be four million mortgages per year with the severely troubled market approximating 80,000 borrowers and growing. That market has attracted a specialized group of lenders who have been in operation for many years.

Lenders, such as United Companies Financial Corp. built a substantial business lending money to B & C credits. The premiums that they charged over good credits ranged from 400 to 450 basis points for loans made at or above 85% LTV ratios. While the economy was healthy they prospered. When the economy softened and then stagnated some of their borrowers fell behind on their loan payments, leading to defaults. Refinancing was difficult since the borrowers had little equity in their homes. These borrowers were often not able to attract lenders at any price.

09/30/2010   08:03  5819950087                    LARRYRAMAEKERS                      #0290 P.010/017

## Business Premise

Aries Financial intends to make loans to sub-sub-prime borrowers in selected states using a plan with the following premises:

Aries loans are carefully structured to avoid the potential penalties that the well-intentioned protective laws could levy.

Loans will have a seven-year term with a balloon payment at the end of that term. Payments will cover interest only.

Interest rates generally decline over the life of the loan. Total interest due during the 7-year term plus the points and fees will be less than that allowed by the High Interest Rate Statute of NY. Currently the limitations are 800 basis points above the 7-year Treasury bond with points and fees no higher than 5%. The rate for the 5-year Treasury bond as of February 28th was 4.5%, therefore allowing an APR of 12.5% for the following 30 days. Our loans are currently set at 12.41 % APR.

Lenders, including Aries, who carefully follow all of the regulations, should be thought of with the understanding that the honest loan-maker and the borrower have come together to consummate a beneficial and profitable transaction with the intention of preventing the loss of a home to a threatening foreclosure. The first lenders that Aries contacted last year shied away from any business that dealt with severely troubled borrowers.

Foreclosures followed and the properties were frequently sold at a loss. United Companies failed, along with several competitors.

## House Rich and Cash Poor

The strong real estate market has given many of today's troubled borrower's equity in their homes and provides us a business opportunity.

Troubled borrowers who have owned their homes for several years can find themselves in an unusual situation where they do not have enough cash to pay their current mortgages but have 40 to 60% equity in their homes.

A new group of lenders has emerged to service this market; making loans at much higher interest rates than the better sub-prime borrowers pay. These private lenders typically obtain their capital from wealthy individuals on a loan-by-loan basis and, therefore, are never sure they can actually fund a loan when the application is received.

Those lenders may become entangled in various state and federal laws designed to combat "Predatory Lending". The laws include Usury, Regulation Z, Section 32 mortgages, HOEPA and state predatory lending statutes. Those lenders that we have met do not bother to follow the rules believing that they are small enough to be below the radar. Many governments (sometimes correctly) have viewed the loans to sub-prime borrowers as an unscrupulous way to steal the borrower's home.

## Current Interest Rate Schedule

| | |
|---|---|
| Partial first month | 15% |
| Months 1 to 12 | 15% |
| Months 13 to 24 | 16% |
| Months 25 to 36 | 15% |
| Months 37 to 84 | 8% |

- The state usury rate of New York is 16%.

## Major Loan Terms

Loans are made only to Limited Liability Companies whose owners have transferred their home to the company. Loans to LLC's in New York do require the lender to be licensed in New York. We believe that if it becomes necessary to foreclose on our collateral the LLC structure will make it easier to do so.

Loans are made at a maximum of 65% LTV. Aries' initial loans have averaged 55% of appraised value. Although the mortgage brokers bring these loans to us with appraisals attached, we order a second appraisal to be performed by our own appraiser. The 55% figure for the LTV is compared to our proprietary appraisal .

Credit scores are less important to us than to lenders making higher LTV loans since all of our loans should have collateral sufficient to cover the anticipated costs of foreclosure without sustaining a loss on the loan. Our first loans have been made to LLC's whose Managing Members have FICO scores ranging form 453 to 617 with most in the low 500's.

Loans have a prepayment penalty of 5% of the outstanding balance if paid off within 365 days of origination thereafter the prepayment penalty is eliminated. This provision provides us with a floor level of earnings on each loan .

Aries will make only first mortgage loans that are designed to payoff the current mortgage holder, liens for property taxes and water bills and pay the major outstanding balances on other consumer debt.

The first year's interest is escrowed from the loan's proceeds, therefore, the payment of the first year's interest payment is virtually assured.

Our expectation is that these troubled borrowers will make substantial improvement in their credit ratings over the course of the initial 12-month period of the loan. Borrowers who do not have to make mortgage payments or payoff old debts out of current income should be able to remain current on their other obligations. This, coupled with our ability to demonstrate 12 months of timely mortgage payments, should provide substantial improvement to their credit scores.

Mortgage brokers that we have discussed this with believe that these borrowers, now with improved credit scores and substantial equity in their dwellings, will qualify for less expensive, though still not A credit, new mortgages within 12 to 15 months of our loan origination.

09/30/2010  08:04  5619950067  LARRYRAMAEKERS  #0280 P.012/017

## Expected Company Performance

Pro forma Profit and Loss Statements and Balance Sheets have been attached, prepared on a cash basis. These assume that the average loan is paid off at 15 months.

Aries should be able to produce about $50,000,000 per year in new loans utilizing a New York network that is already in place. Substantial additional business is available if we choose to expand into additional geographic territory. We believe that additional capital is available from the current members or from new investors to fund the anticipated growth as shown on the attached financial statements. To achieve $50,000,000 in loans would require having 250 outstanding loans, which would give us a market share in this segment of ¼ of one per cent (4.0-5.0 % for New York only).

Aries first loan was made on March 7th, therefore, the actual behavior of its' borrowers after the interest escrow has been fully dispersed at 12 months cannot be known. We have checked the performance of other loans in our sector with a reliable market participant and have been told that 97% of the loans are refinanced or the homes sold by the end of the 15 month period. No losses were sustained on the problem loans.

The experience of United Companies Financial Corp. showed 4% foreclosures with 20% losses on the average foreclosure. Aries is different primarily because United Company loans were often in excess of 85% LTV and the homeowners had little incentive to salvage their dwellings since the equity was almost nonexistent. Therefore, we have made only minor provisions for foreclosure costs. If Aries did have the same troubled experience of United it would reduce our returns by 20% of 4% reducing our effective interest rate by 0.8% to 15.2%, still a very healthy rate of interest.

Aries would have to have more than 50% of its loans in default before it would have a problem servicing its debt and low fixed costs.

## Management and Company Operations

Aries has signed a Management Contract with a sister company, L & R Management, LLC to manage the Aries business. The principals of L & R are Albert London and Larry Ramaekers. London and Ramaekers are the loan committee for Aries and currently handle the management and accounting functions for Aries. Resumes for London and Ramaekers are attached.

By year-end we would anticipate adding a permanent professional banker to assist in the managing of the loan portfolio as well as loan evaluations.

By May of 2006, when our first borrowers are due to begin direct payments of their existing loans, we plan to engage a third-party servicing company to handle our loans.

Aries currently operates primarily in New York, which allows us to make loans to LLC's without the necessity of becoming a licensed banker or lender. We are considering applying for a Charter issued by the State of Maine to become a non-depository bank. This process will allow us to make legal loans in other states including Florida and New Jersey, which will further allow us to expand our business.

## Capitalization and Financing

A $9,000,000 line of credit obtained from Wachovia Wealth Management has been used to fund recent loans. Additional funds are projected to be required to maintain growth by March 31, 2006. We are hopeful that the remaining $1,500,000 of committed investor capital will be matched by an additional $4,500,00 in loans from Wachovia. Prior to July 1 we plan to have our long-term funding plans in place

The owners of Aries Financial LLC are Albert London, Larry Ramaekers and Carl Gallo. Each has committed to invest $1,500,000 to provide the initial funding. Two thirds of the commitment has already been funded. Aries made its initial loans directly from investor capital to borrowers.

## Requested Loan

The Company seeks a lender willing to commit $50,000,000 in a non-recourse Credit to fund 80% of outstanding loans and would be supported by the following collateral;

First mortgage loans on owner-occupied residential real estate having an outstanding balance of at least 125% of the funded amount of the bank debt. The appraised value of the mortgaged property should be a minimum of 192% of the loan.

An assignment of Aries rights to the proceeds from borrower's interest escrow agreements.

We would anticipate that the initial amount disbursed from the new credit would be $13,000,000 in June of 2006 growing to $50,000,000 by 9/30/07.

## Anticipated End Game

Each of our principals has sold or retired from their previous businesses. Aries was formed for the opportunity of utilizing skills and knowledge that have been developed over the years as well as employing capital in a lucrative venture. At the same time none of the principals is looking for a long-term career. Our goal, beyond current income, is to build the company to $250,000,000 in outstanding loans and sell it within 5 to 7 years.

09/30/2010   06:04  5619950067        LARRYRAMAEKERS                    #0290 P.014/017



08/30/2010  08:08  5619950087                    LARRYRAMAEKERS                    #0280 P.015/017

# Aries Financial, LLC
## Business Plan Projections

Interest cost    6.50%

| Month | Outstanding Loans | Capital | Borrowed Money | Monthly Interest Earned | Monthly Interest Paid | Misc. Fees | Manage Fees | Other Exp | Est. Net Profit |
|---|---|---|---|---|---|---|---|---|---|
| March 05 | 225,000 | 255,000 | | | | | | | |
| April | 889,500 | 1,379,250 | | | | | | 28,200 | |
| May | 1,039,500 | 1,379,250 | | 2,625 | | | | 1,485 | 2,625 |
| June | 1,224,500 | 1,439,250 | | 20,682 | | | | 688 | (26,200) |
| July | 1,224,500 | 1,484,250 | 47,975 | 12,636 | (69) | 925 | | 52,909 | 20,122 |
| Aug | 1,714,500 | 2,159,250 | 47,975 | 14,057 | 242 | 2,450 | | (699) | 11,847 |
| Sept | 2,374,500 | 3,105,000 | 47,975 | 17,778 | 242 | 2,800 | | 3,000 | (38,461) |
| Oct | 3,369,500 | 3,105,000 | 397,975 | 24,333 | 242 | 18,545 | | 2,260 | 19,637 |
| Nov | 5,012,500 | 3,000,000 | 2,051,000 | 54,140 | 1,608 | 12,778 | 5,772 | 3,500 | 40,378 |
| Dec | 6,869,500 | 3,000,000 | 3,938,000 | 30,633 | 10,304 | 20,146 | 9,721 | 4,000 | 62,312 |
| Jan 06 | 8,346,500 | 3,000,000 | 5,384,000 | 97,384 | 20,497 | 19,425 | 9,729 | 4,500 | 31,503 |
| Feb | 8,990,500 | 3,000,000 | 6,028,000 | 83,408 | 32,657 | 4,838 | 11,063 | 5,000 | 55,316 |
| March | 11,190,500 | 3,021,435 | 8,207,585 | 104,898 | 44,468 | 16,500 | 12,174 | 5,500 | 60,888 |
| April | 13,590,500 | 3,669,435 | 9,959,585 | 130,656 | 53,948 | 18,000 | 15,387 | 6,000 | 76,835 |
| May | 15,986,500 | 4,310,685 | 11,693,315 | 158,556 | 63,339 | 19,500 | 16,686 | 6,500 | 93,330 |
| June | 18,105,000 | 4,500,000 | 13,635,530 | 185,254 | 73,881 | 21,000 | 21,644 | 7,000 | 108,218 |
| July | 20,651,000 | 4,500,000 | 16,489,690 | 211,178 | 89,318 | 22,500 | 23,143 | 7,500 | 115,717 |
| Aug | 23,666,000 | 4,763,200 | 19,211,300 | 244,428 | 104,061 | 24,000 | 25,745 | 8,000 | 133,724 |
| Sept | 27,386,000 | 5,473,200 | 21,581,300 | 279,603 | 118,795 | 25,500 | 28,745 | 8,500 | 151,584 |
| Oct | 30,476,000 | 6,085,200 | 24,419,300 | 319,270 | 132,271 | 27,000 | 30,313 | 9,000 | 175,186 |
| Nov | 33,431,000 | 6,688,200 | 26,783,300 | 355,553 | 145,078 | 28,500 | 35,037 | 9,500 | 184,940 |
| Dec | 35,446,000 | 7,289,200 | 29,195,300 | 380,028 | 158,141 | 30,000 | 38,988 | 20,000 | 213,399 |
| Jan 07 | 38,993,000 | 7,798,500 | 31,232,500 | 425,203 | 169,178 | 31,500 | 42,680 | 20,500 | 224,845 |
| Feb | 41,506,000 | 8,301,200 | 33,243,300 | 454,916 | 180,068 | 33,000 | 44,969 | 20,500 | 242,381 |
| March | 44,880,000 | 8,932,000 | 35,766,500 | 484,237 | 193,735 | 34,500 | 48,476 | 21,000 | 255,525 |
| April | 48,815,000 | 9,763,000 | 39,090,560 | 521,033 | 211,740 | 36,000 | 51,105 | 21,500 | 272,688 |
| May | 51,815,000 | 10,323,000 | 41,390,500 | 589,508 | 223,874 | 37,500 | 54,538 | 22,000 | 306,697 |
| June | 54,415,000 | 10,883,000 | 43,570,500 | 602,176 | 238,007 | 39,000 | 61,319 | 22,500 | 321,349 |
| July | 57,215,000 | 11,443,000 | 45,810,500 | 634,642 | 248,140 | 40,500 | 64,270 | 23,000 | 339,932 |
| Aug | 60,015,000 | 12,003,000 | 48,050,500 | 667,508 | 260,274 | 42,000 | 67,986 | 23,500 | 357,748 |
| Sept | 62,815,000 | 12,563,000 | 50,280,500 | 700,176 | 272,407 | 43,500 | 71,660 | 24,000 | 375,718 |
| Oct | 65,615,000 | 13,123,000 | 52,630,500 | 732,842 | 284,540 | 45,000 | 75,144 | 24,500 | 383,655 |
| Nov | 68,415,000 | 13,683,000 | 54,770,500 | 765,508 | 296,674 | 46,500 | 78,732 | 25,000 | 411,603 |
| Dec | 71,215,000 | 14,243,000 | 57,010,500 | 798,175 | 308,807 | 48,000 | 82,321 | 25,500 | 429,547 |

