1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK

2

3   --------------------------------X
                             :

4   HERMAN BRITT,              :
                             :  09-CV-2398 (RDD)

5            Plaintiff,     :
                             :

6              v.         :
                             :  225 Cadman Plaza East

7   ARIES FINANCIAL, LLC,. et al.,  :  Brooklyn, New York

8           Defendants.    :  July 6, 2011
   --------------------------------X

9       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE

10      BEFORE THE HONORABLE ANDREW L. CARTER, JR.
          UNITED STATES MAGISTRATE JUDGE

11
   APPEARANCES:

12

13  For the Plaintiff:       KARUNA PATEL, ESQ.
                        NINA SIMON, ESQ.
                        Center for Responsible Lending

14                       910 17th Street NW
                        Washington, DC 20006

15

16                        JENNIFER SINTON, ESQ.
                        South Brooklyn Legal Service
                        105 Court Street

17                        Brooklyn, New York 11201

18  For the Defendants:      FREDERICK L. SOSINSKY, ESQ.

19

   For Mr. Kahan:           DOUGLAS KAHAN, ESQ. (Pro Se)

20

21

22  Court Transcriber:       SHARI RIEMER
                        TypeWrite Word Processing Service

23                        211 N. Milton Road
                        Saratoga Springs, New York 12866

24

25

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

2

1   (Proceedings began at 1:42 p.m.)

2   [Audio recording has buzzing throughout]

3            COURT CLERK:  Civil Cause for Oral Argument, Case

4   Number 09-CV-2398, Britt v. Aries Financial.

5            Counsel, please state your appearance for plaintiff.

6            MS. PATEL: Karuna Patel, Center for Responsible

7   Lending.

8            MS. SIMON: Nina Simon, Center for Responsible

9   Lending.

10            MS. SINTON:  Jennifer Sinton, South Brooklyn Legal

11   Services.

12            MS. ROMAN: Hannah Roman, South Brooklyn Legal

13   Services.

14            MS. LIGHT: Jennifer Light, South Brooklyn Legal

15   Services.

16            THE CLERK: For the defendant.

17            MR. SOSINSKY:  For Aries Financial, Fred Sosinsky.

18            MR. KAHAN:  Douglas Kahan on behalf of myself.  Good

19   afternoon, Your Honor.

20            THE COURT: We're here for an oral argument on the

21   plaintiff's motion for sanctions and a motion to compel.  Let

22   me hear from plaintiff.  Go ahead, you can start off.  You can

23   remain seated.

24            MS. PATEL: I can remain seated.

25            Good afternoon, Your Honor.  I'm here in support of

1    Mr. Britt's motion to compel and for sanctions.  The record

2    here is replete with proof that Aries and Kahan intentionally

3    and materially disregarded the rule [inaudible] civil

4    litigation.  The sanctions undoubtedly are warranted here.  I

5    will address Aries and Mr. Kahan separately.

6              First, I want to give a little bit of background,

7    quick background on why we have thought throughout this

8    process that electronic documents should exist and more

9    electronic documents -- we think that more electronic

10   documents exist still.  We learned from depositions and the

11   documents produced to date how Aries business was conducted

12   and now we know that Aries was started in 2005, 2004-2005 by

13   two savvy businessmen in Boca Raton. [Inaudible] Amaherst

14   [Ph.] was the CEO at some point of a $6 billion subprime

15   mortgage company and Al Lending who owned a company, a foreign

16   brokerage business in the New York Mercantile Exchange with

17   clients like Citibank and Wachovia.  Their goal was cash in on

18   the equity of distressed homeowners in the New York City area

19   where property values are high and continually rising, and

20   their idea, their business model was to refinance home

21   mortgages short term at 15 or 16 percent, charge high fees up

22   front, take one year as escrow from the equity in the home and

23   also use that high equity as collateral.

24              Their one major hurdle was that federal and state

25   consumer protection laws prohibit some of those terms for

4

1  owner occupied home mortgages.  Their [inaudible] was to dress

2  up these mortgages as commercial loans by transferring the

3  title for the home to an LLC.  So all of this occurred in

4  2004-2005, all the research, all the planning. So they drafted

5  up loan documents connected with brokers in New York City.

6          Aries made its first loan in Queens on March 7, 2005

7  and they ran a business the entire time from their homes in

8  Florida.  Over 90 loans were made.  Only two of them were made

9  in Florida.  27 of them were made in 2005 so it's about a

10  third; 56 in 2006; and 7 in 2007.  They hired two employees to

11  work with them but that wasn't until 2006.  So at least a

12  third, almost a third of the loans were made just with Mr.

13  London and Mr. Ramaeker behind the scenes.

14          Since we've learned this information a number of

15  questions arose for us.  How were the loan origination

16  documents created, the notes, the mortgage, any disclosures,

17  who drafted them, where were they made, on whose computer, how

18  did Aries tell brokers about their new product, how did they

19  get information about potential borrowers from brokers, the

20  borrowers were in New York and they were in Florida, was there

21  a loan application, who created that loan application, how did

22  they get copies of loan documents to closing agents in New

23  York, who actually met with the borrowers, and then finally

24  how did they answer questions from brokers, from brokers, from

25  closing agents as they came up especially because this was

1   kind of an exotic product.

2           So there's no doubt now and now that we've received

3   all the documents and as our supplementary submission states

4   that much of the business was electronically run and as shown

5   in our submission there's no doubt that electronic documents

6   and communications that were many of the questions -- that the

7   answers to these questions lie.  As Judge Simon wrote in

8   Zubalacki 4 [Ph.], documents create a paper reality we call

9   proof.  The absence of such documentary proof [inaudible] the

10  search for the truth.

11          The fact that defendant's deposition testimony

12  contradicts those documents confirms that there's no

13  substitute for the documents.  It also explains Aries motive

14  for intentionally for making misrepresentations about the

15  existence of those documents.  As early as the 26(f) discovery

16  plan which was signed by Mr. Kahan and by Aries, they stated

17  the parties are not aware of any relevant ESI to the instant

18  action in their possession previously and/or currently.  This

19  was obviously untrue.  They were using email in 2009, 2008,

20  2007. On the December 2nd conference with the court they

21  insisted that there were no more documents and they said a

22  motion to compel would be fruitless and unnecessary and in a

23  number of letters to plaintiff's counsel culminating with the

24  letter of January 5th where they said, and I quote "plainly and

25  simply there are no other emails to be produced."

6

1          Your Honor, having taken this statement at face

2     value we would have 544 emails with which we would be

3     defending this -- with which we would be litigating this case.

4     Even if we relied on the affidavits, Mr. London's affidavit

5     for example which said there are no more emails, we had an

6     expert look at my computer, even if we had relied on that

7     statement at that point stop pursuing our motion we would have

8     been short the 1,300 emails that were produced on June 1st, a

9     month ago.

10          So since the motion was served we have gotten over

11    9,000 emails and 80 documents and documents are unquestionably

12    relevant. For example, we did a keyword search for Britt in

13    those documents and got over 500 hits, 138 emails, and this is

14    just related to Mr. Britt's loan.  The documents also prove

15    that there must be more documents.  Aries and the principals

16    of Aries and the employees cannot be trusted to produce those

17    documents and we've learned that by now over and over again.

18          Specifically, Mr. Ramaeker is the mastermind and

19    creator of the business model and the documents, admits in his

20    affidavit that he was deleting and destroying documents

21    through 2007, maybe up to the present. He's a key player and

22    he never complied with any kind of litigation hold.  Our

23    letter submission shows that there's evidence from a statement

24    by Mr. London, an email by Mr. London which states that he was

25    the originator of all of the documents, loan originating

7

1  documents that they used and that they were only on his
2  computer up until a certain point.  It's not clear that all of
3  the documents were transferred to somebody else's computer or
4  not, what else he had on his computer and he has produced
5  anything more since -- before the motion.

6          His testimony, Mr. Ramaeker's testimony that he
7  didn't use much email in 2005 or 2006 is also clearly
8  contradicted by Aries most recent production where over 400
9  emails were either to or from Mr. Ramaeker's.  Finally, the
10 metadata reveals that he was the author of 27 of the 80
11 documents that were produced by Mr. London and some of those
12 documents include documents titled loan closing instructions,
13 their purported truth-in-lending disclosure.  In fact, three
14 different versions of a truth-in-lending disclosure, broker
15 application form, Aries loan criteria, Herman Britt refi
16 suggestion letter, and another entitled NY LLC closing plus
17 the business plan we mentioned in our supplemental submission.

18         The same is true for Mr. London in terms of us
19 really needing a third party forensic analysis to look at all
20 of the sources of data.  Mr. London produced over 1,300
21 emails. The dates range from -- there's one from 2005, from
22 2006 to 2011 and there's no explanation whatever where these
23 emails came from, why he still has them.  After submitting an
24 affidavit in which he stated he had an expert look at his
25 computer, there's nothing else left, this would have been

8

1   after the original date for the argument for this motion.  On

2   June 1st we received a disk with no explanation of all of these

3   emails.  In fact, we still can't get the text of some of those

4   emails.  Apparently they're not retrievable by whoever is

5   trying to retrieve them on behalf of Aries and the subject

6   matter shows -- the subject lines show that some of those are

7   clearly relevant and it's probable that a third party forensic

8   analyst would be able to get these emails.