05/30/2010  06.06  5519950061          LARRYRAMAEKERS                    #0290 P.016/017

## Aries Financial, LLC
## Schedule of Loans Originated

| Loan No. | Date | Borrower | Managing Member | Loan Amount | Monthly Payment | Due Date | Orig. Fees | Daily Int. |
|---|---|---|---|---|---|---|---|---|
| 501 | 3/7/2005 | ZWLN Corp. | Castro | $225,000 | $2,625.00 | 7-Apr | | $1,108.33 |
| 502 | 4/7/2005 | SFLG Corp. | Francois | $261,250 | $2,931.25 | 7-May | | $2,146.67 |
| 503 | 4/13/2005 | ZVTW Corp. | Parker | $206,250 | $2,406.25 | 13-May | | $972.22 |
| 504 | 4/19/2005 | 147-17 115th Realty Corp. | Felix | $207,000 | $2,415.00 | 19-May | | |
| 505 | 5/13/2005 | 9 West Meadow Holding Corp. | Nowosielski | $150,000 | $1,750.00 | 1-Jul | $1,200.00 | |
| 507 | 8/9/2005 | 912 Susan Place, LLC | Michel | $240,000 | $2,800.00 | 1-Oct | $1,250.00 | |
| 508 | 8/22/2005 | 500 Liberty Ave, LLC | Genao | $250,000 | $2,916.67 | 1-Oct | | $1,995.00 |
| 509 | 9/13/2005 | 33 Dolphin way, LLC | Humbles | $285,000 | $3,325.00 | 1-Nov | $1,425.00 | |
| 510 | 9/26/2005 | 964 Hillside Ave., LLC | Markowitz | $200,000 | $2,333.33 | 1-Nov | $1,000.00 | $388.89 |
| 511 | 10/3/2005 | 34 Burchell Blvd., LLC | Bailey | $198,000 | $2,310.00 | 1-Dec | | $2,233.00 |
| 512 | 9/29/2005 | 76 Smyrna Ave, LLC | Mastroianni | $360,000 | $4,200.00 | 1-Nov | $1,800.00 | $280.00 |
| 513 | 10/17/2005 | 519 Throop Street, LLC | Peterson | $437,000 | $5,098.33 | 1-Dec | $4,370.00 | $2,549.17 |
| 514 | 10/21/2006 | 8350 NW 24th Place, LLC | Herard | $165,000 | $1,808.33 | 1-Dec | $1,550.00 | $663.05 |
| 515 | 10/21/2005 | 11 Hammersly Ave., LLC | Johnson | $195,000 | $2,275.00 | 1-Dec | $1,950.00 | $834.17 |
| 516 | 11/14/2005 | 70-23 67th Street, LLC | Ambrosch | $302,000 | $3,523.33 | 1-Jan | $3,020.00 | $2,348.89 |
| 517 | 11/14/2005 | 70-23 67th Street, LLC | Ambrosch | $373,000 | $4,351.67 | 1-Jan | $3,730.00 | $2,901.11 |
| 518 | 11/18/2005 | 47 Tamarack Street-LLC | Johnston | $260,000 | $3,033.33 | 1-Jan | $2,600.00 | $2,022.22 |
| 519 | 11/17/2005 | 4023 Foster Ave, LLC | Da Silva | $243,750 | $2,843.75 | 1-Jan | $2,437.50 | $1,327.08 |
| 520 | 11/29/2005 | 71-06 67th Place-LLC | Mangione | $474,500 | $5,535.83 | 1-Jan | $4,745.00 | $184.53 |
| 522 | 12/7/2005 | 385 Leverett Avenue LLC | Nasti | $200,000 | $2,500.00 | 1-Feb | $2,000.00 | $1,944.44 |
| 523 | 12/21/2005 | 289 E. 64th Street, LLC | Moise | $400,000 | $4,666.67 | 1-Feb | $8,000.00 | $1,711.11 |
| 524 | 12/20/2005 | 22 Callcotree Lane, LLC | Benedetto | $211,250 | $2,840.63 | 1-Feb | $1,056.25 | $985.83 |
| 525 | 12/27/2005 | 84 Rutland Road, LLC | Pointer | $520,000 | $6,500.00 | 1-Feb | $6,500.00 | $404.44 |
| 526 | 12/23/2005 | 110-03 163rd Street, LLC | Carroll | $292,500 | $3,656.25 | 1-Feb | $1,462.50 | $1,023.75 |
| 527 | 12/30/2005 | 1145 Coates Avenue, LLC | Iorio | $263,250 | $3,290.62 | 1-Feb | $2,632.50 | $511.88 |
| 528 | 1/5/2006 | 138 6th Avenue, LLC | Hodenfeld | $600,000 | $7,500.00 | 1-Mar | $12,000.00 | $6,300.00 |
| 529 | 1/30/2006 | 52 Linden Avenue, LLC | Natalo | $209,000 | $2,612.50 | 1-Mar | $1,045.00 | $162.56 |
| 530 | 1/31/2006 | 538A Monroe Street, LLC | Holiman | $392,300 | $4,903.75 | 1-Mar | $3,923.00 | $162.56 |
| 531 | 1/31/2006 | 538A Monroe Street, LLC | Holiman | $244,750 | $3,059.38 | 1-Mar | $2,447.50 | $95.18 |
| 532 | 2/14/2006 | 4010 Bronx Blvd., LLC | Love | $253,250 | $3,165.63 | 1-Apr | $2,532.50 | $1,477.29 |
| 533 | 2/27/2006 | 568 Autumn Avenue, LLC | Cooke | $317,000 | $3,962.50 | 1-Apr | $6,340.00 | $132.08 |
| 534 | 2/28/2006 | 107 Glenmore Avenue, LLC | Mehnert | $76,000 | $937.50 | 1-Apr | $375.00 | $31.25 |
| 535 | 3/1/2006 | 810 14th Street, LLC | Spitaleri | $190,000 | $2,375.00 | 1-May | $950.00 | $0.00 |

09/30/2010  06:06 5619950067          LARRYRAMAEKERS            #0290 P.017/017

## Aries Financial, LLC
Revenue, Expense and Profit Trends

| | Interest Income | Miscellaneous Fees | Interest Expense | Professional Fees | Management Fees | Miscellaneous Expense | Net Income |
|---|---|---|---|---|---|---|---|
| May 05 | $2,625 | | | $20,400 | | $5,881 | -$23,656 |
| June 05 | $20,682 | $925 | | | | $1,485 | $20,122 |
| July 05 | $12,535 | | | | | $688 | $11,847 |
| August 05 | $14,067 | $2,450 | $69 | $4,547 | | $48,362 | -$36,461 |
| September 05 | $17,778 | $2,800 | $242 | | | $699 | $19,637 |
| October 05 | $24,333 | $18,545 | $242 | $2,205 | | $55 | $40,376 |
| November 05 | $54,140 | $12,778 | $1,606 | $9,257 | | $2,349 | $53,706 |
| December 05 | $30,933 | $20,146 | $10,304 | $1,138 | $5,772 | $36 | $33,829 |
| January 06 | $63,406 | $19,415 | $20,467 | $4,495 | $9,721 | $292 | $47,846 |
| February 06 | $81,940 | $14,165 | $27,964 | | $15,922 | $2,000 | $50,219 |

# EXHIBIT T

LAW OFFICES OF

# FREDERICK L. SOSINSKY

45 BROADWAY, 30TH FLOOR

NEW YORK, NEW YORK 10006

TELEPHONE (212) 285-2270

TELECOPIER (212) 509-8403

EMAIL: Freds@newyork-criminaldefense.com

November 17, 2010

<u>BY FEDERAL EXPRESS</u>
Jennifer Light, Esq.
Jennifer Sinton, Esq.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, New York 11201

Douglas Kahan, Esq.
225 Broadway, Suite 715
New York, New York 10007

Gary Schoer, Esq.
6800 Jericho Turnpike, Suite 108W
Syosset, New York 11791

Donna Dougherty, Esq.
Legal Services for the Elderly
97-77 Queens Boulevard, Suite 600
Rego Park, New York 11374

Re:    Herman Britt v. Aries Financial, LLC, *et al.*
       09 Civ 2398 (RJD)(ALC)  and
       Marie Petersen v. Aries Financial, LLC *et al.*
       <u>06 Civ 6663 (RJD) (ALC)</u>

Dear Counsel:

On behalf of defendants Aries Financial, LLC ("Aries") and Al London ('London"), this letter shall supplement certain discovery previously provided and/or referenced in my letters dated August 13, 2010 and October 21, 2010.

We reiterate our general reservation of the right to object to the introduction into evidence at trial of any document or item produced herewith on the grounds set

forth in our prior responses to plaintiffs' discovery demands and our responses thereto.

Enclosed herewith is a CD containing the following:

1.   Email messages to/from Larry Ramaekers regarding Aries' matters in Aries' and/or Remailers' possession. As you know, previously, certain of these items (emails) were withheld from disclosure pursuant to our claim of privilege, either attorney-client and/or work product, or on relevance grounds. A privilege log regarding these emails was also provided.   Please note that an updated privilege log is provided herewith separately and you will note that a large number of additional emails that previously were not provided are now provided.  Contrary to Mr. Brinegar's claim in his letter of November 5, 2010, hundreds, not a handful, of these emails were then and are now being provided.  Please also note that where an attachment to such email was available, it has now been provided.  We believe that in the privilege logs, we have provided more than sufficient information, including the type of information set forth in Ms. Salzman's letter of November 11, 2010, regarding these email communications.  The suggestion that you are entitled to further disclosure regarding communication between counsel and my client regarding past or ongoing litigation of other borrowers' claims, the large majority of which are/were foreclosure litigation, is, in our view, misplaced.

2.   Those email messages to/from Al London regarding Aries' matters in Aries' and/or London's possession for which an attachment was available and which was not previously provided.   As you know, previously, certain of these items (emails) were withheld from disclosure pursuant to our claim of privilege, either attorney-client and/or work product, or on relevance grounds. A privilege log regarding these emails was also provided.  Please note that the only change to this privilege log is the removal of item 23 on such log – and our producing the email referenced. We believe that in the privilege logs, we have provided more than sufficient information, including the type of information set forth in Ms. Salzman's letter of November 11, 2010, regarding these email communications.  The suggestion that you are entitled to further disclosure regarding communication between counsel and my client regarding past or ongoing litigation of other borrowers' claims, the large majority of which are/were foreclosure litigation, is in our view, misplaced.

3.   An attachment to an email to/from Douglas Kahan (previously provided) dated November 20, 2007.

2

4.   Documents relating to Ramgallan, LLC.

Also enclosed herewith is a second CD containing files from a computer utilized by Candice London. Most of these documents were previously provided to you, some twice.

Finally, enclosed herewith is a copy of documents already in the possession of plaintiffs' counsel regarding Aries' business and need for ongoing financing.

With regard to Mr. Brinegars' letter dated November 5, 2010, and his characterization of certain documents as being "missing", Aries responds to his numbered demands as follows:

As to "1", you have received from Wells Fargo/Wachovia, according to our information, all of the documents that you have demanded, including all of the various account statements. The fact that Aries may have talked to other lenders does not mean that there are records of these conversations, nor must such conversations be memorialized under any rules. As to "2", Aries previously provided counsel, on several occasions, with such a document and its principals were asked questions *ad nauseum* regarding the document. Furthermore, the document attached hereto, which plaintiffs' had at the time Mr. Brinegar authored his letter, also relates to a business plan. As to "3", we have provided herewith the attachments to the emails previously provided, to the extent that they were not previously accessible. As to "4", each of the witnesses deposed were asked about their methods of communication and you have their answers regarding their retention of emails, replacement of computers and the like. With regard to Candice London, her testimony concerned her keeping the documents that were sent to her by email by others at Aries, which she then worked off of. Then, and again now, we produce files that she received, modified and saved that came to her in these emails. She did not save the emails themselves, as she has explained.

With regard to items "5" through "8", the response is the same as that to item 4.

As to item "9", see documents provided herewith.

As to item "10", as discussed above, hundreds of emails have been provided.

As to item "11", the response is the same as that to item 4. As to item "12", the response is the same as that to item 4. As to item "13", the response is the same as that to item 4.

3

Finally, you are provided herewith with additional emails and attachments and revised privilege logs which address the issue raised in item "14" of the letter.

Thank you for your attention to this matter.

Very truly yours,

Frederick L. Sosinsky

FLS:bms
Encl.

cc: All other parties (w/o enclosures)

4

**Peterson/Britt v. Aries Financial, LLC, et. al.**

**PRIVILEGE LOG**

Document Responses from Larry Ramaekers

| No. | Date | Creator | Recipient | Description | Managing Member Borrower |
|---|---|---|---|---|---|
| 1. | 9-20-07 | AL | DK, Esq/LR/ CL/ Laxner | a.c; w.p. | Ketcham-lit. |
| 2. | 11-3-07 | LR AL | AL/CG LR/CG | irrelevant, partner voting employee performance same | |
| 3. | 11-24-07 | AL | LR/Schottla/ Liebowitz/FP | irrelevant/personal non-Aries matter, Sky Cap | |
| 4. | 12-28-07 | AL | FP/Liebowitz/ Schottland/LR | irrelevant; personal non-Aries matters, Sky Cap | |
| 5. | 12-28-07 | AL | G.McLean, Esq/LR | a.c; | Lorenzo-lit |
| 6. | 1-24-08 | McLean, Esq | AL/CL | a.c. | Lorenzo-lit |
| 7. | 1-23-08 | DK Esq. | AL | a.c. | Moise-fc/lit |
| 8. | 1-25-08 | CL | DK/AL/ LR/Laxner | a.c. | Moise-lit Schweiger-lit |
| 9. | 1-25-08 | McLean, Esq. | AL/LR/CG | a.c. | Lorenzo-lit |
| 10. | 2-1-08 | DK | Laxner/CL/AL/ LR/CG | a.c. | Barnaby-fc Britt-lit |
| 11. | 2-8-08 | DK | CL/AL/LR/ CG | a.c. | Moise/Foley Ketcham/Schwei |
| 12. | 5-30-08 | DK AL | AL/LR/CG LR/CG | a.c. a.c. | Peterson-lit from DK |
| 13. | 9-29-08 10-2-08 | AL DK | LR/CG/DK CL/Laxner | a.c. | Peterson/John Foley/Cruz |

| | | | | | |
|---|---|---|---|---|---|
| 14. | 10-6-08/ 10-7-08 | DK | AL/CL LR/CG | a.c. | Johnson – fc/l |
| 15. | 11-3-08 | AL | LR/CG/ McLean, Esq. | a.c.; w.p. | Bacola-fc |
| 16. | 11-4-08 | DK | AL/LR/CG | a.c. | general thoug impressions/strat |
| 17. | 11-5-08 | AL | DK/LR/CG | a.c. | general thoug impressions/strat |
| 18. | 11-5-08(2) | DK | AL/LR/CG | a.c. | same as abov |
| 19. | 12-18-08 | N. Horner, Esq. CL | CL/Laxner AL/LR/CG | a.c | DaSilva-lit/fc from NH, esq. |
| 20. | 12-30-08 | McLean, Esq. | AL/LR/CG/ Schottland, Esq./ Glick, Esq. | a.c. | Bacola-lit |
| 21. | 1-16-09/ 1-17-09 | DK | AL/LR/CG | a.c. | Foley-fc |
| 22. | 2-4-09 | Manuel-Coughlin, Esq. | AL/Laxner/ LR/CG | a.c. | DaSilva-lit |
| 23. | 2-5-09 | Haas/McLean, Esq. | AL/LR/ CG | a.c. | DaSilva-lit |
| 24. | 2-18-09 | AL AL | DK/LR LR/CG | a.c. a.c.. | Johnson-fc Mora-fc GM, esq. stateme |
| 25. | 2-20-09 | Atkinson, Esq. | AL/Schottland, Esq. LR | a.c. | DaSilva-lit |
| 26. | 2-22-09 | DK | AL/LR | a.c. | Johnson-fc |
| 27. | 4-14-09 | Ryder/Hunt Leibert, Esqs. | Laxner/AL/CL/ LR | a.c. | Lyga-fc |