9          Obviously we also don't know whether or not this is

10  everything.  We have gotten so many -- there have been so many

11  statements that we have everything, we have everything. We

12  still haven't gotten them.

13         Ms. Laxner, one of their employees, clearly lied

14  about having a backup drive.  That was in her deposition, that

15  she didn't have any backup, that Aries didn't have any backup

16  and then in one of the emails she says I bought a backup

17  drive, Mr. London told her to and she did it.  Also, the same

18  in terms of her use of personal email.

19         Finally, with Candice London we don't know what's

20  there.  She said similarly that she continued to delete

21  emails.  Again, no litigation hold was ever put in place.  We

22  don't know from the 8,000 emails which emails were produced by

23  her, which by Ms. Laxner, but we do know that they're really

24  important emails. One of her job duties was to communicate

25  with brokers regularly and we have regular communications but

1   we don't know if everything is there.

2          Lastly, which I've mentioned a number of times, but

3   it's worth saying again.  No litigation hold was put in place

4   here.  It doesn't seem like anybody -- any of the relevant

5   individuals complied with a litigation hold and while that's

6   independently sanctionable where documents can be recovered

7   they really should be.  Mr. Britt has the right to put on the

8   most burlesque case possible especially for his claims for

9   punitive damages, his claims for fraud.  There's -- thus,

10  again, the sanctions are warranted.

11         In terms of Mr. Kahan, a simple time line evidence

12  is the [inaudible] inconsistencies we have in Mr. Kahan's

13  representations to plaintiff's counsel and to the court.  Mr.

14  Kahan was a closing agent for approximately 50 of Aries 90

15  plus loans and the new emails produced by Aries show that over

16  500 emails were to or from Mr. Kahan with 300 plus of those

17  emails being in 2006 or 2007.  So this time line which I'm

18  just going to briefly go through is that in January 2010 we

19  served document production requests to Mr. Kahan.  March 25,

20  2010 he made his first production in which he produced one

21  email and stated that the others were either privileged or

22  don't exist whatever we requested but there was no privilege

23  log.

24         On October 22nd after repeated requests from us Mr.

25  Kahan produced four emails and a privilege log with 59 other

10

1  emails listed from 2007, 2008, 2009, and then on January 10th

2  after receiving our letter, after the wheels were in motion

3  for this motion to compel to be filed, Mr. Kahan sent us a

4  letter stating that he didn't save any email and that there

5  was an AOL server failure in April of 2010.

6       This also raised a number of questions.  One is why

7  didn't he mention the server failure before.  Between April of

8  2010 and January of 2011 there was no mention of any server

9  failure.  What are the details of who he contacted, when, why

10  the server failure happened.  We don't have any of that.

11  Also, the server failure happened after his first production

12  and there was no mention of the extent of the email that he

13  had in March of 2010.  Also, how could his privilege log, the

14  privilege log he produced in October include 59 emails that

15  were supposedly included in this server failure and those

16  emails according to his statements were not available to him

17  until late January.

18       So it doesn't really make any sense.  We don't know

19  the answer to these questions.  He acknowledges that the

20  privilege doesn't apply to correspondence that he had with

21  Aries when he acted as a closing agent.  That acknowledgment

22  was in a November 2010 email to plaintiff's counsel.  A

23  litigation hold should have applied to him as well after

24  December of 2006.  He's an attorney. It should have been clear

25  to him that he shouldn't be deleting documents after

1   litigation had started against Aries when he was so closely

2   involved with their work in closing these loans.

3            To sum up, the court cannot reward or facilitate or

4   Aries or Mr. Kahan's deliberate decision to withhold and

5   destroy documents.  Again, as Judge Simon said in Zubalacki 4

6   there are two questions with respect to what appropriate

7   action -- what the appropriate action would be here.  One is

8   to determine an appropriate penalty for the party causing the

9   loss or withholding the documents and the second is how to

10  determine an appropriate remedy for the party suffering the

11  loss, Mr. Britt.

12           The penalty is particularly meaningful here and

13  there must be a cost to breaking the rules.  It's especially

14  meaningful because there are multiple cases being litigated

15  against Aries by legal services program.  Aries has not

16  produced these documents in any of those cases.  As we

17  outlined in our motion, they've been selectively producing

18  documents assuming -- presuming that no one would be pursue

19  these documents.  So there's actually the ability to deter

20  Aries from continuing to break the rules in this case and in

21  other cases.

22           Also, without penalties parties obviously are

23  incentivized to just to wait until a motion is filed and then

24  make a dump of a production like as has happened here.

25  Thousands of documents being produced after a motion to compel

1   is filed when the threat of sanctions are looming. So we seek

2   an order directly defendants to produce all of their ESI,

3   their devices and all of their web based accounts to a third

4   party for a forensic analysis at their cost, an order

5   precluding defendants from using the evidence produced after

6   the service of our motion which was on February 7, 2011 in any

7   submission in this case or trial, directing defendants to make

8   all parties and individuals, relevant parties and individuals

9   available for deposition following the completion of the

10  forensic analysis again at defendant's cost and awarding Mr.

11  Britt attorney's fees and costs for the motion.  Thank you,

12  Your Honor.

13              THE COURT: Thank you.  Let me hear from counsel for

14  Aries.

15              MR. SOSINSKY: Judge, as I wrote when Mr. Britt's

16  attorneys filed their motion to compel and having learned from

17  my client -- and I'm not going to go into now what was going

18  on behind the scenes with my demonstrations with my client,

19  but as I wrote clearly, clearly as a result of the delay in

20  getting this material out there the court has wide discretion

21  to decide what relief, including sanctions, should be ordered

22  and I do not disagree in principle with the notion that there

23  has to be some price to pay in this case and in any case where

24  there is this type of delay.

25              For that reason I think from the get-go offered at

1    least at the time what I thought was a reasonable proposal

2    which was first -- the second I had my hands on this reaching

3    out to my adversaries to tell them listen, I just got this,

4    it's going to take me some time to go through it for

5    privilege, for relevance, I'm going to get this to you. Maybe

6    you can hold -- we can hold your motion for sanctions in

7    abeyance while I get this to you. You can go through there.

8    I will produce everybody else at our -- at the cost, meaning

9    for the transcript costs of these other people and you can

10   continue to depose them with whatever new material there is

11   and at the end of that process if you still believe that there

12   are further sanctions or remedies that the court should impose

13   you can do so, and they didn't want to do that.  They wanted

14   to continue on with this.  That's fine.  That's their

15   prerogative.  I understand.

16           Prior to that, prior to that time as I also point

17   out in my response, I had in a case concerning a loan made on

18   a particular day in October of 2006 and on behalf of a client

19   who was in foreclosure and had been running to every other

20   bank and entity to try to refinance it and our client makes a

21   loan to him to bail him out of foreclosure I had made all of

22   the loan files of the 90 or so loans available to these folks

23   in electronic form.  Previously they had been turned over in

24   paper form to a prior plaintiff in that case.  I didn't bother

25   to go through them and to try to feel out what might be

14

1  relevant, what's not relevant.  I turned over everything that

2  I had that I got my hands on and turned it over to them.  I

3  turned over every application that came into this business

4  over the course of its four years of operation whether the

5  applications were rejected or accepted.  Every appraisal that

6  was done.  There was no purposeful hiding of anything here on

7  my part.

8        With regard to emails, Your Honor, first they had

9  12,000 plus pages worth of documents that had been turned over

10  them.  They had lists and charts breaking down various

11  litigation matters that Aries was involved in then with the

12  names of those matters, docket numbers, the attorneys

13  involved.  I had turned over to them without the necessity of

14  them making a motion files, folders and files of

15  correspondence and documents between my client, an attorney,

16  attorneys who they were discussing privileged matters with at

17  least at the time because after considering whether or not

18  assertion of an attorney-client privilege under the

19  circumstances was appropriate and it took me some time to

20  think though this and to consult with colleagues to think this

21  through.  I felt that there was no reason to be asserting the

22  attorney-client privilege.  These are documents between my

23  client and a lawyer back in the formative stages of this

24  business, and I turned that over to them without protest.  It

25  did take me some time to come to that conclusion.

1          So they had all of that stuff and much of that, Your

2    Honor, goes back to the very beginning of this business where

3    they're consulting with counsel regarding whether it makes

4    sense to set up the business in this way versus that way, what

5    regulations might be like, whether or not they would be in

6    compliance or not in compliance if they ran the business this

7    way or that.  They had all that stuff a long time ago.

8          Then comes the issue of other emails.  They had

9    hundreds of emails but they certainly didn't have the emails

10   that I then discover are out there.  They came to me.  I

11   picked up the phone and I called them and I said there's a lot

12   here.  It's going to take me some time but rather than go

13   through with a fine tooth comb what was in these emails, a

14   number of approximately 10,000 and include within them

15   separately many, many other documents, many other documents as

16   attachments.  So it's far more than 10,000 pieces of data

17   information. It's probably 12 or 15,000 separate documents if

18   you include the various attachments that are in there, some of

19   which I previously provided, some of which were not.

20         Rather than go through them with a fine tooth comb

21   my concern at that point because it would have taken me far

22   too long to do this, and I knew at a minimum I wanted to get

23   this into their hands, was to establish a privilege log

24   because by that time in 2011 Aries was involved both

25   affirmatively in lawsuits that they brought and in defending

16

1  perhaps a dozen or 15 separate litigation matters for which

2  there were three, four, five, six different law firms and

3  attorneys involved and I labored over and produced a privilege

4  log with regard to everything else that I wasn't turning over

5  and still there was this maybe 15,000 documents that were

6  turned over to them, emails and attachments to those emails.