| 28. | 4-15-09 | DK | AL/LR | a.c. | Cruz-fc |
| 29. | 6-1-09 (2) | DK | AL/LR/CG | a.c. | Johnson-fc |
| 30. | 6-17-09 | CL | DK/AL/LR/ | a.c. | Johnson-fc |
| | | | | | Foley-fc |
| | | | CG | a.c | Cruz-fc |
| | | | | | Moise-fc |
| 31. | 6-23-09(3) | Laxner | DK/CL/AL/LR/CG | a.c. | Cruz-fc |
| | | | | | Barnaby-fc |
| | | | | | Sanchez-fc |
| | | | | | Moise-fc |
| 32. | 6-23-09 | Accisano, Esq. | AL/LR/CG | a.c. | Lorenzo-lit |
| 33. | 7-20-09 | AL | DK/LR/CG | a.c. | Foley-fc |
| 34. | 7-24-09 | AL | McLean, Esq./LR/CG | a.c. | DaSilva-fc |
| 35. | 7-24-09 | Montas/ Liebert,Esqs. | Laxner/AL/LR/CG | a.c. | Lyga-lit |
| 36. | 9-10-09 | Laxner | Penfield/Liebert,Esq/CL | a.c. | Lyga-lit |
| 37. | 9-15-09 | Penfield/ Liebert,Esqs. | Laxner/AL LR/CG | a.c. | Lyga-lit |
| 38. | 10-12-09 | DK | AL/LR/CG | a.c. | Foley-fc |
| 39. | 11-12-09 | DK | AL/LR/CG | a.c. | Cruz-fc |
| 40. | 11-30-09(2) | DK | CL/AL/Laxner/LR/CG | a.c. | Dimitrakis-fc |
| 41. | 12-3-09/ 12-4-09 | AL DK | DK LR/CG | a.c. | Dimitrakis-fc |
| 42. | 12-11-09/ 12-12-09 | AL LR DK | LR AL AL | a.c. a.c.. a.c. | Dimitrakis-fc |

| | | | | | |
|---|---|---|---|---|---|
| 43. | 12-30-09/ 12-31-09 | AL | LR | a.c. | Dimitrakis-fc |
| | | LR | AL | a.c. | |
| | | DK | AL | a.c. | |
| | | AL | LR | a.c. | |
| 44. | 1-19-10 | Penfield-Liebert, Esqs. | Laxner | a.c. | Lyga-fc |
| | | Laxner | Penfield-Liebert, Esq./CL | a.c. | Lyga-fc |
| | | AL | LR/CG | a.c. | Lyga-fc |
| 45. | 2-2-10 | McLean, Esq. | AL/LR/CG | a.c. | Charlie O./strategy |
| 46. | 2-3-10 | Hoffman, Esq. | CL/AL/G. McLean, Esq/ LR/CG | a.c. | Charlie O./strategy |
| 47. | 2-10-10 | Baum, Esq. | AL/LR/CG | a.c. | Burt-fc |
| 48. | 2-14-10 | Case, Esq. | Laxner/AL | a,c. | Burt-fc |
| 49. | 2-25-10 | J. Namm, Esq | AL | a.c. | Burt-fc |
| 50. | 3-3-10 | Arter/ Liebert, Esqs. | Laxner/CL/AL LR/CG | a.c. | Lyga-fc |
| 51. | 5-26-10 | Laxner | DK/AL/CL/LR/ CG | a.c. | thoughts/impression lit strategy |
| 52. | 5-27-10 | LR | AL/CG/DK Laxner/CL | a.c. | thoughts/impression lit strategy |
| 53. | 6-1-10 | DK | AL/LR/CG | a.c. | Foley-fc |
| 54. | 7-12-10 | Accisano, Esq. | Laxner/CL/AL/LR | a.c. | DaSilva-lit |
| 55. | 7-20-10 | McLean, Esq. | AL/CL/Laxner/LR/ CG | a.c. | Charlie O. -fc |
| 56. | 7-27-10 | Accisano, Esq. | AL/LR/CG | a.c. | Lorenzo-lit |
| 57. | 8-5-10 | Accisano | AL/LR/CG | a.c. | Lorenzo-lit |

| 58. | 8-17-10 | McLean, Esq. | Kirn,Esq./AL/LR/ CG/CL/Laxner | a.c. | Royster-lit |
| 59. | 8-26-10 | Accisano | Laxner/AL/LR/CG | a.c | Lorenzo-lit |

# EXHIBIT
# U

| | |
|---|---|
| From: | AL [aolondon@earthlink.net] |
| Sent: | Saturday, January 23, 2010 3:14 PM |
| To: | Larry Ramaekers; Carl Gallo |
| Subject: | news |

Two of our borrowers have indicated that they are actively trying to sell or refinance. They are Hines and Lessard. They both are in foreclosure with us which will continue until they are successful or we get permission to move the property to auction.

Charlie O still has not been resolved. He owes about $25K in taxes. Our new LLC may be able to tackle that one first. Another is DaSilva, a tax lien certificate was purchased by an investor for $14K. We might be able to purchase the lien and use it as leverage to get the BK tossed.

I would like to fund the new LLC from Aries, if it can accumulate enough cash. The mechanics may have to be move money to us personally and then personally fund the new company. Whether to use the three of us by name might require some advice. If we are able to foreclose through a tax lien, I do not want it tossed by a court, saying Newco is still just Aries.

I will seek guidance from Michael Schottland who suggested the strategy to us originally.

Thank you both for your support for the new LLC. I will inform you both as to what additional information I learn about this new approach to foreclosures. If you have any suggestions they are most welcome. AL

# EXHIBIT

# V

TO:       **AL LONDON**
FROM:     **JBN**
DATE:     **8-25-05**
RE:       **NUMERICAL TEST AND TIL-REG. Z**

"Numerical Test" for determining whether business is a "creditor" for specific transaction at issue and subject to coverage and regulation of TIL.

In general, TILA applies to each individual or business that offers or extends credit when four conditions are met:

-The **credit** is offered or extended to **consumers**;
-The offering or extension of credit is **done regularly**;
-The credit is subject to a finance charge or is payable by a written agreement in more than 4 installments; and
-The credit is **primarily** for **personal, family, or household purposes.**

In application you must look at each above requirement. The base requirements of "consumer credit" (including **"who is a consumer"**, what are personal, family, or household purposes and what is credit). Then analysis of who is a **"creditor"** (including what is mean by "regularly" and the finance charge/four installment rule). Then look at the classes of transactions exempted by the Act.

-Consumer credit is defined as credit offered or extended to a consumer primarily for personal, family, or household purposes.

-This definition subsumes three separate elements, each of which must be present. The "primarily for personal, family or household purposes' element is the reverse side of the business purpose exemption.

-Credit must be offered or extended to **a "consumer" who is defined as a "natural person."**[1]

-Issues usually arise under the meaning of "primarily"' There is no precise test for what constitutes credit offered or extended for personal, family or household purposes or for what constitutes the primary purpose. Looking towards the Official Staff Commentary definition of "business purpose" at Sec. 226.3(a).

---

[1] 15 U.S.C. Sec. 1602(h); Reg. Z Sec. 226.2(a)(11). In addition, a separate section of the TILA, Sec. 1603(a), **specifically exempts credit granted to organizations from the statutes coverage.** Prifti v. PNC Bank, 2001 WL 1198653 (E.D. Pa. Oct. 9, 2001) **(corporations and organizations cannot be considered consumers regardless of the purposes for which credit was used).**

*Creditor*

TILA's definition of a creditor is central defining the scope of its coverage.  For most TIL transactions, a creditor is defined as a person:

- Who regularly extends consumer credit that is subject to a finance charge….; and
- To whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

A creditor can be a "person".  While a "consumer" ordinarily can only be a natural person, a person can be a natural person or an organization.  An organization can include a corp., partnership, proprietorship, association, cooperative, estate, trust or government unit.

*Regularly Extends Consumer Credit*

The meaning of "regularly" deserves careful attention.  **In cases where whether the lender meets the definition of creditor is at issue, the burden will be on the borrower to establish that the lender "regularly" extends credit.**  Reg. Z has adopted the mathematical test to determine if a person "regularly" extends consumer credit.  To meet the test of "regularly" a person must have extended consumer credit more than 25 times in the preceding calendar year.

The numerical standard is lower for real-estate secured loans.  A person also regularly extends consumer credit if the person extended credit more than 5 times in the preceding calendar year if each of those transactions was secured by a dwelling.[2]  For example, if a person extends consumer credit secured by a dwelling 6 times in 1998, the person is a creditor for at least the 6th extension of credit in 1998 and for all extensions of consumer credit in 1999.

In high-cost mortgage transactions subject to HOEPA, the numerical standard is lower.  Under the Act, a HOEPA loan is one which meets a specific precise statutory definition; broadly speaking, it is a closed-end home-equity loan which meets the prescribed cost triggers.  A lender who originates 2 or more HOEPA loans in any 12 month period becomes a creditor—for all TIL purposes.[3]  And, to address the problem with brokers,

---

[2] Reg.-Z Sec. 226.17(a), n. 3. (Note, too, that the broad definition of dwelling. Reg.-Z Sec. 226.2(a)(10), includes mobile homes, trailers, condominiums, and cooperatives, as well as traditional houses.) See Thanhauser v. Nemickas, 2001 WL 1617183 (Conn. Super. Ct. Nov. 29 2001) (dismissing borrowers' TIL claim because they did not allege sufficient facts to establish that mortgage lender extended dwelling-secured credit more than 5 times in the preceding year); McDonnell v. Von Feldt, 604 N.W.2d 305 (Wis. Ct. App. 1999) (borrower identified 7 real-estate secured loan transactions, **but lender was able to rebut by establishing that 2 loans were business purpose credit, for one loan he was not the originating lender, and 2 other loans were actually made in a different calendar year**).

[3] 15 U.S.C. Sec. 1602(f).  Reg. Z. Sec. 226.2 n.3.  A person who originates three home-secured loans, two of which are HOEPA loans, must comply with all TIL regulations for the latter 2 loans, even if the third loan is not a HOEPA loan.  Anderson v. Wells Fargo Home Mortgage, 259 F.Supp. 2d 1143 (W.D. Wash. 2003).

originating one HOEPA mortgage through a mortgage broker likewise turns a person into a TIL creditor.

If these standards were not met in the preceding year then they must be applied to the current calendar year.[4] Again, according to the Commentary, a person who did not extend credit in 1998, but extends consumer credit 26 times in 1999, would be a creditor for the 26th and all further extensions of credit in 1999. Or, a person who did not extend credit in 1998, but extends consumer credit secured by a dwelling six times in 1999, would be a creditor for the 6th and all further extensions of credit in 1999.

The Commentary interpretation of the Regulation's numerical test is excessively literal in allowing new creditors who intend to extend far more than 25 credit extensions in their first year of operation to, in effect, have 25 "free-bites" (or five, if the loans are secured by a dwelling) for the first credit extensions in their first year of operation. Nothing in the Act of the Regulation itself dictates a "25 free bites" reading, and it certainly is difficult to justify, given the public policy of disclosure that Truth in Lending is to fulfill. It may well have been the FRB staff's effort to deal with the issue of persons who make occasional loans as a sideline, but it makes no sense to allow a newly established lending business to deny its first customers disclosures concerning the cost of credit or the right to rescind. Though staff interpretation of Reg.-Z are to be given great deference, this free-bite interpretation may be vulnerable to challenge as "demonstrably irrational."

In practice, some fringe lenders have apparently tried to evade TILA by orchestrating sham related entities, each of which appears to keep below the numerical limit each year. If done by those making high-cost home equity loans, the lower numerical test for HOEPA transactions will take care of the problem directly in some cases. In other cases, it may be possible to argue that here, too, substance rather than form should dictate, and the court should consider whether facially distinct creditors are really one single entity.

Therefore, in applying the concept these rules, the commentary and definitions to the situation where a lender made 4 extensions of credit in 2005 in which they are all made to non-natural persons (organizations/corporations). Then in 2006 the lender makes 4 extensions of credit again to non-natural organizations. The fifth extension of credit in 2006 is made to another non-natural person but this organization defaults, thus foreclosure is pursued and in defense the borrower/organization raises a TIL claim for rescission. The borrower would have to meet the burden of first establishing that the lender regularly extends credit, thus was in fact a creditor for that transaction. Based upon the numerical test, all of the previous 8 transactions "could" be rebutted by evidence that the extensions were not made to consumers; but to non-natural personas, corps and organizations.

---

[4] Official Staff Commentary Sec. 226.2(a)(17)(i)-4. While it would appear that the test periods are either the preceding calendar year or, failing that, the current calendar year, the Fourth Circuit has taken the position that the test period begins on January 1 of the preceding calendar year and continues until the date of the transaction in the current calendar year. Redic v. Gary H. Watts Realty Co., 762 F.2d 1181 (4th Cir. 1985) (court examined number of the defendant's consumer credit transactions secured by a dwelling between January 1, 1980 and December 23, 1981; the date of its transaction with the plaintiff).

Was this person a creditor for the transaction at issue bringing them within TIL coverage?

If not a creditor, then cannot be subject to TIL.

If a creditor for this transaction, is there an exemption that applies for this transaction?

If no exemption, then TIL applies and subject to regulation and liability for failure to make disclosures (or if made, made improperly, etc.) and potential rescission.

If there is an exemption; it was made to an organization/corporation thus exempt, or not secured by a dwelling, or made for a business or organizational purpose then creditor not subject to TIL liabilities.

# EXHIBIT
# W

From: Al London [mailto:alolondon@gmail.com]
Sent: Tuesday, August 17, 2010 4:33 PM
To: Ramaekers, Lawrence J.
Subject: Fwd: FW: Values

I enlarged the section and put in red. My purposes is not to argue, embarrass or in any way to act belligerent. If you feel I am, then I apologize in advance.

We do have opinions and we can both be right and wrong at the same time. It comes down to judgement of what to do to solve a problem. I will give more thought to your email and see what I can come up with as a suggestion or solution.

Thanks. AL

---------- Forwarded message ----------
From: Ramaekers, Lawrence J. <ljramaekers@ramaekersgroup.com>
Date: Tue, Aug 17, 2010 at 5:44 PM
Subject: FW: Values
To: AL <aolondon@earthlink.net>, Carl Gallo <crgalla@bellsouth.net>

Al,

The email that I sent you is below. It says that we will lose $1,000,000, not $2,800,000. I can't find any email that I wrote saying that we would lose $2,800,000. My point in the email is that you minimize the loss potential by not including all of the costs related to a property, and, in your attached email you try to further minimize the loss by asking that we consider previously earned interest when making sale decisions. Real banks report their losses as I detailed below. If we take losses on the balance of our portfolio of the magnitude we could experience here of more than 35% then we will lose about $3,500,000 on the remaining $10,000,000 in loans and each of us will lose about half of our original investment. I acknowledge that the amount of our loss does not influence the price that people are willing to pay us. However, I do point up that people who know what they are doing believe that they can make a significant profit by buying these loans from us. You always only tell us about the gross purchase price not the net amount we would receive and deductions always exceed my expectations. If we sell the loans for $2,300,000 how much cash will we receive after paying all costs including license?

From: Ramaekers, Lawrence J.
Sent: Tuesday, August 17, 2010 12:48 PM

Aries 2010-10-15 Disc LR
12 of 323

To: 'Al London'; Carl Gallo
Subject: RE: Values

I don't think that banks, or Aries should consider the amount we have received in interest as part of our current decision. In addition to what we have loaned on these properties we have legal expenses, taxes insurance and other costs of holding these properties plus the interest we have been paying to carry them since their last payments. **The loss we would take by accepting Senese's offer would be $2,800,000 plus all of our additional costs and lost interest less the net payment for the loans.** You have never mentioned what Senese's cut and closing costs will be subtracted from their proposed purchase price.

The loss is likely to far exceed $1,000,000. If they can make money on these properties why can't we?