7  They had all of that then.

8          I am not seeking any approval for the fact that that

9  stuff should have been turned over long before.  It should

10 have been in my hands to be turned over to them.  I can't sit

11 here, Judge, and make arguments to you about the fact that it

12 should have been there.  But when I got it, when I got it

13 broadly without hunkering down and really determining the

14 relevance of a lot of this stuff and much of it despite their

15 protect has nothing to do with what they claim are the real

16 issues in this case but they have it and they can search it.

17 It's in searchable format.

18          The notion that there was a ton of documents

19 regarding the Britt case is simply not true.  This loan was

20 made to Mr. Britt the same way that the other loans were made

21 here.  The case has been in litigation for some time so there

22 are mentions made in non privileged emails that contain his

23 name as well and on charts that track each of the Aries loans

24 his name appears and there may well be a couple of hundred

25 times if that's the case but it's not as if there were

17

1    hundreds or even tens of documents pertaining to the Britt

2    case that were not turned over previously.  Whatever there is

3    in any event was turned over.  The second I got my hands on it

4    I created a privilege log for which there is no complaint they

5    now have this stuff.

6            So we're talking not about a small universe of

7    documents that we've produced in a case in which a person came

8    in for a closing in October of 2006 and we're sitting here in

9    July of 2011.  By the way, I didn't cut off, Your Honor, when

10   these emails with attachments were dated.  They have stuff

11   going through March, February of this year on a loan that was

12   made back in 2006.  Again, I wasn't about to take a narrow

13   view of what should be turned over at that point.  If it came

14   into my hands and I determined that it wasn't properly subject

15   to attorney client or work product privilege it got turned

16   over and that's where we're at now.

17           The question is how do we proceed from here, Your

18   Honor.  I agreed from the get-go that it was appropriate for

19   them to have a recall of the witnesses.  Your Honor should

20   know and I recently found out that one of the four people who

21   were previously deposed, Candice London apparently is no

22   longer working for the company.  She's no longer employed

23   there but she's alive and well as far as I know and can be

24   deposed.  Clearly that should take place.

25           I think it's imminently reasonable under the

1   circumstances that my client pay the costs of conducting those

2   additional depositions and I say that, by the way, with some

3   appreciation for the fact that if counsel had some or all of

4   this stuff last summer when we were taking these depositions

5   they still would have been limited to the same amount of time

6   by which they could depose these folks.  Obviously they might

7   have asked some different questions but there's no surprises

8   here.  There's nothing in these emails, Judge, that was not in

9   terms of how they ran the business.  That was not testified to

10  by the various folks produced for Aries.

11          Constantly throughout their papers with regard to

12  the motion to compel and for sanctions Mr. Britt's lawyers

13  would have you believe somehow that Aries was hiding from

14  brokers, from borrowers, from banks, from the world that as a

15  business decision they were only going to make loans to LLC's

16  or to corporations.  There were several loans early on that

17  [inaudible] corporate entities and at a certain point they

18  decided to do it to LLC's.  The fact of the matter is that's

19  all over.  There's nothing else out there other than that.

20  That's what they testified to at deposition.  They asked each

21  of these individuals involved how they came about and they

22  explained to them how it came about.  They're a private

23  business and as a business model they can choose in what form

24  they wish to make loans to people so long as they're not

25  hiding it from them and the people who come to the table

1  understand that this is a choice that they have to make and it

2  was in every document that every person who took a loan

3  signed.  Some of them with counsel by the way.  Not every

4  borrower came in without counsel.  Some of them with a lawyer

5  sitting next to them and signed.

6            So the notion that somehow in these documents we're

7  going to be able to find proof that Aries intended to make

8  these loans only in the form of an LLC is a big red herring

9  because there's no issue over that fact.  That's exactly how

10 Aries made each and every one of these loans as a business

11 decision with some appreciation for what the law wouldn't

12 allow if these were to be consumer loans.  They said we're not

13 going to be involved in making consumer loans.  We're going to

14 give loans to people who can't get consumer loans.  We're

15 going to give loans to people who couldn't get any loan.

16 We're going to give loans to people if they want to take them

17 from us who are willing to transfer ownership of their home

18 into a company that they own.  There's no strawman in these

19 cases like other mortgage fraud cases.  These people owned the

20 company, the LLC.  They came away from the closing with this.

21 They were mailed statements each month from a bank showing

22 money paid in the name of the LLC.

23           So the notion that somewhere in these -- somewhere

24 amongst the hidden emails there's damning evidence to show

25 that this is how Aries chose to operate doesn't mean anything

1  because that was the first thing they said in a deposition.

2  That's right, this was our business model.  We didn't make

3  consumer loans.  We gave many of the same notices.  We gave

4  many of the same forms to people even though we weren't

5  required to do so but this is the model that we chose to

6  conduct our business under.

7          I think, Your Honor, that amongst the remedies that

8  plaintiff seeks here such as, in essence, a directed verdict

9  is just highly inappropriate under these circumstances where

10 we're nowhere near a trial.  I think for Mr. Britt to come

11 before you and say we should be able to -- Mr. Britt in motion

12 practice and/or at a trial should be able to affirmatively use

13 whatever they find amongst these documents in order to bolster

14 their position but at the same time Aries should be precluded,

15 for example, by placing such an email in context by showing

16 what took place before and after that email was sent is

17 inappropriate.  It's inappropriate under any circumstance.

18 It's no less inappropriate here when dealing with a delay in

19 production circumstance.  They should not be able to moving

20 forward bend the truth from an alternate fact finder here by

21 selectively choosing what they wish to show without at least

22 considering whether or not that opens the door to similar

23 evidence amongst the same body of proof that cashed out on

24 whether or not deposition is accurate under the facts.

25          Your Honor, we've also argued in our papers and

1  asked Your Honor to pay mind to when it is that they claim the

2  most critical time period is here for which they have not been

3  provided discovery, and the fact of the matter is that the

4  litigation, the first litigation I believe, the Peterson case

5  takes place at the close of 2006.  We have now produced as of

6  March 2006 what I think can only be described as one goes

7  through it as I unfortunately had to do in crunch time quickly

8  essentially everything from the day-in and day-out business of

9  Aries financial beginning in March of 2006.  That's about nine

10  months before we get to the end of 2006.

11            As you go through the emails you can see on a day-in

12  and day-out basis what was going on there, who they were in

13  contact with, how applications came in, what was being

14  required of brokers sending in applications, follow ups. So

15  almost every day whether there's five, ten, fifteen, twenty

16  emails from close to the beginning of 2006 or nine months

17  before that critical date according to them you have

18  essentially every email from the two main employees of this

19  business and all of that going up to as I said just a few

20  months ago in 2011.  I think Your Honor has to consider what's

21  out there now in deciding how do we move this case forward and

22  at the same time impose some remedy or discipline upon my

23  clients for this delay.

24            THE COURT: Thank you.  Mr. Kahan.

25            MR. KAHAN: Good afternoon, Your Honor.  I would

22

1  agree with much of what Mr. Sosinsky has said regarding Aries.

2  I would add that a substantial amount of the emails that the

3  plaintiff would be looking to get from me that I no longer

4  have were now produced in the Aries emails.  Communications

5  that I had with the four Aries personnel, emails that I no

6  longer had in my possession have now been produced through

7  Aries production of some 12,000 emails.

8          As I pointed out in my affirmation in opposition,

9  there was an AOL server problem and I did not know it at the

10  time but I tried on many occasions to get a more definitive

11  answer from AOL as to what this was all about.  I've outlined

12  my contact with them in my written affirmation.  When part of

13  missing emails were put back on my account I immediately sent

14  80 emails plus 800 email privilege log to counsel for the

15  plaintiffs.  If I'm not mistaken, I think counsel failed to

16  mention that approximate 880 emails that I sent immediately

17  after they were returned or restored to my account.  I don't

18  have a further explanation as to why my inbox from AOL was no

19  longer accessible.  That's an AOL problem.  AOL has explained

20  it to me.  I've explained it in my affirmation what AOL told

21  me and it wasn't just me.  It was hundreds of thousands of AOL

22  customers.

23          So, Your Honor, I don't believe I misrepresented

24  anything in any of my testimony or any of my letters.  I

25  turned over everything I had when I had it.  I did not take

1   any steps to not turn over what I had, to misrepresent

2   anything to the court, to misrepresent anything to the

3   plaintiffs.

4          Again, Your Honor, I don't know what the remedy

5   would be with me going further going forward. I don't have

6   anything else to turn over.  I don't have any hard drives to

7   turn over.  My AOL accounts are not on any hard drives.  They

8   never were on any hard drives.  They're simply AOL accounts.

9   Those accounts have years -- well, withdrawn.

10         They have whatever is left in there now in my

11  account I've turned over what's relevance.  I have privilege

12  logs.  What's not relevant, what's privileged but they have

13  communications that I had with many of my other clients only

14  in recent time, only since April of last year because

15  everything else is gone.  Anything that had to do with Aries

16  was turned over or put on a privilege log.  So going forward I

17  don't know what else it is that I can give because I don't

18  have anything else to give and I don't have any physical

19  structure that could be looked at for anyone to try to

20  retrieve anything.