---

From: Al London [mailto:alolondon@gmail.com]
Sent: Tuesday, August 17, 2010 11:19 AM
To: Ramaekers, Lawrence J.; Carl Gallo
Subject: Values

The appraisals have come in with the exception of Wechsler which is expected today. My guess for that one is about $500K. Assuming that number for now, says the 7 properties are worth $3.2 million in today's market.

**That number is not what we would receive if we waited to own them all, pay more in legal fees, fix them up, pay the real estate taxes, commissions etc.**

16

**From:**        Ramaekers, Lawrence J.
**Sent:**        Wednesday, July 01, 2009 9:05 PM
**To:**          'Al London'; Carl Gallo
**Subject:**     RE: 51 blaine.pdf - Adobe Reader

Al,  You are the manager of the company.  You were instructed by Carl and I to keep up with the taxes and insurance on the properties we still have.  Obviously you did not do it.  How many other properties are we in danger of losing or being uninsured?  We cannot lose this property.  What do you recommend?

-----Original Message-----
From: Al London [mailto:aolondon@earthlink.net]
Sent: Wednesday, July 01, 2009 8:27 PM
To: Ramaekers, Lawrence J.; Carl Gallo
Subject: FW: 51 blaine.pdf - Adobe Reader

As you can see the attached tax lien is for more than $40K. We were just notified. Apparently this has been going on without our knowledge. The reason for that was because our assignment from Worldwide was never recorded. It is now but they did not have us as the owners. I believe the lien is incorrect since we paid about 1/2 when we closed the loan.

Two separate attorneys told us to pay the lien and then go after the title company and its' agent. That may be sound advice but we do not have enough money to pay the lien. If the lien is not paid within 2 weeks we lose the property to the current lienholder. The property was appraised for more than $500K.

I asked our attorney to delay the sale. It cannot be delayed because the judge has already ruled on the sale.

I need money to continue to operate Aries. Please contact me with any ideas or solutions.  If we had received the Royster money we would be in better shape but it has not arrived despite our daily complaints and threats.  AL

**From:**       Ramaekers, Lawrence J.
**Sent:**       Thursday, July 02, 2009 11:40 AM
**To:**         'Al London'
**Subject:**    RE: 51 blaine.pdf - Adobe Reader

I agree that we need money.  Please provide us with a budget for the next three months so
that we con determine the proper amount to put in.  Include expected receipts from borrowers,
loan closings, salaries and attorney bills taxes to be paid and insurance costs.

-----Original Message-----
From: Al London [mailto:aolondon@earthlink.net]
Sent: Thursday, July 02, 2009 10:49 AM
To: Ramaekers, Lawrence J.; Carl Gallo
Subject: RE: 51 blaine.pdf - Adobe Reader

The reason for us not knowing the extent of the taxes due on this property was because we
paid most of them once, at the closing. We received no notice of taxes due nor any threats of
losing the property from the court. Worldwide received notice and never informed us until
recently, after a judge issued the judgement for sale. It takes years for taxes to built to
the point of a sale and we have not been involved long enoug for this to have happened. The
title agency did not pay those taxes that were due or the county has not recorded the
payments properly. We will investigate but we need to pay the court now.

We believe the property is insured but are rechecking on that too.

The frustration that you feel is shared by everyone involved with Aries. We are being lied
too, lied about to the courts and being delayed at every turn by people who want to keep us
from foreclosing on properties. We also may have been defrauded.

A full effort is being put forth by all of us to succeed while the opposition is putting
forth their own efforts to hamper us in every way possible. We should and I believe will
prevail in time. If our cash flow had not declined over the last six months, we would handle
the problems and keep going to a good ending.

The legal bills have added to the problems significantly, payment of some real estate taxes
has also brought us to this point of cash-poor/mortgage-rich. We need to replenish our cash
account immediately.

To that end I recommend we each put $50,000 into Aries immediately. As soon as some cash
comes in from a refinancing and/or a sale, with a decent cash cushion, we can withdraw those
funds.

Please respond promptly.  Thanks.  AL

| From: | Ramaekers, Lawrence J. |
|---|---|
| Sent: | Thursday, July 02, 2009 1:11 PM |
| To: | 'Al London'; Carl Gallo |
| Subject: | RE: future budget |

Stop the bullshit.  A budget from every company in the world is a guess, however every well run company has one.  You need to prepare a budget with your best information in it.  I don't think that your request for $50,000 is an educated guess.  I think that it just the easy way out.  If we need $15,000 each for the next month (not an educated guess but just an example) we should put that amount in now and look again in 30 days.

-----Original Message-----
From: Al London [mailto:aolondon@earthlink.net]
Sent: Thursday, July 02, 2009 12:48 PM
To: Ramaekers, Lawrence J.; Carl Gallo
Subject: future budget

I agree that a budget for the next three months would be helpful in knowing what our income and expenses will be. Guessing at what our needs will be is just that, guessing. Depending on a budget for this company is not much different than guessing anyway, and that is our problem.

With borrowers paying sometimes and sometimes not, income there is a guess. We know what we owe in legal fees but we can not know what will be generated in the future since there are so many cases that are active but do not cost us money on a regularly scheduled basis. Knowing that taxes are due on a property does not mean we have the money to pay. The big banks, I have read, are not paying either which includes maintenance on condos and co-ops. I suppose they pay when forced like us, but otherwise hold on to their cash.

We are promised that properties will close and then they do not. We have properties for sale and there is no predicting if and when they will sell. I can go on but I hope you get the point. This is a tiny business with no track record of income and expenses that can be relied upon for future predictions. For example, we have been told we are getting the Foley deed, any day now. If we were to put in it's sale, even a quick sale, at $250K, then our budget would look very healthy. As a cash basis company we have been running Aries from a checkbook. That has worked without the need for a cash injection from the partners for four years. In fact, in the early years we withdrew cash when it seemed we could. Budgets were never prepared.

With that said I will try to accommodate your request for a budget but can not recommend that it will be a document that has a high degree of reliable probability for the future cash flow of Aries. My recommendation for a cash contribution of $50K is really just an educated guess but my expectation is that it will not be needed for long once some properties get sold.
AL

| | |
|---|---|
| **From:** | Ramaekers, Lawrence J. |
| **Sent:** | Thursday, July 02, 2009 2:09 PM |
| **To:** | 'aolondon@earthlink.net'; 'crgfla@bellsouth.net' |
| **Subject:** | Re: Bank |

I have been in discussions with Scott.  I provided some information to him and he said he get back to me today.

----- Original Message -----
From: Al London <aolondon@earthlink.net>
To: Ramaekers, Lawrence J.; Carl Gallo <crgfla@bellsouth.net>
Sent: Thu Jul 02 14:05:49 2009
Subject: Bank

Larry; Have you spoken with Altschul from Wachovia as you promised? Where do we stand with our loan? What must we do to continue to have that line/loan stay in place? Time is of the essense.  AL

| From: | Ramaekers, Lawrence J. |
|-------|------------------------|
| Sent: | Thursday, July 02, 2009 5:45 PM |
| To: | 'Al London'; Carl Gallo |
| Subject: | RE: 51 blaine.pdf - Adobe Reader |

I have now gotten what I believe to be Wells response.  What time tomorrow can we do a conference call.

-----Original Message-----
From: Al London [mailto:aolondon@earthlink.net]
Sent: Thursday, July 02, 2009 10:49 AM
To: Ramaekers, Lawrence J.; Carl Gallo
Subject: RE: 51 blaine.pdf - Adobe Reader

The reason for us not knowing the extent of the taxes due on this property was because we paid most of them once, at the closing. We received no notice of taxes due nor any threats of losing the property from the court. Worldwide received notice and never informed us until recently, after a judge issued the judgement for sale. It takes years for taxes to built to the point of a sale and we have not been involved long enoug for this to have happened. The title agency did not pay those taxes that were due or the county has not recorded the payments properly. We will investigate but we need to pay the court now.

We believe the property is insured but are rechecking on that too.

The frustration that you feel is shared by everyone involved with Aries. We are being lied too, lied about to the courts and being delayed at every turn by people who want to keep us from foreclosing on properties. We also may have been defrauded.

A full effort is being put forth by all of us to succeed while the opposition is putting forth their own efforts to hamper us in every way possible. We should and I believe will prevail in time. If our cash flow had not declined over the last six months, we would handle the problems and keep going to a good ending.

The legal bills have added to the problems significantly, payment of some real estate taxes has also brought us to this point of cash-poor/mortgage-rich. We need to replenish our cash account immediately.

To that end I recommend we each put $50,000 into Aries immediately. As soon as some cash comes in from a refinancing and/or a sale, with a decent cash cushion, we can withdraw those funds.

Please respond promptly.  Thanks.  AL

Aries 2010-11-18 Disc 2 (except Doc_(21)(1))
71 of 384

| | |
|---|---|
| **From:** | Ramaekers, Lawrence J. |
| **Sent:** | Thursday, May 27, 2010 8:15 AM |
| **To:** | 'Al London'; 'crgfla@bellsouth.net' |
| **Subject:** | Aries proposed resolution |

As members of Aries we have not previously signed anything regarding the sale of any property and the proposed resolution is offensive in its scope and additional intent. I do not approve of many of the actions that I know Al has taken and, because we have been uninformed about all of his activities, there are certainly other things that he has done of which I am not aware. I will not appoint him Managing Member in violation of our current documents and I will certainly not ratify his known and unknown past actions. I will book any bet either of you wishes to make regarding who requested those provisions be included in the resolution. I will not sign anything changing the documents of our companies unless there is a sound business reason to do so. If the buyer insists that this sale be supported by a resolution approving the sale then send me a simple set of documents with the sale contract, and showing the amount owed on the mortgage; the additional investment, interest, taxes, insurance, anything else that has added to the amount owed and legal fees. Also include a current appraisal. After I have reviewed the information provided and given you verbal approval you may have Doug prepare a resolution that says that the members have approved a sale of the property pursuant to that contract and that Al is authorized by the corporation to sign related papers to complete the sale. No extraneous other provisions may be included.

# EXHIBIT X



December 14, 2010

<u>VIA ELECTRONIC MAIL</u>

Frederick L. Sosinsky, Esq.
45 Broadway, 30th Floor
New York, New York 10006

Douglas Kahan, Esq.
1328 Boston Post Road
Larchmont, New York 10538

       Re: *Britt v. Aries Financial LLC et al.*, 09-Civ-2398
         *Petersen v. Aries Financial LLC et al.*, 06-Civ-6663

Dear Messrs. Sosinsky and Kahan:

I am writing on behalf of counsel in both of the above cases pursuant to our obligation under Rule 37(a)(1) of the Federal Rules of Civil Procedure to attempt to resolve the major disputes surrounding Aries Financial, LLC's ("Aries") and Mr. Kahan's failure to produce electronically stored information and other documents requested, as well as failure to produce those documents timely.

Aries' production of electronically stored information remains inadequate. Aries was formed in or about 2004. As counsel for Ms. Petersen and/or Mr. Britt have discussed with you a number of times by phone as well as in writing, to date Aries has produced no emails to or from any of Aries' principals or employees before August 31, 2007 (except for a limited number of emails *from* Jared Namm). This includes a failure to produce any communications to or from brokers or borrowers. Nor has Aries provided any explanation as to why such emails have not been produced. At a minimum, Aries was obligated to issue a litigation hold on destruction or deletion of all documents in December of 2006 when Ms. Petersen filed her action, likely earlier. We urge you to produce the requested documents or provide an explanation including the details requested in our initial discovery request.[1]

---

[1] **"Lost, Discarded, Destroyed, Erased or Otherwise Disposed of Documents.** In the event that a document called for by these requests has been lost, discarded, destroyed, erased, or otherwise disposed of, with respect to such document you are instructed to:
(a) identify the document by date, type, and subject matter;
(b) describe the circumstances under which the document was lost, discarded, destroyed, erased, or otherwise disposed of;
(c) identify each person who wrote or edited the document, and the employer, business, and title or position of each;
(d) identify all intended recipients of the document, all other known recipients of the document, and the employer, business, title or position of each;
(e) provide the last known location of the document;
(e) [sic] describe the efforts and due diligence undertaken by you to locate and or obtain the document and/or copies of it;
(f) state the reason for the inability to produce the document; and
(g) if the document was destroyed, the date on which the document was destroyed, the reason why the document was destroyed, and identities of the person(s) who authorized the document to be destroyed and/or who destroyed the document(s)." Britt Discovery Request to Aries dated Jan. 28, 2010.

PO Box 3638, Durham NC 27702-3638 • 302 W. Main Street, Durham NC 27701 • Phone 919.313.8500 • Fax 919.313.8595
910 17th Street NW, Suite 500, Washington DC 20006 • Phone 202.349.1850 • Fax 202.289.9009
1330 Broadway, Suite 601, Oakland CA 94612 • Phone 510.379.5000 • Fax 510.893.9300
www.responsiblelending.org

As you have acknowledged, Aries' production of documents related to Ramgallon, LLC is both late and inadequate. In fact, during our last status conference with Judge Carter, Mr. Kahan stated that one of Aries' loans was assigned to Ramgallon, LLC.  Neither Aries nor Mr. Kahan has not produced any documents related to that assignment.  We urge you to produce all relevant documents and to agree to reopen deposition of Aries and Mr. Kahan on this issue.

Other requests remain outstanding as well including, but not limited to, documents relating to Aries' financing, a loan and/or line of credit from Wachovia/Wells Fargo, and correspondence to or from Mr. Kahan when he was acting as closing agent.

We hope to resolve the above issues without the intervention of the court.  However, failing an adequate response, we will move to compel production and seek related attorneys' fees.

Sincerely,

/s/

Karuna Patel

# EXHIBIT

# Y

## AMENDED AND RESTATED LOAN AGREEMENT

Wachovia Bank, National Association
225 Water Street
Jacksonville, Florida  32202
(Hereinafter referred to as the "Bank")

Aries Financial, LLC ("Aries")
2901 Clint Moore Road, PMB 216
Boca Raton, Florida  33496

Albert O. London ("AO London")
6003 Le Lac Road
Boca Raton, Florida  33496

Arlene S. London ("AS London"; and individually
and collectively with AO London, "London")
6003 Le Lac Road
Boca Raton, Florida  33496

Carl R. Gallo ("CR Gallo")
6002 Le Lac Road
Boca Raton, Florida  33496

Joanne M. Gallo ("JM Gallo"; and individually and
collectively with CR Gallo, "Gallo")
6002 Le Lac Road
Boca Raton, Florida  33496

Lawrence J. Ramaekers ("LJ Ramaekers")
6027 Le Lac Road
Boca Raton, Florida  33496

Joy J. Ramaekers ("JJ Ramaekers"; and individually
and collectively with LJ Ramaekers, "Ramaekers")
6027 Le Lac Road
Boca Raton, Florida  33496
(Aries, London, Gallo and Ramaekers, individually and collectively "Borrower")

This Loan Agreement ("Agreement") is entered into March 24, 2006, by and between Bank and Borrower.