21         So in this case from five years ago where for

22  approximately a year-and-a-half I was involved in making loans

23  we then have over four years of no new loans being made and

24  only litigation.  Me as an attorney the overwhelming percent,

25  90, 95, 98 percent of any of those communications are going to

24

1   be privileged, Your Honor.  So I don't know how else to answer

2   what I perceive as some sort of fishing expedition since

3   12,000 emails, many with my name on it were turned over by

4   Aries, stuff that I do not have.  Everything that I do have I

5   either turned over or listed in a privilege log and there's

6   nothing else.

7           I don't believe anything that I did caused any delay

8   on the overall actions of this case.  I was not the lead in

9   anything that went on. I followed counsel.  Either counsel for

10  the plaintiff -- I followed other counsel's leads on what was

11  happening, what to do, what to say but, Your Honor, I turned

12  over everything that I have and I don't know what else I can

13  say about that.  I don't have any control over AOL.  I've

14  asked on many occasions for AOL for them to explain to me what

15  happened, where are the emails are you going to get them back,

16  and they told me it's possible that they will come back and

17  part of it did come back and as soon as they came back I

18  turned it over.

19          So to suggest that I'm either trying to hide

20  anything or delay anything is really not true, Your Honor. If

21  anything, I wish this case was over two years ago.  I gain

22  nothing out of this case continuing to go on.  I don't believe

23  I have a big stake in this case in any regard but the more

24  that this drags out, the more time it takes there's no benefit

25  for me in that.

1        Your Honor, the only other issue that I would want

2   to address -- and I don't know that -- I don't think that

3   there should be any sanction towards me.  I don't think I did

4   anything inappropriate.  I didn't intentionally do anything or

5   hide anything or delay anything.  I really don't know what

6   else I could say and explain to what ultimately was missing

7   emails because AOL deleted them.  I did not delete them but

8   ultimately most or not if all of those subsequently had been

9   turned over based on Aries production, and I apologize if I've

10  said something twice.

11        But, Your Honor, there's nothing else I could have

12  possibly done here.  I would just -- I would also join in a

13  strong portion of Mr. Sosinsky's argument regarding that the

14  defense should be precluded from using emails that they had

15  not produced because of the delay.  I don't think there's

16  anything in the search for truth that can justify that.

17        I was deposed in this case for almost seven hours.

18  I would certainly sit if there's more questions regarding all

19  the emails that took place.  I can't imagine that there would

20  be more questions but I suppose they can try their case and

21  depose and to ask questions however they want but I answered

22  every question under the sun for a lot of hours already.  But

23  to now allow emails -- and I would submit to this court I've

24  read some of the emails.  I haven't read all of them but there

25  are emails that Aries I believe wishes they would have turned

1   over sooner because they help Aries position.  I'm sure the

2   plaintiff thinks there are emails that help their position but

3   there's plenty of emails that are going to help Aries position

4   as well and to preclude that because of delay I think we get

5   an unfair picture of what happened.  So I join in that

6   regarding the issue of preclusion.

7          I understand my obligation.  If AOL somehow restores

8   emails I will turn those over immediately as I've already done

9   but, Your Honor, I was not involved in Aries business plan.  I

10  was not involved in how they went about their loan.  To use

11  Ms. Patel's words, I was not a mastermind in anything.  I

12  don't know anything about this being an exotic product.  All I

13  did was take papers and documents that Aries sent me, I

14  collated them, I met with Mr. and Mrs. Britt. I sat with them

15  for a while.  They asked me questions.  I explained things if

16  they had questions but I was there.  None of the other lawyers

17  here were there.  They knew what they were doing when they

18  were at that closing.  They were happy at the end of the

19  closing.  They were grateful that Aries, that myself were

20  helping them in saving their home and their premises.  So

21  there was nothing sinister going on, Your Honor, and Mr. Britt

22  in his deposition has made many statements that appear to be

23  untrue from my perspective of what went on at the closing.

24         I will end on this note, Your Honor.  Mr. Britt went

25  back to Aries a little over a year after the closing and he

1  told them he was having trouble making the loan or he wouldn't

2  be able to make the loan.  So if Aries was really trying to do

3  something sinister or anyone was trying to do anything that

4  you would call masterminded or not even handed or above wood,

5  Aries would have said to Mr. Britt well, there's nothing we

6  can do, you're stuck, we're going to foreclose.  But Aries

7  voluntarily at that point after a year, maybe 15 months

8  modified Mr. Britt's loan.  They modified it to a number, a

9  monthly payment that Mr. Britt suggested that he would be able

10  to pay and what did Mr. Britt say and do at his deposition.

11  He doesn't remember that modification happening, he doesn't

12  remember coming to my office in Manhattan and signing all the

13  documents for that modification.  He doesn't remember anything

14  about it.

15       So, Your Honor, when Mr. Britt left my office the

16  second time after the modification he shook my hand.  He

17  thanked me.  He was grateful for helping him get this

18  modification to a price and a monthly number that he can meet

19  but he has since not recalled that or denied that it even

20  happened although we have all the signature and all the

21  documents.

22       So, Your Honor, there was nothing that I ever did in

23  my relationship with Mr. Britt or my relationship with Mr.

24  Aries where I ever tried to hide anything, where I ever tried

25  to mislead anybody.  All I thought I was doing was being

28

1  helpful to Mr. and Mrs. Britt on the two occasions that I met

2  them and they thanked me and they were pleased and they were

3  grateful for the help that they got.

4         To look now and say that my AOL problem or the AOL

5  problem that has been a problem for my email is something that

6  I intentionally did or tried to delay on purpose is just so

7  far from the truth, Your Honor.  I would never do that.  I

8  didn't do that and I turned over everything I could,

9  everything I have and subsequently Aries has turned over

10  everything else.

11        So I would ask that Your Honor not impose any

12  sanctions on me if they want me to sit for another deposition

13  that's fine.  I will still turn over if AOL restores anything

14  I will turn -- but there's nothing for me to physically give

15  to be inspected.  Thank you, Your Honor.

16        THE COURT: Okay.  Thank you.  I just have a few

17  questions for the parties.  First of all, Mr. Kahan just

18  recently spoke.

19        My understanding is that this AOL server failure

20  took place in April of 2010; is that correct?

21        MR. KAHAN: Yes.

22        THE COURT: And the discovery requests by plaintiffs

23  were served in January of 2010; is that correct?

24        MR. KAHAN: Yes.

25        THE COURT: So why were the responses provided prior

29

1   to the server failure in April of 2010?

2         MR. KAHAN: Your Honor, I can't suggest anything

3   regarding that other than in the process of my day-to-day life

4   and the day-to-day actions of this case and other cases that I

5   deal with there's a list and you get things done.  If there's

6   an extension to providing discovery there were extensions.  If

7   there's an extension to the time to take depositions, there's

8   extensions and I didn't intentionally not print everything out

9   prior to losing a substantial amount of the emails.  I

10   understand that that is something that I should have done.  I

11   didn't do it intentionally.

12         I had -- when I went to my computer to start

13   printing out the emails I had no idea this stuff wasn't there

14   any more.  So, yes, you can fault me that I didn't print it

15   out in February or March.  That's a very tight time frame when

16   everyone was going to get discovery extensions anyway.  Was I

17   waiting to the last minute to print everything out and do it?

18   I can't say for sure but that's all that was.  I never knew

19   that the stuff was gone until later on.

20         THE COURT: So did you take any other steps to try to

21   preserve these emails prior to April of 2010?

22         MR. KAHAN: They're on my account.  I mean I'm not

23   sure other steps I could have taken.  They don't go anywhere.

24   They're there.  They stay there.  I had no thought in the back

25   of my mind that AOL was going to lose parts of my email

30

1   account.  I didn't know that.

2            THE COURT: When did you first become aware of this

3   server failure?

4            MR. KAHAN: Some time -- I contacted AOL in April,

5   May, June, July of 2010 to find out what was going on.  So

6   during that time period, and I believe it was probably the end

7   of April because I had no more emails after April 31st [sic].

8   I contacted AOL for four months and every time I would call

9   them they say it will be back soon.  So I never thought to

10  suggest that this was a permanent problem. I didn't know that.

11  I thought they'll be back soon.  Not a big deal.  I'll get

12  them as soon as I can.  There were extensions to the

13  discovery.  I didn't think it was going to be a problem and to

14  this --

15           THE COURT: As of April 31st [sic] you thought at

16  least in your mind it was at least a temporary problem?

17           MR. KAHAN: Yes.

18           THE COURT: When did you first make plaintiffs aware

19  of this temporary problem?

20           MR. KAHAN: Your Honor, I don't have the answer off

21  the top of my head.

22           THE COURT: Does the plaintiff have that information?

23           MS. PATEL: January of 2011.

24           THE COURT: Do you have any reason to dispute that,

25  Mr. Kahan?

1          MR. KAHAN: Your Honor, I would go back and look and

2    see what the discovery issues were and what the extensions

3    were and what the deadlines were because I don't know that a

4    deadline ever passed that I didn't know that I wasn't turning

5    over information.