This Agreement applies to the loan or loans (individually and collectively, the "Loan") evidenced by one or more promissory notes including a Promissory Note dated July 11, 2005 and a Promissory Note dated March 24, 2006 or other notes subject hereto, as modified from time to time (whether one or more, the "Note") and all Loan Documents.  This Agreement amends and restates the Loan Agreement, dated July 11, 2005, between Borrower and Bank.  The terms "Loan Documents" and "Obligations," as used in this Agreement, are defined in the Note.  Borrower shall use the Loan solely to fund loans to be made by Aries ("Aries Loans") pursuant to a note ("Aries Note") and secured by a mortgage on residential real property ("Aries Mortgage").

| Deleted: 31. |
| --- |

Relying upon the covenants, agreements, representations and warranties contained in this Agreement, Bank is willing to extend credit to Borrower upon the terms and subject to the conditions set forth herein, and Bank and Borrower agree as follows:

**REPRESENTATIONS.** Borrower represents that from the date of this Agreement and until final payment in full of the Obligations: **Accurate Information.** All information now and hereafter furnished to Bank is and will be true, correct and complete. Any such information relating to Borrower's financial condition will accurately reflect Borrower's financial condition as of the date(s) thereof, (including all contingent liabilities of every type), and Borrower further represents that its financial condition has not changed materially or adversely since the date(s) of such documents. **Authorization; Non-Contravention.** The execution, delivery and performance by Borrower and any guarantor, as applicable, of this Agreement and other Loan Documents to which it is a party are within its power, have been duly authorized as may be required and, if necessary, by making appropriate filings with any governmental agency or unit and are the legal, binding, valid and enforceable obligations of Borrower and any guarantors; and do not (i) contravene, or constitute (with or without the giving of notice or lapse of time or both) a violation of any provision of applicable law, a violation of the organizational documents of Borrower or any guarantor, or a default under any agreement, judgment, injunction, order, decree or other instrument binding upon or affecting Borrower or any guarantor, (ii) result in the creation or imposition of any lien (other than the lien(s) created by the Loan Documents) on any of Borrower's or any guarantor's assets, or (iii) give cause for the acceleration of any obligations of Borrower or any guarantor to any other creditor. **Asset Ownership.** Borrower has good and marketable title to all of the properties and assets reflected on the balance sheets and financial statements supplied Bank by Borrower, and all such properties and assets are free and clear of mortgages, security deeds, pledges, liens, charges, and all other encumbrances, except as otherwise disclosed to Bank by Borrower in writing and approved by Bank ("Permitted Liens"). To Borrower's knowledge, no default has occurred under any Permitted Liens and no claims or interests adverse to Borrower's present rights in its properties and assets have arisen. **Discharge of Liens and Taxes.** Borrower has duly filed, paid and/or discharged all taxes or other claims that may become a lien on any of its property or assets, except to the extent that such items are being appropriately contested in good faith and an adequate reserve for the payment thereof is being maintained. **Sufficiency of Capital.** Borrower is not, and after consummation of this Agreement and after giving effect to all indebtedness incurred and liens created by Borrower in connection with the Note and any other Loan Documents, will not be, insolvent within the meaning of 11 U.S.C. § 101, as in effect from time to time. **Compliance with Laws.** Borrower is in compliance in all respects with all federal, state and local laws, rules and regulations applicable to its properties, operations, business, and finances, including, without limitation, any federal or state laws relating to liquor (including 18 U.S.C. § 3617, et seq.) or narcotics (including 21 U.S.C. § 801, et seq.) and/or any commercial crimes; all applicable federal, state and local laws and regulations intended to protect the environment; and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if applicable. **Organization and Authority.** Each corporation, partnership or limited liability company Borrower and/or guarantor, as applicable, is duly created, validly existing and in good standing under the laws of the state of its organization, and has all powers, governmental licenses, authorizations, consents and approvals required to operate its business as now conducted. Each corporation, partnership or limited liability company Borrower and/or guarantor, as applicable, is duly qualified, licensed and in good standing in each jurisdiction where qualification or licensing is required by the nature of its business or the character and location of its property, business or customers, and in which the failure to so qualify or be licensed, as the case may be, in the aggregate, could have a material adverse effect on the business, financial position, results of operations, properties or prospects of Borrower or any such guarantor. **No Litigation.** There are no pending or threatened suits, claims or demands against Borrower or any guarantor that have not been disclosed to Bank by Borrower in writing, and approved by Bank.

**AFFIRMATIVE COVENANTS.** Borrower agrees that from the date hereof and until final payment in full of the Obligations, unless Bank shall otherwise consent in writing, Borrower will: **Access to Books and Records.** Allow Bank, or its agents, during normal business hours, access to the books, records and such other documents of Borrower as Bank shall reasonably require, and allow Bank, at Borrower's expense, to inspect, audit and examine the same and to make extracts therefrom and to make copies thereof. **Business Continuity.** Conduct its business in substantially the same manner and locations as such business is now and has previously been conducted. **Compliance with Other Agreements.** Comply with all terms and conditions contained in this Agreement, and any other Loan Documents, and swap agreements, if applicable, as defined in the 11 U.S.C. § 101, as in effect from time to time. **Estoppel Certificate.** Furnish, within 15 days after request by Bank, a written statement duly

# EXHIBIT Z

LAW OFFICES OF
# FREDERICK L. SOSINSKY
45 BROADWAY, SUITE 3010
NEW YORK, NEW YORK 10006

TELEPHONE (212) 285-2270
TELECOPIER (212) 248-0999
EMAIL: FredS@newyork-criminaldefense.com

January 5, 2011

BY ELECTRONIC MAIL AND
FIRST CLASS MAIL
Jennifer Sinton, Esq.
Jen Light, Esq.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, New York 11201

Karuna Patel, Esq.
Center for Responsible Lending
910 17th Street NW
Suite 500
Washington, D.C. 20006

Douglas Kahan, Esq.
225 Broadway, Suite 715
New York, New York 10007

Donna Dougherty, Esq.
JASA Legal Services for the Elderly in Queens
97-77 Queens Boulevard, Suite 600
Rego Park, New York 11374

Leslie Salzman, Esq.
Cardozo Bet Tzedek Legal Services
Brookdale Center
55 Fifth Avenue
New York, New York  10003


Re:   Marie Petersen v. Aries Financial, LLC, et al.
      07 Civ. (RJD)(ALC)
      Herman Britt v. Aries Financial, LLC, et al.
      09 Civ 2398 (RJD)(ALC)

Dear Counsel:

I am writing to further respond to Ms. Patel's letter dated December 14, 2001 in which, on behalf of plaintiffs' counsel in both the Petersen and Britt matters, she complains about defendant Aries Financial, LLC's alleged "failure to produce electronically stored information and other documents requested, as well as failure to produce those materials timely."

I will address each of the claims contained in the letter in order.

First, with respect to the continuing complaint regarding the production of emails, once again, as I have advised counsel already, Aries has produced all of the emails in its possession with the exception of those emails that are the subject of the privilege logs that have been provided. Plainly and simply, there are no other emails to be produced. While, as Ms. Patel observes, the emails that Aries has produced largely date from August 2007 to the present, there are no other emails in existence that can be provided to you. Each of the Aries' parties and/or witnesses were questioned at their depositions regarding their use of email and whichever email correspondence is extant has been disclosed. Aries does not have, and therefore I cannot provide you with, any other emails. The witnesses explained that they generally did not save correspondence-type emails and in fact deleted them, they bought new computers and did not save all of the data on the predecessor unit and they experienced data losses. Lawrence Ramaekers purchased new computers used for Aries business on at least two occasions since the business' formation and although he attempted to backup data onto each computer, the emails which predate those provided were not saved and therefore cannot be provided. Al London did not routinely save emails. Further, there is no evidence that anyone at Aries had any communication via email with any borrowers at any time. I remind you that there was no networking or backup system of computers utilized, that this was/is a small, private home-based business and that the individuals involved used their own computers and email.

With regard to the particulars you have requested regarding emails which would have been discoverable if they were in existence, because no one of the four witnesses recalls or could be expected to recall specific dates or times when emails were either not saved, deleted, or became unavailable due to a hard drive crash or the use of a new computer, there is no greater particularization that can be offered. Accordingly, our response to your demand by paragraph is as follows:

(a)     each of the documents are emails; the dates of the emails are unknown, and the subject matter, is unknown;

(b)     as noted, any emails that have not been provided were either not saved or deleted at or around the time of their creation or receipt, or

2

thereafter due to a failure of the computer's drive, or a failure to copy a predecessor computer's drive; no greater specification is possible;

(c)    as testified to at deposition, to varying extent, each of the four witnesses composed or received emails from or to the others, and one or more of the witnesses composed or received emails from or to brokers and closing agents/attorneys.

(d)    See response to c.

(e)    The emails were sent and received from/at the respective home offices of the Aries witnesses.

(f)    On several occasions, counsel requested that each of the witnesses undertake a search of their computer(s) and forward to counsel any and all emails relating to these actions.

(g)    See response above.

(h)    See response to a.

Second, notwithstanding your claim to the contrary, we do not agree that Aries production of documents relating to Ramgallan is "late". As you well know since it is a matter of public record, the only assignment of any of the Aries' mortgage loans to this company formed earlier in the year took place in mid to late August 2010, after the time of the depositions taken of Aries' principals or employees. Moreover, the single assignment in question concerns neither the Petersen nor the Britt loans, but instead a Bronx property owned by 2729 Claflin Avenue LLC, which was the subject of an ongoing foreclosure action in Supreme Court, Bronx County for which you have been provided with discovery by Douglas Kahan. The suggestion that somehow, Al London and/or Larry Ramaekers, at their depositions, deliberately failed to volunteer information about a matter that had yet to take place, but that was to become a matter of public record is in our view woefully misplaced. In any event, attached hereto are copies of documents relating to this assignment. As I have previously related to counsel for Petersen, I have no objection to a limited written interrogatory of Aries regarding this singular assignment of a loan to Ramgallan, LLC. As far as a continued but limited deposition on this subject, after you receive our response to such a limited interrogatory, I would be willing to discuss with you any purported good faith request for such a limited reopening of the depositions.

Third, you claim that Aries has failed to provide documents relating to Aries' financing and a loan or line of credit from Wachovia/Wells Fargo. You have already been provided by Wachovia/Wells Fargo with the entirety of the Aries files from these lenders and by Aries with what could be described as a business plan that was shown to these lenders. I also enclose herewith a CD containing copies of Wachovia/Wells Fargo documents in Aries possession which are all duplicative of documents already produced by the banks.

Finally, with regard to your demand for correspondence with Mr. Kahan dating to the time when he served as a closing agent for Aries, Aries has produced all of its

correspondence including any such correspondence with Mr. Kahan. Aries possesses no further documents regarding this request.

Thank you for your attention to this matter.

Very truly yours,

Frederick L. Sosinsky

FLS:bms
Encl. (CD by mail only)

4

# EXHIBIT AA

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

HERMAN BRITT,

               Plaintiff,

     v.

ARIES FINANCIAL, LLC., DIVINE
INTERVENTION INSTITUTE, INC., ANDREW
MORSE, DOUGLAS KAHAN,

               Defendants.

Civil Action No.: 09-civ-2398
(RJD) (ALC)

**PLAINTIFF'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION
OF DOCUMENTS PURSUANT TO
FED. R. CIV. P. RULES 33 AND 34**

**PLEASE TAKE NOTICE THAT** pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure and Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiff Herman Britt, by and through his undersigned counsel, hereby requests that defendant DOUGLAS KAHAN respond to the following Interrogatories and Requests for Production of Documents.

These documents are to be made available for inspection and duplication, within thirty (30) days after service hereof, at the offices of South Brooklyn Legal Services, 105 Court Street, 3rd Floor, Brooklyn, NY 11201, attention TaeRa Franklin.

## INSTRUCTIONS

1.      **Time Period Covered.**  Unless otherwise specified herein, the period of time covered by these requests is from January 1, 2005 to the present.

2.      **Broad Scope.**  These requests are to be construed broadly, so as to bring within their scope all documents and information that, by a more restrictive interpretation, might be deemed non-responsive.

3.      **Continuing Nature.**  These requests are continuing in character so as to require you to supplement your responses and produce additional documents, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, in the same manner and at the same address as the original production if you generate, locate or obtain possession, custody, or control of such additional responsive documents at any time prior to trial.

4.      **Production of All Responsive Documents**.  Produce both original, drafts and non-identical versions of all responsive documents in your possession, custody, or control, regardless of the location where the information is stored or the manner in which the information is stored, electronically or otherwise.  You are specifically requested to produce all responsive documents or e-mails stored in or originating from personal computers or laptops, Palm Pilots, Blackberries, or any other personal digital assistants (PDAs) used by you.  You are also specifically requested to produce all audio, video, graphic, electronic, or handwritten responsive documents.  A document with handwritten notes, editing marks, or any other notations or markings shall be deemed to be non-identical to any version of the document not bearing such modifications, and shall be produced.

5.      **Production of Documents Requested Not In Possession**.  If a document requested herein is not in your possession, but is in the possession of any other person from

whom you have a legal right to obtain possession of the document, such as present or former attorneys, accountants, advisors, agents, employees, and consultants, you are requested to produce the document.

6. **Lack of Knowledge Sufficient to Answer.** If you lack knowledge sufficient to answer a particular document request or any part of it, state so in writing in your response to the request and state the name, address and telephone number of any person(s) who possesses the necessary information and knowledge.

7. **No Documents Responsive.** If there are no documents responsive to a category in this request, state so in writing in your response to the request.

8. **Inability to Locate Documents Requested.** If you are unable to locate any document requested, state all efforts that have been made to locate it and identify any individual whom you believe is likely to possess any information regarding the document's whereabouts.

9. **Lost, Discarded, Destroyed, Erased or Otherwise Disposed of Documents.** In the event that a document called for by these requests has been lost, discarded, destroyed, erased, or otherwise disposed of, with respect to such document you are instructed to:

(a) identify the document by date, type, and subject matter;

(b) describe the circumstances under which the document was lost, discarded, destroyed, erased, or otherwise disposed of;

(c) identify each person who wrote or edited the document, and the employer, business, and title or position of each;

(d) identify all intended recipients of the document, all other known recipients of the document, and the employer, business, title or position of each;

(e) provide the last known location of the document;

(e)     describe the efforts and due diligence undertaken by you to locate and or obtain the document and/or copies of it;

(f)     state the reason for the inability to produce the document; and

(g)     if the document was destroyed, the date on which the document was destroyed, the reason why the document was destroyed, and identities of the person(s) who authorized the document to be destroyed and/or who destroyed the document(s).

10.     **Manner of Document Production**. The documents requested shall be produced as they have been kept in the usual course of business or shall be organized and labeled to correspond with the categories in this request and with information indicating their source, i.e., the person from whom the documents were obtained. If a document is responsive to more than one paragraph or subparagraph of this document request, it need be produced only once.

11.     **Production of Entire Document**. A request for any document shall be deemed to include, in addition to the document itself, a request for exhibits and attachments to the document and enclosures sent or kept with the document. To the extent that a portion or part of any document is responsive to this request, this request shall be construed to call for production of the entire document.

12.     **Production of File Folder or Container**. The file folder or other container in which a document is kept is deemed to be an integral part of the document and shall be produced with the document. If, for any reason, the folder or container cannot be produced, produce copies of all labels or other identifying marks.

4

13. **Privileged or Work Product Matters.** If any request is deemed to call for the production of privileged or work product materials and any documents or information are not produced because such privilege or work product is asserted, you are instructed to provide:

    (a)    the nature of the privilege or protection that is being claimed;

    (b)    the type of document;

    (c)    the general subject matter of the document;

    (d)    the date of the document; and

    (e)    such other information as is sufficient to identify the document for a *subpoena duces tecum*, including, where appropriate, the author(s) of the document, the addressee(s) of the document, and any other recipient(s) of the document, including anyone who viewed or has possession of the document, and, where not apparent, the relationship of the author(s), addressee(s), and recipient(s) to each other.