6          THE COURT: I understand.  But I'm talking about

7    disputing the time in terms of not letting them know about

8    this AOL problem until January of 2011 -- I guess what I'm

9    wondering is, do you recall.  During the four months that you

10   were contacting AOL trying to get these emails restored,

11   during that four month period of time did you contact

12   plaintiffs to let them know that you were contacting AOL, that

13   you were having these problems with the emails?

14         MR. KAHAN: I don't think so, Your Honor.  Discovery

15   wasn't closing so I didn't see it as an issue.

16         THE COURT: But during that period of time, did you

17   respond to their discovery requests?  Was there a point during

18   that period of time that you responded with one email saying

19   this is the email that's relevant to this matter during that

20   period of time?

21         MR. KAHAN: I don't recall ever sending one email.  I

22   know initially I sent a privilege log that had 60 emails.  I

23   don't think I ever sent one.  I think I sent a stack of

24   papers, more than one email, and even at that point I couldn't

25   really suggest what the other emails were.  When I got back

32

1  about 1,000 emails or 900 emails, 800 of them were subject to

2  the privilege log and I turned over the others and they were

3  all -- had nothing to do with anything.  Nothing to do with

4  this case.  Nothing that's going to help them in their case.

5          The communications with other entities, I think some

6  brokers and -- but then there's nothing relevant to the case.

7  I turned them over as soon as AOL turned them back to me.  I

8  didn't call them and say oh, by the way, I just got these back

9  from AOL.  No, that day, the next day I took them and got them

10  and said oh, great, here they are.

11          So, Your Honor, I could go back through my notes, go

12  back through my file which was really too big for me to carry

13  today to see what the deadlines were for discovery but to me

14  it was ever an issue.  I didn't think I was hiding anything.

15  I didn't think I was withholding anything.  I didn't think

16  anything was missing because we never got to the point where

17  there was a delay -- excuse me, where the discovery ended and

18  I always thought it was going to be back any day.

19          THE COURT: Okay.  Thank you.  Let me just make sure

20  that I'm clear on this. So your plan in terms of trying to

21  preserve the emails was basically you were just going to print

22  them out?  Basically pull up the emails and press print.

23  Essentially that was what your plan was.

24          And that didn't happen between January and April

25  2010 because you had other priorities at the time essentially

33

1   basically is what you're saying?

2            MR. KAHAN: It wasn't due yet.  It might initially

3   have been due but there was all sorts of extensions that

4   everyone was granting to everybody else because it was such a

5   voluminous turn over of documents, at least by Aries.

6            THE COURT: Are you certain -- how are you certain

7   that you don't have any of your files in some temporary folder

8   on your computer or something?  Have you had anyone search

9   your computer or --

10           MR. KAHAN: I've never downloaded my email to my

11  computer.  Like most people use Outlook Express and they take

12  their email, and I've only learned this in the past couple of

13  years -- I didn't know about this earlier.  Then they put

14  their emails on their computer.  I never did that.

15           THE COURT: So do you have a sense from AOL how many

16  emails you have that they're attempting to restore?

17           MR. KAHAN: No.  It's called a unified inbox.  It is

18  all my in email that would have been prior to April 2010.  I

19  do not know how far back it goes but they did restore about

20  1,000 emails.  I can't imagine that it's more or less than

21  that.  Restored 900 that are Aries emails. We're talking about

22  here my emails that have to do with 98 percent of my time with

23  Aries as well.

24           So I would end on this, Your Honor.  I lost a lot of

25  stuff when they got rid of my inbox, when this happened with

34

1   AOL.  Less than one percent, maybe half of a percent has to do

2   with Aries, maybe even this case.  I lost personal stuff.  I

3   lost other business stuff. I lost a lot of stuff. There's no

4   way that I would intentionally have done that and it's more

5   important to me to get that back.  I really -- it doesn't

6   matter to me that much what this case is about and I would

7   certainly turn it over if I get it back.  I could use all the

8   other stuff that's not related to this.  So there's no way I

9   would have intentionally done anything in this case with that

10  because I lost a lot of other stuff.

11          THE COURT: Let me just make sure.  I think I know

12  the answer to this.  Was there any reason that from the end of

13  April of 2010 in between that time and January 2011, was there

14  anything prohibiting you from picking up the phone and calling

15  them or sending them some correspondence saying look, I'm

16  having some problems with my AOL account and I'll get this

17  stuff to you as soon as I can?

18          MR. KAHAN: Probably not, Your Honor, but -- I

19  understand that maybe if I wasn't pro se in this case, if I

20  had a lawyer representing me they would have done that.  I

21  didn't think to do that.

22          THE COURT: Okay.  I have some questions for counsel

23  for Aries as well.  You've indicated that you recently

24  received a bunch of these archived emails and in your

25  submission you indicated that a tech savvy individual in Aries

1  employ was able to find these archived emails.  Why did it

2  take so long for the tech savvy person to attempt to locate

3  these emails?

4         MR. SOSINSKY: I don't know the answer to that but I

5  can tell you -- I'm somewhat uncomfortable revealing attorney-

6  client conversation but, Your Honor, what I certainly am

7  comfortable with telling you is that I had conversations with

8  my client and again demonstrated as best I felt that I could

9  with them to make continued and perhaps better searches to

10  look for things that there was good reason to think from what

11  I had read might be there but not be known to those who had

12  undertaken previously to look for this stuff.  At that point

13  spurred into action if you will.  This is what occurred.  This

14  is what occurred.  I'm not making excuses.  I'm relating to

15  you and I'm trying to answer your question.

16         So why then versus six months earlier, Your Honor?

17  All I can tell you is that there were as you read -- there

18  were productions made of emails prior to that.  There were not

19  of this nature and extent clearly but there were prior

20  productions made from the computers of at least two of the

21  principals of the company turned over and there were

22  production of privilege logs with regard to those.  The fact

23  is now when one looks at those those are obviously subsumed

24  within the much larger mass of these archived emails that were

25  out there.

1           So, Your Honor, if I felt that as an officer of the

2   court I could explain to you in a way where you wouldn't feel

3   I'm making excuses for something that I shouldn't have to make

4   excuses for I would do it.  I'm not going to do that.  There

5   were ongoing and further conversations between counsel and the

6   principals of Aries and that's what happened.  As soon as I

7   had it I picked up the phone and I called and I turned over.

8   As I say, and counsel can tell you differently, but I think

9   the most broad based production that I could make consistent

10  with protecting privilege for the most part relating to

11  irrelevant and ongoing other litigation and counsel and the

12  client at that [inaudible].

13          THE COURT: I understand.  I appreciate the position

14  that you said to me in terms of your relationship with your

15  client.  I guess what I'm wondering is -- what seems a little

16  troubling to me is not simply the delay in the production of

17  these emails but there seems to be prior to the delay there

18  seem to be some sort of an affirmative statement that there

19  weren't any other emails. Again --

20          MR. SOSINSKY: Your Honor, listen.  Mr. Britt's

21  papers detail as they should statements that I made as the

22  company's attorney based on what I understood to be the state

23  of affairs and in my other life I spend much of my time

24  arguing that the government or the people don't produce to the

25  defendant documents or information that they know or should

1   know about.  So I'm very sensitive to this issue.  I don't

2   like to be in a position where my client is being accused of

3   withholding discoverable information.  I tell you that and

4   Your Honor knows how uncomfortable it is to be in this

5   position to begin with.

6          However, Your Honor, having said all of that, and

7   again I'm not making excuses, what I am perfectly comfortable

8   saying because I had -- I went through this stuff is they have

9   it.  I turned the stuff over to them.  It's searchable and in

10  my view -- they can tell you or they can argue later or to a

11  jury if we get that far differently but this case ultimately

12  is going to be about whether or not their client who couldn't

13  get a loan -- who had a loan from a big commercial bank,

14  couldn't pay it, ran around to every other bank known to

15  mankind, an organization who either kicked them out or kicked

16  them out and then runs to someone who they hear about on the

17  radio who says I think I may have someone who might refinance

18  comes to Aries and Aries makes a loan on their terms unlike

19  what everyone else is willing to do and they're entitled to

20  make money doing so, and even when as Mr. Kahan points out,

21  when there's a default and the man hasn't been paying on this

22  mortgage not for the first time but as I just said for years

23  and years with prior banks, even then this big bad terrible

24  client who's dreaming up this bad scheme says okay, what can

25  you afford and cuts the interest rate from 16 to 9 percent

38

1  with a man whose credit score was zero or close to it at that

2  point because he had been in foreclosure with other banks and

3  now is in foreclosure with this bank.

4          So all I'm asking, all I'm asking, Your Honor,

5  please, is they're entitled to some sanction.  There's no

6  question about it.  I wouldn't stand here.  Maybe other

7  lawyers would and try to excuse or justify completely what

8  went on here but at the end of the day, at the end of the day

9  we gave the man a modification.  He traveled to an attorney's

10 office with his wife.  He signed -- I'm talking about a second

11 occasion -- documents at his request saying please take me out

12 of this, I need help.  They do that and still after that when

13 he doesn't want to pay or can't pay or whatever the

14 circumstances instead of coming and trying to work something

15 out finds attorneys who will represent him as is his ability

16 to do so and now here we are five years later.

17         It can't be denied, Your Honor, that my client paid

18 off, paid off a loan to another bank.  He got the benefit of

19 that.  He was taken out of foreclosure by us and now he comes

20 before you and if it gets that far a jury and says that the

21 American way is he should be able to walk away entirely from

22 this obligation even though we paid off his prior loan and

23 that will be that.  Not only that, but we should be paying him

24 hundreds of thousands of dollars because we did the wrong

25 thing, not him, not the man who went to deposition and forgot

39

1    that he signed every document there and forgot that he came in

2    after requesting a modification and didn't remember signing

3    all the modification documents, Your Honor.