If a portion of that document contains information subject to a claim of privilege, only that portion shall be redacted and the remainder shall be produced. If any document or portion thereof is withheld on the basis of some other objection, state with particularity the nature of and complete factual basis for the objection and identify the document as set forth above.

14. **Objection to Document Request.** If you object to any document request or part thereof, all documents to which your objection does not apply shall be produced.

## DEFINITIONS

1.     The Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Rules of the United States District Court for the Eastern District of New York ("Rule 26.3") are incorporated by reference into this document request.

2.     In addition to the Rule 26.3, the term **"Agreement"** means any formal, informal, oral or written contract between two or more parties.

3.     The terms **"all," "any,"** and **"each,"** shall be construed as all, any and/or each as necessary to bring within the scope of the discovery request all responses that otherwise could be construed to be outside of its scope.

4.     **"Aries Financial"** means Aries Financial, LLC, its agents, employees, officers, directors, principals, accountants, and any other person or entities acting on its behalf, as well as any parent, subsidiary or affiliate.

5.     **"Divine Intervention"** means Divine Intervention Institute, Inc., its agents, employees, officers, directors, principals, accountants, and any other person or entities acting on its behalf, as well as any parent, subsidiary or affiliate.

6.     The term **"identify"** means when used in reference to:

(a)     an <u>oral</u> statement, communication, conference or conversation, to state separately (i) its date and the place where it occurred; (ii) means of communication including telephones, in-person meetings, video conferences or Skype; (iii) its substance; (iv) the identity of each person making the statement or participating in the communication, conference or conversation; and (v) the present location and custodian of all notes, memoranda, or other documents

6

memorializing, referring to or relating to the subject matter of the statement, communication, conference or conversation;

(b)     a natural person or persons, to state separately (i) the full name of each such person; (ii) his or her present, or last known business address and his or her present, or last known residential address; (iii) the present or last known employer of the person at the time to which the interrogatory answer is directed and the person's title or position at such employment; and (iv) contact information, including business phone numbers, home phone numbers, email addresses and any other means of contact and

(c)     an organization or entity other than a natural person (e.g., a corporation, company, firm, association, or partnership), to state separately (i) the full name and type of organization or entity; (ii) the date and state of organization or incorporation; (iii) the address of its principal place of business; (iv) the nature of the business conducted; and (v) contact information, including phone numbers, email addresses and any other means of contact

7.     The term **"including"** does not in any way limit a request to specific items or concepts listed, but rather shall be read to mean "including, but not limited to".

8.     An **"LLC"** refers to a Limited Liability Company.

9.     The phrase **"post-closing activities"** refers to any and all any communications, payments, activities or agreements with respect to the Premises, the subject mortgage loan, Herman Britt, or 8901 Avenue L LLC that occurred from October 16, 2006 to the present.

10.     The term **"Premises"** refers to the property located at 8901 Avenue L, Brooklyn, NY 11236.

11.     The terms "**relating to**," "**related to**," or "**regarding**" mean containing, constituting, concerning, embodying, reflecting, identifying, stating, showing, or in any manner relating or referring to the subject, directly or indirectly.

12.     The phrase "**subject matter of this litigation**" means any and all matters described or alleged in any complaint, answer, defense, or counterclaim, filed in this action by any party.

13.     The phrase "**subject mortgage loan**" refers to the mortgage loan originated to 8901 Avenue L LLC by Aries Financial on or about October 16, 2006.

14.     The phrase "**subject mortgage loan transaction**" refers to any closings, transfers, agreements, contracts or transactions, or disclosures and any other documents, made, entered into or involved in connection to negotiation, application(s), underwriting, review, credit assessment, approval, funding, closing and recording of the subject mortgage loan, including the formation of 8901 Avenue L LLC.

15.     The terms "**you**", "**your**" and "**yourself**" refer to you, defendant Douglas Kahan, as well as your agents, representatives, employees, accountants, attorneys, or any other persons acting on your behalf.

16.     The use of the singular form of any word shall include the plural and *vice versa*.

17.     The present tense includes the past and *vice versa*.


## INTERROGATORIES


1.     State your full name and any other name by which you have been known, your home and business addresses, and employment history since January 1, 2005.

2.      Identify by name, last known address, contact information, and last known place of employment each person with knowledge of the facts regarding the subject matter of this litigation or of facts relating to the allegations in the pleadings, including but not limited to any person you may call as a witness, and summarize the knowledge of each person identified.

3.      Identify by name, last known address, contact information, and title all persons who were principals, officers, employees, directors, associates, and/or agents of the law firm Kahan & Kahan for the period January 1, 2005 to present.

4.      Identify by name, job title, and dates of employment each and every of your principals, employees, agents, and contractors, or those of your law firm, including yourself, who performed any task relating to the subject mortgage loan transaction, and describe each person's role.

5.      Identify all persons or entities who were present at the closing on October 16, 2006 in connection to the subject mortgage loan transaction.

6.      Identify all persons or entities who were represented by you or your law firm in connection with the subject mortgage loan transaction.

7.      Identify all compensation you received in connection with the subject mortgage loan transaction, including the amount of compensation, the source, the method of payment (e.g., check, money order, cash), the date upon which you received the compensation, and the service performed in exchange for the compensation.

8.      Identify by name, job title, and dates of employment each and every of your principals, employees, agents, and contractors, or those of your law firm, including yourself, who performed any task relating to the post-closing activities, and describe each person's role.

9.      Identify by name, job title, and employer all individuals who were present at the

meeting on April 23, 2008 relating to the post-closing activities.

10.     Identify all persons or entities who were represented by you or your law firm in connection with the post-closing activities.

11.     Identify all compensation you received in connection with the post-closing activities, including the amount of compensation, the source, the method of payment (e.g., check, money order, cash), the date upon which you received the compensation, and the service performed in exchange for the compensation.

12.     State whether you have ever been retained by or performed any type of legal services for any of the defendants in this litigation, including Andrew Morse and Divine Intervention, and identify the dates and nature of any such legal services.

13.     Identify any meetings, discussions, agreements, conversations, or other oral or written communications between you and any other person or entity concerning Herman Britt, the premises, 8901 Avenue L LLC, the subject mortgage loan transaction, or the post-closing activities, including but not limited to:

        (i)      Aries Financial;

        (ii)     Andrew Morse;

        (iii)    Deborah Robertson;

        (iv)     Fredric Powell;

        (v)      Albert London;

        (vi)     Lawrence J. Ramaekers;

        (vii)    Arlene London;

        (viii)   Candice London;

        (ix)     Eydie Kahan;

      (x)     Kenneth M. Ross;

      (xi)    Martin C. Simmons;

      (xii)   Cheung Ting;

      (xiii)  Divine Intervention;

      (xiv)  Worldwide Financial Resources;

      (xv)   Templar Sales, Inc.;

      (xvi)  First Lincoln Mortgage Bankers;

      (xvii) U.S. Bank, N. A.;

      (xviii) Wachovia Bank, N.A.;

      (xix)  Stein & Sheidlower LLP;

      (xx)   Sharp Appraisal, Inc.;

      (xxi)  Filmore Agency;

      (xxii) L&R Management, LLC;

      (xxiii) Land America Lawyers Title Insurance Corporation; or

      (xxiv) Tower Insurance Company of New York.

State the date, place, nature and substance of such meetings, discussions, agreements, conversations or communications.

     14.    Identify and describe any agreements, employment relationships, or business relationships between or involving you or your law firm and the following persons:

      (i)     Aries Financial;

      (ii)    Andrew Morse;

      (iii)   Deborah Robertson;

      (iv)   Fredric Powell;

  (v)  Albert London;

  (vi)  Lawrence J. Ramaekers;

  (vii)  Arlene London;

  (viii)  Candice London;

  (ix)  Eydie Kahan;

  (x)  Kenneth M. Ross;

  (xi)  Martin C. Simmons;

  (xii)  Cheung Ting;

  (xiii)  Divine Intervention;

  (xiv)  Worldwide Financial Resources;

  (xv)  Templar Sales, Inc.;

  (xvi)  First Lincoln Mortgage Bankers;

  (xvii)  U.S. Bank, N. A.;

  (xviii)  Wachovia Bank, N.A.;

  (xix)  Stein & Sheidlower LLP;

  (xx)  Sharp Appraisal, Inc.;

  (xxi)  Filmore Agency;

  (xxii)  L&R Management, LLC;

  (xxiii)  Land America Lawyers Title Insurance Corporation; or

  (xxiv)  Tower Insurance Company of New York.

15.  List by property address and transaction date all real property transactions involving you or your law firm and Aries Financial.

16.     List by property address and transaction date all real property transactions involving you or your law firm and Andrew Morse.

17.     List by property address and transaction date all real property transactions involving you or your law firm and Deborah Robertson and/or Divine Intervention.

18.     List by property address and transaction date all real property transactions involving you or your law firm and involving a residential property where an LLC held or took title to the property. For each property identified, also provide:

      (i)     the name of the LLC;

      (ii)    the date of the formation of the LLC; and

      (iii)   the original principal balance of any mortgage loan associated with the transaction.

19.     Identify all proceeds you or your law firm disbursed with respect to the subject mortgage loan including the name of each recipient of loan proceeds, the amount disbursed to each recipient, the method of payment, and the date of payment.

20.     Identify all judicial actions, administrative proceedings, regulatory inquiries, or other complaints (including those currently pending) that have been brought against you or your law firm, agents, employees, partners, or principals, including but not limited to those made to any federal, state, or local agency and to any disciplinary committee.  Provide a summary of:

      (i)     the issues raised;

      (ii)    how the matter was resolved;

      (iii)   the caption of each action, proceeding, inquiry or complaint;

      (iv)    the name of the court or forum;

      (v)     the docket or case number; and

13

     (vi)    the venue for each actions proceeding, inquiry, or complaint.

21.    Identify by name, last known address and contact information all business or corporate entities that you or your law firm assisted to establish, organize, form, incorporate, or create from January 1, 2005 to present.  For each entity identified, provide the name of the person who retained you for your services, the date such services were provided, and the amount and source of compensation for such services.

## REQUEST FOR PRODUCTION OF DOCUMENTS
### (From January 1, 2005 to Present)

1.    All documents referred to in the foregoing interrogatories and in the answers thereto.

2.    All documents, including electronic correspondence, handwritten notes, and calendar entries, relating to:

    (i)    Herman Britt;

    (ii)    8901 Avenue L LLC;

    (iii)    the subject mortgage loan transaction;

    (iv)    the Premises, or

    (v)    the post-closing activities.

3.    All conversation, communication, or telephone logs concerning:

    (i)    Herman Britt;

    (ii)    8901 Avenue L LLC;

    (iii)    the Premises;

    (iv)    the subject mortgage loan transaction, and

    (v)    the post-closing activities.

4.      All correspondence between you and Aries Financial regarding the subject mortgage loan transaction, including electronic correspondence.

5.      All correspondence between you and Aries Financial regarding the post-closing activities, including electronic correspondence.

6.      All correspondence between you and Aries Financial regarding any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

7.      All correspondence between you and Andrew Morse regarding the subject mortgage loan transaction, including electronic correspondence.

8.      All correspondence between you and Andrew Morse regarding the post-closing activities, including electronic correspondence.

9.      All correspondence between you and Andrew Morse regarding any other mortgage loan brokered by Andrew Morse from January 1, 2005 to present, including electronic correspondence.

10.     All correspondence between you and Divine Intervention regarding the subject mortgage loan transaction, including electronic correspondence.

11.     All correspondence between you and Divine Intervention regarding the post-closing activities, including electronic correspondence.

12.     All correspondence between you and Divine Intervention regarding any other mortgage loan brokered by Divine Intervention from January 1, 2005 to present, including electronic correspondence.

13.     All correspondence between you and Deborah Robertson regarding the subject mortgage loan transaction, including electronic correspondence.

15

14.     All correspondence between you and Deborah Robertson regarding the post-closing activities, including electronic correspondence.

15.     All correspondence between you and Deborah Robertson regarding any other mortgage loan brokered by Deborah Robertson or Divine Intervention from January 1, 2005 to present, including electronic correspondence.

16.     All correspondence between you and Fredric Powell regarding the subject mortgage loan transaction, including electronic correspondence.

17.     All correspondence between you and Fredric Powell regarding the post-closing activities.

18.     All correspondence between you and Fredric Powell regarding any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

19.     All correspondence between you and First Lincoln Mortgage Bankers regarding the subject mortgage loan transaction, including electronic correspondence.

20.     All correspondence between you and First Lincoln Mortgage Bankers regarding the post-closing activities, including electronic correspondence.

21.     All correspondence between you and Templar Sales, Inc. regarding the subject mortgage loan transaction, including electronic correspondence.

22.     All correspondence between you and Templar Sales, Inc. regarding the post-closing activities, including electronic correspondence.

23.     All correspondence between you and U.S. Bank, N.A. regarding any other loan originated by Aries Financial from January 1, 2005 to present, including electronic correspondence.

16

24.     All correspondence between you and U.S. Bank, N.A. regarding the subject mortgage loan transaction, including electronic correspondence.

25.     All correspondence between you and U.S. Bank, N.A. regarding the post-closing activities, including electronic correspondence.

26.     Copy of any retainer agreement between you and any other person or entity which relates in any way to any service you provided in connection with:

    (i)     the Premises;

    (ii)    the subject mortgage loan transaction;

    (iii)   the formation of 8901 Avenue L LLC;

    (iv)    the post-closing activities; or

    (v)     the subject matter of this litigation.

27.     All documents, including the front and back of all checks, bank records, and any other records, including electronically-stored records, that show disbursement of funds from the settlement of the subject mortgage loan.

28.     All documents relating to fees and/or closing costs charged to in connection with the subject mortgage loan, including any fee schedules or guidances provided to you or your law firm by Aries Financial.

29.     All documents relating to the policies and procedures of your law practice or law firm for real estate closings and/or mortgage transactions that were used and/or in effect at the time of the subject mortgage loan transaction.

30.     Any and all time records, diaries, invoices, or other documents that reflect services you have provided to Aries Financial.

31.     Any and all time records, diaries, invoices, or other documents that reflect

17

services performed in connection with the subject mortgage loan transaction and/or post-closing activities.

32.     Any and all bonds, liability or other indemnification, insurance policies that may cover your alleged liability as alleged in this litigation.

DATED:     January 28, 2010
           Brooklyn, NY

                                        SOUTH BROOKLYN LEGAL SERVICES
                                        John C. Gray, Esq.