4          THE COURT: I understand.  I guess the other thing

5    that -- again, how are we certain -- I understand that you had

6    some difficulty getting these emails from your client.  I have

7    no doubt that you turned these emails over or let plaintiff's

8    counsel know about these emails as soon as you became aware of

9    them but how are we to be certain that these are all the

10   emails?  What about plaintiff's suggestion for a third party

11   vendor? Wouldn't that make sense given the history of this

12   case perhaps?

13         MR. SOSINSKY: Look, Your Honor, the problem I have

14   with the suggestion is it doesn't come in a vacuum.  They're

15   asking -- maybe Your Honor feels it's appropriate but they're

16   asking for everything.  That's one of ten pieces of relief

17   that they're asking for.  First they want us to agree or they

18   want the court to impose that.  Then they want a directed

19   verdict.  Then they want an adverse inference instruction.

20   Then they want us not to be able to use what they find but

21   they're allowed to use it.  Then they want us to pay for six

22   lawyers to attend four more depositions.  Right?  I mean this

23   is a discovery issue that I think I approached the second I

24   realized what I was dealing with here in a responsible

25   fashion.

1          In answer to your question, there is -- there is

2    certainly some reason to be concerned that what now is in

3    their possession given what previously was represented is all

4    but here's what I can say about that.  Here's what I can say

5    about that.  To the extent that one or more -- there were

6    four, really four people who worked for this company.  There

7    was a silent partner.  All of a sudden now in a letter they

8    sent you while I was away for the weekend on Friday before the

9    July 4th holiday all of a sudden we hear for the first time

10   about the demands of Carl Gallo, a man who according to all

11   the evidence he had essentially nothing to do with the

12   business who was a silent partner.

13          Anyway, they have in their possession starting on

14   the day that the first employees started to work for Aries

15   which was early in 2006 until essentially yesterday every

16   email where one can trace the ongoing day-to-day business.

17   You can see every one of the loans that takes place from I

18   think it's February or March of 2006 until yesterday, you can

19   see the history and development of the loans because you see

20   brokers inquiring, you see the applications come in, you see

21   them answering them, sending it back, sending it out for an

22   appraisal.  So you have the operation of the business.  Prior

23   to that you already had all of these documents and emails back

24   and forth between Aries, Mr. London and this attorney Jarred

25   Mann again which, Your Honor, I turned over.  I didn't make a

1   contentious mess of arguing that that somehow is privileged.

2   I turned it over to them when it came into my possession and

3   after I carefully considered whether or not I should make that

4   objection. I turned it over in whole to them.

5            To the extent that there's one or more of the

6   employees who they say well, we have ten thousand emails now

7   from them but we -- all we know is even though we have who

8   sent it and who it's to and we have the cc's, but we don't

9   have all four of their -- we don't have proof that all four of

10  them actually received this email so we don't know whether or

11  not there's more on that fourth computer, meaning we have all

12  the emails back and forth but we may not have the person who

13  sent it, we only have the emails from the person who received

14  it even though it's the same email.  It's the same email.

15  It's to someone, right.  It's to someone from someone and

16  there may be other people cc'd on it.

17           My point is this.  What is it that they're claiming

18  that at this point troubles Your Honor with a larger picture

19  of where this litigation is going in mind.  Because what I

20  fear is if Your Honor orders that type of thing what's going

21  to happen is -- and I'd like them to agree that if we're right

22  they pay for it but if my clients are wrong maybe that's the

23  way to go but that's not going to be the end of it.  Then what

24  you're going to hear, what you're going to hear are things

25  that are still conceded, Your Honor, which is yes, in the

42

1  course of the operation of this business over the course of

2  the last five years like me people deleted emails.  People

3  deleted emails.  That's just the way that life is sometimes,

4  certainly outside the context of litigation.

5          So they may discover, they may discover that some

6  emails over the course of this time were deleted.  Then we're

7  going to come back here, we're going to have a new motion for

8  preclusion and sanctions when the people testified, some of

9  them did that they did delete things.  Then what happens is we

10 find out actually that in an archived section of their

11 computers what they believed that they deleted actually exists

12 and that's why you have in essence the entire operation of the

13 business from early in '06 to 2011 five years later.

14         So my only concern -- and I know Your Honor

15 [inaudible] right question.  I apologize.  But my only concern

16 is that this is not ever going to come to an end.  All that's

17 going to happen is we're going to get to the point where they

18 do it and they find some or they find none or they find some

19 more deleted.  By the way, I have emails, clearly privileged

20 emails back and forth with these people.  What are we going to

21 do?  We're going to allow someone to come in -- and there's

22 ten or twenty other lawyers involved here.  We're going to

23 allow someone to come in and report to them about emails

24 between the principals of a company, employees of a company

25 and an attorney that presumably are already on a log for which

43

1   they're not complaining?  I mean I have great concerns about a

2   third party coming in and exposing to them in the first

3   instance privileged conversations.  How would this work?

4   Certainly I want to be sure if Your Honor is considering

5   something like that that when it happens that I can look at

6   what this person or company says that they found and make sure

7   before they hear anything about it that I can continue to

8   assert claims of privilege with regard to whatever else is

9   found.  Nothing else I don't think would be fair.

10          THE COURT: I don't believe that the plaintiffs were

11  suggesting that by sending these -- by having a third party

12  vendor included in this that you would waive any sort of

13  privilege.  I don't believe that's --

14          MR. SOSINSKY: Correct. Clearly I wouldn't but I have

15  concern over that type of issue and I don't know how --

16          THE COURT: Your concern is essentially that if it

17  goes to a third party vendor you just want to be able to see

18  the things and make sure that there's no privileged

19  information and you can have a privilege log?

20          MR. SOSINSKY: Yes, and I'm happy -- the person can

21  be sitting with me as we get to that point of this so that he

22  can objectively report back without looking at the substance

23  what was going on.  But, again, my big concern in that regard

24  is that they can't have it all, Your Honor.  I don't think

25  it's appropriate I should say.  Whatever Your Honor rules

44

1  obviously is by its nature appropriate but I don't think it's

2  the right thing here.  If we're going to embark on this for

3  them to have this whole other litany of sanctions that they're

4  seeking with equal fervor --

5          THE COURT:  I understand.  I haven't decided exactly

6  what I'm going to do but it doesn't -- there's no necessity

7  that I have to either grant every request for sanctions in

8  total or deny every request.  It doesn't have to be an all or

9  nothing proposition.

10         MR. SOSINSKY: No, no, I understand that.  Nor have I

11  suggested that.  That's why I had offered to produce them at

12  our transcription costs certainly which is thousands and

13  thousands of dollars when you're talking about four people for

14  potentially seven hours a day.

15         THE COURT: You're suggesting again transcription

16  costs. What about attorney time, attorney's fees during --

17         MR. SOSINSKY: Your Honor, if this had been turned

18  over when they say it should have they still would have been

19  limited.  They would have been limited to the same amount of

20  time to take depositions.  As it was some of these people were

21  deposed already for two days. You can see -- just look at

22  today. There's one, two, three, four, five -- there's a nice

23  young man.  There's another man here in the audience who may

24  be working with them.  My concern is, my concern is, Your

25  Honor, is that the attorney's fees here and every deposition

1  we've attended have been multiple attorneys sitting there.  So

2  I mean there's a limit -- there's a limit, Your Honor, in

3  criminal cases when you're representing someone who could go

4  to jail for the rest of their life there's not provision made

5  to have two, three, four, five, six people sitting there at

6  public expense.  So I am concerned about what that means in a

7  case like this.

8       THE COURT: Those are all things again, the details

9  that can be addressed and worked out.  Let me hear from

10 plaintiffs.  Do plaintiffs have any response?

11      MS. PATEL: Sure.  Your Honor, Mr. Sosinsky and Mr.

12 Kahan are making light of both Mr. Britt's claims in this case

13 and the egregious conduct of both Aries and Mr. Kahan in this

14 case.  First there's no response except for what Mr. Sosinsky

15 just said about a litigation hold and that being that people

16 sometimes delete emails.  This is a company against whom there

17 was litigation pending since December of 2006.  That people

18 are regularly deleting emails is a major issue.  It is nothing

19 small.  It is not like me deleting my personal email.  This is

20 email that -- emails that are related to their business.

21 They're related to how they conduct their business and

22 continue to conduct their business.

23      In 2006, December of 2006, that was a few months

24 after Mr. Britt's loan was made, there are decisions that we

25 know were being made over email by the principals alone about

1  how to conduct this business, how to get out from under these

2  consumer protection laws that they did not comply with, that

3  they do not want to comply with.

4          And to make light of claims under the Truth and

5  Lending Act for an individual who lived in an owner occupied

6  home, these laws are intended to protect people from these

7  kinds of predatory loans.  That's why people aren't allowed to

8  make loans with terms such as the terms that Aries offered and

9  made.  And also under New York Banking Law specifically

10 there's a provision for subterfuge where there's an effort to

11 get around consumer protection laws, where there's an effort

12 to get around the application of the law, the law still

13 applies.  That's in the statute.