                              By:       _____
                                        TaeRa Franklin, Of Counsel
                                        Jennifer Sinton, Of Counsel
                                        105 Court Street, Third Floor
                                        Brooklyn, NY 11201
                                        (718) 246-3271 (Telephone/Fax)
                                        *Attorneys for Plaintiff*

To:     Douglas Kahan
        1328 Boston Post Road
        Larchmont, New York 10538
        dougkahanlegal@aol.com
        *Pro Se Defendant*

        Frederic Sosinsky, Esq.
        THE LAW OFFICE OF FREDERIC L. SOSINSKY
        45 Broadway, 30th Floor
        New York, NY 10006
        fsosinsky@hotmail.com
        *Attorney for Defendant Aries Financial, LLC*

        DIVINE INTERVENTION INSTITUTE, INC.
        36 North Columbus Avenue
        Freeport, New York 11520

18

# EXHIBIT BB

**DOUGLAS KAHAN**
**1328 Boston Post Road**
**Larchmont, New York 10538**
**(914) 630-1178**
**(914) 630-0043 Fax**
**Pro Se Defendant**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------x

**HERMAN BRITT,**

                              **Plaintiff,**

                                                            **09-Civ-2398 (RJD)(ALC)**

          **v.**
                                                            **DOUGLAS KAHAN'S**
                                                            **RESPONSE'S TO**
**ARIES FINANCIAL, LLC.,**                                  <u>**INTERROGATORIES**</u>
**DIVINE INTERVENTION INSTITUTE, INC.,**
**ANDREW MORSE, DOUGLAS KAHAN,**

------------------------------------------------------x

          Pro Se Defendant, Douglas Kahan ("Defendant"), with an address of 1328 Boston Post

Road, Larchmont, New York, 10538 respectfully submits these responses to interrogatories:

## RESERVATION OF RIGHTS

          Any production of documents by Kahan in response to Discovery Demands of Plaintiff

are subject to Defendant's right to object to the admission into evidence of any and all such

documents on the grounds that they, or any of them, are irrelevant to the issues in this action or

are otherwise inadmissible. The responses and objections are based upon Kahan' present

knowledge and/or information and belief. These responses and objections are subject to

amendment and may be supplemented as Kahan acquires additional information or

documentation and competes its investigation, review and analysis.

## GENERAL OBJECTIONS

1.        Kahan objects to the Discovery Demand to the extent that it seeks the production

of documents subject to the attorney-client, attorney work-product or other privileges. In responding to these Demands, Kahan does not waive but preserves all such privileges.

2.  Inadvertent production of privileged or otherwise objectionable documents shall not be deemed a waiver of such privilege or objection.

3.  Plaintiff's Discovery Demands in their entirety fail to describe the categories or types of documents requested with any "reasonable particularity". Fed. R. Civ. P. 34(b) requires that "the request shall set forth the items to be inspected either by individual item or category and describe each item and category with reasonable particularity."

4.  Kahan objects on the ground that the individual requests for documents are ambiguous, confusing, and voluminous and subject to varied interpretation compelling Kahan to guess at the meaning of the Discovery Demands and whether a category of documents is responsive.

5.  Kahan objects to the requests for documents created on or after the date of the filing of this action on the grounds of relevance and privilege.

6.  Kahan reserves the right to produce additional documents  as they are identified and located.

## SPECIFIC OBJECTIONS AND RESPONSES TO DISCOVERY DEMANDFS

1.  Q. State your full name and any others used, home and business addresses and employment history.

    A. Douglas Kahan, Doug Kahan
    home address - objection, unnecessary, immaterial, irrelevant, seeks to harass
    business address':
    225 Broadway- Suite 715, New York, New York 10007
    1328 Boston Post Road, Larchmont, New York 10538

2.  Q. Identify by name, address, contact information...each person with knowledge of the facts regarding the subject matter of this litigation.

A. The parties

3.  Q. Identify contact information principals, officers, employees, directors, associates and/or agents of the law firm of Kahan & Kahan.
A. self

4.  Q. Identify anyone who performed any tasks relating to subject mortgage loan transaction.
A. self - settlement agent

5.  Q. Identify all persons present at closing on October 16, 2006.
A. Herman Britt, Mrs. Britt, Eydie Kahan-title closer

6.  Q. Identify all persons or entities who were represented by you or your law firm.
A. Aries Financial, LLC

7.  Q. Identify all compensation received.

A. $1,345.00 by check at closing, for collating of documents, attending closing, filing articles of organization for 8901 Avenue L, LLC, state filing fee, reviewing documents, sending out documents to lender, sending check to broker, schedule closing, writing checks, reviewing New York State Department of Taxation and Finance Warrant, answered any and all questions of borrower, gave copies of all documents to borrower,

8.  Q. Identify anyone who performed post-closing activities and describe their role.

A. Self - reviewed file, sent file to lender, sent check to homeowners insurance company,

9.  Q. Identify all individuals who were present at meeting on April 23, 2008 relating to the post-closing activities.

A. Herman Britt signed a modification agreement for the loan on April 23, 2008.
I was present along with Mr. Britt.

10.  Q. Identify all persons who were represented by you or your law firm in connection with the post-closing activities.

A. Represented Aries Financial, LLC

11.  Q. Identify all compensation you received in connection with post-closing activities...and the service performed.

A. Part of the compensation from October 16, 2006 was for post closing activities. Sending file to lender, sending check for Homeowners insurance. $300.00 by check from Aries Financial in or about July 2008 for preparing modification documents, meeting with Mr. Britt to have modification documents executed

12.    Q. State whether you have ever been retained or performed any work for the defendants in this litigation,

A. Objection - to the word "retained", nature of the services - privileged information.
Hired by Aries Financial, settlement agent, never hired by Andrew Morse or Divine Intervention.

13.    Q. Identify any meeting, discussions, agreements, conversations between you and any other person or entity concerning Herman Britt, 8901 Avenue L LLC, the mortgage loan transaction, or the post-closing activities.

A.    I-Aries Financial - Objection, privileged
ii-Andrew Morse - do not recall
iii-Deborah Robertson - none prior to this litigation
iv-Fredric Powell-do not recall any regarding this loan
v-Albert London- Objection, privileged
vi-Lawrence Ramaekers- Objection, privileged
vii-Arlene London-none
viii-Candice London- Objection, privileged
ix-Eydie Kahan - Objection, privileged, scheduling the closing
x-Kenneth Ross-none
xi-Martin Simmons-none that I recall
xii-Cheung Ting-none
xiii-Divine Intervention-none prior to this litigation
xiv-Worldwide Financial Resources-do not recall
xv-Templar Sales- do not recall
xvi-First Lincoln Mortgage Bankers-none
xvii-US Bank, NA-none
xviii-Wachovia Bank-none
xix-Stein & Sheidlower- do not recall
xx-Sharp Appraisal-none
xxi-Filmore Agency-none
xxii-L&R Management, LLC - none
xxiii-Land America Lawyers Title Ins.- do not recall
xxiv-Tower Insurance Company NY- to get information to send check

14.    Q. Identify and describe any agreements, relationships between you or your law form and the following:

    A.     Objection - privileged, confidential.

            Hired by Aries Financial, LLC. Albert London, Managing member and Lawrence Ramaekers, member.

            None to the others.

15.    Q. List by property address and transaction date all real property transactions involving you or your law firm and Aries Financial.

         A.     Objection - privileged, confidential

             Property address' and transaction dates already provided in documents

16.    Q. List by property address and transaction date all real property transactions involving you or your law firm and Andrew Morse.

         A. Possibly 1-2 other Aries Financial loans. Already provided in document package.

17.    Q. List by property address and transaction date all real property transactions involving you or your law firm and Deborah Robertson and/or Divine Intervention.

         A. None

18.    Q. List by property address and transaction date all real property transactions involving you or your law firm and involving a residential property where an LLC held or took title to the property. For each property identified, also provide:

         (I)   The name of the LLC;

         (ii)  The date of the formation of the LLC; and

         (iii) The original principal balance of any mortgage loan associated with the transaction.

         A. The names, dates and balances are already provided in the documentation package

19.    Q. Identify all proceeds you or law firm disbursed with respect to subject mortgage loan...name, amount, method of payment and date.

         A. Copies of all checks have already been provided

20.    Q. Identify all judicial actions, administrative proceedings, regulatory inquiries, or other complaints (including those currently pending) that have been brought against you or your law firm, agents, employees, partners, or principals, including but not limited to those made to any federal, state, or local agency and to any disciplinary committee. Provide summary of:

         (I)   The issues raised;

         (ii)  How the matter was resolved;

        (iii)  The caption of each action, proceeding, inquiry or complaint;

(iv)   The name of the court or forum

(v)   The docket or case number

(vi)   The venue for each actions proceeding, inquiry, or complaint.

A.   Objection-Irrelevant, overly broad, immaterial, fishing expedition. No administrative proceedings, No regulatory inquiries, No federal, state, or local agency inquiries or proceedings

21.   Q. Identify by name, last known address and contact information all business or corporate entities that you or law firm assisted to establish, organize, form, incorporate, or create from January 1, 2005 to present. For each entity identified, provide the name of the person who retained you for services, the date such services were provided, and the amount and source of compensation for such services.

A. Objection - irrelevant, immaterial, overly broad.

Anything information relating to the subject matter loan and/or entities relating to Aries loans have already been provided.

## RESPONSES TO REQUEST FOR PRODUCTION OF DOCUMENTS

1.   See documents provided
2.   See documents provided
3.   See documents provided
4.   Privileged, see documents provided
5.   Privileged, see documents provided
6.   Privileged, irrelevant, immaterial, overly broad
7.   None, See documents provided
8.   See Answer to #7
9.   Same as above
10.   Same
11.   Same
12.   Same
13.   Same
14.   Same
15.   Same
16.   Same
17.   Same
18.   Same
19.   Same
20.   Same
21.   Same
22.   Same
23.   Same
24.   Same

25.  Same
26.  Same
27.  See the documents provided
28.  See the documents provided
29.  See Ans. To #6 & #7 above
30.  Privileged, confidential, irrelevant, immaterial, Same as #29.
31.  See # 30
32.  To be determined.

Dated: Larchmont, New York
       March 25, 2010

Douglas Kahan, Esq. (DK-4282)
Pro se
1328 Boston Post Road
Larchmont, New York 10538
Tel (914) 630-1178
Fax (914) 630-0043

**DOUGLAS KAHAN**
**1328 Boston Post Road,**
**Larchmont, New York  10538**
**(914) 630-1178**
**Fax (914) 630-0043**
**Pro Se Defendant**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**HERMAN BRITT,**

                                        **Plaintiff,**

**v.**

                                        **Civil Action No.: 09-Civ-2398**
                                                           **(RJD) (ALC)**

**ARIES FINANCIAL, LLC.,**
**DIVINE INTERVENTION INSTITUTE, INC.,**
**ANDREW MORSE, DOUGLAS KAHAN,**

                                        **Defendants.**

## RESPONSES TO PLAINTIFFS INTERROGATORIES

*DOUGLAS KAHAN*
**Pro Se Defendant**
*Office of Post Office Address, Telephone*
**1328 Boston Post Road**
**Larchmont, New York 10538**
**914-630-1178**

To: South Brooklyn Legal Services
      105 Court Street, Third Floor
      Brooklyn, New York  11201

Service of a copy of the within
is hereby admitted.
Dated:_____20____
_____

Attorney(s) for Defendants – Franklin/Sinton

**PLEASE TAKE NOTICE:**

( ) NOTICE OF ENTRY

that the within is a (certified) true copy of a duly entered in the office of the clerk of the within named court on

( ) NOTICE OF SETTLEMENT                                one of the judges of the within named Court, at

that an order will be presented for settlement to the HON.

      on        19    At        M.                             Yours, etc.

Dated.

# EXHIBIT CC

# DOUGLAS KAHAN

ATTORNEY AT LAW
1328 Boston Post Road
Larchmont, New York 10538
(914) 630-1178
FAX (914) 630-0043

August 11, 2010

South Brooklyn Legal Services
Jennifer Light, Esq.
105 Court Street, 3rd Floor
Brooklyn, NY 12201

JASA – Legal Services
Donna Dougherty, Esq.
97-77 Queens Boulevard, Suite 600
Rego Park, New York  11374

Re: Britt v. Aries Financial, LLC et al., 09-civ-2398
     Petersen v. Aries Financial, LLC et al., 06-civ-06663

Dear Counselors:

This letter and the annexed documents are Douglas Kahan's responses to the document demand of July 14, 2010. I am writing as pro se defendant on the Britt matter and co-counsel on the Peterson matter. Frederick Sosinsky, Esq. will more fully correspond as Aries counsel on both matters.

1.  None
2.  Will be provided.
6.  Previously provided
12. Attached i and ii.
13. None other than previously provided.
18. Objection – privileged attorney-client communications
19. See #18 above.
21. Department of State document attached.
22. See #13 above.
23. See #21 above.
28. Previously provided.
29. Previously provided.
30. Previously provided.
31. None

Very truly yours,

Douglas Kahan

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through August 3, 2010.

Selected Entity Name: J & G PROPERTY SOLUTIONS, LLC
Selected Entity Status Information

**Current Entity Name:** J & G PROPERTY SOLUTIONS, LLC
**Initial DOS Filing Date:** NOVEMBER 17, 2005
**County:** RICHMOND
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC LIMITED LIABILITY COMPANY
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
J & G PROPERTY SOLUTIONS, LLC
1140 BAY STREET
STATEN ISLAND, NEW YORK, 10305

**Registered Agent**

NONE

This office does not require or maintain information regarding the names and addresses of members or managers of nonprofessional limited liability companies. Professional limited liability companies must include the name(s) and address(es) of the original members, however this information is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

\*Stock information is applicable to domestic business corporations.

**Name History**

Entity Information

| Filing Date | Name Type | Entity Name |
|---|---|---|
| NOV 17, 2005 | Actual | J & G PROPERTY SOLUTIONS, LLC |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Services/Programs  |  Privacy Policy  |  Accessibility Policy  |  Disclaimer  |  Return to DOS
Homepage  |  Contact Us  |  Web Feedback

# MODIFICATION AGREEMENT

$ 160,657.63
Principal Amount

Dated: *August 6, 2008*

Executed at: *NY, NY*
City, State

FOR VALUE RECEIVED, the Undersigned (jointly and severally, if the Undersigned is more than one)
promises to pay to Aries Financial, LLC
located at 2901 Clint Moore Road, PMB 216, Boca Raton, FL 33496

or such address as may be designated by any holder of the Note,
the principal sum of $160,657.63
with **Interest Only Payments** to be paid monthly in 36 equal payments,
beginning on September 1, 2008
Interest rate is 9%
This Note modifies the Note executed by the maker on 03/27/07. If this Note is defaulted to
Aries Financial, LLC can proceed with a foreclosure on the original Note with the original terms
of the Mortgage and Note including default payments and accelerations.

1. This Note may be prepaid in whole or in part without penalty. If this note is payable on more than one date, prepayments shall be credited to the installments in the reverse order of their due dates.

2. In the event of the failure to make any payment when due, the holder of this Note may declare the entire principal balance and accrued interest immediately due and payable. Any overdue payment shall bear interest at the increased rate of sixteen percent (16%) per annum or the maximum rate permitted by law, whichever is lower.

3. All parties to this Note, including the Undersigned and any endorsers or guarantors jointly and severally waive presentment, notice of dishonor and diligence in collecting and all agree to remain fully obligated under the terms of this Note even if, without notice, the time for payment is extended; or the Note is renewed or modified; or one of the parties is released or discharged; or the release or substitution of any collateral given as security for the payment of the Note.

4. If this Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of collection, including reasonable attorney fees. In the event that any judgment is obtained under this Note, the Undersigned waive, to the extent permissible under law, the benefit of any law exempting their property, or any part of it.

5. The Undersigned/Borrower agrees to maintain Hazard Insurance on the property at all times. Payment of Hazard Insurance is the responsibility of the Undersigned/Borrower, not the Lender. Borrower acknowledges and understands that it has been the Borrower's responsibility to pay all Property Taxes since the origination of the loan on 03/27/07, and that Borrower further agrees and understands that Borrower will continue to pay all Property Taxes when they become due.