14         Finally, our fraud claim.  There's a claim for

15 fraud.  Mr. Kahan and Mr. Sosinsky may say what they will but

16 we have these pending claims and we have the right to all of

17 the evidence to try to prove those claims.

18         In terms of specific issues, the first thing I just

19 want to clarify is that the 12,000 pages of documents that we

20 got all of those loan files that we received, those were

21 received based on an order by Judge Matsumoto.  Aries had

22 actually refused to produce those documents saying that they

23 were not relevant and this was in our reply.  It was Exhibit

24 FF in our reply to that order.  In that order she specifically

25 ordered Aries to produce those documents.  That's why those

47

1  documents were produced.  Those documents were not produced

2  out of the kindness of Aries.

3        Second, in terms of Mr. Sosinsky turning over what

4  his client has produced, I think Your Honor really kind of hit

5  the point that we are trying to make which is that the

6  individuals who are claiming that they're turning everything

7  over here cannot be trusted.  Those are the individuals.

8  While we don't believe that Mr. Sosinsky is holding documents

9  that have been turned over to him, we do believe, strongly

10 believe that Mr. Ramaeker for example is holding documents and

11 has not turned them over, that he has them on his computer,

12 that he had been deleting them and that we may get access to

13 those documents.

14       Similarly, Mr. London whose emails had been deleted

15 which again should never have been deleted and then some

16 emails suddenly appeared, 1,300 of them on June 1st with no

17 explanation whatsoever.  The fact that we've received a lot of

18 documents isn't really the point here and I think that we've

19 been very careful to explain why the other documents, the

20 documents that we think should exist either on Mr. Ramaeker's

21 computer or Mr. London's, even Ms. Laxner's, why those

22 documents would be extremely relevant because they show how

23 Aries decided to make certain changes, specific changes on how

24 they did business including at first not offering a Truth in

25 Lending disclosure and then offering a Truth in Lending

1   disclosure which is not required in -- for a commercial loan.

2   If this was really a commercial loan why are they making these

3   disclosures.   There's an email from August of 2006 when Mr.

4   London says to Mr. Powell we can no longer essentially take

5   kickbacks which are illegal under RESPA, Real Estate

6   Settlement Procedures Act, but which again only applies to

7   consumer loans and not to commercial loans.   There's another

8   email about a loan threshold in New Jersey for New Jersey's

9   predatory lending law and Aries decision to make loans above

10  that threshold or below that threshold because they don't want

11  the law to apply to them.

12          Their admissions that we have outlined -- and

13  there's also evidence that these parties are not truthful.

14  That alone has to be enough for us to warrant -- that has to

15  be enough to warrant a third party forensic review.

16          Now, in terms of all of the other relief that we

17  seek, we have not sought since we received these emails we

18  have not sought an adverse inference.   We agree that getting

19  the documents, learning what are in those documents first and

20  seeing whether or not there has been any sort of wiping of

21  hard drives, data, et cetera that before we seek an adverse

22  inference we would want to know about from a third party

23  forensic analyst. But we would not agree that regardless of

24  what happens with the third party analyst in terms of what

25  they find that the costs should be shifted here.   We have done

49

1   a significant amount of work to fare out these documents and

2   these documents -- everything we've submitted to the court

3   show that these documents are going to be critical to Mr.

4   Britt's case to making Mr. Britt's case.  There's no reason

5   why we should be bearing the burden at this point.

6           If perhaps they did get it right or their tech

7   savvy -- Mr. Ramaeker's tech savvy son was able to find

8   everything there was that's not our burden any more.  Before

9   this motion was filed and during the discovery process Aries

10  had every opportunity and in fact Aries had an obligation, Mr.

11  Sosinsky had an obligation to figure out what kind of

12  electronic information they had, how the electronic

13  information was being stored, what needed to be produced, what

14  needed to be reviewed, and that wasn't done here.

15          At this point we've reached the moment and the delay

16  has been seven months even just in this motion because of all

17  the documents that have been produced in between.  The delay

18  is not something Mr. Britt is interested in either and the

19  cost of this at this point to complain about potential costs

20  of redeposing witnesses, of doing a third party analysis again

21  all of that could have been avoided if Aries had taken, and

22  Mr. Kahan had taken their obligations under the law seriously

23  which they did not.

24          In terms of Mr. Kahan, I just want to make some

25  clarifications also.  We know some of the dates here.  Mr.

1   Kahan was deposed on April 22nd of 2010.  This Aries server

2   failure was never mentioned.  Mr. Kahan signed a certification

3   that he turned everything over on March 31st.  There are no

4   extensions that we are aware of.  On July 14, 2010 we sent

5   another letter seeking the same information saying this a

6   second request for the documents, for the emails --

7   specifically that letter says the email correspondence.  Mr.

8   Kahan produced documents in October of 2010 without revealing

9   the server failure.  He produced documents and he produced a

10  privilege log and there's no explanation why if there was a

11  server failure if his whole inbox had disappeared how he was

12  able to create this privilege log at that time.

13          At this point to call what we've been doing here,

14  the work we put in to fare out this information, a fishing

15  expedition is nonsensical.  The emails have revealed so many

16  inconsistencies between what has been represented to us.

17  Ramgallon [Ph.] is another example. The email that we cited in

18  our supplemental submission where in January of 2010 Mr.

19  London is talking about assigning all of the loans in New York

20  that are in foreclosure to Ramgallon and months later over the

21  course of months representations are made to Aries counsel

22  that oh, this is only about one loan and nothing is really

23  going to happen, they're not planning on doing anything.  Then

24  there's another email that was produced from January of 2011

25  that said the same thing, that said Mr. Kahan is representing

51

1   us in these foreclosures.  There's a spreadsheet and it says

2   potentially assigned to Ramgallon, potentially assigned to

3   Ramgallon.  Nine emails on January -- I mean nine loans on

4   January 22 of 2011.

5          The record is really replete with these kinds of

6   inconsistencies that the parties are making, that the

7   individuals are making, the four individuals we have here and

8   we need to look at their electronically stored information.

9          THE COURT: Thank you.  Let me hear -- putting aside

10  the issue of costs of this third party, third party forensic

11  analyst, how would this work practically?

12         MS. PATEL: We have contacted one potential vendor

13  and the vendor would go to the locations for the hard drives.

14  They would go to the location and essentially take an image of

15  the hard drive.  They then download the image of that hard

16  drive and none of this is accessible to us, plaintiff's

17  counsel until they make it accessible to us so the third

18  party -- this is done, this has been done before.  There are

19  cases where this has been done before.  Once they do that they

20  can give us an inventory of what's on the computer.  That

21  inventory can be provided to the court under seal.  That

22  inventory can be provided to Mr. Sosinsky first.  In terms of

23  web based emails which they also say they do on a regular

24  basis, it's the same thing.  They get the information to log

25  into an account and in fact the person even represented that

52

1  he often just tell people they can change their password for

2  that moment.  They go in, they download the entire -- they

3  have to download the entire email account and then they cull

4  through it.  They provide documents, certificates of

5  destruction for anything that's not used.  Confidentiality is

6  really important to these third party vendors.  They

7  understand the importance of confidentiality for businesses

8  that end up using them regardless of whether it's court

9  ordered or even voluntary.  A lot of businesses in terms of

10 producing discovery in large commercial litigation they do

11 this all the time.

12        So once that is done they would give us this report

13 and they offer other services depending on what is found.  It

14 looks like the hard drive has been wiped out.  There are

15 individual services where they can do a deeper forensic

16 analysis.  I don't know the technical aspects of that but they

17 can do a further analysis as to when stuff was deleted, what

18 was deleted.  They can tell us who's logged into a computer if

19 we wanted to know, how many times, what's been printed, what

20 hasn't been printed.  There are a lot of actions that are

21 taken that can be logged.  If we determine secondarily I guess

22 that it would be necessary or useful to have that

23 information --

24        THE COURT: This first go through of the forensic

25 analysis, how long did that take?

53

1          MS. PATEL: Oh, it's really fast.  They said actually

2    that they would -- once the person is there they just kind of

3    download all the information and then they upload it into

4    their system and the process, the uploading process where it

5    has to do with is kind of getting rid of the programs like the

6    Windows, et cetera and just culling it down to what --

7          THE COURT: After the hard drive, the image of the

8    hard drive is taken, how long does it take them?

9          MS. PATEL: Like a week I guess to get a report.  I

10   think that's probably about a week would be -- the turnaround

11   time is pretty fast.  After that if we wanted to have searches

12   done or specific terms, et cetera and deal with the different

13   section then again the turnaround times for those would also

14   be fast.

15          MR. SOSINSKY: Your Honor, I've had some experience

16   with forensic experts.  I had one such individual who

17   depending on cost I would -- if that's where Your Honor is

18   going, I would put in touch with either the court or

19   plaintiff's counsel who I know works relatively inexpensively

20   compared and is wonderfully qualified, has testified in court

21   any number of times.  I'm not saying that ultimately if that's

22   what Your Honor is going to do they have to use him but

23   certainly if Your Honor is inclined to have my clients pay for

24   the cost I would want some discussion about our ability to

25   choose someone who would operate by the same rules and they

54

1   would have the same access to but might be willing to do it at

2   a fraction of that cost.  I have no idea what the cost that

3   they're talking about is to begin with but that's been my

4   experience.