Maker's Signature-884 Academy Street 5A, LLC

Address *91 Van Cortland Pt Ave. W Brooklyn NY 10463*

Co-Maker's Signature-Rafael Geronimo

Address

## GUARANTY

FOR VALUE RECEIVED, the Undersigned (jointly and severally if more than one) hereby guarantee absolutely and unconditionally prompt payment of the foregoing Promissory Note and agree to pay all costs of collection and/or enforcement of the Note and the enforcement of this Guaranty.

This Guaranty shall continue in full force and binding upon the Undersigned until the Note has been fully paid and discharged.

Guarantor's Signature

Guarantor's Signature

Address

SUPERIOR COURT OF THE STATE OF NEW YORK

COUNTY OF New York

|  |  |
|---|---|
| ARIES FINANCIAL, LLC, | ) Index No. |
| | ) Address of Plaintiff: |
| | ) **2901 Clint Moore Rd., PMB 216,** |
| Plaintiff, | ) **Boca Raton, FL 33496** |
| | ) |
| vs. | ) AFFIDAVIT OF CONFESSION OF JUDGMENT |
| | ) |
| 584 Academy Street 5A, LLC and | ) |
| | ) |
| Rafael Geronimo, | ) |
| Defendant(s) | |

Rafael Geronimo, being duly sworn, does hereby execute the following Confession of Judgment and Verified Statement, and states under penalties of perjury, as follows:

1. Deponent is one of the defendants herein.

2. The Defendant hereby confesses judgment herein and authorizes entry thereof against defendant in the sum of $ 150,000.00 . Defendant resides at 584 Academy Street, # 5A  in the County of New York, State of New York. Defendant authorizes entry of judgment of foreclosure in Superior Court County of New York, New York.

3. This confession of judgment of foreclosure is for a debt justly due plaintiff arising from the following facts:

On August 5, 2008 Aries Financial, LLC and the Defendant entered into a Modification Agreement resolving a dispute of the payment of a mortgage.  A copy of the Modification Agreement is annexed hereto.

A Mortgage and Note were taken out by the defendant using the premises known as 584 Academy Street # 5A, New York, New York as collateral.  Said defendant hereby consents and confesses to a judgment of foreclosure against the property as directed in the Mortgage, Note and Modification Agreement.

4.  If there shall be an uncured default under the Modification Agreement, Note and/or Mortgage, Plaintiff may file this Confession of Judgment in New York County Superior Court where the property is located to effectuate a Foreclosure Judgment and Sale of the premises.

5.  This Confession of Judgment shall be held in escrow by Douglas Kahan, Esq., attorney for the Plaintiff.

_____
Rafael Geronimo.

Sworn to before me this
_____ 6 _____ day of _____ August _____, 2008

_____
Notary Public

DOUGLAS KAHAN
Notary Public, State Of New York
Reg. No. 01KA5048315
Qualified New York County
My Commission Exp. Aug. 21, 2010

## VERIFICATION

Rafael Geronimo, being duly sworn, deposes and states: that he is one of the defendants named herein; that he knows the facts and contents set forth in the foregoing Confession of Judgment; that he signed the foregoing instrument, and that the statements contained therein are true and correct of his own personal knowledge; and that he delivers the Confession of Judgment for the purposes contained therein.

By: _____
                Rafael Geronimo

STATE OF NEW YORK )

)ss.:

COUNTY OF New York        )

On this ___6___ day of _____, 2008, before me personally appeared Rafael Geronimo and executed the foregoing instrument under oath.

_____
Notary Public

DOUGLAS KAHAN
Notary Public, State Of New York
No. 01KA6048315
Qualified New York County
My Commission Exp. Aug. 21, 20/0

# RELEASE OF CLAIMS

KNOW ALL PARTIES, that in exchange for the consideration of the modification of the Note and Mortgage and the reduction in the interest rate, 584 Academy Street 5A, **LLC**, (hereinafter referred to as "Releasor(s)"), its managing member, members, agents and servants, successors and assigns, and all other persons, firms, corporations, associations and partnerships, knowingly, freely, voluntarily and without reservations, forever release:

**ARIES FINANCIAL, LLC**, their agents and servants, heirs, successors and assigns, and all other persons, firms, corporations, associations and partnerships of and from any liabilities, debts, or other interests that RELEASORS may have had, currently have or possibly have as a result of any and all damages resulting from the loan, Note, Mortgage and all other documents executed at the closing dated

Releasor acknowledges that as an LLC it is not entitled to the 3-DAY RIGHT OF RESCISSION after the closing, which allowed for immediate funding of the loan, and Releasor further acknowledges waiver of the 3-DAY RIGHT OF RESCISSION if applicable.

IN WITNESS WHEREOF, RELEASOR has read the foregoing, has had time to consult with counsel of its choosing, fully understand its content and has hereunto set his/her name and signature, on this

584 ACADEMY STREET 5A, LLC
Rafael   Geronimo,   Managing
Member

SWORN TO BEFORE ME THIS
6 day of _____ , 2008

NOTARY PUBLIC

DOUGLAS KAHAN
Notary Public, State Of New York
No. 01KA5048315
Qualified New York County
My Commission Exp. Aug 21, 20

**SUPERIOR COURT OF THE STATE OF NEW YORK**

**COUNTY OF Suffolk**

|  |  |
|---|---|
| ARIES FINANCIAL, LLC, | ) Index No. |
|  | ) Address of Plaintiff: |
| Plaintiff, | ) **2901 Clint Moore Rd., PMB 216,** |
|  | ) **Boca Raton, FL 33496** |
| vs. | ) |
|  | ) AFFIDAVIT OF CONFESSION OF JUDGMENT |
| Michael Williams, and Mary Jane Williams | ) |
|  | ) |
| Defendant(s) | ) |

Michael Williams, being duly sworn, does hereby execute the following Confession of Judgment and Verified Statement, and states under penalties of perjury, as follows:

1. Deponent is one of the defendants herein.

2. The Defendant hereby confesses judgment herein and authorizes entry thereof against defendant in the sum of $ 195,000.00 . Defendant resides at 43 Oakdale Avenue, Central Islip, in the County of Suffolk, State of New York. Defendant authorizes entry of judgment of foreclosure in Superior Court County of Suffolk, New York.

3. This confession of judgment of foreclosure is for a debt justly due plaintiff arising from the following facts:

On April 25, 2008 Aries Financial, LLC and the Defendant entered into a Modification Agreement resolving a dispute of the payment of a mortgage. A copy of the Modification Agreement is annexed hereto.

A Mortgage and Note were taken out by the defendant using the premises known as 43 Oakdale Avenue, Central Islip, NY as collateral. Said defendant hereby consents

and confesses to a judgment of foreclosure against the property as directed in the Mortgage, Note and Modification Agreement.

4.  If there shall be an uncured default under the Modification Agreement, Note and/or Mortgage, Plaintiff may file this Confession of Judgment in Suffolk County Superior Court where the property is located to effectuate a Foreclosure Judgment and Sale of the premises.

5.  This Confession of Judgment shall be held in escrow by Douglas Kahan, Esq., attorney for the Plaintiff.

_Michael E. Williams_

Michael Williams.

Sworn to before me this
4ᵗ day of _June_ 2008

Notary Public

DOUGLAS KAHAN
Notary Public, State Of New York
Reg. No. 01KA6048315
Qualified New York County
My Commission Exp. Aug. 21, 2009

**VERIFICATION**

Michael Williams, being duly sworn, deposes and states: that (s)he is one of the defendants named herein; that (s)he knows the facts and contents set forth in the foregoing Confession of Judgment; that (s)he signed the foregoing instrument, and that the statements contained therein are true and correct of his/her own personal knowledge; and that (s)he delivers the Confession of Judgment for the purposes contained therein.

By: _Michael E Williams_

Michael Williams


STATE OF NEW YORK )

                   )ss.:

COUNTY OF Suffolk       )


On this ___4th___ day of ___June___ 2008, before me personally appeared Michael Williams and executed the foregoing instrument under oath.


Notary Public

DOUGLAS KAHAN
Notary Public, State Of New York
Reg. No. 01KA5048315
Qualified New York County
My Commission Exp. Aug. 21, 2009

# MODIFICATION AGREEMENT

$ 214,652.75
Principal Amount

Dated: _6-4-08_

Executed at: _C Islip, NY_
City, State

FOR VALUE RECEIVED, the Undersigned (jointly and severally, if the Undersigned is more than one)
promises to pay to Aries Financial, LLC
located at 2901 Clint Moore Road, PMB 216, Boca Raton, FL 33496

or such address as may be designated by any holder of the Note,
the principal sum of $214,652.75
with **Interest Only Payments** to be paid monthly in 36 equal payments,
beginning on July 1, 2008
Interest rate is 10%
This Note modifies the Note executed by the maker on 10/06/06. If this Note is defaulted to Aries Financial, LLC can proceed with a foreclosure on the original Note with the original terms of the Mortgage and Note including default payments and accelerations.

1. This Note may be prepaid in whole or in part without penalty. If this note is payable on more than one date, prepayments shall be credited to the installments in the reverse order of their due dates.

2. In the event of the failure to make any payment when due, the holder of this Note may declare the entire principal balance and accrued interest immediately due and payable. Any overdue payment shall bear interest at the increased rate of sixteen percent (16%) per annum or the maximum rate permitted by law, whichever is lower.

3. All parties to this Note, including the Undersigned and any endorsers or guarantors jointly and severally waive presentment, notice of dishonor and diligence in collecting and all agree to remain fully obligated under the terms of this Note even if, without notice, the time for payment is extended; or the Note is renewed or modified; or one of the parties is released or discharged; or the release or substitution of any collateral given as security for the payment of the Note.

4. If this Note is not paid promptly in accordance with its terms, the Undersigned agrees to pay all costs of collection, including reasonable attorney fees. In the event that any judgment is obtained under this Note, the Undersigned waive, to the extent permissible under law, the benefit of any law exempting their property, or any part of it.

5. The Undersigned/Borrower agrees to maintain Hazard Insurance on the property at all times. Payment of Hazard Insurance is the responsibility of the Undersigned/Borrower, not the Lender. Borrower acknowledges and understands that it has been the Borrower's responsibility to pay all Property Taxes since the origination of the loan on October 6, 2006, and that Borrower further agrees and understands that Borrower will continue to pay all Property Taxes when they become due.

_Michael E Williams_
Maker's Signature-43 Oakdale Avenue, LLC
_43 Oakdale Ave._
Address _Central Islip_

_Michael E Williams_
Co-Maker's Signature-Michael Williams
_43 Oakdale Ave_
Address _Central Islip_

## GUARANTY

FOR VALUE RECEIVED, the Undersigned (jointly and severally if more than one) hereby guarantee absolutely and unconditionally prompt payment of the foregoing Promissory Note and agree to pay all costs of collection and/or enforcement of the Note and the enforcement of this Guaranty.

This Guaranty shall continue in full force and binding upon the Undersigned until the Note has been fully paid and discharged.

_Michael E Williams_
Guarantor's Signature
_43 Oakdale Ave_
_Central Islip_

Guarantor's Signature

Address

# RELEASE OF CLAIMS

KNOW ALL PARTIES, that in exchange for the consideration of the modification of the Note and Mortgage and the reduction in the interest rate, 43 Oakdale Avenue, **LLC,** (hereinafter referred to as "Releasor(s)"), its managing member, members, agents and servants, successors and assigns, and all other persons, firms, corporations, associations and partnerships, knowingly and voluntarily and without reservations, forever release:

**ARIES FINANCIAL, LLC,** their agents and servants, heirs, successors and assigns, and all other persons, firms, corporations, associations and partnerships of and from any liabilities, debts, or other interests that RELEASORS may have had, currently have or possibly have as a result of any and all damages resulting from the loan, Note, Mortgage and all other documents executed at the closing dated

IN WITNESS WHEREOF, RELEASOR has read the foregoing, fully understand its content and has hereunto set his/her name and signature, on this

_____
Michael Williams - Managing Member

SWORN TO BEFORE ME THIS
4 day of June 2008

_____
NOTARY PUBLIC

DOUGLAS KAHAN
Notary Public, State Of New York
Reg. No. 01KA5048315
Qualified New York County
My Commission Exp. Aug. 21, 2009

# EXHIBIT DD

**From:** Light, Jenn
**Sent:** Tuesday, January 25, 2011 11:20 AM
**To:** Roman, Hannah
**Subject:** FW: Britt and Petersen v. Aries Joint Status Letter DRAFT

---

**From:** dougkahanlegal@aol.com [mailto:dougkahanlegal@aol.com]
**Sent:** Wednesday, November 17, 2010 4:36 PM
**To:** Light, Jenn; fsosinsky@hotmail.com; Sinton, Jennifer; Simon, Nina; Brinegar, Matthew;
Karuna.Patel@responsiblelending.org; Salzman, Leslie
**Subject:** Re: Britt and Petersen v. Aries Joint Status Letter DRAFT

Counselors:
With regard to my privilege log. You have the date Aries ceased giving new loans.
All my privileged communications are after that date and include the letters f.c.lit which stand for foreclosure litigation.
The communications were after being a closing/settlement agent ended. They have to do with litigation.
Also, please send copies of depositions that you refer to in your requests so that we can review the testimony.
We do not have the transcripts of Al London, Candice London or Larry Ramaekers.
Thank you very much,
Douglas Kahan


-----Original Message-----
From: Light, Jenn <JennL@sbls.org>
To: fred sosinsky <fsosinsky@hotmail.com>; Sinton, Jennifer <JenniferS@sbls.org>; Simon, Nina
<nina.simon@self-help.org>; Brinegar, Matthew <Matthew.Brinegar@self-help.org>; Karuna Patel
<Karuna.Patel@responsiblelending.org>; Salzman, Leslie <salzman@yu.edu>; dougkahanlegal@aol.com
Sent: Wed, Nov 17, 2010 3:58 pm
Subject: Britt and Petersen v. Aries Joint Status Letter DRAFT

Dear Fred and Doug,

Please contact me regarding this letter tomorrow morning (or via email tonight).  I will be filing it via ECF at 1:30
p.m. tomorrow.

Thank you,
Jennifer

Jennifer Light
Staff Attorney
Foreclosure Prevention Project
South Brooklyn Legal Services
105 Court St., 3d Fl
Brooklyn, NY 11201
(718) 237-5556 (phone)
(718) 875-8546 (fax)

# EXHIBIT

# EE

# DOUGLAS KAHAN
**Attorney at Law**
**225 Broadway – Suite 715**
**New York, New York 10007**
**(212) 566-2566**
**(212) 566-8165**

**Via Electronic Mail**


Dear Counsel:

Kindly accept this as further response to Ms. Patel's letter dated December 14, 2010.

I have produced all of the emails in my possession with the exception of those emails that are the subject of the privilege log that has been provided. There are no other emails to be produced. This was already made clear in my deposition testimony. I did not save emails and my emails were lost in April 2010 due to AOL server failure. I do not have any other correspondence from when I was acting as closing agent to produce.

As acknowledged, one of Aries' loans has been assigned to Ramgallon, LLC. I have previously produced the documents pertaining to Ramgallon. That assignment has been recorded in the County Clerk's Office, Bronx County. It is a matter of public record. I do not believe that there are any other documents to produce.

Please contact me at your earliest convenience if you would like to further discuss these issues.

Thanks you for your attention to this matter.


Very truly yours,


Douglas Kahan