5           THE COURT: Let's hold on for a minute.  I had

6   another question.  As of the date of the filing of the motion

7   I know the interrogatories that were supplied by Aries and

8   Kahan weren't signed.  Have those been signed yet?

9           MR. SOSINSKY: No, because I was -- much of that

10  information now in light of our production I wouldn't want my

11  client -- I mean to make their point at a trial if that's

12  where they think that this is important, Your Honor, they can

13  make it and I can guarantee you that none of my -- none of the

14  people who testify on behalf of Aries are going to say well, I

15  didn't sign something so that's not my statement because I'll

16  stand up and correct the record at that point.  But for me,

17  for me, at that point that I'm producing this stuff in March

18  and April to go back now and have someone sign something that

19  is inaccurate I think compounds the issue.  If they're telling

20  you that well, we understand and Mr. Sosinsky can amend and

21  make footnotes as supplemented by disclosure then I have no

22  problem with that but Im not going to knowingly at least

23  unless you order me to do so walk my client into now at this

24  juncture signing something for their edification that that is

25  problematic and I think you would feel the same way if you

55

1   were sitting where I was as they would.

2          THE COURT: Do plaintiffs have any position on that?

3          MS. PATEL: Can I confer?

4                     [Pause in proceedings.]

5          MS. PATEL: We're willing to take steps and we'll

6   [inaudible] to accept a substitution for the [inaudible] that

7   would be accurate.

8          THE COURT: I think I have all the information I

9   need.  I'll give the parties a brief opportunity if there's

10  anything they want to add.  I'll give you two minutes if

11  there's anything you want to say. You don't have to.  If you

12  wish I'll give -- let me give counsel for Aries a brief two

13  minutes if you want to say anything.

14         MR. SOSINSKY: Just to respond to a couple of things

15  here, Judge.  Number one, Ms. Patel just said again that we're

16  dealing with a situation where Aries regularly destroyed or

17  deleted emails.  The fact of the matter is that that was

18  testimony previously given by three, if not four of the people

19  who worked for the company when as it turns out and as is the

20  case now we know that that wasn't going on and that's why

21  we're dealing with now approximately 15,000 documents, emails

22  and the attachments that pertain to them.

23         So to beat a drum that ultimately is not established

24  by what's there -- they weren't regularly deleting emails.

25  They weren't saving them and they were discovered and turned

1    over to counsel but the fact is if -- and if they have

2    information that that's going on independently and they can

3    let you know but as I said, two women began to work at this

4    company at the beginning, near the beginning of 2006, and

5    beginning on that date until yesterday you have the day-in and

6    day-out operation of that business very evident on these

7    emails.  You have summaries provided that go over what's going

8    on with each loan on a regular basis and you can track

9    essentially everything that went on.  Again, all of that, Your

10   Honor, is after, all that is before and continues running at

11   the time of the first litigation there in the Peterson case

12   because it begins before that.  It begins nine months prior to

13   the Peterson case.  It's there.  It's all there.

14          So I don't think they can have it both ways.  They

15   can't say well, it's all been deleted when in fact as it turns

16   out it hasn't been deleted; it just was produced in a tardy

17   fashion and inconsistent with statements that were made

18   previously about their belief that these things were not

19   maintained, were not saved.

20          Judge Matsumoto, at the time Magistrate Judge

21   Matsumoto issued that order in the Peterson case.  There was

22   no order issued here in this case by you or any other

23   magistrate judge.  Those things were scanned in and provided

24   to counsel and we opposed in Peterson the initial turnover

25   only on a limited basis.  It was because we were hoping Judge

1   Dearie would move forward with our motion to dismiss the

2   action in lieu of arbitration because there were arbitration

3   contracts and agreements signed in this case and in that case,

4   and that was her determination.  So we turned that over.

5          Finally, they keep talking about the use of an LLC

6   violating the law somehow because of the consumer protection

7   laws and they attached a decision from one Bronx County court

8   judge which as I understand it to this date is still the only

9   mortgage to which Aries has assigned that mortgage to this

10  Ramgallon in July of 2011.  I know there's been discussion

11  about it.  As we sit here now as I understand it from what I

12  was told by counsel handling the case one, there was a judge

13  in Nassau County who issued a decision that we made note of in

14  our papers who dealing with the same arguments about this

15  being an Enron around consumer protection laws decided that

16  that was not the case, that this was a commercial loan because

17  it was made to an LLC.

18          THE COURT: Thank you.  One quick question on what

19  you indicated.  You indicated two individuals that started

20  working there in 2006 and you're referring to Ms. Laxner and

21  Ms. London; is that correct?

22          MR. SOSINSKY: That's correct, yes, and --

23          THE COURT: I'm just curious.  Ms. London, is she

24  related to Mr. London?

25          MR. SOSINSKY: That's one of his daughters.  Again,

58

1    as of I think a few months ago she no longer works there.

2          THE COURT: Thank you.  Mr. Kahan?  You don't have to

3    say anything.

4          MR. KAHAN: The only thing I would point out, Your

5    Honor, which is in my papers that either the last week of

6    January or the first week in February of 2011 my sent emails

7    were restored dating back to 2007 and I shortly thereafter put

8    a privilege log together and sent them out without delay.

9          I did not know why or how they came back.  They just

10   came back.  AOL gave me no explanation and they further

11   explained at that time because after I got those emails back I

12   called them to find out what about the unified inbox, the

13   others.  They said well, we're still working on it.

14         So I don't have anything else other than to say

15   again that I gave honest answers to the questions that were

16   posed to me.  I don't believe I misled or intended to

17   misstatement anything and that's just my function how I knew

18   to provide the emails.

19         MS. PATEL: Your Honor, just one point, one major

20   point which is that a litigation hold requires that

21   individuals do not delete emails, do not delete documents.

22   The fact that those documents may have been archived, some of

23   those documents may have been archived.  We don't even know if

24   all of them were.  It doesn't change the fact that a

25   litigation hold was not put in place here and there were

59

1   potentially documents that we didn't get.  Specifically true

2   about Mr. Ramaeker whose affidavit still stands and in his

3   affidavit he says I just delete emails that I don't think are

4   important.  That's what he said in March of 2011 and he's been

5   doing that.  He has since not produced any emails whatsoever

6   and we have nothing more from him than the 200 or so emails

7   that we got before this motion was filed.

8           There have been -- one of the documents that was

9   given to us was a document that was created by Mr. Ramaeker

10  that was an advertisement to brokers that didn't mention the

11  fact that the homeowner's home would be put into a LLC.  The

12  merits of this case are separate from the merits of this

13  motion.  Of course they're relevant to this motion because

14  what evidence we have or don't have is of course relevant to

15  our claim but here where there's evidence or there's proof

16  that emails, documents were being deliberately deleted, the

17  fact that we may find them after the fact doesn't preclude or

18  shouldn't preclude -- in fact, the court must I think sanction

19  in some way Aries for continuing in this process of violating

20  a rule

21          THE COURT: Thank you.  Just so I'm clear, what costs

22  is plaintiff seeking?  Which costs are you seeking?

23          MS. PATEL: For --

24          THE COURT: I understand.  By implication obviously

25  if there was a third party vendor you're seeking costs for

60

1   that, you're seeking that the defendants pay for that.

2          MS. PATEL: Yes.

3          THE COURT: You're seeking that the defendants pay,

4   my understanding is you're seeking that the defendants pay for

5   the costs of any further depositions?

6          MS. PATEL: Yes.

7          THE COURT: I'm just trying to make sure what --

8          MS. PATEL: The time of one attorney, not four or

9   five or --

10         THE COURT: Okay.  I just wanted to make sure that

11  I'm clear on all the costs that you're seeking.  Are there any

12  other costs that plaintiffs are seeking?

13         MS. PATEL: Well, whatever analysis we end up -- that

14  ends up having to be done to compare what we received to what

15  has -- what is later produced we're also seeking.

16         Can I just confer?

17                  [Pause in proceedings.]

18         MS. PATEL: There's the cost of motions.

19         THE COURT: You are seeking cost for the motions. So

20  then plaintiff should also then submit an affidavit of costs

21  and attorney time records.

22         MS. PATEL: Sure.

23         THE COURT: Let's have that submitted -- can you

24  submit that within two weeks?  By July 20.

25         MS. PATEL: July 20, Your Honor?

61

1              THE COURT: Yes.

2              MR. SOSINSKY: Will we have time to respond once we

3      get that or what does Your Honor intend?

4              THE COURT: I haven't made up my mind yet.  You can

5      certainly respond.  Again, I'm just asking them to submit the

6      time -- you can certainly respond to that if you wish.  I

7      don't know what you [inaudible].  I'll give you a week to

8      respond.  Respond by July 27th.  I doubt there will be a need

9      for a reply but if there is any reply it can be filed by the

10     29th.

11             Thank you very much.  Anything else from plaintiff?

12             MS. PATEL: No.

13             MR. KAHAN: Thank you, Your Honor.

14             THE COURT: Anything else from defendant Aries?

15             MR. SOSINSKY: No.  Thank you for your patience.

16             THE COURT: Anything else, Mr. Kahan?

17             MR. KAHAN: No, Your Honor.  Thank you.

18             THE COURT: Thank you very much.

19                          * * * * *

20

21

22

23

24

25

62

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5   _____

6                               Shari Riemer

7   Dated:   July 8, 2011

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25